DONALD W. SEARLES, Cal. Bar No. 135705
SearlesD@sec.gov
KELLY BOWERS, Cal. Bar No. 164007
BowersK@sec.gov
J. CINDY ESON, Cal. Bar No. 219782
EsonJC@sec.gov
ROBERTO A. TERCERO, Cal. Bar No. 143760
TerceroR@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Acting Regional Director
Andrew Petillon, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908



FILED
MAR 0 4 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                      DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>TUCO TRADING, LLC and DOUGLAS G. FREDERICK,<br><br>Defendants. | Case No.: '08 CV 0400 DMS BLM<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1. This case involves ongoing violations of the antifraud and broker-dealer registration provisions of the federal securities laws by Tuco Trading, LLC ("Tuco"), an unregistered Southern California securities day-trading firm, and its controlling principal, Douglas G. Frederick ("Frederick" and collectively "Defendants").

2. Tuco and Frederick provide day-trading capability to over 250 day-traders. A day-trader actively purchases and sells securities, often on the same day, and hopes to make at least a small profit on a large number of buy-and-sell transactions. Tuco and Frederick allow Tuco's members to day-trade through Tuco's own brokerage accounts ("master accounts"), by creating "sub-accounts" for each trader. Tuco and Frederick then track the activity in each trader's sub-account, including trades, balances, commissions, fees, deposits and withdrawals, which Tuco reports to the trader on a daily basis. Tuco, however, is not registered as a broker or dealer with the Commission, in violation of Section 15(a) of the Exchange Act, 15 U.S.C. §78o(a)(1).

3. Tuco and Frederick entice traders with services unavailable to day-traders at any registered broker-dealer. First, the Defendants allow a trader to day-trade even if his or her sub-account has less than $25,000 equity, which, under applicable National Association of Securities Dealers ("NASD") regulations, is the minimum equity requirement to day-trade. Second, traders at Tuco can use up to $20 of Tuco's equity to purchase securities for each $1 in the trader's sub-account (*i.e.*, 20:1 buying power). Applicable NASD and New York Stock Exchange ("NYSE") rules, however, only allow a day-trader to have 4:1 buying power.

4. Tuco and Frederick are also violating the antifraud provisions of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. On a daily basis, Tuco and Frederick report to the traders their purported equity balances in their sub-accounts. As of December 31, 2007, however, Tuco and Frederick have used approximately $3.62 million of the traders' approximate $10.2 million total equity to pay Tuco's expenses and to cover trader losses. In reporting the traders' equity balances, however, Tuco and Frederick

1  have failed to disclose to Tuco's traders that their equity balances are overstated and that Tuco
2  and Frederick have misused approximately 35% of the traders' equity to pay Tuco's expenses
3  and to cover other traders' losses. Defendants' misuse of the traders' equity is continuous and
4  ongoing. As of January 31, 2008, Tuco and Frederick used approximately $1.35 million of the
5  traders' approximate $11.4 million total equity to pay Tuco's expenses and to cover trader losses.
6       5.   The Defendants' conduct violates the antifraud and broker-dealer registration
7  provisions of the federal securities laws. By this action, the Commission seeks a temporary
8  restraining order, preliminary and permanent injunctive relief, an asset freeze, an accounting, an
9  order preventing the destruction of documents, the appointment of a receiver over Tuco,
10 disgorgement with prejudgment interest of the defendants' ill-gotten gains, and civil penalties.

**THE DEFENDANTS**

6.   Tuco Trading, LLC, is a Nevada limited liability company formed in August 2006 and based in La Jolla, California. Tuco is a self-described "trading firm" that creates sub-accounts for members to day-trade securities through Tuco's master brokerage accounts. Tuco is not registered with the Commission as a broker or dealer.

7.   Douglas G. Frederick, age 38, resides in San Diego, California. Frederick formed Tuco in August 2006 and is its sole managing member. He has held various securities licenses, including Series 6 and 7 since 1993 and Series 55 and 63 since 2002. Frederick has been associated as a registered representative with thirteen broker-dealers since 1993, including GLB Trading, Inc. since April 2006. Frederick is not registered with the Commission in any capacity.

**RELATED NON-PARTY**

8.   GLB Trading, Inc. ("GLB Trading") has been registered with the Commission since 2003 as a broker-dealer. It is an introducing broker-dealer based in Irvine, California, and clears through Penson Financial Services, Inc. Tuco maintains it principal master accounts at GLB Trading.

**JURISDICTION AND VENUE**

9.   This Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(d)(1)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15

1  U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of conduct alleged in this Complaint.

10. Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because the defendants reside and transact business in this district and certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws alleged in this Complaint occurred within this district.

### GENERAL ALLEGATIONS

**Tuco's Operations**

11. Tuco describes itself on its website as a "private equity firm" that provides "trading solutions for the active trader." Frederick is Tuco's only Class A "owner member" and, as such, has exclusive managerial authority over Tuco and is vested with the sole and exclusive power to transact business on Tuco's behalf. Frederick also actively participates in Tuco's day-to-day activities, controls all of Tuco's trading and bank accounts, and is the only person authorized to withdraw funds from Tuco's accounts. Frederick also controls and monitors the daily trading activity of Tuco's traders and determines each trader's maximum buying power.

12. To trade through Tuco, customers contribute funds to Tuco and sign Tuco's Operating Agreement as a "Class B" member, and sign Trader Agreements and Confidentiality Agreements with Tuco. There is no minimum initial capital contribution amount required by Tuco or Frederick for a customer to open an account. New traders come from referrals by Tuco's existing traders or vendors, or through Tuco's website, which Tuco uses to advertise its day-trading brokerage services.

13. As of December 31, 2007, Tuco had 274 traders, with 330 sub-accounts. Of those, 186 traders had 229 sub-accounts with positive equity balances totaling approximately $10.2 million. Significantly, 157 of the 229 sub-accounts that had positive equity balances had equity balances below $25,000, the minimum equity required by NASD day-trading rules.

///

14. As of January 31, 2008, Tuco had 261 traders, with 335 sub-accounts. Of those, 198 traders had 257 sub-accounts with positive equity balances totaling approximately $11.4 million. Significantly, 159 of the 257 sub-accounts that had positive equity balances had equity balances below $25,000, the minimum equity required by NASD day-trading rules.

15. Tuco pools its traders' funds in bank, brokerage and commodity futures accounts in Tuco's name, all of which are controlled by Frederick. Tuco has three brokerage accounts at GLB Trading, and Frederick is the registered representative on each account. Tuco also allows customers to trade commodity futures through two commodities accounts in Tuco's name which are also controlled by Frederick. Tuco also maintains two bank accounts, both controlled by Frederick, which Tuco uses to receive traders' initial and additional contributions, to send withdrawals or distributions to traders, and to pay Tuco's expenses. Frederick is the only person authorized to withdraw funds from Tuco's accounts.

16. Tuco uses its own back office system to create sub-accounts for each trader through which the trader can day-trade securities through Tuco's master accounts. All but 1% of Tuco's business consists of equity trading, and 99% of that trading occurs in Tuco's master accounts at GLB Trading. Traders can conduct their trading activities at Tuco's six offices located nationwide, its two foreign offices, and at a remote location of the customer's choosing. Tuco provides trading platform software from several vendors, which enables a trader to use his or her sub-account to place trades through Tuco's master accounts. Tuco also uses the trading software to monitor each trader's profits and losses on a real-time basis and whether the trader is incurring substantial trading losses.

17. Under Tuco's Operating and Trader Agreements, Tuco determines how much of Tuco's funds each trader may use in trading securities and can stop the trader from trading at any point. Frederick sets each trader's buying power based upon the amount of funds in the trader's sub-account and the trader's trading experience. New traders begin with 6:1 to 10:1 buying power (*i.e.*, a new trader can use $6 to $10 of Tuco's equity to purchase securities for each $1 in the trader's sub-account). Approximately 80% of Tuco's traders have between 10:1 and 20:1 buying power, far in excess of the 4:1 buying power maximum imposed by applicable NASD

and NYSE rules.

18.  Frederick monitors how much trading power each trader uses by checking Tuco's back office system daily.  Tuco's master accounts at GLB Trading are limited to 4:1 power.  If a master accounts exceeds the 4:1 limit, Tuco receives a margin call from GLB Trading, which Tuco satisfies by borrowing funds from third parties.  Each week, Tuco borrows and pays back from $500,000 to $2.3 million to meet these margin calls.

19.  Under Tuco's Operating Agreement, the trader is responsible for all of the trading profits and losses in his or her trading account and does not share in other traders' profits and losses.  The Operating Agreement also states that the trader may withdraw any of the trader's net trading profits.  Tuco is required under the Operating Agreement to adjust, on a daily basis, the amount of funds in the trader's account by the amount of the trader's trading profits and losses, net any commissions, expenses, or other charges that Tuco may take.  If a trader suffers losses in excess of his or her contributions, resulting in a negative equity balance, under the Operating Agreement, the Class A member (*i.e.*, Frederick) is solely responsible for the negative equity balance.

20.  Each trader can log onto Tuco's back-office system and see the activity in his or her sub-account.  The back office system displays, as of the previous day, the sub-account's equity and account history (trades, trade breaks, commissions, fees, deposits, and withdrawals), and purports to represent the balance available to the trader for withdrawal or distribution.

21.  Tuco's traders are conducting substantial amounts of day-trading through Tuco's master accounts at GLB Trading — both in terms of the dollar amount of the trades and the number of trades.  For example, in December 2007, one trade was worth $42.7 million.  The most recent monthly account statement for Tuco's principal master account is over 10,000 pages, representing hundreds of millions of shares traded each month.

**Tuco's Commissions, Fees and Expenses**

22.  Tuco charges its traders commissions on their securities trades.  Frederick negotiates with each trader the commissions that will be charged but typically sets the commission rate for new traders at $5 per 1,000 shares traded.  Commissions range from $0.20

1  to $8 per 1,000 shares traded. Tuco also charges its traders certain additional fees, such as for
2  wiring of funds withdrawn from Tuco, sending withdrawal checks by overnight mail, and for
3  providing software, stock quotes and news feeds.

4      23.    The trading software calculates Tuco's commissions, which are then downloaded
5  daily into Tuco's back office system and then debited from the trader's sub-account. The
6  commissions are collected at GLB Trading's clearing firm, Penson Financial, which also
7  receives a copy of the commission calculations generated by the trading software. Penson
8  Financial and GLB Trading then subtract from the calculated commissions various expenses and
9  fees, and GLB Trading's share of the commission. GLB Trading then pays the net commissions
10 to Frederick, which Frederick then deposits into Tuco's bank accounts to pay Tuco's expenses or
11 to pay trader withdrawals, or deposits into Tuco's master accounts.

12     24.    Through their trading activity, Tuco's traders have generated substantial
13 commissions for Frederick as the registered representative on the Tuco-GLB Trading accounts.
14 From December 2006 through October 2007, Frederick received approximately $1.12 million in
15 net commissions from GLB Trading, of which more than 90% has come from trading in Tuco's
16 accounts. Frederick's commissions skyrocketed to $2.14 million in November 2007 alone, the
17 increase being largely attributable to a new trader, which is itself a day-trading firm with
18 approximately 150 traders.

19     25.    Tuco incurs substantial costs that its pays through its transaction-based
20 commission charges to its traders. These expenses include the costs associated with purchasing
21 and operating the trading software and back office system, salaries, consulting fees, interest
22 charges, travel, website maintenance and office expenses. Tuco is only able to pay its expenses
23 using the transaction-based commissions it receives.

24     **Tuco's and Frederick's Material Misrepresentations and Omissions and Tuco's**
25     **Multi-Million Dollar Shortfall**

26     26.    In connection with its solicitation and enrollment of new traders, Tuco and
27 Frederick provide to each new trader, among other things, a copy of Tuco's Operating
28 Agreement. Each new member is required to execute a counterpart signature page to the

Operating Agreement in order to become a member of Tuco, in which the trader acknowledges receipt of the Operating Agreement and agrees to be bound by its terms.

27. In the Operating Agreement, Tuco and Frederick represent that they will create a separate sub-account for each trader through which the trader can conduct day-trading activities. In the Operating Agreement, Tuco and Frederick further represent that the profits (and losses) generated by each trader within the trader's sub-account shall be allocated pursuant to a certain, agreed upon "payout percentage." In practice, the agreed upon payout percentage is always 100%. In other words, Tuco and Frederick agree and represent to the trader that 100% of the trader's net profits shall be allocated to the trader for the trader's exclusive benefit.

28. In the Operating Agreement, Tuco and Frederick further represent that Tuco's books shall reflect, among other things, the trader's initial and additional funds deposited and the amount of the net trading profits that has been credited to the trader. Tuco and Frederick further represent that the only amounts that shall be debited from the trader's sub-account shall be the amount of money (or property) distributed by Tuco to the trader and the amount of any net trading losses assessed to the trader.

29. In the Operating Agreement, Tuco and Frederick further represent that Tuco will maintain true and correct books and records, in which shall be entered all transactions of Tuco, and all other records necessary, convenient or incidental to recording Tuco's business and affairs, which shall be sufficient to record the allocation of net income and net losses and distributions to traders as provided by the Operating Agreement.

30. In connection with the daily trading activity of Tuco's traders, and to induce Tuco's traders to continue trading with Tuco and to generate commissions and other charges for Tuco's brokerage services, Tuco and Frederick make additional representations to Tuco's traders through the operation of Tuco's back office system, which traders can log onto to see the activity and current balances in their designated sub-accounts. Tuco's back office system displays, as of the previous day, the trader's account equity, which is purportedly the amount of money available to the trader for trading, distribution or withdrawal.

///

31.     Tuco and Frederick knew, or were reckless in not knowing, that each of the aforementioned material statements were false and misleading, in that the sub-accounts, Tuco's books and records, and Tuco's back office system and associated software did not accurately reflect the traders' net equity balances or the actual amount of money available to the trader for distribution or withdrawal.

32.     Indeed, Tuco and Frederick have misused and continue to misuse various amounts of the traders' net equity to pay Tuco's expenses, to cover other traders' trading losses, and to otherwise maintain and continue Tuco's operations. The Defendants' misuse of the traders' funds was neither authorized by, nor disclosed to, Tuco's traders.

33.     As of December 31, 2007, there was approximately a 35% shortfall between what traders saw when viewing their sub-accounts on Tuco's back office system and what Tuco actually held for its traders in its accounts. As of December 31, 2007, Tuco and Frederick represented to its traders that the traders had positive net equity totaling approximately $10.2 million. As of that date, however, Tuco's bank, brokerage and commodities accounts had net assets of only approximately $6.59 million. Therefore, approximately $3.62 million of the trader's funds, or about 35%, was unaccounted for.

34.     As of January 31, 2008, there was approximately a 12% shortfall between what traders saw when viewing their sub-accounts on Tuco's back office system and what Tuco actually held for its traders in its accounts. As of January 31, 2008, Tuco and Frederick represented to its traders that the traders had positive net equity totaling approximately $11.4 million. As of that date, however, Tuco's bank, brokerage and commodity futures accounts had net assets of only approximately $10.05 million. Therefore, approximately $1.35 million of the trader's funds, or about 12% was unaccounted for.

35.     These misused funds were used to pay Tuco's operating expenses and to cover other traders' losses. Tuco's and Frederick's use of those funds was improper and contrary to Tuco's and Frederick's representations set forth in Tuco's Operating Agreement, in which they represented that traders' net profits would not be used to meet Tuco's operating expenses or to cover other traders' trading losses. Needless to say, Tuco and Frederick failed to disclose to

Tuco's traders that their net trading profits were being used to meet Tuco's and Frederick's expenses and liabilities and that there were insufficient funds in Tuco's accounts to cover all of its traders' net positive equity balances.

36. Tuco and Frederick are continuing Tuco's operations and allowing traders to day-trade securities through Tuco's accounts. Tuco and Frederick are also continuing to solicit new traders, receive deposits from and pay withdrawals to traders, and receive commissions. Tuco and Frederick are also continuing to make false and misleading statements to traders and continuing to misuse traders' funds.

### FIRST CLAIM FOR RELIEF
### UNREGISTERED BROKER-DEALER
### VIOLATIONS OF SECTION 15(a) OF THE EXCHANGE ACT
### (AGAINST TUCO)
### AIDING AND ABETTING VIOLATIONS OF SECTION 15(a) OF THE EXCHANGE ACT
### (AGAINST FREDERICK)

37. The Commission realleges and incorporates by reference paragraphs 1 through 36 above.

38. Defendant Tuco, by engaging in the conduct described above, directly or indirectly, made use of the mails and other means or instrumentalities of interstate commerce to effect transactions in securities, without being registered as a broker or dealer pursuant to Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b), in violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

39. Defendant Frederick knowingly provided substantial assistance to Tuco's violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a). By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), defendant Frederick aided and abetted defendant Tuco's violations of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

40. By engaging in the conduct described above, defendants Tuco and Frederick violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the

Exchange Act, 15 U.S.C. §78o(a).

## SECOND CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER

### (AGAINST TUCO AND FREDERICK)

41. The Commission realleges and incorporates by reference paragraphs 1 through 36 above.

42. The defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a. employed devices, schemes, or artifices to defraud;

    b. made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

43. By engaging in the conduct described above, each of the defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that the defendants committed the alleged violations.

### II.

Issue orders, in a form consistent with Fed. R. Civ. P. 65(d), temporarily, preliminarily and permanently enjoining defendant Tuco and Frederick and their officers, agents, servants,

employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Sections 10(b) and 15(a), of the Exchange Act, 15 U.S.C. §§ 78j(b), 78o(a), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### III.

Issue in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order and a preliminary injunction freezing the assets of defendants Tuco and Frederick; appointing a receiver over defendant Tuco; prohibiting each of the defendants from destroying documents; and ordering accountings from the defendants.

### IV.

Order defendants Tuco and Frederick to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

### V.

Order defendants Tuco and Frederick to pay civil penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED: March 4, 2008

ROBERTO A. TERCERO
Attorneys for Plaintiff
Securities and Exchange Commission

⚞JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Securities and Exchange Commission

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Donald W. Searles, Roberto A. Tercero, SEC, 5670 Wilshire Blvd., 11th Fl., Los Angeles, CA 90036, Telephone - 323-965-3998

## DEFENDANTS
Tuco Trading, LLC and Douglas G. Frederick

08 MAR -4 AM 8:59
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

County of Residence of First Listed Defendant San Diego
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

BY: _____ DEPUTY

Attorneys (If Known)  '08 CV 0400 DMS BLM

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|   | PTF | DEF |   | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | PERSONAL PROPERTY | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | LABOR | SOCIAL SECURITY | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | FEDERAL TAX SUITS | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15USC78j(b), 17CFR240.10b-5, 15USC78o(a)
Brief description of cause:
Securities fraud, broker-dealer registration violations

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE 03/03/2008   SIGNATURE OF ATTORNEY OF RECORD  /s/ Roberto A. Tercero

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____