*ORIGINAL*

1 DONALD W. SEARLES, Cal. Bar No. 135705
SearlesD@sec.gov
2 KELLY BOWERS, Cal. Bar No. 164007
BowersK@sec.gov
3 J. CINDY ESON, Cal. Bar. No. 219782
EsonJC@sec.gov
4 ROBERTO A. TERCERO, Cal. Bar No. 143760
TerceroR@sec.gov
5
Attorneys for Plaintiff
6 Securities and Exchange Commission
Rosalind R. Tyson, Acting Regional Director
7 Andrew Petillon, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
8 Los Angeles, California 90036
Telephone: (323) 965-3998
9 Facsimile: (323) 965-3908



FILED

MAR 0 4 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                            DEPUTY

10

11                    UNITED STATES DISTRICT COURT

12                 SOUTHERN DISTRICT OF CALIFORNIA

13

14

15 SECURITIES AND EXCHANGE          Case No.: '08 CV 0 4 00 DMS BLM
   COMMISSION,
16                                  MEMORANDUM OF POINTS AND AUTHORITIES
                                    IN SUPPORT OF PLAINTIFF SECURITIES AND
17            Plaintiff,            EXCHANGE COMMISSION'S *EX PARTE*
                                    MOTION FOR A TEMPORARY RESTRAINING
18        vs.                       ORDER AND ORDERS: (1) FREEZING ASSETS;
                                    (2) APPOINTING A TEMPORARY RECEIVER;
19 TUCO TRADING, LLC, and DOUGLAS G. (3) GRANTING EXPEDITED DISCOVERY; (4)
   FREDERICK,                       PROHIBITING THE DESTRUCTION OF
20                                  DOCUMENTS; (5) REQUIRING ACCOUNTINGS;
            Defendants.             AND (6) ORDER TO SHOW CAUSE RE
21                                  PRELIMINARY INJUNCTIONS AND
                                    APPOINTMENT OF A RECEIVER
22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................. 1

II. STATEMENT OF FACTS ................................................................................. 2

    A.   The Defendants ............................................................................. 2

    B.   Related Non-Party ........................................................................ 3

    C.   Tuco's Operations ........................................................................ 3

        1.   The Defendants' Solicitation Efforts and Tuco's Structure .................. 3

        2.   Tuco Provides Substantial—and Impermissible—Buying Power to the. Traders and Monitors Their Activities ................................................. 5

        3.   The Traders Can Track Their Sub-Account Activity, which Has Been Substantial ......................................................................................... 7

    D.   Tuco's Commissions, Fees, and Expenses..................................... 8

    E.   Tuco's Multi-Million Dollar Shortfall........................................... 9

        1.   The Defendants' Misrepresentations and Omissions ........................... 9

        2.   The December 2007 and January 2008 Shortfalls............................... 11

    F.   The Defendants' Ongoing Activities ........................................... 12

III. LEGAL DISCUSSION ................................................................................... 13

    A.   Pursuant to the Special Standard for Granting the Commission's Motion, a Temporary Restraining Order Prohibiting the Defendants from Continuing to Violation the Federal Securities Laws Is Appropriate............................. 13

    B.   The Commission Has Made a Substantial Showing that the Defendants Are Violating the Federal Securities Laws ................................................. 14

        1.   Tuco Is Violating the Broker-Dealer Registration Provisions............. 14

        2.   Frederick Is Aiding and Abetting Tuco's Violations .......................... 16

        3.   The Defendants Are Violating the Antifraud Provisions of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder ...................... 16

            a.   The Defendants Are Misrepresenting and Omitting to State

Material Facts.................................................................................. 17

b.    The Defendants Are Acting with Scienter .................................... 18

c.    The Defendants' Fraud Is "In Connection With" the Purchase or

Sale of Securities.................................................................. 18

6.    There Is a Reasonable Likelihood that the Defendants Will Continue

Their Fraud Unless Enjoined .................................................................. 19

B.    The Court Should Order an Immediate Asset Freeze to Protect Investor

Funds ......................................................................................................... 20

C.    Orders Requiring Accountings, Prohibiting the Destruction of Documents,

and Expediting Discovery Are Necessary and Appropriate ....................... 21

D.    Order Appointing a Temporary Receiver Over the Assets of Tuco ........... 21

IV. CONCLUSION .......................................................................................................... 22

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Aaron v. SEC*
    446 U.S. 680 (1980) ............................................................ 19

*Arrington v. Merrill Lynch*
    651 F.2d 615 (9th Cir. 1981)................................................ 20

*Basic Inc. v. Levinson*
    485 U.S. 224  (1988).......................................................... 18

*Ernst & Ernst v. Hochfelder*
    425 U.S. 185 (1976) .......................................................... 19

*FSLIC v. Sahni*
    868 F.2d 1096 (9th Cir. 1989)........................................ 13,22

*FTC v. Affordable Media, LLC*
    179 F.3d 1228 (9th Cir. 1999)............................................. 22

*Hollinger v. Titan Capital Corp.*
    914 F.2d 1564 (9th Cir. 1990) (en banc)............................... 19

*Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp.*
    411 F. Supp. 411 (D. Mass.), *aff'd*, 545 F.2d 754 (1st. Cir. 1976). ................................. 15

*SEC v. Burns*
    816 F.2d 471 (9th Cir. 1987) ............................................. 19

*SEC v. Fehn*
    97 F.3d 1276 (9th Cir. 1996)..................................... 17, 18, 20

*SEC v. Fifth Ave. Coach Lines, Inc.*
    289 F. Supp. 3 (S.D.N.Y. 1968)........................................... 23

*SEC v. GLT Dain Rauscher*
    254 F.3d 852 (9th Cir. 2001)............................................... 18

*SEC v. Hansen*
    1984 U.S. Dist. Lexis 17835, at *26 (S.D.N.Y. Apr. 6, 1984) ......................... 15

*SEC v. Hickey*
    322 F.3d 1123 (9th Cir. 2003)............................................. 22

*SEC v. Interlink Data Network*
    1993 U.S. District Lexis 20163, *46-48 (C.D. Cal. Nov. 15, 1993) .................................. 14

*SEC v. International Swiss Investments Corp.*
    895 F.2d 1272 (9th Cir. 1990) .......................................................................................... 21

*SEC v. Koracorp Industries, Inc.*
    575 F.2d 692 (9th Cir. 1978) ............................................................................................. 21

*SEC v. Management Dynamics, Inc.*
    515 F.2d 801 (2d Cir. 1975) .............................................................................................. 13

*SEC v. Margolis*
    1992 U.S. Dist. Lexis 14872 at *15 (S.D.N.Y. Sept. 30, 1992) ........................................ 15

*SEC v. Murphy*
    626 F.2d 633 (9th Cir. 1980) ....................................................................................... 20, 21

*SEC v. Rana Research, Inc.*
    8 F.3d 1358 (9th Cir. 1993) .............................................................................................. 17

*SEC v. Sandifur*
    2006 U.S. Dist. Lexis 12243, *34-38 (W.D. Wash. Mar. 2, 2006) .................................... 17

*SEC v. Unique Fin. Concepts, Inc.*
    196 F.3d 1195 (11th Cir. 1999) ......................................................................................... 13

*SEC v. United Financial Group, Inc.*
    474 F.2d 354 (9th Cir. 1973) ............................................................................................. 13

*SEC v. Wencke*
    622 F.2d 1363 (9th Cir. 1980) .......................................................................................... 21

*SEC v. Zandford*
    535 U.S. 813 (2002) .................................................................................................... 19, 20

*TSC Industries, Inc. v. Northway, Inc.*
    426 U.S. 438 (1976) ......................................................................................................... 18

*United States v. Nutri-Cology, Inc.*
    932 F.2d 394 (9th Cir. 1992) ....................................................................................... 13 21

## FEDERAL STATUTES

### Securities Exchange Act of 1934

Section 15(a)
    [15 U.S.C. § 78o(a)] .................................................................................................. 14, 16

Section 15(a)(1)
    [15 U.S.C. § 78o(a)(1)] .................................................................................................... 14

1

2

Section 15(c)(3)
[15 U.S.C. §78o(c)(3)].......................................................................... 16

3

Section 3(a)(12)(A)
[15 U.S.C. § 78c(a)(12)(A)].................................................................. 16

4

5

6

Section 10(b)
[15 U.S.C. § 78j(b)]............................................................................. 17

7

Section 21(d)
[5 U.S.C. § 78u(d)].............................................................................. 13

8

9

## CODE OF FEDERAL REGULATIONS

10

17 C.F.R. § 240.10b-5............................................................................ 17

11

17 C.F.R. § 240.15c3-3........................................................................... 16

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.    **INTRODUCTION**

By this *Ex Parte* Motion, Plaintiff Securities and Exchange Commission ("Commission") seeks a temporary restraining order and other emergency relief to halt an ongoing securities fraud by Tuco Trading, LLC ("Tuco"), an unregistered brokerage firm, and its principal, Douglas G. Frederick ("Frederick" collectively "Defendants").

Tuco and Frederick provide day-trading capability to over 250 day-traders. A day-trader actively buys and sells securities, often on the same day, and hopes to make at least a small profit on each buy-and-sell transaction. The Defendants allow the traders to day-trade in Tuco's own brokerage accounts ("master accounts") by creating "sub-accounts" for each trader. Tuco and Frederick then track the activity in each trader's sub-account, which Tuco reports to the trader daily.

The Defendants entice traders with services which are unavailable to day-traders at any registered broker-dealer. First, the Defendants allow a trader to day-trade even if his or her sub-account has less than $25,000 in equity, which is below the minimum equity requirement under NASD regulations for day-trading. Second, traders at Tuco can also use up to $20 of Tuco's equity to purchase securities for each $1 in the trader's sub-account (*i.e.,* 20:1 buying power). NASD and NYSE regulations, however, only allow a day-trader to have 4:1 buying power. Despite providing these brokerage services, Tuco is not registered with the Commission as a broker-dealer. Tuco, aided and abetted by Frederick, is therefore violating Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act").

Tuco and Frederick are also committing securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. On a daily basis, Tuco and Frederick report to the traders the equity balances in their sub-accounts. As of December 31, 2007, however, Tuco and Frederick have used $3.62 million, or 35%, of the traders' $10.2 million total equity to pay Tuco's expenses and to cover trader losses. Frederick claims that he will cover most of the $3.62 million from money he says he is owed from others. In reporting the traders' equity balances, however, Tuco and Frederick have failed to disclose that that they have used approximately 35% of the traders' equity to cover other traders' losses and to pay Tuco's expenses and that their

1   recovery of that 35% of the traders' equity is dependent on Frederick's recovering the funds

2   from third parties.  Furthermore, even though Tuco and Frederick have not provided reliable

3   information for January 2008, what they have provided shows that about a $1.35 million shortfall

4   remains.

5           The Defendants are violating, and unless enjoined will continue to violate, the federal

6   securities laws.  The Commission seeks a temporary restraining order against both Defendants,

7   and orders freezing the Defendants' assets, appointing a temporary receiver over Tuco, requiring

8   the Defendants to provide accountings, and granting the Commission expedited discovery.  The

9   Commission further seeks an order to show cause why both a preliminary injunction should not

10  be granted and appointment of a permanent receiver over Tuco should not be ordered.  Pursuant

11  to Rule 65(b)(1) and CivLR 83.3(h), the Commission provided notice of this Motion to counsel

12  for the Defendants on March 3, 2008, at 10:03 a.m., by e-mail and facsimile at 10:12 a.m. and

13  10:19 a.m., respectively . [Declaration of Roberto A. Tercero ("Tercero Dec."), at ¶¶ 8-9. Ex.

14  26.]

15  **II.    STATEMENT OF FACTS**

16          **A.    The Defendants**

17          Tuco Trading, LLC, is a Nevada limited liability company formed in August 2006 and

18  based in La Jolla, California.  [Tercero Dec., Ex. 1.]  Tuco is a self-described "trading firm" that

19  creates sub-accounts for members to day-trade securities through Tuco's master brokerage

20  accounts.  [Tercero Dec., ¶ 5, Ex. 2, p. 40 (Frederick Transcript ("TR"), pp. 107, line 3 to 108,

21  line 13), ¶ 5(b) (Tuco Website), Ex. 4, p. 80; Woo Dec., ¶ 12.]  It is not registered with the

22  Commission as a broker or dealer.  [Declaration of Kent L. Woo ("Woo Dec.") ¶ 8, Ex. 4.]

23          Douglas G. Frederick, age 38, resides in San Diego, California.  [Tercero Dec., Ex. 2, p.

24  16 (TR, pp. 11-12); Woo Dec., ¶ 7, Ex. 3.]  He formed Tuco Trading in August 2006 and is its

25  sole managing member.  [Tercero Dec., Ex. 1; Woo Dec., ¶ 11.]  He has held various securities

26  licenses at various times since 1993.  [Woo Dec., ¶ 7, Ex. 3.]  In 1998, the NASD censured

27  Frederick and revoked his licenses for engaging in outside business activities and failing to

28  notify his firm.  *Id.*  Frederick has been associated with thirteen broker-dealers since 1993,

1   including GLB Trading, Inc. since April 2006. *Id.* Frederick is not registered with the

2   Commission in any capacity. [Woo Dec., ¶ 9, Ex. 5.]

**B.    Related Non-Party**

4   GLB Trading, Inc., has been registered with the Commission since 2003 as a broker-

5   dealer. [Woo Dec., ¶ 6, Ex. 2.] It is an introducing broker-dealer based in Irvine, California, and

6   clears through Penson Financial Services, Inc.[1] [*Id.*] Tuco maintains its principal master

7   accounts at GLB Trading. [Tercero Dec., Ex. 2, p. 38 (TR., 98, line 20 to 99, line 17); Woo

8   Dec., 11.]

**C.    Tuco's Operations**

**1.    The Defendants' Solicitation Efforts and Tuco's Structure**

11   Tuco describes itself on its website (www.tuco.com) as a "private equity trading firm"

12   that provides "trading solutions for the active trader." [Tercero Dec., ¶ 5(b) (Tuco Website), Ex.

13   4, p. 78.] Frederick is Tuco's only Class A "owner-member" and, as such, has exclusive

14   managerial authority over Tuco and is vested with the sole and exclusive power to transact

15   business on Tuco's behalf. [Tercero Dec., Ex. 2, p. 20 (TR, pp. 26, line 16 to 26, line 20);

16   Tercero Dec., ¶ 5(c) (Operating Agreement), Ex. 5, p. 125 (¶ 2.02(a)).] To trade through Tuco,

17   customers must contribute funds and sign Tuco's Operating Agreement as a Class B "trader"

18   member of Tuco and sign Trader and Confidentiality Agreements with Tuco. [Tercero Dec., ¶

19   5(c) (Trader Agreement); Ex. 5(c), p. 116; Ex. 5(c) (Operating Agreement); Ex. 5, pp. 125 at ¶

20   2.02(a), 129 at ¶ 4.01.] New traders come from referrals of either Tuco's existing traders or from

21   vendors that Tuco uses. [Tercero Dec., Ex. 2, pp. 22-23; 36 (TR, pp. 37 line 9 to 41, line 6; 92

22   line 3 to 92, line 17).] Frederick also solicits traders directly who have accounts at other day-

23   trading firms. [Tercero Dec., Ex. 2, pp. 22-23 (TR, pp. 37, line 22 to 38, line 9).] The remaining

---

[1]        An introducing broker has a direct relationship with the customer and takes the customer's orders, including securities trades and deposit and withdrawal requests for funds and securities. An introducing broker then delegates the actual execution of customer orders to a clearing broker. Clearing brokers also maintain the paperwork associated with the orders and their execution.

1    traders open accounts through Tuco's website, which Tuco uses to advertise its day-trading

2    brokerage services. [Tercero Dec., Ex. 2, p. 36 (TR, pp. 91, line 22 to 91, line 24); Tercero Dec.,

3    ¶ 5(b), Ex. 4 (Tuco Website).]

4         Tuco's records show that as of December 31, 2007, Tuco had 274 traders with 330 sub-

5    accounts, and 186 traders had 229 sub-accounts with a net positive equity balances totaling $10.1

6    million. [Woo Dec., ¶ 18.] Of the 229 sub-account with positive equity balances, 157 had equity

7    balances of less than $25,000, the minimum equity required by NASD rules.[2] [Id.]

8         As of January 31, 2008, Tuco had 261 traders, with 335 sub-accounts. [Woo Dec., ¶ 36.]

9    Of those, 198 traders had 257 sub-accounts with positive equity balances totaling approximately

10    $11.4 million. [Id.] Significantly, 159 of the 257 sub-accounts that had positive equity balances

11    had equity balances below $25,000. [Id.] Furthermore, according to Frederick, some of Tuco's

12    traders are day-trading firms themselves with a combined total of over 1,000 of their own

13    traders. [Tercero Dec., Ex. 2, p. 37 (TR, pp. 96, line 25 to 97, line 10).] Frederick has no

14    records for these sub-sub-account holders but characterizes them as Tuco traders. [Id.; Woo

15    Dec., ¶ 36.]

16         Tuco then pools the trader's funds into bank, brokerage, and commodity futures accounts,

17    which are all in Tuco's name. [Tercero. Dec., Exs. 7-13; Woo Dec, ¶¶ 10-11, 20-27, Exs. 6-8.]

18    Frederick controls all of Tuco's accounts. [Tercero Dec., Ex. 2, pp. 24, 26-27, (TR, pp. 45, line

19    6 to 45, line 17; 52, line 16 to 54, line 4).] Tuco has three brokerage accounts at GLB Trading,

20    and Frederick is the broker for each one. [Tercero Dec., Ex. 2, pp. 24 (TR, pp. 43, line 24 to 44,

21    line 6); Tercero Dec., Ex., 10; Woo Dec., ¶¶ 10-11.] Tuco also allows traders to trade futures

22    through two small commodity futures accounts that Tuco maintains. [Tercero Dec., Ex. 2, pp.

23    25-26 (TR, pp. 49, line 24 to 50, line 4).] Tuco also maintains two bank accounts, which it uses

24    to receive the traders' initial and additional contributions, send them withdrawals, and pay

25    Tuco's expenses. [Tercero Dec., Ex. 2, pp. 23-24, 26, 68 (TR, pp. 40, line 7 to 43, line 15; 50,

26    line 5 to 51, line 9; 219, line 24 to220, line 24).] Only Frederick can withdraw funds from

27

28    [2]     NASD Rule 2520(f)(8)(B)(iv)(a).

1    Tuco's accounts. [Tercero Dec., Ex. 2, pp. 26 (TR, pp. 52, line 20 to 53, line 3); Woo Dec., ¶

2    11.]

3        Tuco uses its own back office system to create sub-accounts for each trader in which he

4    or she can day-trade securities through Tuco's master accounts. [Tercero Dec., Ex. 2, pp. 38, 40

5    (TR, pp. 98, line 5 to 99, line 17; 107, line 3 to 108, line 9); Woo Dec., ¶ 12.] All but 1% of

6    Tuco's business consists of equity trading, and 99% of that trading occurs in the master accounts

7    at GLB Trading. [Tercero Dec., Ex. 2, pp. 25, 34 (TR, pp. 47, line 23 to 48, line 1; 83, line 10 to

8    84, line 7).] Traders can conduct their trading, including publicly traded stock, at Tuco's six

9    offices located nationwide, its two foreign offices, or a remote location. [Tercero Dec., Ex. 2,

10   pp. 20 (TR, pp. 26, line 5 to 27, line 5); Tercero Dec., Ex. 4 at 89-90 (Tuco Website).] Tuco

11   provides trading software from several vendors, enabling a trader to place trades through various

12   trading platforms, which provide access to the securities markets. [Tercero Dec., Ex. 2, pp. 20

13   (TR, pp. 27, line 11 to 29, line 5); Woo Dec., ¶ 12.]

14        2.   **Tuco Provides Substantial—and Impermissible—Buying Power to the**

15             **Traders and Monitors Their Activities**

16        Under Tuco's Trader and Operating Agreements, Tuco determines how much of Tuco's

17   equity each trader may use when trading securities and can stop the trader from trading at any

18   point. [Tercero Dec., Ex. 2, pp.44-45 (TR, pp. 125, line 14 to 128, line 3); Tercero Dec., ¶ 5(c)

19   (Trader Agreement), Ex. 5, p. 116 at ¶¶ 6-7; Tercero Dec., ¶ 5(c) (Operating Agreement), Ex. 5,

20   p. 127 at ¶ 2.05 and p. 132 at ¶ 5.02).] Frederick sets each trader's buying power based upon his

21   or her trading experience and the amount of funds in the trader's sub-account. [*Id.*] New traders

22   begin with 6:1 to 10:1 buying power (*i.e.*, a new trader can use $6 to $10 of Tuco's equity to

23   purchase securities for each $1 in the trader's sub-account), but about 80% of the traders to use

24   Tuco's equity in a ratio from 10:1 to 20:1, which is far in excess of the 4:1 buying power

25   maximum imposed by applicable NASD and NYSE rules. [*Id.*] Tuco monitors how much

26   buying power each trader uses by checking the back office system daily.[3] [Tercero Dec., Ex. 2,

27

28   _____

     [3]    *See* NASD Conduct Rule 2520(f)(8)(B) and NYSE Rule 431(f)(8)(B).

1  p. 63 (TR, pp. 200, line 1 to 24).] Nevertheless, Tuco's master accounts at GLB Trading are

2  limited to 4:1 buying power. [Tercero Dec., Ex. 2, p. 63 (TR, pp. 200, line 1 to 24).] If a master

3  account exceeds the 4:1 limit, Tuco receives a margin call from GLB Trading, and which Tuco

4  satisfies by borrowing funds. [Tercero Dec., Ex. 2, p. 63 (TR, pp. 200, line 19 to 201, line 8).]

5  Each week, Tuco borrows and pays back from $500,000 to $2.3 million to meet these margin

6  calls. [Tercero Dec., Ex. 2, p. 32 (TR, pp. 75, line 6 to 77, line 3); Woo Dec., ¶¶ 37, 39, Ex. 16.]

7      Frederick and four Tuco employees use the trading software to monitor each trader's

8  profit and loss in real time. [Tercero Dec., Ex. 2, pp. 63-64 (TR, pp. 201, line 12 to 203, line

9  14).] Tuco sets a 25% stop loss limit, but traders can also set their own loss limit, which

10  Frederick and Tuco's employees also monitor. [Tercero Dec., Ex. 2, pp. 63-64 (TR, pp. 201, line

11  12 to 205, line 13).] If the trader's account drops 25%, or reaches his or her own loss limit, Tuco

12  contacts the trader to determine the reason for the loss and, if appropriate in its discretion, can

13  stop further trading. [Tercero Dec., Ex. 2, pp. 63-64 (TR, pp. 201, line 12 to 205, line 13).]

14      Under Tuco's Operating Agreement, the trader is responsible for all of the trading profits

15  and losses in his or her sub-account and does not share in other traders' profits and losses.

16  [Tercero Dec, ¶ 5(c) (Operating Agreement), Ex. 5, pp. 132-33 at ¶¶ 5.04, 5.05.] The Operating

17  Agreement also states that the trader may withdraw any of the trader's net trading profits.

18  [Tercero Dec, ¶ 5(c), Ex. 5, pp. 133-34 at ¶ 5.08.] Tuco is required under the Operating

19  Agreement to adjust the amount of funds in the trader's sub-account daily by the amount of the

20  trader's net trading profits or losses, which takes into account commissions, expenses, and other

21  charges that Tuco may make. [Tercero Dec, ¶ 5(c) (Operating Agreement), Ex. 5, pp. 132-33 at

22  ¶¶ 5.04, 5.05.] If a trader suffers losses resulting in a negative equity balance, under the

23  Operating Agreement, the Class A member (*i.e.*, Frederick) is responsible for the negative

24  balance, which as of December 31, 2007, totaled $1.35 million. [Tercero Dec, ¶ 5(c), Ex. 5, pp.

25  132-33 at ¶ 5.05.]

26

27

28

### 3.   **The Traders Can Track Their Sub-Account Activity, which Has Been Substantial**

Each trader can log onto Tuco's back office system and see the activity in his or her sub-account, which is updated daily. [Tercero Dec., Ex. 2, pp. 51, 66-67 (TR, pp. 150, line 7 to 151, line 4; 211, line 22 to 214, line 25); Tercero Dec., *see also*, Ex. 19.] The back office system displays the sub-account's equity and account history (trades, commissions, fees, deposits, and withdrawals). [Tercero Dec., Ex. 2, pp. 51, 66-67 (TR, pp. 150, line 7 to 153, line 18; 211, line 22 to 214, line 25); Tercero Dec., *see also*, Ex. 19.]

Tuco's traders are conducting substantial amounts of day-trading through Tuco's master accounts—both in terms of the dollar amount of the trades and the number of trades. In December 2007, one trade was worth $42.7 million. [Tercero Dec., ¶ 7, Ex. 25.] The most recent monthly account statement for Tuco's principal account is over 10,000 pages, representing hundred of millions of shares traded each month. [Tercero Dec., Ex. 2, p. 57, (TR, pp. 174, line 5 to 174, line 9); Woo Dec., ¶¶ 37, Ex. 16.]

The traders have generated substantial commissions for Frederick as the broker on the Tuco-GLB Trading accounts. [Tercero Dec., Ex. 2, pp. 52-53 (TR, pp. 157, line 23 to 158, line 3); Tercero Dec., Ex. 6.] From December 2006 through October 2007, Frederick has received a total of about $1.12 million in net commissions from GLB Trading, of which more than 90% has come from trading in Tuco accounts. [Tercero Dec., Ex. 2, pp. 56-57 (TR, pp. 172, line 13 to 174, line 9); Tercero Dec., Ex. 6.] Recently, Frederick's commissions skyrocketed to about $2.14 million in November 2007 alone because one of Tuco's new sub-accounts, T-3, is itself a day-trading firm with 150 traders.[4] [Tercero Dec., Ex. 2, pp. 56-57 (TR, pp. 172, line 13 to 174, line 9), Ex. 6, pp. 177-78.]

---

[4]     Tuco only charges T-3 Tuco's cost per trade. [Tercero Dec., Ex. 2, p. 57 (TR, pp. 175, line 3 to 175, line 24).] Tuco, however, allows T-3 to charge its own traders commissions using Tuco's trading software and back office system. [*Id.*] Once Frederick receives the T-3-based commissions from GLB Trading, he sends them to T-3. [Tercero Dec., Ex. 2, pp. 57-58 (TR, pp., 177, line 23 to 179, line 13).] T-3's commissions are substantial because they trade heavily and charge $3 to $7 per 1,000 shares traded. [Tercero Dec., Ex. 2, pp. 57-58 (TR pp. 175, line 20 to 177, line 15).] Frederick, however, is a 10% owner of T-3 and will receive 10% of its

D.    **Tuco's Commissions, Fees, and Expenses**

Tuco charges its traders commissions on their securities trades. [Tercero Dec., Ex. 2, pp. 20, 44 (TR, pp. 26, line 5 to 26, line 13; 124, line 23 to 125, line 13).] Frederick negotiates with each trader the commissions that will be charged but typically sets the commission rate for new traders at $5 per 1,000 shares traded. [Tercero Dec., Ex. 2, pp. 21, 37 (TR, pp. 31, line 4 to 31, line 12, 96, line 4 to 96, line 5).] If a trader subsequently requests a lower rate, Frederick or Tuco's head trader will adjust it after considering the capital in the trader's account, the trading volume in the account, the amount of buying power the trader uses, and the level of risk in the account. [Tercero Dec., Ex. 2, pp. 21 (TR, pp. 31, line 4 to 32, line 3).] Commissions range from $0.20 to $8 per 1,000 shares traded. [Tercero Dec., Ex. 2, pp. 37 (TR, pp. 96, line 25 to 97, line 10).]

The trading software calculates Tuco's commissions, which are then downloaded daily into Tuco's back office system, and then debited from the trader's Tuco sub-account. [Tercero Dec., Ex. 2, p. 38 (TR, pp. 100, line 6 to 101, line 1).] The commissions, however, are actually collected at GLB Trading's clearing firm, Penson Financial, which also receives a copy of the trading software's calculation. [Tercero Dec., Ex. 2, pp. 28, 38 (TR, pp. 58, line 6 to 58, line 16; 100, line 6 to 101, line 1).] Penson Financial and GLB Trading then subtract from the commissions certain expenses, trading-related fees, including clearing and software fees, and GLB Trading's share of the commission. [Tercero Dec., Ex. 2, pp. 28-30 (TR, pp. 60, line 5 to 62, line 18; 64, line 22 to 67, line 23). Tercero Dec., Ex. 6.] GLB Trading then pays the net amount to Frederick. [*Id.*] Frederick explained that he has to receive the commissions because they have to go to a licensed person. [Tercero Dec., Ex. 2, pp. 31 (TR, pp. 72, line 4 to 72, line 16).] He further admits, however, that the commissions are Tuco's and that he either deposits the commissions into Tuco's bank accounts, to pay Tuco expenses or trader withdrawals, or he deposits the commissions into the master accounts. [Tercero Dec., Ex. 2, pp. 27-28, 31-32 (TR, pp. 55, line 6 to 55, line 17; 58, line 21 to 59, line 4; 72, line 17 to 75, line 5).] According to

commissions. [Tercero Dec., Ex. 2, pp. 57-58 (TR, pp., 175, line 9 to 175, line 19; 177, line 23 to 179, line 13).]

1  Frederick, that it takes GLB Trading from one to three months to pay commissions. [Tercero

2  Dec., Ex. 2, pp. 30 (TR, pp. 67, line 24 to 69, line 5).]

3        Tuco charges its traders certain additional fees, such as for wiring of funds withdrawn

4  from Tuco, sending withdrawal checks by overnight mail, and for providing certain software,

5  stock quotes, and news feeds. [Tercero Dec., Ex. 2, pp. 46-48 (TR, pp. 130, line 25 to 136, line

6  18; 137, line 23 – 139, line 3); Tercero Dec., ¶ 5(c), Ex. 5 (Incidental Fees List), p. 147.] None

7  of these fees are transaction-based, in that the fee is charged whether the trader has made a trade

8  or not. [Tercero Dec., Ex. 2, pp. 46-48 (TR, pp. 130, line 25 to 136, line 17; 137, line 23 to 139,

9  line 3); Tercero Dec., ¶ 5(c), Ex. 5, pp. 147.]

10        Tuco incurs substantial costs that it pays, at least in part, with the transaction-based

11  commission payments. [Tercero Dec., Ex. 2, pp. 24, 47-48 (TR, pp. 43, line 16 to 43, line 23;

12  134, line 12 to 137, line 22; 139, line 4 to 141, line 6).] These expenses include the costs

13  associated with purchasing and operating the trading software and back office system, salaries,

14  consulting fees, travel, website maintenance, and office expenses. [*Id.*] Tuco relies on the

15  commissions paid to Frederick to pay its expenses. [Tercero Dec., Ex. 2, pp. 27-28, 48 (TR, pp.

16  55, line 6 to 59, line 4; 139, line 4 to 141, line 6).]

17        E.    **Tuco's Multi-Million Dollar Shortfall**

18              1.    **The Defendants' Misrepresentations and Omissions**

19        In connection with its solicitation and enrollment of new traders, Tuco and Frederick

20  provide to each new trader, among other things, a copy of Tuco's Operating Agreement.

21  [Tercero Dec., Ex. 2, pp. 36-37, 41 (TR, pp. 92, line 25 to 94, line 7; 112, line 7 to 113, line 7);

22  Tercero Dec., ¶ 5(c), Ex. 5 (Operating Agreement), pp. 123-146.] Each new member is required

23  to execute a counterpart signature page to the Operating Agreement in order to become a

24  member of Tuco, in which the trader acknowledges receipt of the Operating Agreement and

25  agrees to be bound by its terms. [Tercero Dec., Ex. 2, pp. 41, 46 (TR, pp. 112, line 7 to 113, line

26  7; 129, line 15 to 130, line 24); Tercero Dec, ¶ 5(c), Ex. 5 (Operating Agreement), p. 143.]

27        In the Operating Agreement, Tuco and Frederick represent that they will create a separate

28  sub-account for each trader through which the trader can conduct day-trading activities. [Tercero

1  Dec., ¶ 5(c), Ex. 5 (Operating Agreement), p. 132 at ¶ 5.02.]  In the Operating Agreement, Tuco

2  and Frederick further represent that a percentage of the profits and losses generated by each

3  trader with the trader's sub-account shall be allocated to the trader for the trader's exclusive

4  benefit with the balance going to Frederick. [Tercero Dec., ¶ 5(c), Ex. 5 (Operating Agreement),

5  pp. 132-33 at ¶ 5.05.]  In each case, however, Tuco and Frederick agree that 100% of the traders'

6  net profits shall be allocated to the trader. [Tercero Dec., Ex. 2, pp. 41-42 (TR, pp. 113, line19 to

7  115, line 6).]

8         In the Operating Agreement, Tuco and Frederick further represent that Tuco's books

9  shall reflect, among other things, the trader's initial and additional funds deposited and the

10  amount of the net trading profits that has been credited to the trader. [Tercero Dec., ¶ 5(c), Ex. 5

11  (Operating Agreement), pp. 130-33 at ¶¶ 5.01-5.06, p. 139 at ¶ 12.01.]  Tuco and Frederick

12  further represent that the only amounts that shall be debited shall be the amount of money (or

13  property) distributed by Tuco to the trader and the amount of any net trading losses from the sub-

14  account assessed to the trader. [Tercero Dec., ¶ 5(c), Ex. 5 (Operating Agreement), pp. 132-33 at

15  ¶¶ 5.02-5.06]

16         In the Operating Agreement, Tuco and Frederick further represent that Tuco will

17  maintain true and correct books and records, in which shall be entered all of Tuco's transactions,

18  and all other records necessary, convenient or incidental to recording Tuco's business and

19  affairs, which shall be sufficient to record the allocation of net income and net losses and

20  distributions to traders as provided by the Operating Agreement.  [Tercero Dec., ¶ 5(c), Ex. 5

21  (Operating Agreement), pp. 130-33 at ¶¶ 5.01-5.06, p. 139 at ¶ 12.01.]

22         In connection with the daily trading activity of Tuco's traders, and to induce Tuco's

23  traders to continue trading with Tuco and to continue to use and pay commissions and other

24  charges for Tuco's brokerage services, Tuco and Frederick make additional representations to

25  Tuco's traders through Tuco's back office system, which traders can log onto to see the activity

26  and current balances in their designated sub-accounts. [Tercero Dec., Ex. 2, pp. 51-52, 66-67

27  (TR, pp. 150, line 7 to 155; line 12; 191, line 21 to 192, line 8; 211, line 22 to 214, line 25); *see*

28  *also*, Ex. 19.]  Tuco's back office system displays, as of the previous day, the trader's account

1   equity, which is purportedly amount of money available to the trader for trading, distribution or

2   withdrawal.  [Tercero Dec., Ex. 2, pp. 51-52 (TR, pp. 150, line 7 to 155, line 12).]

3                   2.       **The December 2007 and January 2008 Shortfalls**

4           Tuco and Frederick know, or are reckless in not knowing, that the sub-accounts and

5   Tuco's books and records, including Tuco's back office system, contain false and misleading

6   information because they did not accurately reflect the traders' net equity balances or the actual

7   amount of money available to the trader for withdrawal.  Indeed, Frederick admits that there is a

8   shortfall and that the traders do not know that Tuco is using their funds to pay expenses.

9   [Tercero Dec., Ex. 2, pp. 62-63 (TR, pp. 196, line 1 to 199, line 2).]

10          Additionally, Frederick admits that the shortfall resulted from traders' losses and his use

11  of traders' funds to pay Tuco expenses and to cover trader withdrawals.  [Tercero Dec., Ex. 2,

12  pp. 61-62 (TR, pp. 193, line 15 to 197, line 21).]  Frederick uses trader funds because he must

13  wait one to three months to receive commission payments from GLB Trading.  [Tercero Dec.,

14  Ex. 2, pp. 30 (TR, pp. 67, line 24 to 69, line 5).]  He also admits that Tuco would not be able to

15  pay all of the traders if they were to close their accounts (*i.e.*, a "run on the bank").  [Tercero

16  Dec., Ex. 2, pp. 62-63 (TR, pp. 197, line 18 to 198, line 25).]

17          As of December 31, 2007, the traders had a positive equity totaling $10.2 million.  [Woo

18  Dec., ¶¶ 18, 28-29, Ex. 9 (*see also*, ¶¶ 19-27 and Tercero Dec., Exs. 7-13 for underlying data).]

19  As of that same date, however, Tuco's bank, brokerage, and commodities accounts had net assets

20  of only $6.59 million.  [Woo Dec., 28-29, Ex. 9 (*see*, ¶¶ 19-27 and Tercero Dec., Exs. 7-13 for

21  underlying data).]  Therefore, $3.51 million of the traders' funds, or about 35%, was missing

22  from Tuco's accounts.  [Woo Dec., ¶ 30, Ex. 9.]

23          A shortfall remains as of January 31, 2008.  Even though the Commission has made

24  repeated requests for updated figures, the Defendants have been unable to provide reliable

25  information despite numerous attempts to do so.  [Woo Dec., ¶¶ 31-36, Exs. 10-14.]  At best,

26  however, about a $1.35 million shortfall remains.  [Woo Dec., ¶¶ 46-48, Ex. 23 (*see*, ¶¶ 37-45,

27  Exs. 10-22 for underlying data).]  As of January 31, 2008, the traders have a positive equity

28  totaling about $11.4 million, but Tuco's bank, brokerage, and commodities accounts had net

1    assets of only about $10.05 million, resulting in a $1.35 million, or about a 12%, shortfall. [Woo

2    Dec., ¶¶ 47-48, Ex. 23 (*see*, ¶¶ 37-45, Exs. 10-22 for underlying data).]

3         Frederick admits that Tuco is dependent upon his recovering funds from third parties to

4    replenish the funds that he has used. [Tercero Dec., Ex. 2, pp. 60-62 (TR, pp. 189, line 16 to

5    196, line 5).]  He claims, however, that he will cover the shortfall from the money that he claims

6    he is owed from GLB Trading for commissions, the losing traders for their negative equity

7    balances, a trading platform for $819,000 in overpaid fees, Penson Financial for $109,000 in

8    overpaid fees, and a co-owner of Tuco's predecessor for $250,000. [Tercero Dec., Ex. 2, pp. 60-

9    62 (TR, pp. 189-16 to 194, line 24).]  Even if he were to collect all of these funds, however,

10    Frederick admits that Tuco would still have a shortfall. [Tercero Dec., Ex. 2, pp. 61-62 (TR, pp.

11    193, line 15 to 196, line 5).]

12         Even though Frederick admits to the shortfall and his need to collect from third parties,

13    neither he nor Tuco have disclosed these facts to the traders. [Tercero Dec., Ex. 2, pp. 62-63

14    (TR, pp. 196, line 1 to 199, line 2).]  Indeed, Frederick claims that he sees no need to disclose the

15    losses. [Tercero Dec., Ex. 2, pp. 52, 62-63 (TR, pp. 154, line 13 to 155, line 12; 196, line 1 to

16    199, line 2).]  Instead, Frederick views the losses as Tuco's, not the traders', responsibility.

17    [Tercero Dec., Ex. 2, pp. 60-62 (TR, pp. 189, line 16 to 191; line 13; 193, line 15 to 196, line 5).]

18    The Defendants' misuse of the traders' funds was neither authorized by, nor disclosed to, Tuco's

19    traders. [*See,* Tercero Dec., ¶ 5(c), Ex. 5 (Operating Agreement), pp. 123-46.]

20        **F.**    **The Defendants' Ongoing Activities**

21         Tuco is continuing its operations and allowing traders to day-trade securities through its

22    accounts. [Tercero Dec., Ex. 2, pp. 71 (TR, pp. 232, line 14 to 233, line 23).]  Tuco is also

23    continuing to receive deposits from, and pay withdrawals to, traders. [Tercero Dec., Ex. 2, pp.

24    71 (TR, pp. 232, line 14 to 233, line 23).]  Its website remains on the Internet. [Tercero Dec., ¶

25    6.]  Furthermore, Frederick plans to continue Tuco's operations, even though he admits that it is

26    difficult for him to run his business because he must wait one to three months to receive

27    commission payments from GLB Trading, which puts him two to three months behind on trying

28

1    to figure out what Tuco's available funds are to meet its expenses. [Tercero Dec., Ex. 2, pp. 30,

2    71 (TR, pp. 67, line 24 to 69, line 5; 232, line 14 to 233, line 23).]

3    **III.    LEGAL DISCUSSION**

4          **A.    Pursuant to the Special Standard for Granting the Commission's Motion, a**

5              **Temporary Restraining Order Prohibiting the Defendants from Continuing**

6              **to Violation the Federal Securities Laws Is Appropriate**

7          Section 21(d) of the Exchange Act provides that the Commission may obtain a permanent

8    or temporary injunction or restraining order without a bond on a proper showing.  15 U.S.C. §

9    78u(d).  To obtain such relief, the Commission must demonstrate:  (1) a *prima facie* case that a

10   violation of the securities laws has occurred; and (2) a reasonable likelihood that the violation

11   will be repeated.  *See SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 n.2 (11th Cir.

12   1999); *SEC v. United Financial Group, Inc.*, 474 F.2d 354, 358-59 (9th Cir. 1973).

13         The Commission appears before this Court "not as an ordinary litigant, but as a statutory

14   guardian charged with safeguarding the public interest in enforcing the securities laws."  *SEC v.*

15   *Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).  The need for temporary relief is

16   of great importance where, as here, the Commission acts to protect the public interest and the

17   investing public.  "[W]hen 'the public interest is involved in a proceeding of this nature, [the

18   district court's] equitable powers assume an even broader and more flexible character than when

19   only a private controversy is at stake.'"  *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989).

20         For these reasons, the Commission faces a lower burden than a private civil litigant when

21   seeking a temporary restraining order or other pretrial relief.  Unlike private litigants, the courts

22   presume irreparable injury in Commission enforcement actions in which injunctive relief is

23   sought.  *United States v. Nutri-Cology, Inc.*, 932 F.2d 394, 397-98 (9th Cir. 1992) ("[i]n statutory

24   enforcement cases . . . passage of the statute is itself an implied finding by Congress that

25   violations will harm the public").  In fact, under established Ninth Circuit precedent, an

26   injunction is authorized "solely upon a showing of a statutory violation."  *Id.* at 398.  Because the

27   evidence in this case establishes that the Defendants are violating the federal securities laws, and

28

1   that it is reasonably likely they will continue to do so unless enjoined, the Court should grant the

2   Commission's Motion for temporary relief.

3        **B.     The Commission Has Made a Substantial Showing that the Defendants Are**

4                  **Violating the Federal Securities Laws**

5        The Defendants are violating numerous provisions of the federal securities laws.  Tuco,

6   aided and abetted by Frederick, is violating the broker-dealer registration provisions.  The

7   Defendants are also violating the antifraud provisions of the securities laws by making material

8   misrepresentations and omissions regarding the amount of equity in Tuco's accounts, how the

9   Defendants are using trader funds, and how the Defendants plan to replenish the funds.

10           **1.     Tuco Is Violating the Broker-Dealer Registration Provisions**

11       Section 15(a)(1) of the Exchange Act requires brokers and dealers who effect securities

12  transactions through interstate commerce to be registered with the Commission or, if the broker

13  or dealer is a natural person, be associated with a registered broker or dealer that is not a natural

14  person.  15 U.S.C. § 78o(a)(1).  Scienter is not required in order to prove a violation of Section

15  15(a).  *See SEC v. Interlink Data Network*, 1993 U.S. District Lexis 20163, *46-48 (C.D. Cal.

16  Nov. 15, 1993).

17       Section 3(a)(4) of the Exchange Act defines "broker" as "any person engaged in the

18  business of effecting transactions in securities for the accounts of others."  The phrase "engaged

19  in the business" connotes regular participation in securities transactions and is evidenced by

20  soliciting securities transactions and receiving transaction-based compensation, such as

21  commissions.  *See SEC v. Margolis*, 1992 U.S. Dist. Lexis 14872 at *15 (S.D.N.Y. Sept. 30,

22  1992); *SEC v. Hansen*, 1984 U.S. Dist. Lexis 17835, at *26 (S.D.N.Y. Apr. 6, 1984);

23  *Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp.*, 411 F. Supp. 411,

24  415 (D. Mass.), *aff'd*, 545 F.2d 754 (1st. Cir. 1976).

25       A person effects securities transactions for others by participating in the key points of a

26  securities transaction, including soliciting investors, handling customer funds and securities,

27  participating in the order-taking or order-routing process, and extending or arranging for the

28  extension of credit in connection with a securities transaction.  *See SEC v. Schmidt*, 1971 U.S.

-14-

1   Dist. Lexis 11884, at *3-4 (S.D.N.Y. Aug. 26, 1971); *Massachusetts Fin. Srvcs.*, 411 F. Supp. at

2   415; *Hansen*, 1984 U.S. Dist. LEXIS 17835, at *26.

3        Tuco has not been registered with the Commission as a broker-dealer.  Nevertheless,

4   Tuco has operated as a broker-dealer since November 2006.  Tuco has solicited securities

5   transactions through Frederick's direct efforts to solicit new traders and through Tuco's website.

6   Tuco also regularly participates in securities transactions by providing day-trading services,

7   including creating and maintaining sub-accounts for the traders and providing traders access to

8   software to place and route securities orders.  In addition, Tuco handles the traders' funds, which

9   are used for securities transactions, and grants leverage and access to trade by allowing sub-

10   account holders to trade against the equity of Tuco's pooled master accounts.

11        Tuco also receives commissions.  It sets commission rates for each trader and deducts the

12   commission for each trade from the trader's sub-account.  Although the commissions are actually

13   collected by GLB Trading's clearing broker and are paid to Frederick, Frederick remits the

14   commissions to Tuco.  Tuco relies on the commissions paid to Frederick to pay its operating

15   expenses.

16        Tuco does not qualify for any exceptions from the broker-dealer registration requirement.

17   Section 15(a) excepts broker-dealers whose business is exclusively intrastate or is restricted to

18   "exempted securities."  15 U.S.C. § 78o(a).  Tuco does not fall within these exceptions because it

19   enables trading from locations nationwide and internationally.  The traders trade in the stock of

20   public companies located on the various exchanges and therefore not "exempted securities" as

21   defined in Exchange Act Section 3(a)(12)(A) (exempted securities include government

22   securities, municipal securities, any interest in a common trust fund or similar fund maintained

23   by a bank, any interest or participation in a single trust fund, or a collective trust fund maintained

24   by a bank, and such other securities as the Commission, by such rules and regulations, may deem

25   consistent with the public interest and the protection of investors). `15 U.S.C. § 78c(a)(12)(A).

26        Tuco's registration violations have significant consequences for the traders and the

27   securities markets generally.  The $25,000 minimum equity and 4:1 margin requirements are

28   designed, among other things, to "ensure the overall financial well being of the securities

markets" from the risk resulting from the intra-day credit extended to day-traders. *See Securities Exchange Act Release No. 44009*, 2001 SEC Lexis 383 (Feb. 27, 2001).  As an unregistered broker-dealer, Tuco does not require its traders to comply with these rules.

Tuco creates additional risks to its traders.  For instance, although it has custody and control over the traders' funds, it does not comply with the customer protection rules of Exchange Act Section 15(c)(3) and Rule 15c3-3 thereunder.  15 U.S.C. §78o(c)(3); 17 C.F.R. § 240.15c3-3.  These provisions, among other things, require broker-dealers to maintain all funds that have as their source customer assets in a bank account for the exclusive benefit of the customers.  The failure to maintain an exclusive customer bank account has allowed Tuco and Frederick to use trader funds for their own business purposes.

### 2.    Frederick Is Aiding and Abetting Tuco's Violations

Section 20(e) of the Exchange Act imposes aiding and abetting liability on any person for violations of the Act.  Under the Exchange Act, the Commission must show:  (1) the existence of an independent primary violation; (2) actual knowledge by the alleged aider and abettor of the primary violation and his or her own role in furthering it; and (3) "substantial assistance" in the commission of the primary violation. *SEC v. Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996); *SEC v. Sandifur*, 2006 U.S. Dist. Lexis 12243, *34-38 (W.D. Wash. Mar. 2, 2006).

Frederick is aiding and abetting Tuco's violations of Section 15(a) of the Exchange Act. Tuco is committing primary violations of these provisions by operating as a broker-dealer without registering with the Commission.  Frederick knows of Tuco's violations and his role in furthering it because he formed Tuco, structured its operations, and runs its ongoing day-to-day operations, including its financial operations.

### 3.    The Defendants Are Violating the Antifraud Provisions of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraudulent conduct in connection with the purchase or sale of securities.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. To establish a violation of Section 10(b) and Rule 10b-5, the Commission must prove three

-16-

1    elements in addition to the use of jurisdictional means:  (1) a material misrepresentation; (2)

2    scienter; (3) in connection with the purchase or sale of any security.  *SEC v. Rana Research, Inc.*,

3    8 F.3d 1358, 1364 (9th Cir. 1993).

4              a.      **The Defendants Are Misrepresenting and Omitting to State**

5                      **Material Facts**

6              Violations of the antifraud provisions require that the omissions and misstatements

7    concern material facts. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  A fact is material if

8    there is a substantial likelihood that a reasonable investor would consider it important in making

9    an investment decision. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

10   Liability arises not only from affirmative representations but also from failures to disclose

11   material information. *SEC v. GLT Dain Rauscher*, 254 F.3d 852, 855-56 (9th Cir. 2001).  The

12   antifraud provisions "imposes a duty to disclose material facts that are necessary to make

13   disclosed statements, whether mandatory or volunteered, not misleading." *Fehn*, 97 F.3d at 1290

14   n.12.

15            The Defendants are misrepresenting to the traders the equity in their sub-accounts.  As of

16   December 31, 2007, there was about a 35% shortfall between the equity a trader sees when

17   accessing Tuco's back office system and the amount Tuco has available to repay each trader's

18   equity.  In reporting the traders' equity balances, Tuco and Frederick have failed to disclose that

19   that they have used approximately 35% of the traders' equity to cover other traders' losses and to

20   pay Tuco's expenses.  The Defendants also fail to disclose that recovery of the traders' missing

21   equity is dependent on Frederick's recovering the funds from third parties.  Even with the

22   unreliable information provided by the Defendants for January 2008, about a 12% shortfall

23   remains.  These statements are material because reasonable investors would consider a

24   substantial shortfall in their brokerage accounts, the misuse of their funds, and the likelihood of

25   being made whole, important in making their decisions to day-trade securities and whether to do

26   so through Tuco.

27

28

1    **b.    The Defendants Are Acting with Scienter**

2    Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require a

3    showing of scienter. *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980). Scienter is defined as a

4    "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*,

5    425 U.S. 185, 193 n.12 (1976). In the Ninth Circuit, scienter may be established by a showing of

6    recklessness. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-1569 (9th Cir. 1990) (en

7    banc). Proof of recklessness can be inferred from circumstantial evidence. *SEC v. Burns*, 816

8    F.2d 471, 474 (9th Cir. 1987).

9    The Defendants are acting with scienter.[5] Tuco and Frederick know, or are reckless is

10    not knowing, about the shortfall, the use of trader funds to pay expenses and to cover traders'

11    losses and withdrawals, and his Frederick's need to collect from third parties to make up the

12    shortfall. Ferederick admits his knowledge of all of these materially false and misleading

13    statements. Additionally, he knows Tuco's financial condition because he alone controls each of

14    Tuco's accounts, pays Tuco's expenses, and executes trader withdrawal requests. Frederick also

15    admits that he knows that the traders' sub-accounts do not reflect the shortfall. Despite this

16    knowledge, however, Frederick does not change the traders' equity balances to reflect the

17    shortfall.

18    **c.    The Defendants' Fraud Is "In Connection With" the Purchase**

19    **or Sale of Securities**

20    Violations of Section 10(b) and Rule 10b-5 thereunder require that the fraudulent conduct

21    occur "in connection with" the purchase or sale of any security. Indeed, the Supreme Court has

22    held that the "in connection with" element is met if the fraudulent statement and the securities

23    transaction coincide. *SEC v. Zandford*, 535 U.S. 813, 822 (2002). Consistent with *Zandford*, the

24    Ninth Circuit has stated repeatedly that the requirement is met if the fraud "'somehow touches

25    upon' or has 'some nexus' with 'any securities transaction.'" *Rana Research*, 8 F.3d at 1362

26    (citations omitted). The fraudulent statement need not concern a specific security. *See*

27    _____

28    [5]    As Tuco's principal, Frederick's mental state is imputed to it. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

*Zandford*, 535 at 820-21; *Arrington v. Merrill Lynch*, 651 F.2d 615, 619 (9th Cir. 1981)

(misrepresenting the risks of buying securities on margin).  Even undisclosed and unauthorized

securities sales, as part of a course of business that operates as a fraud, are "in connection with."

*Zandford*, 535 at 821.  Here, the Defendants' fraudulent statements have a close nexus to

securities purchases and sales and therefore meet the "in connection with" requirement.  The

Defendants' fraudulent statements concern the value of the actual sub-accounts in which the

traders purchase and sell securities and the risk of loss associated with trading in the sub-

accounts.  The Defendants also fail to disclose that that they use trader funds to pay Tuco's

expenses and trader withdrawals.  The fraudulent statements, therefore, coincide with securities

trading.

### 6. <u>There Is a Reasonable Likelihood that the Defendants Will Continue Their Fraud Unless Enjoined</u>

To obtain injunctive relief, the Commission must establish that there is a reasonable

likelihood of future violations.  *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).  Whether

likelihood of future violations exists depends upon the totality of the circumstances.  *Murphy*,

626 F.2d at 655; *Fehn*, 97 F.3d at 1295-96.  Courts consider the degree of scienter involved, the

isolated or recurrent nature of the violative conduct, the defendant's recognition of the wrongful

nature of the conduct, the likelihood that, based on the defendant's occupation, future violations

may occur, and the sincerity of defendant's assurances (if any) against future violations.  *Fehn*,

97 F.3d at 1295-96.

The key factor to be considered is the past illegal conduct of the defendant, from which

the Court may infer a likelihood of future violations.  *SEC v. Koracorp Industries, Inc.*, 575 F.2d

692, 698 (9th Cir. 1978).  Indeed, the Ninth Circuit held that where the public interest is at stake,

"an injunction [is] authorized solely upon a showing of a statutory violation." *Nutri-Cology*, 982

F.2d at 398.

Injunctive relief is appropriate here because the Defendants' statutory violations are

serious.  Tuco, aided and abetted by Frederick, is violating the broker-dealer registration

provisions of Section 15(a) of the Exchange Act and risking its traders' funds, and the securities

1   markets as a whole, by failing to comply with NASD and NYSE rules and regulations, as well as

2   the customer protection rule of Section 15(c)(3) of the Exchange Act and Rule 15c3-3

3   thereunder.  The Defendants are also engaged in an ongoing fraud.  The Defendants'

4   misrepresent to the traders the equity in their sub-accounts, and the Defendants fail to disclose

5   that they use traders' equity to cover other traders' losses and to pay Tuco's expenses.  As a

6   broker at a registered firm (GLB Trading), Frederick's conduct is particularly egregious because

7   his fifteen years in the securities industry should have given him a greater appreciation for the

8   importance of the rules he is obligated to follow.  His occupation also makes it more likely that

9   he will continue his violations absent injunctive relief.

10        The Defendants' violations are ongoing.  They continue to solicit new traders,

11   misrepresent the equity to existing traders, and still permit day-trading through Tuco's master

12   accounts.  Frederick admits that he plans to continue Tuco's operations.  The *Murphy* factors,

13   therefore, weigh in favor of granting temporary and preliminary injunctive relief.

14        **B.**     **The Court Should Order an Immediate Asset Freeze to Protect Investor**

15              **Funds**

16        Federal courts have inherent equitable authority to issue a variety of ancillary relief

17   measures in Commission injunctive actions.  *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir.

18   1980).  Included in these powers is the authority to freeze assets of parties and nonparties.  *SEC*

19   *v. International Swiss Investments Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *SEC v. Hickey*,

20   322 F.3d 1123, 1131 (9th Cir. 2003).  Courts use freeze orders to prevent waste and dissipation

21   of assets and to ensure their availability for restitution and disgorgement for the benefit of

22   victims of the fraud.  *SEC v. Hickey*, 322 F.3d at 1132.  Indeed, the Ninth Circuit specifically has

23   found that "the public interest in preserving the illicit proceeds [of a defendant's fraud] for

24   restitution is great."  *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999).

25        To obtain an asset freeze, the Commission need only establish the mere possibility that

26   dissipating assets exists.  *FSLIC v. Sahni*, 868 F.2d at 1097.  It is unnecessary for the Court to

27   find that dissipation of funds is likely.  *Id.*  As Frederick admitted, the Defendants are using

28   traders' funds to pay Tuco's expenses, execute trader withdrawal requests, and cover other

1   traders' losses, all of which has resulted in a $3.51 million shortfall in Tuco's accounts as of

2   December 31, 2007.  Even under the unreliable information provided by the Defendants, a $1.35

3   million shortfall remains as of the end of January 2008.  Therefore, an asset freeze is necessary

4   to prevent the Defendants from further dissipating or secreting funds or other assets and to

5   ensure that assets are available to satisfy any future judgments against them.

6           **C.      Orders Requiring Accountings, Prohibiting the Destruction of Documents,**

7                     **and Expediting Discovery Are Necessary and Appropriate**

8           The Court's broad equitable powers in Commission enforcement actions include the

9   ability to order ancillary relief to require an accounting and prohibit document destruction.

10  *Wencke II*, 622 F.2d at 1369.  Accountings are particularly appropriate here because the traders'

11  equity is being used to pay Tuco's operating expenses, cover other traders' losses, and execute

12  trader withdrawals.  Accordingly, it is necessary to identify all available assets to help ensure

13  that funds and assets are frozen properly and available to satisfy any future order of

14  disgorgement or civil penalties against the Defendants.  *Int'l Swiss Invest. Corp.*, 895 F.2d at

15  1276.  An order prohibiting the destruction of documents is necessary because of the possibility

16  that the Defendants will destroy evidence of their ongoing fraud.

17          Expedited discovery is authorized by Rules 30, 33, and 34 of the Federal Rules of Civil

18  Procedure and the Court's broad equitable powers in Commission enforcement actions to order

19  all necessary ancillary relief.  *See Wencke II*, 622 F.2d at 1369.  The Commission seeks

20  expedited discovery to develop additional evidence regarding the Defendants' wrongdoing and

21  to ensure that any asset freeze is fully implemented.  The Commission has brought this action

22  expeditiously to immediately halt the ongoing fraudulent scheme and has not had an opportunity

23  to subpoena all relevant documents nor examine persons who have essential information, such as

24  the location of all of the Defendants' remaining assets and additional evidence regarding the

25  Defendants' fraudulent conduct.  Accordingly, this Court should grant expedited discovery.

26          **D.      Order Appointing a Temporary Receiver Over the Assets of Tuco**

27          The appointment of a temporary receiver over the assets of Tuco is necessary.  The

28  appointment of a receiver is appropriate to "marshal and preserve [assets] against further

-21-

1  misappropriation and dissipation." *Wencke II*, 622 F.2d at 1372. Factors such as the integrity of

2  management and the likelihood of future misuse of assets are critical in determining whether a

3  receiver should be appointed. *See SEC v. Fifth Ave. Coach Lines, Inc.*, 289 F. Supp. 3, 42

4  (S.D.N.Y. 1968). Here, a receiver over the assets of Tuco is necessary. First, Frederick does

5  business as Tuco, so there is no reason to put any faith in the integrity of Tuco's "management,"

6  such as it is. Second, if Frederick or his subordinates retain power of disposition over the assets

7  of Tuco, there will likely be a "run on the bank" with traders seeking to withdraw their funds

8  from their sub-accounts and the likelihood that preferential distributions will occur. Therefore, a

9  receiver is needed to ensure that the distribution of client funds is done equitably, orderly and

10  promptly.

11  **IV.    CONCLUSION**

12       For the foregoing reasons, the Court should grant the Commission's *Ex Parte* Motion in

13  its entirety.

14

15

16  DATED: March 3, 2008

17                                    DONALD W. SEARLES
                                      ROBERTO A. TERCERO
18                                    Attorney for Plaintiff
                                      Securities and Exchange Commission
19

20

21

22

23

24

25

26

27

28