1  DONALD W. SEARLES, Cal. Bar No. 135705
   SearlesD@sec.gov
2  KELLY BOWERS, Cal. Bar No. 164007
   BowersK@sec.gov
3  J. CINDY ESON, Cal. Bar. No. 219782
   EsonJC@sec.gov
4  ROBERTO A. TERCERO, Cal. Bar. No. 143760
   TerceroR@sec.gov
5
   Attorneys for Plaintiff
6  Securities and Exchange Commission
   Rosalind R. Tyson, Acting Regional Director
7  Andrew Petillon, Associate Regional Director
   5670 Wilshire Boulevard, 11th Floor
8  Los Angeles, California 90036
   Telephone: (323) 965-3998
9  Facsimile: (323) 965-3908

**FILED**

MAR 0 4 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

10

11                  **UNITED STATES DISTRICT COURT**

12                **SOUTHERN DISTRICT OF CALIFORNIA**

13

14

15  SECURITIES AND EXCHANGE            Case No. **08 CV 0400 DMS BLM**
    COMMISSION,
16                                      **DECLARATION OF ROBERTO A. TERCERO IN**
17              Plaintiff,              **SUPPORT OF PLAINTIFF SECURITIES AND**
                                        **EXCHANGE COMMISSION'S *EX PARTE***
18         vs.                          **MOTION FOR A TEMPORARY RESTRAINING**
                                        **ORDER AND ORDERS: (1) FREEZING ASSETS;**
19  TUCO TRADING, LLC, and DOUGLAS G.   **(2) APPOINTING A TEMPORARY RECEIVER;**
    FREDERICK,                          **(3) GRANTING EXPEDITED DISCOVERY; (4)**
20                                      **PROHIBITING THE DESTRUCTION OF**
              Defendants.              **DOCUMENTS; (5) REQUIRING ACCOUNTINGS;**
21                                      **AND (6) ORDER TO SHOW CAUSE RE**
                                        **PRELIMINARY INJUNCTIONS AND**
22                                      **APPOINTMENT OF A RECEIVER**

23                                      **VOLUME III**

24

25

26

27

28

TABLE OF CONTENTS - EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Certified - Tuco's Certificate of Existence with Status in Good Standing, Articles of Organization, and Annual List of Managers or Managing Members; Certified – Annual List of Managers or Managing Members, dated July 8, 2007 | 9 |
| 2 | Testimony Transcript of Douglas G. Frederick | 13 |
| 3 | SEC Supplemental Information Form 1662 | 73 |
| 4 | Printout of Tuco's website (www.tuco.com) | 78 |
| 5 | Tuco's New Account Package | 105 |
| 6 | November 2006 through November 2007 settlement statement for Frederick's commissions from GLB Trading | 153 |
| 7 | December 2007 bank account statement for Tuco's JPMorganChase account number 000000722923067 and account number 000000722923075 | 179 |
| 8 | December 2007 account statement for Tuco's Advantage Futures LLC account number L  MH006 A0535 | 192 |
| 9 | December 2007 Statement of Account for Tuco's Evolution Financial account number 11532603 | 223 |
| 10 | Portions of December 2007 Statement of Account for Tuco's GLB Trading account number 2131-4075, account number 2132-0155, and account number 2131-7813 | 225 |
| 11 | December 2007 Monthly Commodity Statement for Tuco's MF Global Inc. account number E 480 HSP1 SP404 | 229 |
| 12 | December 2007 Account Summary for Tuco's ViewTrade account number 49363559 | 234 |
| 13 | December 2007 Account Summary for Tuco's Wedbush Morgan Securities account number 8244-9330 and account number 8244-9331 | 237 |
| 14 | E-mail from Frederick to Kent L. Woo, dated February 4, 2008, attaching a spreadsheet of Tuco's traders' equity balances as reflected in Tuco's back office system as of December 31, 2007 | 241 |
| 15 | E-mail from Frederick to Kent L. Woo, dated February 12, 2008, attaching a revised spreadsheet of Tuco's traders' equity balances as reflected in Tuco's back office system as of December 31, 2007 | 248 |
| 16 | E-mail from Frederick to Kent L. Woo, dated February 12, 2008, attaching spreadsheets noting revisions to Tuco's traders' equity balances as reflected in Tuco's back office system as of December 31, 2007 | 256 |
| 17 | Wires transfers from GLB Trading to Frederick for the period November 15 to December 28, 2007 | 294 |
| 18 | Wire transfers to Frederick on January 8 and January 15, 2008, a true and correct copy of which is attached hereto as Exhibit 18 | 308 |
| 19 | Tuco's back office system snapshot for trader Rick Boensche for the period January to December 2007 | 311 |
| 20 | E-mail from Frederick to Kent L. Woo, dated November 26, 2007, attaching Lending Agreement between Tuco and Frank McDonald | 313 |

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| 21 | March 30, 2007 authorization from Frederick to Penson Financial Services, Inc. to journal funds from Tuco's GLB Trading account number 21314075 to Caledonia Trading, LLC and Worldwide Trader Capital | 317 |
| 22 | E-mail from Frederick to Kent L. Woo, dated February 7, 2008, summarizing conversation | 318 |
| 23 | January 2008 bank account statement for Tuco's JPMorganChase account number 000000722923067 and account number 000000722923075 | 320 |
| 24 | Frederick's business card | 336 |
| 25 | Page 4,225 of December 2007 Account Statement of Tuco Trading, LLC for account number 2131-4075 at GLB Trading, Inc. | 337 |
| 26 | Letter giving notice of *Ex Parte* Motion from Roberto A. Tercero to Stephen Young, dated March 3, 2008 | 338 |



## New Account Notification Form
Fax to:858-454-5360
ATTN: Ben Ball

Referred By: _____

Trader Name: _____

Commission Rate: _____    Software fee_____

Location ("Remote" if not in an office) _____

Software to be Used:_____

Special Considerations: _____





## Sign Up Checklist

☐   I have completely filled out Tuco Trading's Trader Information Sheet

☐   I have provided an AOL Instant Messenger name on the Trader Information Sheet

☐   I have signed:
        ☐ The Confidentiality Agreement and Acknowledgement
        ☐ The Trader Agreement
        ☐ The Counterpart Signature Page to the Operating Agreement
        ☐ The Incidental Fees List
        ☐ The Agreement for Market Display Services

☐   I have enclosed a copy of my Drivers License

☐   I have enclosed a check made payable to "Tuco Trading , LLC" funding my account

Send Paperwork to:

Tuco Trading, LLC
909 Prospect Street Suite 224
La Jolla, CA 92037

**If you have any questions, call Operations Support at 858-454-5044**

Exhibit __5__ Page _106_

Account #: _____



member FINRA, SIPC

## PENSON FINANCIAL SERVICES
### 1700 Pacific Avenue, Suite 1400,  Dallas, Texas 75201

## LIMITED TRADING AUTHORIZATION
(Authorization limited to cash/margin purchases and sales of securities and securities futures and commodities only)

Gentlemen:

The undersigned hereby authorizes _____ as the undersigned's agent and attorney-in-fact (Authorized Agent) to buy, sell (including short sales) and trade in any and all securities of any kind, including without limitation stocks, bonds, securities futures and commodities and any other securities and/or puts, calls, options or other contracts relating to the same on margin or otherwise (collectively "securities"), in accordance with your terms and conditions for the undersigned's account and risk, and in the undersigned's name or number on your books.

This authorization is limited to purchase (cash or margin) and sales transactions only and does not afford the Authorized Agent authority to transfer securities and/or disburse funds from the undersigned's account.

You are authorized to follow the instructions of the Authorized Agent in every respect concerning the undersigned's account with you except as otherwise stated above. In all matters and things aforementioned, as well as in all other things necessary or incidental to the furtherance or conduct of the account of the undersigned, the Authorized Agent is authorized to act for the undersigned and in the undersigned's behalf in the same manner and with the same force and effect as the undersigned might or could do.

This authorization and indemnity shall benefit you, your successors and assigns, as well as introducing brokers for which you clear. This authorization shall apply to all accounts of the undersigned or in which the undersigned has an interest, whether previously opened, now open or opened in the future, with you, your predecessor firms or any introducing brokers for which you clear, and all previous, current and future transactions in any and all such accounts. All prior transactions for the undersigned by the Authorized agent are ratified in all respects.

You may accept and rely upon any instructions received from the introducing broker concerning the undersigned's accounts and shall have no obligation to determine whether such instructions received from the introducing broker or its representative, employees, or other agents are in accordance with the terms of this authorization.

The undersigned hereby agrees to indemnify and hold you harmless from and to pay you promptly on demand any and all losses arising therefrom or debit balances thereon. This authorization and indemnity is in addition to (and in no way limits or restricts) any rights, which you may have under any other agreement or agreements between the undersigned and you. This authorization and indemnity is also a continuing one and shall remain in full force and effect until revoked by the undersigned by a written notice actually received by you at the above address, marked to the attention of your compliance officer, but such revocation shall not affect any liability in any way resulting from transactions initiated prior to such revocation.

If any provision of this authorization or indemnity shall be rendered invalid for any reason, the provisions of this agreement shall be deemed modified or superceded as the case may be and these provisions shall in all respects continue and be I full force and effect.

Very truly yours,

### Individual Account Holders:

| Name: | Signature: | Date: |
|---|---|---|
| Joint Name: | Signature: | Date: |

### Entity Account Holders (Corporation, Partnership, Trust, Estate):

| Name of Entity: | Authorized Officer Name: | |
|---|---|---|
| Authorized Officer Signature: | | Date: |
| Address: | | Phone: |

### Individual to Whom Discretion is Given:

| Name: | | Signature: | |
|---|---|---|---|
| SSN, Fed ID, Cedula, NIT# | | ID # | |
| ID Type: | Exp. Date: | Issued By: | Issue Date: |
| Address: | | | Phone: |

### Approved By: (Branch Manager/Compliance)

| Name: | Signature: | Date: |
|---|---|---|

Exhibit ___5___ Page ___107___



<u>**Trader Information Sheet**</u>

## All information provided is kept confidential.

NAME: - _____

ADDRESS: _____

CITY: _____STATE: _____ZIP: _____

HOME PHONE: _____

WORK PHONE: _____

FAX: _____

CELL PHONE: _____

SS# or Taxpayer ID # _____

DATE OF BIRTH _____

EMAIL :

_____

INTERNET MESSENGING:

AIM_____

MSN_____

YAHOO_____

<u>REMOTE TRADERS</u> - PHONE NUMBER WHERE YOU CAN <u>ALWAYS</u> BE

REACHED DURING MARKET HOURS: _____

Exhibit _5____ Page _108____



## TRAINING, CONFIDENTIALITY, NON-SOLICITATION AND NON-INTERFERENCE AGREEMENT

THIS TRAINING, CONFIDENTIALITY, NON-SOLICITATION AND NON-INTERFERENCE AGREEMENT, dated as of _____, 2007 (the "Agreement"), by and among TUCO TRADING, LLC, a Nevada limited liability company. ("TUCO"), and _____(the "Restricted Party"), an individual residing at:

Street _____
City _____
State _____ ZIP _____
(the "Restricted Party Address").

WHEREAS, the Restricted Party desires to become an employee of TUCO, a member of TUCO or otherwise associated with TUCO;

WHEREAS, in connection with the employment by TUCO of the Restricted Party or any other association of the Restricted Party with TUCO, TUCO may provide to the Restricted Party, among other things, compensation, instruction, training, licensing, registration, equipment, expenditures, support services and facilities and may assume certain risks in connection with the Restricted Party's trading on behalf of TUCO;

WHEREAS, TUCO proposes to enroll the Restricted Party in its Training Program (as defined in <u>Section 1</u> of this Agreement), is committed to the professional development of the Restricted Party as a trader, and will avail the Restricted Party of the advantages of its Training Program; and

WHEREAS, TUCO has availed or proposes to avail the Restricted Party of, among other things, certain Confidential Information (as defined in <u>Section 1</u> of this Agreement) in connection with the employment of the Restricted Party by TUCO or the establishment of any other association of the Restricted Party with TUCO;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, agreements and understandings contained herein, the parties hereto agree as follows:

1. <u>Definitions</u>. As used herein, the following terms have the meanings set forth below:

Exhibit ___5___ Page ___109___

"Affiliate" shall mean any Person directly or indirectly controlling, controlled by or under common control with the Person of which it is an Affiliate.

"Confidential Information" shall mean any and all information obtained by the Restricted Party's employment by TUCO or other association with TUCO, including, but not limited to, the following information: (a) any and all information concerning the trading secrets, stock picking methodology, and or any other trading methods learned from trainers and or other TUCO members; (b) any and all information concerning any computerized trader software management program to be used by TUCO to manage and continue the training of traders at TUCO; (c) any and all information concerning the broker, dealer or proprietary trading operations of TUCO; (d) any and all information concerning business relationships or arrangements with other brokers, dealers or investment advisors; (e) any and all information concerning the performance of any member or employee of TUCO; and (f) any and all information conveyed to the Restricted Party, either verbally, in writing or otherwise, and arising out of the employment of the Restricted Party by TUCO or other association by the Restricted Party with TUCO.

"Operating Agreement" shall mean the limited liability company Operating Agreement of TUCO Capital, LLC, dated August 14, 2006, as such may be amended from time to time, or any successor agreement or instrument thereto.

"Person" shall mean and include an individual, a partnership, a joint venture, a corporation or trust, and unincorporated organization, a group or a government or governmental entity.

"Training Program" shall mean any and all information received by the Restricted Party pertaining and/or related to the principles of trading evidenced in, among other things, classroom instruction, lectures, expert guest speakers, and hands-on trading from trainers/members.

2.  Confidentiality. The Restricted Party hereby agrees to keep confidential any and all Confidential Information within the scope of this Agreement, and the Restricted Party hereby agrees to use all reasonable efforts to cause to keep confidential each and every term of this agreement, except (a) to the extent necessary to carry out the terms of this Agreement, (b) to the extent necessary for personal legal or financial purposes unrelated to the prosecution of any litigation, (c) to governmental or regulatory authorities having a legal right to any matter within the scope of this Agreement, (d) pursuant to a valid subpoena or (e) as otherwise prohibited by law. The obligations of the Restricted Party under Section 4 shall survive the termination of this Agreement and the termination of the employment of the Restricted Party by TUCO or the termination of any other association of the Restricted Party with TUCO. Without limiting your obligations under this paragraph, the Restricted Party shall exercise at least the same degree of care as the Restricted Party would exercise with respect to his own most valuable confidential and proprietary property. The Restricted Party shall keep confidential and not

2

Exhibit _5_    Page _110_

issue or make any statement concerning TUCO or this agreement to the press or other media (including the internet) without the prior written approval of TUCO unless the information contained in said statement is known to the general public without any violation of this agreement or any law, rule or regulation or has been disclosed to the Restricted Party by another source. The foregoing sentence shall continue to be binding upon the termination of this agreement.

In the event of a breach or a threatened breach by the Restricted Party of the provisions of the paragraph set forth above, TUCO shall be entitled to an injunction restraining the Restricted Party from disclosing the aforementioned Confidential Information, and/or from rendering any services to any person, TUCO, corporation, association or other entity to whom such Confidential Information has been disclosed or is threatened to be disclosed, since the remedy at law would be inadequate and insufficient. In addition, TUCO shall be entitled to such damages as it can show it has sustained by reason of such breach, and in its discretion from time to time shall be entitled to withhold, and offset against and deduct from, any payments due to the Restricted Party the amount of such damages. TUCO shall be entitled to recover its attorneys' fees, client costs and disbursements relating to a dispute over such offset from the Restricted Party as the court may determine to be equitable. Nothing herein contained shall be construed as prohibiting TUCO from pursuing any other remedies available to TUCO for such breach or threatened breach or any other breach of this agreement.

3. <u>Non-Solicitation and Non-Interference</u>.  The Restricted Party hereby acknowledges and recognizes the highly competitive nature of TUCO's business and, accordingly, agrees that the <u>Restricted Party shall not</u>, within any state in which TUCO operates, other than on behalf of TUCO or any affiliate of TUCO, from the date of this Agreement and ending on the date twelve (12) months (or the longest period of time that a court of competent jurisdiction finds to be enforceable) after the later of;

    i. the effective date of termination, for any reason or no reason whatsoever, of the employment of the Restricted Party by TUCO (which termination shall be at TUCO' sole and absolute discretion); or

    ii. the effective date of the termination of any other association of the Restricted Party with TUCO,

    (a)    whether for the benefit of the Restricted Party or for the benefit of any other individual, partnership, limited liability company, corporation, TUCO or any other organization, directly or indirectly, solicit, negotiate with, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or endeavor to entice from TUCO or its Affiliates, or otherwise directly interfere with the relationship of TUCO or its Affiliates, with any Person who is employed by or otherwise associated with, or engaged to perform services for, TUCO or its Affiliates within the

3

Exhibit ___5___ Page _//l_

past two years from the date of termination from TUCO. The obligations of the Restricted Party under this Section 5 shall survive the termination of this Agreement and the termination of the employment of the Restricted Party by TUCO or the termination of any other association of the Restricted Party with TUCO;

(b)    directly or indirectly solicit, divert or accept any business, or attempt to solicit, divert or accept any business of the type performed by TUCO, from any current or former customer or client or any prospective customer or client of TUCO. As used in this subparagraph, "prospective customers" shall be defined as any person or entity with whom or which TUCO has undertaken a dialogue concerning a prospective business relationship within the preceding twelve (12) months;

c)    hire, offer to hire, solicit or in any manner persuade or attempt to persuade any officer, employee or agent of TUCO to leave the employ of, or to sever a contractual relationship with TUCO.

4.    Breach by Restricted Party.    In the event of a breach or threatened breach by the Restricted Party of the provisions of the above paragraphs, TUCO shall be entitled to an injunction restraining the Restricted Party from such breach, since the remedy at law would be inadequate and insufficient. In addition, TUCO shall be entitled to such damages as it can show it has sustained by reason of such breach, and in its discretion from time to time shall be entitled to withhold, and offset against and deduct from, any payments due to the Restricted Party the amount of such damages. TUCO shall be entitled to recover its attorneys' fees, client costs and disbursements relating to a dispute over such offset from the Restricted Party as the court may determine to be equitable. Nothing herein contained shall be construed as prohibiting TUCO from pursuing any other remedies available for such breach or threatened breach or any other breach of this agreement.

5.    Arbitration.    Any controversy, claim or counterclaim arising out of or in connection with this Agreement, or any other account, agreement or instruments executed with or contemporaneously with this Agreement, whether in contract, in tort, or asserting rights created by Federal or State rules, regulations or laws, or otherwise, shall be governed by arbitration. Arbitration shall be conducted in Orange County, California in accordance with a single arbitrator selected and serving under the Commercial Arbitration Rules of the American Arbitration Association, and judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The arbitrators may grant any remedy or relief that they deem just and equitable within the scope of this Agreement of the parties, including, but not limited to, specific performance of a contract.    The Restricted Party hereby consents and agrees to the issuance of a temporary restraining order or preliminary injunction by a court of contempt jurisdiction to prevent the breach of the confidentiality and non-solicitation provisions proceeding which may be initiated. Upon demand by TUCO, the Restricted Party consents and

4

Exhibit ___5___    Page _112_

agrees to expedited arbitration and the issuance of an injunction by the arbitrators. Either party may obtain provisional or ancillary remedies such as injunctive relief or the appointment of a receiver, or exercise self-help, such as the right to setoff, at any time without waiving its right to arbitration. In the event TUCO institutes legal or equitable proceedings to enforce or collect damages under this contract, the Restricted Party agrees to pay all of TUCO' attorney's fees and costs together with interest at the highest rate allowed by law. This Section 7 shall survive any termination of this Agreement and the termination of the employment of the Restricted Party as a member of TUCO or the termination of any other association of the Restricted Party with TUCO.

6. <u>Binding Effect/Assignment</u>. This agreement shall be binding upon the parties hereto and shall inure to the benefit of TUCO and its successors and assigns. This agreement may be assigned by TUCO to its successors or Affiliates. Neither this Agreement, nor any right or obligation hereunder shall be assignable or transferable by the Restricted Party, or such party's beneficiaries or legal representatives.

7. <u>Governing Law</u>. This Agreement shall be governed in all respects by the laws of California, without giving regard to any conflict of law principles thereof.

8. <u>Severability</u>. Nothing in this Agreement is intended to conflict with or violate any applicable law. Any interpretation of any provision of this Agreement shall be limited, if necessary, to give legal effect to such terms by applicable law. If any provision of this Agreement, or any application thereof in any circumstances, is invalid, in whole or part such provision or application shall not in any way affect the meaning or interpretation of any other provision of this Agreement.

9. <u>Headings</u>. The headings contained herein are solely for the purpose of reference, are not part of this Agreement and shall not in any way affect the meaning of interpretation of this agreement.

10. <u>Amendment; No Waiver</u>. No provision of this Agreement may be modified, waived or discharged unless such modification, waiver or discharge is agreed to in a written instrument signed by both parties hereto. No waiver by any party to this Agreement at any time of any breach by any other party hereto, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

11. <u>No Third Party Beneficiaries</u>. This Agreement is only for the benefit of the parties hereto, and nothing hereunder, expressed or implied, is intended or will be construed as conferring upon any Person, other than the parties hereto, any right or remedies under or by reason of, and no Person, other than the parties hereto, is entitled to rely in any way upon, this Agreement.

5

Exhibit __5__    Page __113__

12. <u>Acknowledgement</u>.  The Restricted Party acknowledges that nothing herein can be construed as a guarantee, assurance or promise that trading profits shall result from the training the Restricted Party receives.

13. <u>Rule of Construction</u>.  The parties hereto acknowledge and agree that;

    i.    each party has received and read a copy of this Agreement prior to signing it and understands the terms hereof and has afforded the opportunity to consult with an counsel with respect to the execution of the Agreement;

    ii.    each party reviewed and negotiated the terms and provisions of this Agreement and have contributed to its revision;

    iii.    the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement; and

    iv.    the terms and provisions in this Agreement shall be construed fairly as to all parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

TUCO TRADING, LLC            RESTRICTED PARTY


_____    _____

Manager / Tuco Trading            Trader Signature

6

Exhibit __5__  Page _114_



## ACKNOWLEDGMENT

The undersigned, by signature below, represents and agrees that the undersigned is in compliance with all past employment, confidentiality, non-solicitation and related agreements and in no way was solicited or enticed to associate with TUCO TRADING, LLC or it affiliates, by any member of TUCO TRADING, LLC. The undersigned, by signature below, represents and agrees that the undersigned is in compliance with all past employment, confidentiality, non-solicitation and related agreements and in no way was solicited or enticed to divulge, disclose, disseminate or communicate to any person or entity, in any manner whatsoever, confidential information, trade secrets or data of any third party persons or entities. The undersigned acknowledges and agrees that the divulgence, disclosure, dissemination, communication or use in any manner or form of any confidential information, trade secrets or data of a third party person or entity to do business, or solicit or entice any employee of a third party person or entity to work for or do business with TUCO TRADING, LLC or its affiliates, is strictly prohibited.

PLEASE RESOLVE ANY UNCERTANTITIES ABOUT YOUR RIGHTS, DUTIES OR OBLIGATIONS BEFORE SIGNING BELOW

Signed_____

_____(print name)

Dated:_____

Exhibit ___5___ Page___115___



## TRADER AGREEMENT

AGREEMENT made the _____ day of _____ , 2007 by
and between TUCO TRADING, LLC (the "Company") and
_____ ("Trader").

In consideration of the foregoing and the covenants herein contained, the Company and
Trader hereby agree as follows.

1.  The Company agrees to retain Trader to engage in trading the Company's
    account pursuant to the terms of this Agreement.

2.  Trader shall deposit a minimum sum of $_____ with the
    Company. This sum shall be held in a non-interest bearing account and
    commingled with other monies of the Company ("Direct Capital"). Such sum
    shall be paid by the trader on the date of hire. Such amount is not insured by
    SIPC or the additional coverage obtained by the Company's clearing firm.

3.  The Trader shall be entitled to receive as compensation for his or her trading
    the payout pursuant to Schedule A (Payout Schedule) hereto as amended from
    time to time by the Company in its sole discretion upon written notice to the
    Trader.

4.  The Trader is not authorized to commit the Company's funds or to bind the
    Company to any contract without receiving prior written approval from the
    Company's management. All orders must be transmitted to the Company for
    execution.

5.  The Company shall provide the Trader with such office space, furniture and
    communication and computer equipment as the Company, in its sole
    discretion, deems is required by the Trader to conduct his or her business.

6.  The Company shall establish a firm trading account ("FTA") with an initial
    buying power to be established upon commencement of trading and may be
    adjusted from time to time at the sole discretion of the Company.

7.  The Company shall have the right to stop the Trader from trading at any point
    during the day. The Company shall also have the right to impose upon Trader
    a stop profit level for the day, to lock in Trader's intra-day gains.

Exhibit ___5___ Page _116_

8. The Trader hereby agrees that s/he will comply with all statutes, laws, rules, regulations and promulgations of the SEC, NASD, all applicable securities exchanges, and all other applicable federal, state and local agencies and authorities, as well as internal rules, regulations and procedures established by the Company from time to time, and that s/he will promptly notify the Company in the event s/he becomes aware of any violation or non-compliance with any of the same or the commencement of any action, suit, proceeding or investigation involving the Trader's performance of his or her securities trading business.

9. The Trader represents and warrants to the Company that:

A. S/he is fully familiar with all the rules, regulations and statues of all state and federal agencies which regulate securities markets as well as the constitution, rules, by-laws, regulations and customs of all applicable securities markets, associations, exchanges and clearing houses (herein collectively referred to as the "Applicable Rules"} and will fully comply therewith;

B. S/he understands that trading securities involves a high degree of risk and the Trader represents that s/he has such business and financial experience to evaluate and assume such risks and that neither the Company, its officer, employees, corporate affiliates and agents have made any representations of warranties as to the profitability of losses that may accrue as a result of trading securities hereunder nor have they passed on or endorsed the merits of any trading methodology or strategy, which are the sole responsibility and sole decision of the Trader. All investment decisions are those solely of the Trader.

C. S/he understands that market access times and systems response may vary due to market condition, systems performance and other factors.

D. S/he is not under any contractual or other obligation or restriction, which would in any way impair his or her ability to comply with the provisions of this Agreement

E. The Trader agrees to follow the trading instructions orally conveyed to the Trader from time to time by the Company supervisory personnel.

F. The Trader understands and agrees that the Trading System services are provided "as is", without warranty of any kind by the system provider, express, implied or statutory (including, without limitation, timeliness, sequence, completeness, accuracy, or freedom from interruption), any implied warranties arising from trade usage, course of dealing or course of performance, or the implied warranties of

Exhibit ___5___ Page _117_

merchantability, fitness, for a particular purpose, title and non-infringement. The entire risk as to the quality and performance of the services offered through the Trading System is with the Trader. Nor is there any representation by the Company that such services, or any information provided in connection therewith, will meet Trader's requirements, be error free, or operate without interruption. Tuco Trading, LLC, its broker/dealer, and its clearing broker rely upon sophisticated computer software and hardware to execute transactions, which are subject to failure due to a variety of factors. In addition, the exchanges, Nasdaq and the ECNs have computer systems that sometimes malfunction. Trader understands that among other events, Trader may experience losses due to system crashes during both peak and low volume periods, the loss of orders, and delayed, conflicting and inaccurate confirmations on orders or cancellations that initiated by Trader.

10. The Trader hereby agrees to indemnify, defend and hold the Company and its officers, directors, employees, corporate affiliates and agent harmless from any loss, damage, liability, claim, cost, awards and expense, including but not limited to reasonable attorneys' fees, arising out of his or her trading or his or her breach of Agreement. Without in any way limiting the foregoing, this indemnity clause shall apply to all allegations of wrongdoing including allegations of illegal use of insider information and all transactions requiring corrective action. If the Company is informed of any pending action or possible loss against the Trader, the Company may hold reserves otherwise due the Trader in amounts sufficient in the Company's sole discretion to cover any pending arbitrations, litigations, customer complaints, unsecured debits and unpaid expenses in connections with the Trader's trading.

11. Non-Disclosure
   A. Either during or after the term of this Agreement, the Trader will not communicate, disclose or utilize to his or her own benefit or the benefit of any other entity or persons, any techniques, plans, designs, programs, customer information, or other information not in the public domain pertaining to the business or affairs of the Company or any of its affiliates. Information shall not be considered to be in the public domain if revealed or disclosed in contravention of this Agreement or the agreements made between the Company and other parties. The Trader agrees not to divulge to any others, nor use any of the foregoing confidential and exclusive information, including the accounts of The Company and/or relationships maintained by the Company. The Trader hereby agrees that all confidential and exclusive information, including any and all account information, shall remain the exclusive property of The Company under all circumstances.

Exhibit ___5___ Page ___118___

B. Upon termination of this Agreement pursuant to Paragraph 13 hereof, the Trader agrees to immediately surrender to The Company all originals software or computer systems programs, any other documents and material received by the Trader while retained under this Agreement and in the Trader's possession, custody or control and to purge all hard drives, tape back-up, CD ROM and any other form of data storage not the property of The Company and under the possession, custody or control of the Trader on any and all such information. The Trader shall not retain or deliver to any other entity or person any of the foregoing or any summary memorandums thereof. The Trader shall also return any equipment belonging to The Company.

12. Either party may terminate this Agreement at any time without cause upon written notice to the other party. Once notice has been given, then the following actions shall be undertaken.

A. The Trader shall close any open positions and immediately cease trading on behalf of The Company.

B. The Company shall review the net asset value of the FTA. If there is an increase in the net asset value of the FTA that has not been distributed, The Company shall compensate the Trader in the same manner as described in Paragraph 3 and return the Deposit Capital in accordance with the TUCO TRADING, LLC Operating Agreement pursuant then to Schedule A hereto. If there is a deficiency in the net asset value of the FTA, then The Company (i) may utilize the Deposit Capital deposited with The Company by the Trader to the extent applicable and shall return the balance to the Trader in accordance with the TUCO TRADING Operating Agreement. or (ii), if Deposit Capital is less than the Trader's losses, request the balance to be paid into Deposit Capital by the Trader. Upon any such request being made by The Company to the Trader, Trader shall pay the differential within five (5) business days.

13. No rights under this Agreement shall be assignable nor any duties assumed by another party except by an affiliate, as such term is defined in the Securities Act of 1933, as amended, of The Company. This Agreement shall be binding upon and inure to the benefit of the successors and permitted assigns of The Company and the representative and heirs of the Trader.

14. This Agreement contains the entire agreement of the parties hereto with respect to the subject matter hereof. It may be modified or amended only in a writing signed by each of the parties hereto.

Exhibit __5__    Page _119_

15. All disputes hereunder shall be settled by arbitration under the rules and auspices of the National Association of Securities Dealers, Inc., such arbitration to be conducted in Orange County, California. The award of the arbitrators, or the majority of them, shall be final, and judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction.

16. This Agreement shall be governed by California State law applicable to agreements made and to be performed wholly in such state.

17. In the event that any provision of this Agreement shall be held unenforceable, the same shall not affect the remainder of the provisions hereof, which shall be given full effect without regard to the invalid portions hereof.

18. No waiver of any breach of any provision of this Agreement shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement of provision herein contained.

19. Any notice required or permitted to be given hereunder shall be in writing. Any notice required or permitted shall be sufficiently given if sent by registered or certified mail or delivered, in person or by overnight courier, if to the Trader at his or her address as set forth on the signature page hereof, or at such other address as the Trader shall designated by notice to The Company duly given as set forth herein, and if to The Company at 3333 Michelson ST. Suite #620, Irvine, California 92612 or at such other address as The Company shall designate by notice to trader duly given as set forth above.

20. The respective rights and obligations of the parties hereunder shall survive any termination of this Agreement to the extent necessary to carry out the intended preservation of such rights.

21. Rule of Construction. The parties hereto acknowledge and agree that;

    i.    each party has received and read a copy of this Agreement prior to signing it and understands the terms hereof and has afforded the opportunity to consult with an counsel with respect to the execution of the Agreement;

    ii.    each party reviewed and negotiated the terms and provisions of this Agreement and have contributed to its revision;

    iii.    the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement; and

    iv.    the terms and provisions in this Agreement shall be construed fairly as to all parties hereto and not in favor of or against any party, regardless

Exhibit __5__ Page _120_

of which party was generally responsible for the preparation of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

TUCO TRADING, LLC                                    RESTRICTED PARTY


_____            _____
TUCO TRADING MANAGER                        Signature


                                                            _____
                                                            Printed Name of Trader

Exhibit __5__ Page _121_



## Schedule A

Trader Name_____

Start Date _____

Payout Percentage_____

Notes:

Exhibit ___5___  Page__122__



# OPERATING AGREEMENT

## OF

## TUCO TRADING, LLC

### a Nevada limited liability company

### Adopted as of AUGUST 14, 2006

Exhibit __5__ Page _123_

# OPERATING AGREEMENT

## OF

## TUCO TRADING, LLC

### a Nevada limited liability company

This OPERATING AGREEMENT is adopted as of August 14, 2006 by the Managers of the Company as set forth in Section 3.02 below and by the members of TUCO TRADING, LLC, a Nevada limited liability company (the "*Company*"), each of whom has indicated acceptance hereof by executing this Agreement.

In accordance with the Nevada Limited Liability Company Law, the Members desire to adopt this Agreement in order to set forth their agreement with respect to the business of the Company, the conduct of its affairs, and the rights, powers, preferences, limitations or responsibilities of the Company's Members, Managers, employees or agents.

NOW, THEREFORE, the Members agree as follows:

## ARTICLE I
## ORGANIZATIONAL MATTERS

1.01    Definitions.  Capitalized terms used herein have the meanings assigned to such terms in Annex A attached hereto.

1.02    Formation. The Members shall file or cause to be filed Articles of Organization with the Secretary of State of the State of Nevada (the "*Articles of Organization*") in accordance with the Act.

1.03    Name.  The name of the Company is "TUCO TRADING, LLC" and all of the Company business shall be conducted under that name or such other names that comply with applicable law as the Managers may select from time to time.

1.04    Registered Office; Registered Agent.  The CT Corporation shall be designated as the registered agent of the Company upon whom process against the Company may be served. The post office address within or without the State of Nevada to which The CT Corporation shall mail a copy of any process against the Company served upon such person is 3333 Michelson Street, Suite 620, Irvine, CA 92612, Attn.: Doug Frederick, or at such other location (which need not be a place of business of the Company) as the Managers may designate from time to time.

1.05    Principal Office; Other Offices.  The initial principal office of the Company shall be located at 3333 Michelson Street, Suite 620, Irvine, CA 92612.  The Company may change its principal office or have such other offices as the Managers may designate from time to time.

Exhibit _5_    Page _124_

1.06    Purposes. The purposes of the Company is to engage in Securities Trading, including electronic day-trading of listed and over-the-counter securities. The Company, with the approval of the Managers, may engage in any lawful business that may be conducted by a Nevada limited liability company under the Act. The Company shall have the power to do any and all acts and things necessary, appropriate, advisable or convenient for the furtherance and accomplishment of the purposes of the Company, including, without limitation, to engage in any kind of activity and to enter into and perform obligations of any kind necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company, so long as said activity and obligations may be lawfully engaged in or performed by a limited liability company under the Act.

1.07    No State Law Partnership. The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member shall be a partner or joint venturer of any other Member, for any purposes other than federal, state and local tax purposes, and the provisions of this Agreement shall not be construed otherwise.

## ARTICLE II
## MEMBERS

2.01    Members. The names, addresses and classes of each of the Members are set forth in the Member Schedule.

2.02    Classes of Members.

(a)    The Company shall initially have two (2) classes of Members identified as Class A Members and Class B Members. The Managers may designate additional classes of Members. Each Member shall subscribe to such class or classes as shall be agreed by such Member and the Managers as set forth on a counterpart signature page hereof for each such class of membership. The initial two (2) classes of Members in the Company, as more particularly described below, are comprised of:

Class A                       Owner-Members; and

Class B                       Traders.

(b)    The Class A Members are the voting Members of the Company, each of whom shall contribute such amount of capital as he or she and the Managers shall mutually agree. Each Class A Member shall also be assigned a Designated Trading Account for the conduct of trading operations for the Company, the operations of which will be governed in all respects by the terms of the Class A Addendum. Class A Members shall be allocated Net Income and Net Losses and shall be subject to the terms and conditions of the Class A Addendum. A Class A Member may also hold a separate interest in the Company as a Member of one or more other classes of Members.

(c)    The Class B Members shall contribute such amount of capital as he or she and the Managers shall mutually agree. Except as set forth in Article XIV or as otherwise

2

Exhibit ___5___ · Page _125_

required by the Act, the Class B Members shall have no voting rights or management rights with respect to the operations of the Company. Each Class B Members shall be assigned a Designated Trading Account for the conduct of trading operations for the Company, the operations of which will be governed in all respects by the terms of such Class B Member's Trader Agreement. Profits and losses generated by each Class B Member from trading within such Class B Member's Designated Trading Account shall be allocated in accordance with the percentages set forth in such Class B Member's Trader Agreement and this Agreement. The Managers may remove a Class B Member at any time for any or no reason by giving such Member written notice of removal.

2.03    Scope of Responsibilities. Except as otherwise expressly provided herein, no Member (in his or her capacity as such) shall take part in the management of the business of the Company, transact any business for the Company or have the power or authority to bind the Company to any agreement or document, said powers being vested solely and exclusively with the Managers as set forth herein.

2.04    Authority and Activities of a Member.

(a)    A Member (in his or her capacity as such) shall have only such authority to bind the Company, and shall perform only such duties with respect to the business and activities of the Company, as shall be granted or assigned to the Member by the Managers; *provided, however*, that nothing herein shall be construed to restrict any Member's authority to engage in trading activities on behalf of the Company in accordance with the trading strategies and guidelines established by the Managers. The Member is obligated at all times not to exceed his or her trading limits and any violation thereof shall constitute a breach of this Agreement and shall make such Member personally liable for any losses that accrue as a result of such violation.

(b)    No Member shall have any interest in or rights with respect to the properties or assets of any other Member by virtue of holding an Interest in the Company.

2.05    Trading Activities.

(a)    Subject to such restrictions established by the Managers, a Member may be responsible for a portion of the Company's trading activities. Except as otherwise set forth herein or in any applicable Trader Agreement, and subject to such restrictions established by the Managers, a Member shall have the authority to (i) purchase, hold, sell (including sell short), transfer, exchange, or otherwise acquire and dispose of, and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Securities and (ii) acquire a long or short position with respect to any Security, subject to the approval of the Managers, and to make purchases or sales increasing, decreasing or liquidating such positions or changing from a long position to a short position or vice versa.

(b)    Upon admission to the Company, Class B Members shall be subject to the terms and conditions of the Company's Policies and Procedures Manual (as it may be amended or modified from time to time by the Company, the "*Manual*"), a copy of which has been provided to each Class B Member. Amendments to the Manual shall not be binding upon

3

Exhibit __5__ Page _126_

such Member until delivered to such Member, *provided* that amendments to the Manual may be delivered by any means, including, without limitation, by email. Said Manual sets forth certain rights, obligations, duties, trading restrictions and other provisions related to the Class B Member's trading activity.

(c)    Upon admission to the Company, a Class B Member shall execute a Trader Agreement. Said Trader Agreement sets forth certain rights, obligations, duties, trading restrictions and other provisions related to the Class B Member's trading activity. The terms of the Trader Agreement are incorporated herein by reference.

2.06    Voting Rights. Except as otherwise set forth herein, the Managers shall take all actions and make all decisions without requiring the approval of the Members. All voting rights shall be vested in the Class A Members as provided in this Agreement. Class A Members shall vote upon any actions and decisions requiring the approval of the Members as set forth herein. Except as set forth in Article XIV or as otherwise required by the Act, the Class B Members shall have no voting rights or management rights with respect to the operation of the Company.

2.07    Admission of Additional Members. The Company may, at such times and on such terms and conditions as determined by the Managers in their sole discretion, admit additional Members. No Person shall be admitted as a Member unless such Person executes, acknowledges and delivers such instruments as the Managers deem necessary or advisable to effect the admission of such Person as a Member, including, without limitation, a written acceptance and adoption of this Agreement. The records of the Company shall be amended from time to time to reflect any sale of additional Interests and the admission of any additional Members.

2.08    Limitation of Liability. Except as otherwise required by any non-waivable provision of the Act or other applicable law, or as provided in any guaranty by one or more Members of one or more Company obligations: (a) no Member shall be personally liable for any debt, liability or other obligation of the Company; and (b) no Member shall have any liability to any Person in excess of (i) the amount of its Capital Contributions and (ii) without duplication, its share of any assets and undistributed profits of the Company.

2.09    Indemnification of Company by Members. In the event that the Company is made a party to any claim, dispute or litigation or otherwise incurs any loss or expense as a result of, or in connection with, any Member's obligations or liabilities unrelated to the Company's business, such Member (or assignees cumulatively) will indemnify and reimburse the Company for all losses and expenses incurred in connection therewith, including attorneys' fees.

2.10    Meetings of Class A Members. At any time, and from time to time, the Managers or Class A Members holding among them at least thirty-five percent (35%) of the Interests of all Class A Members may call a meeting of the Class A Members. No meeting is required to be called or held. Written notice of a meeting, stating the place, date and hour of the meeting and the purpose(s) for which the meeting is called, shall be given by the Managers to each Class A Member entitled to vote at such meeting not less than three (3) nor more than thirty (30) days in

4

Exhibit 5     Page 127

advance. The Class A Members holding a Supermajority in Interest entitled to vote, present in person or represented by proxy, shall constitute a quorum at all meetings of the Class A Members. No minutes of the meetings shall be required to be taken, but the Managers may, in their sole and absolute discretion, take minutes of one or more meetings. Unless otherwise provided in this Agreement, any action required or permitted to be taken at a meeting of the Class A Members may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action to be so taken, shall be signed by the Managers and holders of Interests having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Class A Members entitled to vote thereon were present and voted. Prompt notice of the taking of any such action without a meeting by less than unanimous consent shall be given to those Class A Members that have not consented in writing.

2.11 ⁻ Annual Report. Within ninety (90) days following the end of each fiscal year of the Company, the Class A Members shall be provided with an annual report containing financial statements consisting of a balance sheet as of the last day of the preceding fiscal year and a statement of operations for the preceding fiscal year.

## ARTICLE III
## MANAGEMENT; MANAGERS

3.01    General. Except where otherwise required by law, the Articles of Organization or this Agreement, the Company shall be managed and controlled by the Managers.

3.02    Election of Managers. The Managers and/or the number of Managers shall be fixed from time to time by a Supermajority in Interest of the Class A Members, *provided* that in no instance shall there be less than one (1) or more than five (5) Managers. As of the date hereof, there shall be one (1) Manager and such Manager shall initially be Douglas Frederick. Unless a Manager resigns or is removed, each Manager shall hold office until a successor shall have been elected and qualified.

3.03    Authority. The Managers shall, except as otherwise expressly provided by applicable law, the Articles of Organization or this Agreement, have all of the authority permitted to be exercised by Managers under the Act in furtherance thereof. Any decision by the Managers to be made hereunder shall require the unanimous vote of the Managers.

3.04    Indemnification of Managers and Members. Notwithstanding anything provided in Article X herein, the Company, its receiver or its trustee shall indemnify, defend and hold each Member and Manager (and their respective heirs, personal representatives and successors) harmless from and against any expense, loss, damage or liability incurred by or connected with, or any claim, suit, demand, loss, judgment, liability, cost or expense (including reasonable attorneys' fees) arising from or related to, the Company or any act or omission of the Member or Manager on behalf of the Company (exclusive of acts taken as an independent contractor for the Company), including any actions brought by the Members' former employer(s), and amounts paid in settlement of any of the foregoing, *provided* that the same were not the result of fraud, gross negligence, or reckless or intentional misconduct on the part of the Member or Manager against whom a claim is asserted, excepting any claim for breach of an express or implied

Exhibit __5__  Page _128_

covenant made by the Members' former employer. The Company may advance to any Member or Manager (and their respective heirs, personal representatives and successors) the costs of defending any claim, suit or action against such Person if the Person undertakes to repay the funds advanced, with interest, if the Person is not entitled to indemnification under this Section 3.04.

     3.05    Procedures.  Any action to be taken by the Manager may be taken without a meeting of the Managers if all Managers consent thereto in writing. The Managers may adopt such other rules, regulations and procedures for the conduct of their business as the Managers, from time to time, deem appropriate.

     3.06    Compensation of Managers.  Each Manager may be a paid a reasonable administrative fee for its services rendered and to be rendered on behalf of the Company, as approved by a Supermajority in Interest of the Class A Members.

     3.07    Officers.  The Managers may appoint and remove officers of the Company in their sole discretion, which may include a Chief Executive Officer, a Chief Financial Officer, one or more Managing Directors, a Director of Trading, a Secretary and/or one or more Assistant Secretaries, and such other officers as determined from time to time by the Managers. Any number of offices may be held by the same person. The Managers may choose such other officers and agents as they shall deem necessary who shall hold such offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Managers. Each officer shall hold such office until his or her removal or resignation.

     3.08    Conflicts of Interest.  Subject to the other express provisions of this Agreement, each Member or Manager of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any Member or Manager the right to participate therein. The Company may transact business with any Member or Manager or a party related thereto.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS

     4.01    Initial Capital Contributions of Members.  Each Member shall contribute to the capital of the Company cash in an amount determined by the Managers. Such funds shall be used for the business of the Company and subject to all of the risks of the Company. The names, addresses, classes of Interests and Capital Contributions of the Members shall be set forth on the Member Schedule.

     4.02    Admission of Additional Members.  Except as otherwise provided in this Agreement (including the Class A Addendum), the Managers may admit to the Company one or more additional Class A Members or Class B Members ("*Additional Members*") in their sole discretion. Each Additional Member shall, simultaneously with his or her admission to the Company, contribute to the capital of the Company cash in an amount determined by the Managers. The admission of any Additional Member to the Company shall be effected by the execution by the Additional Member of a counterpart of this Agreement and such other

6

Exhibit _5_    Page _129_

documents as the Managers may require. The consent or agreement of the other Members to such admission shall not be required. All references in this Agreement to "Members" shall be deemed to include Additional Members, unless the context of the reference limits such reference to the original Members.

4.03.  Additional Capital Contributions.  No Member shall be required to make an additional Capital Contribution to the Company. If a Member desires to make an additional Capital Contribution to the Company, such Member shall provide notice thereof to the Managers indicating the amount of the desired additional Capital Contribution. The Managers shall have the right, on behalf of the Company, to accept or decline to accept any such additional Capital Contribution, in whole or in part.

4.04  Loans.  Upon request made by the Managers, Members may loan money to the Company, upon such terms and conditions as the Member and the Managers may agree.

4.05  Company Assets.  All Company assets will be in the name of the Company, and no Member shall have any rights in any Company assets.

4.06  Other Matters.  Under circumstances requiring a return of any Capital Contributions, no Member shall have the right to receive property other than cash except as may be specifically provided herein. No Member shall receive any interest, salary or drawing with respect to his or her Capital Contributions or his or her Capital Account or for services rendered on behalf of the Company or otherwise in his or her capacity as a Member except as otherwise provided in this Agreement. No Member shall, either directly or indirectly, take any action to require partition or appraisal of the Company or of any of its assets or properties or cause the sale of any of the Company's property, and notwithstanding any provisions of applicable law to the contrary, each Member (and his or her legal representatives, successors and assigns) hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to his or her Interest, or with respect to any assets or property of the Company, except as otherwise expressly provided in this Agreement.

### ARTICLE V
### CAPITAL ACCOUNTS; DESIGNATED TRADING ACCOUNTS; ALLOCATIONS; AND DISTRIBUTIONS

5.01.  Capital Accounts.  A separate Capital Account shall be established and maintained for each Member on the books of the Company, which account shall set forth the initial Capital Contribution of such Member and shall be adjusted according to this Agreement.

(a)  To each such account there shall be credited:

(1)  the amount of all additional Capital Contributions made by such Member to the Company pursuant to Section 4.03 above;

(2)  the fair market value of any property other than money contributed to the Company by such Member net of the liabilities securing such contributed property that the Company is considered to

7

Exhibit 5  Page 130

assume or take subject to pursuant to Section 752 of the Code;

(3)    the amount of Net Trading Profits from the Designated Trading Account credited to the Member pursuant to Section 5.05 below; and

(4)    the amount of Net Income credited to the Member, if any, pursuant to Section 5.06 below; and

(b)    From each such account there shall be debited:

(1)    the amount of money distributed to the Member by the Company;

(2)    the fair market value of all property distributed to such Member by the Company net of the liabilities securing such distributed property that such Member is considered to assume or take subject to pursuant to Section 752 of the Code;

(3)    the amount of Net Trading Losses from the Designated Trading Account credited to the Member pursuant to Section 5.05 below; and

(4)    the amount of Net Losses credited to the Member, if any, pursuant to Section 5.06 below.

(c)    In addition to the foregoing adjustments, each Member's Adjusted Capital Account shall be maintained consistently with and reflect all adjustments described in Regulations Section 1.704-1(b)(2)(iv).

(d)    If ownership of any Interest in the Company is assigned in accordance with the terms of this Agreement, the assignee shall succeed to the Capital Account of the assignor to the extent it relates to the assigned Interest.

(e)    In determining the amount of any liability for purposes of subsections 5.01(a) and (b) above, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Regulations.

(f)    To each Member's Capital Account there shall be debited or credited, as the case may be, adjustments which are necessary to reflect a revaluation of Company assets to reflect the Gross Asset Value of all Company assets, as required by Regulations Section 1.704-1(b)(2)(iv)(f) and the terms hereof.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 704 of the Code and Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such provisions. The Company shall make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet as computed for book purposes in accordance

8

with Section 1.704-1(b)(2)(iv)(q) of the Regulations.

5.02    Designated Trading Accounts.  Each Class A Member and Class B Member who trades is authorized to make securities trades on behalf of the Company in accordance with Company rules, procedures and limitations established by the Managers.  One or more separate sub-account(s) of the Company's proprietary trading account (each of which, a "*Designated Trading Account*") shall be established and maintained for each trading Member with the clearing broker of the Company, which sub-account(s) shall be the only accounts through which such Member may trade.

5.03    Interest, Clearing and Administrative Charges.  Except as otherwise provided in this Agreement (including the Class A Addendum), each Designated Trading Account shall be reduced (debited) (a) by charges for the execution and clearing of each trade made by the applicable Member, (b) by charges for interest expenses for each position held in the Designated Trading Account and (c) for administrative expenses relating to such Member's trading activities.  Such clearing, interest and administrative charges shall be in such amounts and at such rates as the Managers may determine, which charges and rates may change from time to time in the sole discretion of the Managers effective upon written notice to the Members.

5.04    Trading Profits and Losses of Class B Members.  Except as otherwise provided in this Agreement, as of the end of each business day, the trading profits or losses of each Class B Member shall be determined based upon the net realized increase or net realized decrease in the Designated Trading Account resulting from such Class B Member's trading activity during the day (after all clearing and interest charges).  A daily profit or loss statement for such Class B Member's Designated Trading Account shall be prepared for each Class B Member.  This profit and loss statement will reflect the prior day's trading activity.

5.05    Allocations of Profits and Losses from the Designated Trading Accounts of Class B Members.

(a)    For each Class B Member, as of the end of each business day, the Capital Account of such Class B Member shall be adjusted by allocating an amount equal to the cumulative increase, if any, in the balance of such Class B Member's Designated Trading Account(s) from all trading gains and all trading losses, commissions, expenses and other charges made from time to time by the Company in respect of the operations of such Designated Trading Account(s) ("*Net Trading Profits*") multiplied by the percentage set forth adjacent to "Payout Percentage" on Schedule A to such Class B Member's Trader Agreement. Any amount of such Net Trading Profits that is not allocated to the Class B Member pursuant to the preceding sentence shall be allocated to the Capital Accounts of the Class A Members as set forth in the Class A Addendum (and the Designated Trading Account(s) of such Class B Member shall be accordingly reduced for the amount of Net Trading Profits allocated to the Capital Accounts of the Class A Members).

(b)    For each Class B Member, as of the end of each business day, the Capital Account of such Class B Member shall be adjusted by allocating 100% of the cumulative decrease, if any, in the balance of such Class B Member's Designated Trading Account(s) from all trading gains and all trading losses, commissions, expenses and other charges made from

9

Exhibit  5  Page 132

time to time by the Company in respect of the operations of such Designated Trading Account(s) ("*Net Trading Losses*") until the Capital Account of the Class B Member is reduced to zero, then any losses, which would reduce such Class B Member's Capital Account below zero, shall be allocated 100% to the Capital Accounts of the Class A Members as set forth in the Class A Addendum.

    5.06    <u>Allocation of Net Income and Net Loss</u>.

        (a)    "*Net Income*" or "*Net Loss*" is the Company's annual taxable income or loss, respectively, from Member investments and trading, execution, clearing charges, interest charges, administrative fees and such other sources of income as may arise, determined annually or for such other period as determined by the Managers, in each case after all expenses have been paid.  Subject to Section 5.06(b) below, the Net Income or Net Loss of the Company shall be allocated 100% to the Class A Members in accordance with their respective ownership percentages as set forth in the Class A Addendum.

        (b)    The Managers may allocate a portion of the Net Income or Net Loss of the Company to the Capital Accounts of one or more Class B Members based on the trading results of such Class B Member(s) in their sole and absolute discretion; *provided, however*, that Net Losses shall only be allocated to a Class B Member to the extent of any Net Income previously allocated to such Class B Member pursuant to this Section 5.06(b).

    5.07    <u>Tax Allocations</u>.  All items of income, gain, loss and deduction shall be allocated among the Members for federal income tax purposes in accordance with the allocations of profits or losses from the Designated Trading Accounts to the extent they relate thereto, and to the extent they are unrelated to profits or losses from the Designated Trading Accounts, such items shall be allocated among the Members in accordance with the allocation of Net Income or Net Loss (and items thereof) as provided for in this Agreement.

    5.08    <u>Distributions</u>.

        (a)    <u>Tax Distributions</u>.  To the full extent of available funds and subject to the provisions of the Act, the Company shall, on or before March 31 of each year, make a distribution to the Members in accordance with their Interests that, in the judgment of the Managers, reasonably approximates the personal federal, state and local tax liability of the Members resulting from their respective allocations of Net Income.

        (b)    <u>Distributions of Realized Net Trading Profits to Class B Members</u>.  Distributions of realized Net Trading Profits, if any, shall be made as mutually agreed upon by the Company and each Class B Member and shall be paid on or about the **[first]** and **[fifteenth]** days of the month.  The Company reserves the right to permit distributions to Class B Members under this Section 5.08(b) on a more frequent basis in its sole discretion.

        (c)    <u>Distributions of Net Income</u>.

            (1)    At the end of each quarter, the Managers shall determine the amount of Net Income which shall be distributed to the Class A Members and the amounts

Exhibit ___5___ Page /33

which are to be retained by the Company. Notwithstanding the foregoing, the Managers in their sole and absolute discretion may make additional distributions of Net Income at any time.

(2)    In determining the Net Income or Net Losses of the Company for any accounting period, the following deductions or reserves shall first be charged as part of the expense of doing business: (i) expenses, maintenance and overhead charges of the operations of the Company's business, including start-up expenses relating to the formation of the Company and compensation to the Managers; and (ii) such reserves for accrued or contingent liabilities as the Managers deem reasonably necessary.

(3)    Class A Members shall be fully reimbursed for any out-of-pocket expenditures made in connection with the formation of the Company, including legal, accounting and other fees and costs.

(d)    <u>Distributions Upon Dissolution of the Company</u>. Upon the dissolution of the Company, the Company's assets will be distributed in accordance with Article VIII below.

5.09    <u>Offset</u>. The Company may offset all amounts owing to it by a Member against any amounts that would otherwise have been distributable to such Member hereunder.

5.10    <u>Interest</u>. Members are not entitled to the payment of interest on their Capital Accounts.

## ARTICLE VI
## TRANSFER AND DISASSOCIATION

6.01    <u>Transfer</u>.

(a)    The Class A Members shall be subject to the restrictions on transfer set forth in the Class A Addendum.

(b)    No Class B Member may sell, assign, pledge, encumber, exchange or otherwise transfer (each, a "*Transfer*") their Interests in the Company or any rights as a Class B Member thereof without the prior written consent of the Managers. Notwithstanding the foregoing, each Class B Member may, without the written consent of the Managers, Transfer his or her Interest in the Company to a family trust or other entity which is set up for estate planning purposes, and which is for the benefit of such Class B Member's immediate family members, and of which such Class B Member is the sole trustee or equivalent officer.

(c)    In all cases a Transfer of an Interest hereunder must comply with all applicable Federal and state securities laws.

6.02    <u>Disassociation</u>. Except as otherwise set forth in this Agreement (including the Class A Addendum), a Person shall cease to be a Member hereunder upon the occurrence of any of the following events:

(a)    the voluntary withdrawal of a Member, *provided* that no Member may withdraw from the Company after the Company has announced its intent to liquidate, except

11

Exhibit __5__ Page __134__

with the consent of the Managers (which consent may be given or withheld in their sole discretion);

(b)     the decision by the Managers to remove a Class B Member;

(c)     a Member (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition of bankruptcy, (iii) is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding, (iv) seeks, consents to or acquiesces in the appointment of a trustee for, receiver for or liquidation of the Member or of all or any substantial part of the Member's properties or (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in subsections (i) through (iv) above;

- (d)     in the case of a Member who is a natural person, the death of the Member or an adjudication by a court of competent jurisdiction that such Member is incompetent to manage his or her person or property;

(e)     in the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not the mere substitution of a new trustee thereof); or

(f)     in the case of a Member that is an entity, the dissolution and commencement of winding up of such entity or the filing of a certificate of dissolution for such entity (or similar document) or the revocation of such entity's charter (or other similar document) by the state in which such entity was incorporated or formed.

6.03     Rights Upon Disassociation.  Upon the occurrence of any of the events specified in Section 6.02 above, the Company shall distribute to such disassociating Member (or such other person as required by law), the amount of such Member's Capital Account (as determined by the Managers or any person designated by the Managers in accordance with generally accepted accounting principles) as set forth below.

(a)     The disassociation of a Class A Member shall be subject to the terms of the Class A Addendum.

(b)     Upon disassociation of a Class B Member, the Company shall review such Class B Member's Designated Trading Account and make any necessary adjustments to the Capital Account of such Class B Member to give effect to any Net Trading Profits or Net Trading Losses that have not otherwise been allocated to such Class B Member's Capital Account.  Subject to any retention pursuant to Section 6.03(c) below, the Company shall pay to the Class B Member (i) within forty five (45) calendar days of disassociation an amount equal to 50% of the Class B Member's positive Capital Account balance, if any, and (ii) within one hundered and eighty (180) calendar days of disassociation an amount equal to 50% of the Class B Member's positive Capital Account balance, if any.

(c)     Notwithstanding the foregoing, the Managers may retain from the distribution contemplated by this Section 6.03 an amount deemed sufficient by the Managers to

12

Exhibit ___5___  Page__135__

satisfy any liability or contingent liability pertaining to the disassociating Member. The retained amount or any remaining portion thereof will be released to the disassociating Member upon the resolution of the liability or contingent liability or after a reasonable time (as determined in the sole discretion of the Managers) during which the contingent liability does not occur. By executing this Agreement, each Member specifically consents to the provisions of this Section 6.03(c).

6.04    Tax Considerations.  Any capital gains, income, transfer, gift or other taxes imposed upon any transferor or transferee as a result of any conveyance of any interest in the Company shall be exclusively the responsibility of the person upon whom such tax is imposed. The Company shall have no responsibility therefor whatsoever. In the event that any tax, expense (including legal and accounting fees) or cost is incurred by or imposed upon the Company as a result of any conveyance of an interest in the Company, except as a result of the Company's issuing or purchasing any interest in the Company, the Member conveying such interest shall indemnify, or cause the transferee to indemnify, the Company for such tax and the reasonable and necessary expenses or costs incurred by the Company in connection therewith.

## ARTICLE VII
## MERGERS AND CONSOLIDATION

7.01    The Company may enter into a merger or consolidation, in accordance with the Act, pursuant to an agreement of merger or consolidation (the "*Merger Agreement*") that has been adopted by the Company under the procedures set forth in Section 7.02 below.

7.02    The Company may adopt a Merger Agreement only if:

(a)    the Merger Agreement is approved by the Managers;

(b)    after approval of the Managers, the Merger Agreement is approved by a Supermajority in Interest of the Class A Members, who shall be the only members entitled to vote thereon.

## ARTICLE VIII
## LIQUIDATION

8.01    Upon dissolution of the Company, the assets of the Company shall be liquidated by one of the Managers (or a liquidating trustee appointed by the Managers, which may be a Member) as promptly as possible, but in an orderly and businesslike manner so as not to involve undue sacrifice, and the proceeds thereof will be applied and distributed in the following priority, unless otherwise required by applicable law:

(a)    to pay all creditors of the Company (other than Members), in the order of priority provided by law;

(b)    to pay all creditors of the Company that are Members; and

(c)    after the payment of all debts, liabilities and obligations of the Company,

13

Exhibit ___5___ Page_136_

to increase the Members' capital accounts in accordance with this Agreement and to distribute to the Members their respective positive capital accounts' balances, if any, after giving effect to all contributions, distributions and allocations for all periods, including the period during which such liquidation occurs. Any property distributed in kind in the liquidation shall be valued at fair market value.

8.02    Distributions to Members pursuant to this Article VIII shall be made by the end of the taxable year of the liquidation, or, if later, ninety (90) days after the date of such liquidation in accordance with Regulations Section 1.704-1(b)(2)(ii)(b).

8.03    The Managers may withhold from distributions under this Article VIII, such reserves which are required by applicable law and such other reserves for subsequent computation adjustments and for contingencies, including contingent liabilities relating to pending or anticipated litigation or to examinations by the Internal Revenue Service. Any amount held as a reserve shall reduce the amount payable under this Article VIII. The unused portion of any reserve shall be distributed pursuant to this Article VIII after the Managers shall have determined that the need therefore shall have ceased.

8.04    If a Member has a deficit balance in his or her Capital Account after giving effect to all contributions, distributions and allocations for all taxable years, including the year in which the liquidation occurs, such deficit shall not be considered a debt owed by such Member to the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

8.05    Within one hundred eighty (180) days after the completion of final distributions, the Manager (or liquidating trustee) shall cause to be prepared by a firm of certified public accountants a statement setting forth the assets and liabilities of the Company as at the date of dissolution, which statement shall be furnished to all of the Members.

8.06    The liquidating trustee, if engaged, shall be entitled to receive reasonable compensation.

## ARTICLE IX
## DURATION

Unless the Company shall have been sooner dissolved in accordance with the provisions of the Act, the Company shall dissolve on the earlier of:

(a)    the one hundred eightieth (180th) day following the bankruptcy, death, dissolution, expulsion, incapacity or withdrawal of any Class A Member, unless at least 67% of the capital interests and 67% of the interests in profits of the surviving Class A Members are sooner voted in favor of the continuation of the Company; or

(b)    at any time upon the unanimous written consent of all of the Class A Members.

14

Exhibit ___5___    Page _137_

## ARTICLE X
## INDEMNIFICATION

Every person (and the heirs, executors and administrators of such person) who is or was a Member, Manager, officer, employee or agent of the Company or of any other company (including another company, partnership, joint venture, trust or other enterprise) which such person serves or served as such at the request of the Company, shall be indemnified by the Company against all judgments, payments in settlement (whether or not approved by court), fines, penalties and other reasonable costs and expenses (including fees and disbursements of counsel) imposed upon or incurred by such person in connection with or resulting from any action, suit, proceeding, investigation or claim, whether civil, criminal, administrative, legislative or other (including any criminal action, suit or proceeding in which such person enters a plea of guilty or nolo contendere or its equivalent), or any appeal relating thereto which is brought or threatened by any other person, governmental authority or instrumentality (herein called a "***third-party action***") and in which such person is made a party or is otherwise involved by reason of his being or having been such Member, Manager, officer, employee or agent or by reason of any action or omission, or alleged action or omission, by such person in his capacity as such Member, Manager, officer, employee or agent if either (a) such person is wholly successful, on the merits or otherwise, in defending such third-party action or (b) in the judgment of a court of competent jurisdiction or, in the absence of such determination, in the judgment of the Managers of the Company, such person acted in good faith and in what he or she reasonably believed to be the best interest of the Company or such other company and, in addition, in any criminal action, he or she had no reasonable cause to believe that his or her conduct was unlawful. In case such person is successful, on the merits or otherwise, in defending part of such action, or, in the judgment of such a court or the Managers, has met the applicable standard of conduct specified in the preceding sentence with respect to part of such action, he or she shall be indemnified by the Company against the judgments, settlement payments, fines, penalties and other costs and expenses attributable to such part of such action.

The foregoing rights of indemnification shall be in addition to any rights to which any such Member, Manager, officer, employee or agent may otherwise be entitled.

In any case in which, in the judgment of the Managers, any such Member, Manager, officer or employee will be entitled to indemnification under the foregoing provisions of this Article X, such amounts as they deem necessary to cover the reasonable costs and expenses incurred by such person in connection with the action, suit, proceeding, investigation or claim prior to final disposition thereof shall be advanced to such person upon receipt of an undertaking by or on behalf of such person to repay such amounts if it is ultimately determined that he or she is not so entitled to indemnification.

## ARTICLE XI
## ARBITRATION

The parties acknowledge that the expeditious and equitable settlement of disputes arising under this Agreement is to their mutual advantage. To that end, the parties agree to use their best efforts to resolve all differences of opinion and to settle all disputes through joint cooperation and consultation. Any dispute, alleged breach, interpretation, challenge or disagreement

15

Exhibit _____5_____ Page _138_

whatsoever arising out of this Agreement (or any other agreement to the extent incorporated herein by reference) that the parties are unable to settle within sixty (60) days, as set forth in the preceding sentence, shall be resolved by final and binding arbitration before a single arbitrator selected and serving under the Commercial Arbitration Rules of the American Arbitration Association. The arbitration shall be held in Orange County, California or such other location as is mutually agreed upon by the parties to such arbitration. Such arbitration shall be the exclusive remedy hereunder. The decision of the arbitrator may, but need not, be entered as a judgment in accordance with the provisions of the laws of the State of California. If this arbitration provision is for any reason held to be invalid or otherwise inapplicable to any dispute, the parties hereto agree that any action or proceeding brought with respect to any dispute arising under this Agreement, or to interpret or clarify any rights or obligations arising hereunder, shall be maintained solely and exclusively in the courts of the State of California.

## ARTICLE XII
## BOOKS AND RECORDS; ACCOUNTING AND TAX ELECTIONS

12.01  Maintenance of Records. The Company shall maintain true and correct books and records, in which shall be entered all transactions of the Company, and shall maintain all other records necessary, convenient or incidental to recording the Company's business and affairs, which shall be sufficient to record the allocation of Net Income and Net Losses and distributions as provided for herein. All decisions as to accounting principles, accounting methods and other accounting matters shall be made by the Managers. Each Class A Member or its authorized representative may examine any of the books and records of the Company during normal business hours upon reasonable notice for a proper purpose reasonably related to the Member's Interest in the Company. The Class B Members shall not be entitled to review the books and records of the Company but shall be entitled to receive upon request (i) information with respect to such Class B Member's Designated Trading Account and (ii) information concerning such Member as set forth in the Member Schedule (as the same may be revised from time to time), including with respect to the value of such Member's Capital Account and the Capital Contributions made by such Member.

12.02  Reports to Class A Members. As soon as practicable after the end of each Fiscal Year, the Company (i) shall cause to be prepared and sent to each Class A Member a balance sheet and a statement of income for the Company which may, but need not, be audited by a certified public accountant, and (ii) shall cause to be prepared and sent to each Member a report setting forth in sufficient detail all such information and data with respect to the Company for such Fiscal Year as shall enable each Member to prepare his or its income tax returns in accordance with the laws, rules and regulations then prevailing. The Company shall also cause to be prepared and filed all tax returns required of the Company. All balance sheets, statements, reports and tax returns required pursuant to this Section 12.02 shall be prepared at the expense of the Company.

12.03  Tax Elections; Determinations Not Provided for in the Agreement. The Managers shall be empowered to make or revoke any elections now or hereafter required or permitted to be made by the Code or any state or local tax law, and to decide in a fair and equitable manner any accounting procedures and other matters arising with respect to the Company or under this Agreement which are not expressly provided for in this Agreement. Notwithstanding the

16

Exhibit 5 Page 139

foregoing, neither the Company nor any Member shall make an election for the Company to be excluded from taxation as a partnership under the Code or any state or local law, and no provision of this Agreement (including Section 1.06) shall be construed to sanction or approve any such election.

## ARTICLE XIII
## GENERAL PROVISIONS

13.01   Miscellaneous.

(a)   Article, section and subsection headings are not to be considered part of this Agreement, are included solely for convenience of reference and are not intended to be full or accurate descriptions of the contents thereof.

(b)   Use of the terms "herein," "hereunder," "hereof," and like terms shall be deemed to refer to this entire Agreement and not merely to the particular provision in which the term is contained, unless the context clearly indicates otherwise.

(c)   Use of the word "including" or a like term shall be construed to mean "including but not limited to."

(d)   Exhibits and schedules to this Agreement are an integral part of this Agreement.

(e)   Words importing a particular gender shall include every other gender and words importing the singular shall include the plural and vice-versa, unless the context clearly indicates otherwise.

(f)   Any reference to a provision of the Code, Regulations or the Act shall be construed to be a reference to any successor provision thereof.

13.02   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada, excluding any conflict-of-laws rule or principle that might refer the governance, construction or interpretation of this Agreement to the laws of another State.

13.03   Binding Agreement.  This Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, executors, administrators, personal representatives and successors.

13.04   Severability.  Each term and provision of this Agreement is intended to be severable.  If any term or provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable for any reason whatsoever that term or provision shall be ineffectual and void and the validity of the remainder of this Agreement shall not be adversely affected thereby.

13.05   Entire Agreement.  This Agreement (including the exhibits hereto) supersedes any and all other understandings and agreements, either oral or in writing, between the Members with

17

Exhibit ___5___  Page ___140___

respect to the Interests and constitutes the sole and only agreement between the Members with respect to the Interests.

13.06  Further Action.  Each Member shall execute and deliver all papers, documents and instruments and perform all acts that are reasonably necessary or appropriate to implement the terms of this Agreement and the intent of the Members.

13.07  Notices.  Except as expressly provided in this Agreement, all notices, consents, waivers, requests or other instruments or communications given pursuant to this Agreement shall be in writing, signed by the party giving the same, and shall be delivered by hand or sent by registered or certified United States mail, return receipt requested, postage prepaid, or by a recognized overnight delivery service, addressed, in the case of the Company, to the Company at its principal place of business, and to any of the Members at the address set forth in the Member Schedule.  Any Member may, by notice to the Company and each other Member, specify any other address for the receipt of such notices, instruments or communications.  Except as expressly provided in this Agreement, any notice, instrument or other communication shall be deemed properly given only when received, or upon refusal of receipt, by the person to whom it is sent.

## ARTICLE XIV
## AMENDMENTS

This Agreement may be amended only by the affirmative vote of a Supermajority in Interest of the Class A Members (or such higher percentage as may be required for such amendment pursuant to the Act); *provided*, *however*, that the adoption of any matter which materially and adversely affects in a disproportionate manner the rights, obligations or economic interests of the Class B Members, taken as a whole, shall require the approval of the holders of a Supermajority in Interest of the Class B Members voting in person or by proxy.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit ___5___ Page _141_

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**MANAGER:**

_____

DOUGLAS FREDERICK

19

Exhibit ___5___ Page___142___

## COUNTERPART SIGNATURE PAGE TO
## OPERATING AGREEMENT OF TUCO TRADING, LLC

By execution of this counterpart signature page, the undersigned does hereby become a Member of TUCO TRADING, LLC, a Nevada limited liability company (the "Company"), pursuant to the Operating Agreement of TUCO TRADING, LLC, adopted as of August 14, 2006 (the "Agreement"). The undersigned hereby agrees to be bound by all of the terms and conditions of the Agreement and authorizes the Managers to attach this counterpart signature page to the Agreement and, when so attached with the signature pages of all of the Members, such Agreement will constitute one and the same document as if all signatories had originally signed thereon.

**MEMBER:**

_____
[Print Name of Class B Member/Trader]


_____
[Initial Capital Contribution]


_____
[Signature]


_____
[Print Name]


_____

_____
[Address]


_____
[Federal Taxpayer Identification Number]


COUNTERPART SIGNATURE PAGE

Exhibit ___5___ Page __143__

## ANNEX A

## DEFINITIONS

*Unless otherwise identified, references contained in this Appendix to "Sections" are references to the Sections of the Operating Agreement of TUCO TRADING, LLC, of which this Annex is a part.*

"*Act*" means the Nevada Limited Liability Company Act and any successor statute, as amended from time to time.

"*Additional Members*" is defined in Section 4.02.

"*Adjusted Capital Account*" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant accounting period, after giving effect to the following adjustments:

   (1)    credit to such Capital Account any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the next to the last sentences of Section 1.704-2(g)(1) and Section 1.704-2(i)(5) of the Regulations; and

   (2)    debit to such Capital Account the items described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) and Section 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

"*Agreement*" means this Operating Agreement, the Class A Addendum executed by the Company and by each Class A Member and any schedules or exhibits hereto or thereto, all as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Operating Agreement as a whole, unless the context otherwise requires.

"*Articles of Organization*" is defined in Section 1.02.

"*Capital Account*" means an account established for each Member on the books of the Company (i) as of the date of formation of the Company or (ii) on such later date on which such Member is admitted to the Company, in each case as increased or decreased as provided in this Agreement.

"*Capital Contribution*" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property other than money contributed to the Company by that Member.

"*Class A Addendum*" means the Class A Addendum entered into by the Company and the Class A Members. The Class A Addendum sets forth certain additional terms governing the rights and responsibilities of the Class A Members. Class B Members shall not have the right to review or otherwise gain access to the Class A Addendum or any of the terms thereof.

Exhibit __5__    Page __144__

"*Class A Members*" means those Members admitted to the Company as Class A Members, as shown from time to time on the Member Schedule.

"*Class B Members*" means those Members admitted to the Company as Class B Members, as shown from time to time on the Member Schedule.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time.

"*Company*" is defined in the preamble.

"*Designated Trading Account*" is defined in Section 5.02.

"*Interest*" means an ownership interest in the Company and, if applicable, voting rights, and any and all benefits to which the holder of such interest may be entitled as provided in this Agreement, together with all obligations of such holder to comply with the terms and provisions of this Agreement.

"*Managers*" means the Person or Persons designated as a Manager by the Members pursuant to the terms of this Agreement.

"*Manual*" is defined in Section 2.05(b).

"*Members*" means the Class A Members and the Class B Members as shown from time to time on the Member Schedule.

"*Member Schedule*" means a schedule to be maintained by the Managers (and updated from time to time as provided herein) showing the names and addresses, Capital Contributions and Interests owned by the Members. The Member Schedule may include any additional information deemed appropriate by the Managers. No Member shall have the right to review the Member Schedule without the consent of the Managers, which consent the Managers may withhold or grant in their sole, absolute and unfettered discretion. However, each Member shall have the right to obtain from the Managers the information concerning such Member as set forth in the Member Schedule, as the same may be revised from time to time.

"*Merger Agreement*" is defined in Section 7.01.

"*Net Income*" and "*Net Loss*" are defined in Section 5.06.

"*Net Trading Losses*" is defined in Section 5.05(b).

"*Net Trading Profits*" is defined in Section 5.05(a).

"*Person*" means an individual, corporation, association, partnership, joint venture, limited liability company, estate, trust or any other legal entity.

"*Regulations*" means the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time.

Exhibit _5_ Page _145_

"*Securities*" has the meaning given to such term in Section 3 of the Securities Exchange Act of 1934, as amended.

"*Securities Trading*" means the trading, buying, selling, selling short, spreading or otherwise acquiring, holding or disposing of Securities.

"*Supermajority in Interest*" means Members entitled to vote (or any specified subset thereof) holding, in the aggregate, at least 66 2/3% of the Interests entitled to vote held by all Members entitled to vote (or by such specified subset).

"*Trader Agreement*" means, with respect to each Class B Member, the Trader Agreement entered into by the Company and such Class B Member with respect to the trading operations of such Class B Member.

"*Transfer*" is defined in Section 6.01(b).

A-3

Exhibit _____5_____ Page _146_



# Incidental Fees List

| Optional Fees: | Cost | Initial to Select Service |
|---|---|---|
| NYSE Open Book | $60 Monthly | _____ |
| Sterling Trading Platform | $240 Monthly | _____ |
| Trade The News Reader | $150 Monthly | _____ |
| ArcaBook / Quotes | $10 Monthly | _____ |

**Trading Fees**

| | |
|---|---|
| HydraTrade Data Fees | $16 Monthly |
| SEC Fees | $15.30/Million Dollars Net Value Sold |
| NASD/TAF Fees | $0.000075/share   Maximum $3.75 per order |
| Essex Slips | $0.04/share |

**Distribution Fees**

| | |
|---|---|
| Check Mailed First Class | Free |
| Check FedEx Overnight | $30 |
| Wire Fee | $30 |
| International Wire Fee | $50 |

I have read and understand all fees illustrated on this page

Signed _____     Date _____

Printed Name _____

Exhibit ___5___ Page ___147___



# TUCO
## ECN Rate Schedule

### LISTED ORDER TYPES

| GATEWAY | NASDAQ |  |  | NASDAQ < $1 |  |  | NYSE |  |  | AMEX |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Adding Liquidity | Remove Liquidity | Routed Out | Adding Liquidity | Remove Liquidity | Routed Out | Adding Liquidity | Remove Liquidity | Routed / Specialist | Adding Liquidity | Remove Liquidity | Routed / Specialist |
| ARCA | -0.002 | 0.003 | 0.004 | -0.002 | 0.003 | 0.004 | -0.002 | 0.003 | 0.001 | -0.002 | 0.003 | 0.004 |
| INET/BRUT | -0.002 | 0.003 | 0.003 | 0 | 10 Basis | 0.0003 | -0.0005 | 0.0007 | 0.0007 | -0.0005 | 0.0007 | 0.0007 |
| BATS | -0.0014 | 0.0015 | 0.003 | 0 | 0 | 0 |  |  |  |  |  |  |
| EDGA | -0.0026 | 0.003 | 0.0025 | -0.0026 | 0.003 | 0.0025 |  |  |  |  |  |  |
| EDGX | -0.0025 | 0.0028 | 0.0026 | 0 | 0.001 | 0.0025 | -0.0024 | 0.0028 |  | -0.0024 | 0.0028 | 0.0028 |
| TRAC/INT | -0.0025 | 0.0026 | 0.0026 | -0.0023 | 0.0025 | 0.0026 |  |  |  |  |  |  |
| TRAC/EXT | -0.0027 | 0.003 | 0.003 | -0.0027 | 0.003 | 0.003 |  |  |  |  |  |  |
| DATA | -0.0029 | 0.003 | 0.003 |  |  |  |  |  |  |  |  |  |
| NITE | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.0002 | 0.0002 | 0.0007 | 0.0002 | 0.0002 | 0.0007 |
| INETDOT |  |  |  |  |  |  | 0.0007 | 0.0007 | 0.0007 | -0.0005 | -0.0005 | 0.0007 |
| NYFIX |  |  |  |  |  |  |  |  |  |  |  |  |
| MILL | 0.0015 |  |  |  |  |  | 0.0015 | 0.0015 | 0.0007 | 0.0015 | 0.0015 | 0.0007 |
| ESSEX | 0.037 |  |  |  |  |  | 0.037 | 0.037 | 0.0007 | 0.037 | 0.037 | 0.0007 |

### ETF's ORDER TYPES

| GATEWAY | NYSE |  |  | AMEX |  |  |
|---|---|---|---|---|---|---|
|  | Adding Liquidity | Remove Liquidity | Routed / Specialist | Adding Liquidity | Remove Liquidity | Routed / Specialist |
| ARCA | -0.002 | 0.003 | 0.004 | -0.002 | 0.003 | 0.004 |
| INET/BRUT | -0.002 | 0.003 | 0.003 | -0.002 | 0.003 | 0.003 |
| BATS |  |  |  |  |  |  |
| EDGA |  |  |  |  |  |  |
| EDGX | -0.0025 | 0.0028 | 0.0025 | -0.0025 | 0.0028 | 0.0025 |
| TRAC/INT |  |  |  |  |  |  |
| TRAC/EXT |  |  |  |  |  |  |
| DATA |  |  |  |  |  |  |
| NITE | 0.0002 | 0.0002 | 0.003 | 0.0002 | 0.0002 | 0.003 |
| INETDOT |  |  | 0.003 |  |  | 0.003 |
| NYFIX |  |  | 0.0007 |  |  | 0.0007 |
| MILL | 0.0015 | 0.0015 |  | 0.0015 | 0.0015 |  |
| ESSEX | 0.037 | 0.037 |  | 0.037 | 0.037 |  |

Exhibit ___5___   Page 148

EXHIBIT B

## AGREEMENT FOR

## MARKET DATA DISPLAY SERVICES

### (Usage-Based Services/Nonprofessional Subscriber Status)

### (Printed Version)

_____[NAME OF VENDOR/BROKER DEALER] ("Vendor")
agrees to make "Market Data" available to you pursuant to the terms and conditions set forth in
this agreement. By executing this Agreement in the space indicated below, you ("Subscriber")
agree to comply with those terms and conditions. Section 1 sets forth terms and conditions of
general applicability. Section 2 applies insofar as Subscriber receives and uses Market Data made
available pursuant to this Agreement as a Nonprofessional Subscriber.

### SECTION 1: TERMS AND CONDITIONS OF GENERAL APPLICABILITY

**1.    MARKET DATA DEFINITION** – For all purposes of this Agreement, "Market
Data" means (a) last sale information and quotation information relating to securities that are
admitted to dealings on the New York Stock Exchange ("NYSE"), (b) such bond and other equity
last sale and quotation information, and such index and other market information, as United
States-registered national securities exchanges and national securities associations (each, an
"Authorizing SRO") may make available and as the NYSE may from time to time designate as
"Market Data"; and (c) all information that derives from any such information.

**2.    PROPRIETARY NATURE OF DATA** – Subscriber understands and
acknowledges that each Authorizing SRO and Other Data Disseminator has a proprietary interest
in the Market Data that originates on or derives from it or its market(s).

**3.    ENFORCEMENT** – Subscriber understands and acknowledges that (a) the
Authorizing SROs are third-party beneficiaries under this Agreement and (b) the Authorizing
SROs or their authorized representative(s) may enforce this Agreement, by legal proceedings or
otherwise, against Subscriber or any person that obtains Market Data that is made available
pursuant to this Agreement other than as this Agreement contemplates. Subscriber shall pay the
reasonable attorney's fees that any Authorizing SRO incurs in enforcing this Agreement against
Subscriber.

**4.    DATA NOT GUARANTEED** – Subscriber understands that no Authorizing
SRO, no other entity whose information is made available over the Authorizing SROs' facilities
(an "Other Data Disseminator") and no information processor that assists any Authorizing SRO

Exhibit ___5___ Page __149__

or Other Data Disseminator in making Market Data available (collectively, the "Disseminating Parties") guarantees the timeliness, sequence, accuracy or completeness of Market Data or of other market information or messages disseminated by any Disseminating Party. Neither Subscriber nor any other person shall hold any Disseminating Party liable in any way for (a) any inaccuracy, error or delay in, or omission of, (i) any such data, information or message or (ii) the transmission or delivery of any such data, information or message, or (b) any loss or damage arising from or occasioned by (i) any such inaccuracy, error, delay or omission, (ii) non-performance or (iii) interruption in any such data, information or message, due either to any negligent act or omission by any Disseminating Party, to any "force majeure" (e.g., flood, extraordinary weather conditions, earthquake or other act of God, fire, war, insurrection, riot, labor dispute, accident, action of government, communications or power failure, equipment or software malfunction) or to any other cause beyond the reasonable control of any Disseminating Party.

     **5.**    **PERMITTED USE** – Subscriber shall not furnish Market Data to any other person or entity and, subject to Paragraph 10, shall use Market Data only for its individual use in its business.

     **6.**    **DISSEMINATION DISCONTINUANCE OR MODIFICATION** – Subscriber understands and acknowledges that, at any time, the Authorizing SROs may discontinue disseminating any category of Market Data, may change or eliminate any transmission method and may change transmission speeds or other signal characteristics. The Authorizing SROs shall not be liable for any resulting liability, loss or damages that may arise therefrom.

     **7.**    **DURATION; SURVIVAL** – This Agreement remains in effect for so long as Subscriber has the ability to receive Market Data as contemplated by this Agreement. In addition, Vendor may terminate this Agreement at any time, whether at the direction of the Authorizing SROs or otherwise. Paragraphs 2, 3 and 4, and the first two sentences of Paragraph 8, survive any termination of this Agreement.

     **8.**    **MISCELLANEOUS** – The laws of the State of New York shall govern this Agreement and it shall be interpreted in accordance with those laws. This Agreement is subject to the Securities Exchange Act of 1934, the rules promulgated under that act, and the joint-industry plans entered into pursuant to that act. This writing contains the entire agreement between the parties in respect of its subject matter. Subscriber may not assign all or any part of this Agreement to any other person. The person executing this Agreement below represents and warrants that he or she has legal capacity to contract and, if that person is executing this Agreement on behalf of a proprietorship or a business, partnership or other organization, represents and warrants that he or she has actual authority to bind the organization.

Exhibit ___5___ Page ___150___

## SECTION 2: NONPROFESSIONAL SUBSCRIBER

**9.    NONPROFESSIONAL SUBSCRIBER DEFINITION** -"Nonprofessional Subscriber" means any natural person whom Vendor has determined to qualify as a "Nonprofessional Subscriber" and who is not:

    (a)    registered or qualified with the Securities and Exchange Commission (the "SEC"), the Commodities Futures Trading Commission, any state securities agency, any securities exchange or association, or any commodities or futures contract market or association.

    (b)    engaged as an "investment advisor" as that term is defined in Section 201(11) of the Investment Advisor's Act of 1940 (whether or not registered or qualified under that Act), nor

    (c)    (c) employed by a bank or other organization exempt from registration under Federal and/or state securities laws to perform functions that would require him or her to be so registered or qualified if he or she were to perform such functions for an organization not so exempt.

**10.    PERMITTED USE** – If Subscriber is a Nonprofessional Subscriber, he or she shall receive Market Data solely for his or her personal, non-business use.

**11.    PERSONAL AND EMPLOYMENT DATA** – As a prerequisite to qualifying as a "Nonprofessional Subscriber", Subscriber shall provide the following information:

Subscriber's name and address:

Subscriber's occupations (list all occupations – including homemaker, student, retiree, etc.):

Name(s) and address(es) of Subscriber's employer(s):

Subscriber's title(s) and/or position(s):

Subscriber's employment functions (description):

Exhibit ____5____ Page__151__

Subscriber shall notify Vendor promptly in writing of any change in his or her circumstances that may cause him or her to cease to qualify as a Nonprofessional Subscriber.

**12.    CERTIFICATION** – By executing this Agreement, Subscriber hereby certifies that he or she falls within Paragraph 9's definition of "Nonprofessional Subscriber" and that the personal and employment information that he or she has included in Paragraph 11 is truthful and accurate.

\*            \*            \*

ACCEPTED AND AGREED: I, the "Subscriber" to which the preceding terms and conditions refer, acknowledge that I have read the preceding terms and conditions, that I understand them and that I hereby agree to comply with those terms and conditions.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

SUBSCRIBER                                          VENDOR

_____                    _____
(Name of Subscriber)                              (Name of Vendor)

By:_____                    By:_____
     Name:                                                    Name:
     Title:                                                      Title:
     Date:                                                     Date:

Exhibit ____5____ Page _153_