1  DAVID L. OSIAS (BAR NO. 091287)
   DEBRA A. RILEY (BAR NO. 151925)
2  TED FATES (BAR NO. 227809)
   ALLEN MATKINS LECK GAMBLE
3    MALLORY & NATSIS LLP
   501 West Broadway, 15th Floor
4  San Diego, California 92101-3541
   Phone:  (619) 233-1155
5  Fax:  (619) 233-1158
   E-Mail:  dosias@allenmatkins.com
6          driley@allenmatkins.com
           tfates@allenmatkins.com
7
   Attorneys for Permanent Receiver Thomas F. Lennon
8

9              UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF CALIFORNIA

11

12  SECURITIES AND EXCHANGE          Case No. 08-CV-0400 DMS (BLM)
    COMMISSION,
13                                   **FIRST INTERIM REPORT OF**
                Plaintiff,           **PERMANENT RECEIVER AND PETITION**
14                                   **FOR FURTHER INSTRUCTIONS**
          v.
15                                   **[Civil Local Rule 66.1.e]**
    TUCO TRADING, LLC and
16  DOUGLAS G. FREDERICK,            Date:    July 18, 2008
                                     Time:    1:30 p.m.
17              Defendants.          Ctrm:    10
                                     Judge:   Hon. Dana M. Sabraw
18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................1

II.  OVERVIEW OF TUCO TRADING .......................................................................2

    A.  Corporate Structure ........................................................................................2

    B.  Member Trading Activity ...............................................................................2

    C.  Commissions Earned .......................................................................................5

    D.  Accounting of Member Balances ....................................................................6

III.  PROCEDURAL BACKGROUND ...........................................................................6

IV.  SUMMARY OF RECEIVER'S ACTIVITIES .........................................................8

    A.  Employment of Professionals .........................................................................8

    B.  Securing Tuco Premises ..................................................................................9

    C.  Securing Tuco's Assets ...................................................................................9

    D.  Securing Electronic Data ..............................................................................10

    E.  Winding Down the Business ..........................................................................10

    F.  Interviewing Witnesses and Gathering Documents .....................................11

        1.  Frederick and Tuco .............................................................................11

        2.  Former Employees/Independent Contractors of Tuco .......................12

        3.  GLB Trading ........................................................................................13

        4.  Other Tuco Broker-Dealers .................................................................13

        5.  Penson .................................................................................................14

        6.  NYFIX ................................................................................................14

        7.  Alchemy Ventures, LLC .....................................................................14

        8.  Certain Tuco Members ........................................................................14

        9.  Certain Tuco Creditors .......................................................................15

    G.  Filing the Judgment in Other Jurisdictions .................................................15

    H.  Tuco Website .................................................................................................15

    I.  Communications with Members and Creditors .............................................16

|  |  |  |  | **Page** |
|---|---|---|---|---|
| V. | | INVENTORY OF ASSETS | | 16 |
| | A. | Investigation of Assets | | 17 |
| | | 1. | GLB Trading Receivable | 17 |
| | | 2. | NYFIX Charges | 18 |
| | | 3. | Penson Interest Charges | 19 |
| | | 4. | T3 Ownership Interest | 19 |
| | B. | Investigation of Payments | | 19 |
| | | 1. | GLB Deductions | 19 |
| | | 2. | Schiller/Southwest Securities | 20 |
| | | 3. | Halperin/Marquis Jet Partners | 20 |
| | | 4. | Jonathan Kirkland | 21 |
| | | 5. | Michael Kestler | 21 |
| | | 6. | Lisa Hyatt/Kayo Financial | 21 |
| VI. | | SHORTFALL ANALYSIS | | 22 |
| VII. | | RECEIPTS AND DISBURSEMENTS | | 22 |
| VIII. | | CREDITORS AND CLAIM AMOUNTS | | 23 |
| IX. | | PENDING AND POTENTIAL LITIGATION | | 23 |
| X. | | CONTINUING ACTIVITY | | 24 |

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

697128.02/SD

1    Thomas F. Lennon ("Receiver"), Court-appointed permanent receiver for Tuco Trading,

2  LLC ("Tuco"), hereby reports on his efforts to date and the status of his investigation, and

3  petitions the Court for further instructions pursuant to Civil Local Rule 66.1.e, and this Court's

4  Order in Aid of Receivership entered on March 19, 2007.  Attached hereto as Exhibit A and

5  discussed herein is the Receiver's preliminary accounting of Tuco ("Preliminary Accounting").

6    The volume of material and information acquired, the shortness of time between receipt of

7  material information and the report, the complexity of the matters analyzed and the need for

8  additional information, verification and analysis requires that this report be considered preliminary

9  only; the Receiver may need to materially modify its contents after further investigation and

10  consideration.

11               I.    INTRODUCTION

12    The Receiver's duties, responsibilities and activities fall generally into four categories:

13  (1) securing, protecting and recovering assets; (2) investigating the who, when, how and why of

14  the basis for the receivership proceedings; (3) analyzing and developing, with Court approval, an

15  equitable approach for distribution of assets and losses to investors and creditors; and (4) the

16  liquidation of assets and the review and allowance of claims against the receivership estate.  This

17  report touches on each of these four categories in varying detail and degree in relation to the focus

18  of the Receiver during the first 75 days of this case.

19    The Receiver and his professionals have worked diligently to carry out the tasks and

20  responsibilities of the Receiver with a consistent effort to minimize administrative expenses.  As

21  part of that effort, the Receiver has sought documents and witness statements on an informal

22  consensual basis so far, rather than expending additional resources on document subpoenas and

23  depositions.  As discussed below, certain information has been produced in a prompt and

24  cooperative fashion, while other information has taken longer to obtain.  As documents, data and

25  witness statements are obtained and reviewed, the Receiver has assessed whether the information

26  is sufficient and reliable or additional investigation is warranted.  The Receiver has not yet used

27  the subpoena power granted to him, but doing so may become necessary as his investigation

28  continues.

## II.    OVERVIEW OF TUCO TRADING

On August 14, 2006, Douglas Frederick ("Frederick") formed Tuco Trading, LLC.  On or about November 1, 2006, Tuco acquired a day trading firm called Evolution Capital, LLC ("Evolution").  Evolution had been owned and managed by Jonathan Kirkland and Michael Kestler.  Frederick had worked as a consultant for Evolution.

### A.    Corporate Structure

Tuco is a Nevada limited liability company.  Tuco's structure consists of class A members, whom are described in the Tuco Operating Agreement as "Owner-Members", and class B members, whom as described as "Traders."  Under the Operating Agreement, a copy of which is included in Exhibit 5 to the Declaration of Robert A. Tercero in Support of the SEC's Ex Parte Motion for TRO, the class A members had voting rights, including the ability to elect "Managers" of the company.  Managers were vested with the authority to manage, control and operate the company.  Frederick was the only class A member and Manager of Tuco.[1]

### B.    Member Trading Activity

The traders, or class B members, are referred to herein as "Members."  Members did not have voting or management rights within the company.

Tuco did not operate as a brokerage firm that traded securities on behalf of its clients.  Rather, Tuco made trading software platforms available to its Members, allowed its Members to place trade orders through its brokerage accounts, and, for a small number of Members, provided office space at which they conducted their trading activities.  Tuco allowed its Members to trade with greater leverage and with less money than they could trade if they opened their own brokerage accounts with a broker-dealer.  Tuco allowed its Members to trade with buying power between 6:1 and 20:1,[2] as opposed to the 4:1 limit for standard brokerage accounts.  Frederick

---

[1]  Michael Kestler, who had been a managing member of Evolution, was listed as a class A member of Tuco on the 2006 Tuco federal tax return.  According to Frederick, this was a mistake made by the accountant that prepared the return.  Mr. Kestler is not listed as a class A member under the Tuco Operating Agreement.  Additionally, as discussed further below, Lisa Hyatt and/or her entity Kayo Financial invested in Tuco as a class A member.  The investment was later recharacterized as a loan and repaid to Ms. Hyatt by Tuco.

[2]  By way of example, 6:1 buying power means that the Member could place trade an order of $6 for every $1 dollar in his or her Member account.

1  determined each Member's buying power based on, among other things, his or her account

2  balance, trading experience and trading volume. Tuco also allowed its Members to open an

3  account with only $10,000 (and sometimes even less), whereas $25,000 is the minimum required

4  for standard brokerage accounts.

5       As discussed on page 2 of the Preliminary Accounting, each Member completed a new

6  account package when they opened an account with Tuco. The new account materials do not state

7  the terms on which the Members were allowed to trade. Rather, the Members made oral

8  arrangements with Frederick regarding the commissions Tuco would charge them and the buying

9  power at which Tuco would allow them to trade.[3]

10      As discussed on page 3 of the Preliminary Accounting, there were three types of Member

11  accounts at Tuco:

12           1) <u>Single Members Accounts</u> in which one Member traded using one account with Tuco;

13           2) <u>Master Member Accounts</u> in which one Member traded using multiple accounts with

14  Tuco, which accounts were aggregated as one combined account balance; and

15           3) <u>Member Accounts with Sub-Accounts</u> in which one entity-Member had one account

16  with Tuco that was used by numerous individual traders associated with the entity. The individual

17  traders associated with the entity would place trade orders through the entity's account with Tuco.

18  Examples of these discussed below are Members Lanai, Ltd. ("Lanai") and T3 Capital, LLC

19  ("T3"). Tuco treated these entities each as one Member with one account balance derived from

20  the collective deposits, withdrawals, trading activity, fees and Commissions of the individual

21  traders associated with the entity.

22      An account at one of several trading software platforms ("Trading Platforms") used by

23  Tuco was created for each Member. The Trading Platforms provided the Members with access to

24  the securities markets. Tuco had rights to all Member accounts at the Trading Platforms.

25  Pursuant to the oral arrangement between the Member and Frederick, Tuco would set the

26

27  [3]  Tuco did not maintain records reflecting the commission rate for to each Member. However,
    the Titans System used to track Member accounts (discussed below) reflects the volume of
    shares traded and the commissions charged to each Member's account. Furthermore, there are

28  no records of Member complaints regarding commissions, nor has the Receiver received any
    such complaints.

1   Commission rate and buying power available to each Member through the Trading Platforms.

2   Tuco could also set certain risk parameters for its Members for use of the Trading Platforms,

3   including a daily loss threshold at which the Member's ability to place trade orders would be

4   terminated for that day.  Frederick, Mr. Kestler and certain of Tuco's employees would supposedly

5   monitor Member trading accounts in real time and contact the Member regarding significant

6   losses.  As discussed on page 4 of the Preliminary Accounting, the number of negative Member

7   account balances shows that this monitoring either did not occur or was ineffective.  Schedules

8   listing the negative Member account balances as of December 31, 2006, December 31, 2007,

9   March 5, 2008 and May 5, 2008 are attached to the Preliminary Accounting as Exhibits XIV A-D

10  respectively.

11        Under the Operating Agreement, profits obtained and losses incurred from the trading

12  activities of each Member were allocated entirely to the Member.  Tuco did not receive any

13  portion of Member trading profits.  If a Member's trading losses resulted in a negative account

14  balance, the Member was not allowed to place trade orders through Tuco until the account was

15  restored to a positive balance.  Tuco did not have a right to payment from Members for negative

16  balances, however.  As noted on Exhibit XIV D to the Preliminary Accounting, negative Member

17  account balances totaled $1,849,654.15 as of May 5, 2008.

18        The majority of the Members would place trade orders through Tuco's accounts at its

19  primary broker-dealer, GLB Trading, Inc. ("GLB").  A small number of Members used Tuco's

20  accounts at other broker-dealers, such as ViewTrade.  GLB and ViewTrade used Penson Financial

21  Services ("Penson") as the clearing broker for all trades orders placed by Tuco's Members.

22        Tuco's main offices were located at 909 Prospect Street, Suite 224, La Jolla, California (the

23  "Tuco Premises").  Tuco also subleased space in Chicago, Illinois[4] and Dallas, Texas.  Only a

24  small number of Tuco's Members conducted their trading activities at office space provided by

25  Tuco.  The majority of the Members traded remotely from other locations, including locations

26

27

28

---

[4]   The Chicago office space was subleased from GLB.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

1    outside the United States.[5]  Tuco hosted a Internet virtual "chat room" for its Members in which all

2    Members could discuss stocks, trades and related issues in real time.

3         **C.     Commissions Earned**

4         Tuco's primary source of income was commissions earned from the trading activities of its

5    Members.  Tuco also earned commissions for referring traders directly to GLB.  The trading

6    commissions and referral commissions are collectively referred to herein as "Commissions."  The

7    Commissions would be recorded by the Trading Platforms and reported to Penson.  Penson would

8    collect the Commissions directly from the Tuco accounts at Penson and, after deducting certain

9    industry fees and charges, pay them to GLB.  GLB would then deduct other fees and charges,

10    including its own legal fees and costs (discussed further below), and pay the net Commission

11    amount to Frederick as the registered representative of Tuco.  Frederick would deposit the

12    Commission amounts received from GLB into Tuco accounts.

13         Frederick's Commissions increased dramatically in November 2007, due primarily to the

14    increase trading volume of Members Lanai and T3.  As discussed on page 4 of the Preliminary

15    Accounting, trading volume in Tuco's accounts had been at approximately 400 million shares per

16    month.  In November and December 2007, that amount jumped to approximately 2 billion shares

17    per month and remained at that level until trading halted on March 6, 2008.

18         A substantial amount of the increased Commissions, however, were passed on to Member

19    T3.  T3 had a unique relationship with Tuco in that Tuco did not charge it any Commissions for

20    trading activities.  T3 charged its own individual traders commissions.  These commissions would

21    be collected by Penson, paid to GLB, and in turn, paid to Frederick.  Frederick would then forward

22    that amount to T3.  Tuco benefited from T3's trading activity, however, in that T3's large trading

23    volume allowed Tuco to obtain lower rates from Lightspeed, the Trading Platform used by T3 and

24    other Tuco Members.  Tuco also may own a 10% interest in T3 (discussed further below).

25         As the trading volume in the Tuco accounts with GLB increased, the delay in receiving

26    Commission reconciliation statements from GLB grew.  As of about September 2007, and from

27    _____

28    [5]  Significantly, the Receiver understands that Members Lanai and Blackhawk Trading are
         headquartered in China, and Members Coper Trading and Serafin Group are headquartered in
         Canada.

1    that point forward, it took GLB approximately 90 days to provide Commission reconciliation

2    statements.  During this period, GLB would often make several interim and partial Commission

3    payments while the Commission reconciliation statements were pending.

4        **D.**    **Accounting of Member Balances**

5        Tuco used custom-designed software to track its Members' deposits, withdrawals, trading

6    profits and losses, fees and commissions (the "Titans System").  Each Member had an account in

7    the Titans System that would automatically update on a daily basis with trading activity, fees and

8    Commissions recorded by the Trading Platforms and communicated to the Titans System.  Tuco

9    would also update the Titans System manually with Member deposits, withdrawals and other fees

10   not reported by the Trading Platforms, including those reported later in the Commission

11   reconciliation statements provided by GLB.  Tuco had servers located in La Jolla and Dallas that

12   supported the Titans System.

13       **III.    PROCEDURAL BACKGROUND**

14       On March 4, 2008, the Securities and Exchange Commission ("SEC") filed its Complaint

15   and Ex Parte Motion for Temporary Restraining Order and Orders: (1) Freezing Assets;

16   (2) Appointing a Temporary Receiver; (3) Requiring Accountings; (4) Prohibiting the Destruction

17   of Documents, (5) Granting Expedited Discovery; and (6) Order to Show Cause re Preliminary

18   Injunction and Appointment of a Permanent Receiver.  On March 5, 2008, the Court issued a

19   Temporary Restraining Order and Orders: (1) Appointing a Temporary Receiver; (2) Requiring

20   Accountings; (3)  Prohibiting the Destruction of Documents, (4) Granting Expedited Discovery;

21   and (5) Order to Show Cause re Preliminary Injunction and Appointment of a Permanent Receiver

22   ("TRO").  The Receiver, the SEC and the Defendants sought clarification of the TRO, which was

23   provided in the Court's Supplement to the TRO ("Supplement"), entered on March 6, 2008.

24       The TRO and Supplement appointed the Receiver as temporary receiver with limited

25   powers.  The Receiver was granted access to the company, but Tuco was permitted to continue

26   operations in the ordinary course of business.  The Supplement also restricted the ability of

27   Members to withdraw funds.

28

1       On March 6, 2008, trading activity at Tuco was halted when Penson terminated clearing

2   service to Tuco's main broker accounts.  Members were only permitted to issue liquidating orders

3   from that point forward.  The Court held telephonic hearings on March 7 and March 10, 2008 to

4   address this change in circumstances.  At those hearings, it was determined that Tuco could

5   continue to operate on a limited basis until the Receiver could provide an initial accounting and

6   the parties could brief the Order to Show Cause re Preliminary Injunction.

7       On March 11, 2008, Douglas Frederick and Tuco filed financial statements as required

8   under the TRO and Supplement ("Financial Statements").  On March 14, 2008, the SEC filed the

9   Consents of Tuco and Frederick, and a Joint Motion for Judgment as to Defendants Tuco and

10  Frederick and Orders: (1) Freezing Tuco's Assets, (2) Appointing a Permanent Receiver for Tuco;

11  and (3) Prohibiting the Destruction of Documents ("Judgment").  The Court entered the Judgment

12  on March 17, 2008.

13      On March 19, 2008, in response to the Receiver's application, the Court entered an Order

14  in Aid of Receivership:  (1) Allowing Notice by Email to Members; (2) Providing that

15  Commissions Earned or Payable to Frederick are Property of the Receivership Estate;

16  (3) Authorizing the Receiver to Enter into a Temporary Transaction with GLB Trading, Inc.; and

17  (4) Granting Ancillary Relief ("Order in Aid").  The Order in Aid provides, among other things,

18  that the Receiver's initial report may be filed in conjunction with the accounting due under Part

19  VIII.E. of the Judgment, and that interim reports shall be filed by the Receiver approximately

20  every 120 days thereafter.

21      On May 1, 2008, the Receiver applied for approval of a sale of Tuco's office furniture and

22  equipment to Frederick for $21,000.  The Court entered an order approving the sale on May 5,

23  2008.

24      On May 15, 2008, new counsel representing Frederick filed a Stipulation for Substitution

25  of Counsel ("Stipulation").  The Stipulation states that Frederick's new counsel is substituted as

26  counsel of record for Tuco and Frederick.  With the assistance of Allen Matkins, the Receiver

27  contacted Frederick's new counsel and advised that Frederick's former counsel was not employed

28

1  by the Receiver or Tuco at any time after entry of the Judgment.  The Stipulation is therefore

2  improper to the extent that Frederick's new counsel purports to represent Tuco.

3       On May 19, 2008, new counsel for Frederick, again purporting to represent Tuco, filed a

4  Notice of Appeal of the Judgment ("Notice of Appeal").  On May 29, 2008, the Ninth Circuit

5  Court of Appeals issued a Time Schedule Order for the appeal that was entered on this Court's

6  docket.  As of the filing of this report, Frederick has not sought a stay of the Judgment pending

7  appeal or filed any other motions with the Court of Appeals.

8  ### IV.    SUMMARY OF RECEIVER'S ACTIVITIES

9       The Judgment grants broad relief, including a permanent injunction, a freeze of all assets

10  of Tuco, the permanent appointment of the Receiver with full powers of an equity receiver, a stay

11  of all actions against Tuco, an authorization for the Receiver to investigate the assets of Tuco,

12  including claims and causes of action, and an order requiring that Tuco and Frederick pay the

13  costs of the Receiver and his professionals.  As discussed further below, the Receiver has taken

14  steps to implement and enforce the Judgment, including employing professionals, securing Tuco's

15  assets, opening and managing receivership bank accounts, securing electronic data, winding down

16  the business, interviewing witnesses and gathering documents, recording the Judgment in the

17  appropriate judicial districts, and disseminating information about the Judgment and the case to

18  Members and creditors.

19  ### A.    Employment of Professionals

20       Pursuant to the authority granted to him under Part VIII.G. of the Judgment, the Receiver

21  has employed Allen Matkins Leck Gamble Mallory & Natsis, LLP ("Allen Matkins") as his

22  general receivership counsel in this matter.  Further, the Receiver has employed William H. Ling,

23  CPA ("Ling") to assist in his forensic accounting.  Finally, the Receiver has employed

24  Investigative Technologies ("IT") as his information and technology consultant to assist in the

25  investigation, preservation and analysis of electronic data.  Allen Matkins, Ling and IT have

26  assisted the Receiver in all phases of this matter, including in preparation for and during his

27  appointment as temporary receiver.

28

**B.   Securing Tuco Premises**

Immediately after his appointment, the Receiver took control of the Tuco Premises. The Receiver determined that it was in the best interest of the estate and its creditors to maintain the Tuco Premises for a short period to allow for (a) the Tuco employees and independent contractors to provide information needed for the Receiver's accounting, (b) IT to do its investigation, preservation and analysis of electronic data, (c) the Tuco employees to assist the Receiver in the liquidation of open positions and reconciliation of the same to the Titans System, (d) the Receiver to inventory, obtain an appraisal of, and, with Court permission, sell Tuco's office furniture and equipment, and (e) the Receiver to give sufficient notice to the landlord of the termination of the lease. The Receiver terminated the lease effective May 10, 2008. The landlord secured a replacement tenant to move in promptly thereafter, thus eliminating any lease termination claim by the landlord.

Tuco also sub-leased office space in Chicago and Dallas. Those leases were terminated by the Receiver in April and May 2008 respectively.

**C.   Securing Tuco's Assets**

With respect to the cash assets of Tuco, the Receiver opened an interest-bearing, money market account at California Bank & Trust for the receivership estate, closed the bank and broker accounts of Tuco, and had the balances wired to the receivership account. The Receiver has also instructed Tuco's broker-dealers, GLB, ViewTrade, Wedbush, Advantage Futures, Mann Financial and MB Trading Futures to direct any and all amounts payable to Frederick or Tuco to the Receiver.

As noted above, the Receiver also secured the Tuco Premises, including the furniture and equipment located therein. The sale of the furniture and equipment to Frederick for $21,000 was approved by order entered on May 5, 2008 ("Sale Order"). Frederick has not yet paid the $21,000 due under the sale agreement and Sale Order. The Receiver will pursue recovery of these funds from Frederick and seek relief from the Court as necessary.

1    **D.    Securing Electronic Data**

2    As noted above, Tuco had servers located in La Jolla and Dallas that supported the Titans

3    System.  Tuco also had a website supported by a server in La Jolla.  IT took an initial and final

4    image of the servers supporting the Titans System.  IT also imaged the website server.  These

5    servers were all wiped (i.e. all data erased) before being turned over to Frederick in connection

6    with the sale.

7    In response to certain Member inquiries, IT conducted an investigation of the Titans

8    System and certain Member accounts.  IT did not identify any problems with the manner in which

9    the Titans System was operating or its ability to receive and properly record data transmitted from

10    the Trading Platforms.  As discussed in the Preliminary Accounting, however, the Receiver and

11    Ling have thus far been unable to reconcile the aggregate profit and loss from trading activity

12    reflected in the Titans System with the aggregate profit and loss derived from the Tuco brokerage

13    account statements.

14    **E.    Winding Down the Business**

15    On March 5, 2008, when the Receiver was initially appointed as temporary receiver with

16    limited powers, Tuco was an operating day trading firm.  This changed almost immediately when

17    clearing services to Tuco's main accounts were terminated by Penson.

18    Tuco received a margin call[6] on February 29, 2008.  Tuco historically covered this margin

19    call with a weekly loan from Frank McDonald or one of his entities ("McDonald").  The amount

20    loaned by McDonald would be transferred at McDonald's instruction from his accounts at Penson

21    to the Tuco accounts at Penson, thereby restoring the Tuco accounts to the required 4:1 ratio.

22    Penson was aware of the SEC's intention to commence an action against Tuco and

23    Frederick before the action was commenced.  McDonald was not aware of the SEC's impending

24    action, however.  The weekly McDonald loan that Tuco would have received on March 3, 2008

25    was therefore disallowed by Penson.  As a result, Tuco did not meet the February 29 margin call.

26    _____

[6]    A "margin call" occurs when a trader exceeds the 4:1 leverage or "buying power" for its
27    brokerage account.  In response to a margin call, the trader must deposit additional funds into
its account in order to restore the account to the required 4:1 ratio.  If the trader fails to do so,
28    the clearing broker generally will lend money to the account on a temporary basis and charge
interest on the loan to the trader.

1   On March 6, 2008, the morning after the Receiver was appointed as temporary receiver, Penson

2   terminated clearing services to Tuco's main accounts. Tuco's Members were only permitted to

3   liquidate open positions from that point on. All trade orders placed by Members between

4   February 29 and March 6 were placed into an "error account" by Penson.

5       The liquidation of open positions by Members continued for several weeks until the

6   Receiver instructed the Members to liquidate any remaining open positions within a specific

7   period of time. Penson worked to manually reconcile individual trades in the error account.

8   Because the reconciliation of these trades was not done in the ordinary automated fashion, it was

9   not communicated to the Titans System via the Trading Platforms. Therefore, the Receiver

10  worked to reconcile and update the Titans System with the trade reconciliation work being done

11  by Penson. This process took approximately a month. With the accounts finally settled, Penson

12  wired all but $300,000 of the Tuco account balances to the Receiver on May 15, 2008. The

13  amount withheld is discussed below.

14      **F.    Interviewing Witnesses and Gathering Documents**

15      The Receiver, with the assistance of Allen Matkins, Ling and IT, has interviewed and

16  obtained documents from the following persons and entities:

17          1.    Frederick and Tuco

18      During the week following his initial appointment as temporary receiver, the Receiver and

19  his professionals met with Frederick and his former counsel, Michele Fron and Audette Morales of

20  the Keesal Young & Logan law firm. The Receiver team interviewed Frederick at length over

21  approximately 5 days regarding Tuco's operations, its structure, its Members, its relationships with

22  its broker-dealers, Penson and its Trading Platforms, its assets and liabilities, and certain specific

23  transactions. The Receiver, Ling and Allen Matkins have conducted numerous follow-up

24  interviews of Frederick regarding various accounting issues, Member and creditor issues, specific

25  transactions, accounts receivable and payable, and other matters. Frederick has been cooperative

26  consistently responded to questions directly from the Receiver and his professionals in a prompt

27  and forthcoming manner. Frederick has made himself available to answer questions at almost any

28  time of day, any day during the week.

1    Frederick has also made substantial efforts to produce documents promptly.  He has been

2   hindered in this regard, however, by his and Tuco's failure to create documents, maintain records

3   and sufficiently organize their business dealings and affairs.  As discussed in the Preliminary

4   Accounting, Tuco's books and records were in very poor condition.  Additionally, the limited files

5   kept by Tuco were mostly out of date.  As a result, the Receiver has sometimes had to obtain

6   records from third parties that Frederick and Tuco should have maintained.  Some records that

7   should have been created, apparently were not.  The lack of documentation kept by Frederick and

8   Tuco has delayed the Receiver's investigation and accounting, and forced the Receiver to incur

9   fees and costs to obtain missing records or piece together an analysis from oral statements and

10  existing records.

11          2.      Former Employees/Independent Contractors of Tuco

12    On March 6, 2008, the Receiver and his professionals met with Tuco former employee

13  Adam Korsin, and former independent contractors Jarrod Vrazel and Mike Kestler to discuss the

14  Receiver's appointment and the terms of the TRO and Supplement.  Former employee Benjamin

15  Ball (on vacation at the time), former independent contractor Yuan Tai Lee and former employee

16  Chi-Shiuan Lu (both located at the Tuco offices in Dallas) were reached by telephone and advised

17  of the same.  From that point forward, the Receiver, Ling and Allen Matkins spoke with

18  Mr. Korsin, Mr. Vrazel and Mr. Ball on numerous occasions to discuss trading and accounting

19  matters, and certain Member issues.  Additionally, IT met with Mr. Vrazel and Mr. Lee on several

20  occasions to discuss the Titans Systems, Tuco's servers, certain Member accounts and other

21  electronic data issues.

22    Although no document requests were issued to the employees and independent contractors,

23  Mr. Vrazel, Mr. Korsin, Mr. Ball and Mr. Lee were asked to assist the Receiver, in varying

24  capacities.  The tasks included allocating fees and charges reported by Tuco's broker-dealers to the

25  Member accounts, reconciling trades in the error account and the liquidation of open positions to

26  the Member accounts, making appropriate adjustments in the Titans System, and generating

27  Member account reports from the Titans System for specific time periods.  The employees and

28  independent contractors were paid by the Receiver for their time at their pre-receivership rates of

1 | compensation. The employees and independent contractors were terminated effective May 10,

2 | 2008. Their final paychecks included two weeks severance and a cash out of unused vacation

3 | hours. To the best of the Receiver's knowledge, there are no employee claims against Tuco.

4 |         3.    <u>GLB Trading</u>

5 |     In the first few weeks following his appointment as temporary receiver, the Receiver, Ling

6 | and Allen Matkins spoke briefly to Gus Katsafaros and Bob Lechman, principals of GLB Trading,

7 | on several different occasions. In or about mid-March, Allen Matkins was directed to

8 | communicate with counsel for GLB located in Chicago. GLB's counsel subsequently instructed

9 | the Receiver and Ling to communicate only with him and not directly with anyone at GLB.. GLB

10 | counsel later instructed Frederick not to communicate with him and only to have his counsel

11 | communicate with him. After several requests, Allen Matkins was permitted to interview

12 | Mr. Katsafaros briefly regarding the Penson interest charges discussed below. The inability to

13 | communicate directly with Mr. Katsafaros, Mr. Lechman and others at GLB has delayed the

14 | process of obtaining information and increased administrative expenses.

15 |     GLB has generally been slow to respond to document requests, including Commission

16 | reconciliation statements for the months of January, February and March 2008. This has

17 | historically been the case with GLB. As noted above, it has generally taken GLB approximately

18 | 90 days to produce Commission reconciliation statements over the last 9 months, requiring Tuco

19 | to go back and allocate fees and charges reported in the statement to its Members well after they

20 | were incurred. Nevertheless, GLB has produced these Commission reconciliation statements,[7] as

21 | well as spreadsheets regarding the outstanding Penson interest charges, statements for Evolution

22 | accounts with GLB, and documents pertaining to the FINRA Proceeding (discussed below).

23 |         4.    <u>Other Tuco Broker-Dealers</u>

24 |     The Receiver requested Tuco account statements and related documents from broker-

25 | dealers ViewTrade, Wedbush, Advantage Futures, Mann Financial and MB Trading Futures.

26 | These broker-dealers all promptly responded and provided the requested documents.

27 |

28 | [7]  On May 23, 2006, GLB produced the March 2008 reconciliation statement. No Commission
payment for March 2008 has been received as of the date of this report, however.

1        5.    <u>Penson</u>

2        In the weeks following his appointment, the Receiver, Allen Matkins and Ling participated

3  in several telephone calls with Tim Davis, Associate General Counsel at Penson. Mr. Davis

4  provided limited information regarding the February 29 margin call and subsequent events leading

5  up to Penson's termination of clearing services. Mr. Davis also communicated on a limited basis

6  with Allen Matkins regarding the loss amount claimed by Penson in connection with the

7  liquidation of open positions (discussed below). Thereafter, Mr. Davis advised the Receiver and

8  counsel to communicate only with Penson's outside counsel. Through its outside counsel, Penson

9  has produced documentation regarding the outstanding interest charges (also discussed below).

10  The Receiver has requested additional information on these charges as well as the loss amount

11  claimed by Penson. Such information has not been received to date. Accordingly, the Receiver's

12  investigation into and efforts to resolve these issues with Penson are ongoing.

13        6.    <u>NYFIX</u>

14        With the assistance of Allen Matkins, the Receiver contacted Paul Fitzpatrick and Brian

15  Carr at NYFIX to discuss charges assessed by NYFIX that Tuco has been unable to allocate to its

16  Members. These charges are discussed further below. Subsequently, Allen Matkins was

17  contacted by Richard Bassler, Senior Legal Counsel for NYFIX. Mr. Carr and Mr. Bassler stated

18  that NYFIX is unable to produce additional information regarding the charges at issue.

19        7.    <u>Alchemy Ventures, LLC</u>

20        With the assistance of Allen Matkins, the Receiver contacted Mark Rogers of Alchemy

21  Ventures, LLC ("Alchemy") to discuss certain short-term loans that Alchemy made to Tuco.

22  Mr. Rogers was forthcoming with information about the loans, which were arranged by Gus

23  Katsafaros of GLB. Alchemy promptly produced records showing the transfers from its account

24  at Penson to Tuco's account at Penson. The Receiver has requested written communications from

25  Alchemy regarding the loans, which Mr. Rogers has agreed to provide.

26        8.    <u>Certain Tuco Members</u>

27        As noted below, the Receiver, his staff and Allen Matkins have spoken to and responded to

28  emails from numerous Tuco Members. Significantly, Allen Matkins has discussed trading activity

1   and Tuco account issues with Member David Halperin and counsel for Members Lanai and T3.

2   Allen Matkins has also spoken to attorneys representing Members Kevin Wojtowicz, Kier

3   Robinson and HG Trading, LLC.

4           9.      Certain Tuco Creditors

5           Promptly after his appointment as permanent receiver, the Receiver sent letters to all

6   known creditors advising them to deal with him directly regarding all Tuco matters.  The Receiver

7   also directed the Trading Platforms to terminate services to Tuco.

8           The Receiver and Allen Matkins have communicated with creditor Lightspeed, both

9   directly and through its counsel, regarding the amounts claimed to be owed by Lightspeed and

10  certain issues regarding the termination of the Lightspeed Trading Platform service.  The Receiver

11  requested that Lightspeed produce documents pertaining to the Schiller/Southwest Securities

12  trading activity discussed below.  Lightspeed promptly produced the requested documents.

13          The Receiver and Allen Matkins have also communicated with counsel for the landlord for

14  the Tuco Premises, Prospect Plaza Holdings, LLC, regarding rent, utilities, parking and other lease

15  issues.  The Receiver terminated the lease effective May 10, 2008.  Finally, the Receiver made

16  arrangements with the new tenant, Ocean View Capital, and Tuco's Internet, bottled water and

17  cleaning services, to assign the contracts to Ocean View Capital, thereby avoiding cancellation

18  fees.

19      **G.      Filing the Judgment in Other Jurisdictions**

20          Pursuant to 28 U.S.C. § 754, the Receiver caused certified copies of the Judgment to be

21  filed in the United States District Courts for the Northern District of Illinois and the Northern

22  District of Texas to assist in obtaining jurisdiction and control of Tuco property located in those

23  districts.  The filings were completed within 10 days of entry of the Judgment, pursuant to

24  section 754.  The Receiver will file the Judgment in such other jurisdictions as he deems

25  appropriate based on his continuing investigation.

26      **H.      Tuco Website**

27          Prior to the Receiver's appointment, Tuco maintained a website at www.tucotrading.com.

28  On March 12, 2008, the Receiver created a webpage for this case at his website, www.tflinc.com.

1  After entry of the Judgment, the Receiver caused the Tuco website to be shut down and redirected

2  all traffic to his website. The webpage for this case at the Receiver's website includes the TRO,

3  Supplement, Judgment, Order in Aid, Notice of Appeal and notices to investors, all of which can

4  be viewed and printed. This report, including the Preliminary Accounting and other Exhibits, will

5  also be posted. The Receiver will continue to update the SEC v. Tuco Trading page on his

6  website with all pertinent Receiver's Reports, Court filings and Orders.

7      **I.     Communications with Members and Creditors**

8         The Receiver has sent two e-mail notices to Tuco's Members advising them (a) of the

9  status of the case and the Receiver's investigation, (b) that the Receiver obtained an extension to

10  file the 2007 Tuco federal tax returns until October 15, 2008, and that Member K-1 statements

11  would be issued in connection with that filing, and (c) regarding the possibility of the Receiver

12  proposing an interim distribution. These notices, which were sent to all known Member email

13  addresses on March 20 and March 28 respectively, are attached hereto as Exhibits C and D. The

14  March 20 notice instructed all Members to provide the Receiver with updated contact information

15  if their contact information should change. The Receiver's staff has maintained and updated a

16  Member email list and creditor mailing list. The Receiver, with the assistance of his staff and

17  Allen Matkins, has also returned numerous telephone calls and emails from Tuco Members and

18  creditors.

19      **V.     INVENTORY OF ASSETS**

20         Attached hereto as Exhibit A is Ling's Preliminary Accounting of Tuco ("Preliminary

21  Accounting"). The Preliminary Accounting tracks the activity and financial condition of Tuco

22  from inception on November 1, 2006 through May 5, 2008. It must be emphasized, however, that

23  the analysis and conclusions drawn to date are preliminary only. As noted above, the Receiver

24  and Ling have reviewed and analyzed a great deal of information in a short period of time. During

25  its 21-month life span between August 14, 2006 and May 5, 2008, Tuco maintained five bank

26  accounts, eleven brokerage accounts[8] and approximately 323 Member accounts. Tuco used

27

28

[8]   The brokerage accounts used by Tuco are listed on Exhibit VI to the Preliminary Accounting. The account with broker-dealer Lightspeed under the name Schiller, LLC is not listed on Exhibit VI, but is included in Exhibit XXII (Summary of Related Party Activity for Frank

1  approximately eight different Trading Platforms and six different broker-dealers.[9]  Tuco received

2  or made loans, or had credit arrangements with as many as nine different financial institutions and

3  private parties.  The analysis of activity, statements, reports and specific transactions for these

4  numerous bank, brokerage, credit and Member accounts is ongoing.

5      In particular, Members should understand that the Member account balances listed in

6  Exhibits IX. A-C. to the Preliminary Accounting are based on the best information currently

7  available, and are subject to adjustment by the Receiver as the outstanding issues discussed herein

8  (and any new issues that arise) are resolved.  The Receiver and Ling intend to file an updated

9  accounting with the Court in connection with the Receiver's Second Interim Report.

10  **A.    Investigation of Assets**

11      The Receiver's investigation into the following items listed on the Tuco Financial

12  Statement prepared by Frederick and filed with the Court on March 11, 2008 ("Tuco Financial

13  Statement") and/or stated to be assets of Tuco by Frederick is ongoing:

14      1.    GLB Trading Receivable

15      The Tuco Financial Statement lists an amount of $2,554,028 for "Commissions Owed"

16  from GLB as of February 28, 2008.  Since that time, GLB has made Commission payments to

17  Frederick/Tuco totaling $1,693,005.88.  GLB has produced Commission reconciliation statements

18  for months through and including March 2008.  The Receiver and Ling are in the process of

19  reviewing and reconciling the monthly statements produced by GLB, including amounts deducted

20  by GLB from gross Commissions both before and after entry of the Judgment freezing Tuco's

21  assets and prohibiting creditors from using self-help.  Specifically, GLB made "net" Commission

22  payments to the Receiver for Commissions earned by Frederick in February and March, after

23  offsetting various fees and charges, including legal fees.  These net payments were made after

24  entry of the Judgment, on March 26, April 1, April 9 and May 27, 2008.  Summaries of the

---

27  [9]  McDonald).  Tuco's use of the Schiller, LLC account is discussed further below.

28  The bank accounts, brokerage accounts and Member accounts are listed throughout the Exhibits to the Preliminary Accounting.  Also listed and included in the Receiver and Ling's ongoing review are two Evolution bank accounts and five Evolution brokerage accounts.

1    Commissions paid to Frederick by GLB and the deductions made by GLB are attached to the

2    Preliminary Accounting as Exhibits VII and XX respectively.

3        Additionally, Tuco issued an interest-free loan of $250,000 to GLB and/or its President,

4    Robert Lechman, on November 15, 2007. According to Frederick, the loan was for GLB to set up

5    "Portfolio Margin" trading,[10] which supposedly would allow Tuco greater leverage for its

6    brokerage accounts with GLB. Portfolio Margin trading was never set up, however. GLB has

7    made payments on the loan totaling $150,000. A balance of $100,000 remains.

8                    2.      NYFIX Charges

9        The Tuco Financial Statement lists an amount of $819,990 for "ECN Fees Owed" from

10   NYFIX. The Receiver interviewed Frederick, Gus Katsafaros of GLB, and Brian Carr and Paul

11   Fitzpatrick of NYFIX regarding this issue. The Receiver understands that, pursuant to certain

12   securities regulations (referred to as "Reg. NMS"), there are fees assessed by NYFIX for trade

13   orders that must be satisfied by directed, specific brokerage houses or firms, rather than the entire

14   market place. NYFIX assessed these charges to GLB for trades orders placed by Tuco. GLB

15   deducted these charges from Commissions payable to Frederick. Tuco and Frederick would then

16   allocate the charges to the appropriate Members of Tuco and make the corresponding adjustments

17   to their Member account balances.

18       Tuco and Frederick were unable to allocate $819,990 of these charges to its Members.

19   According to Frederick, NYFIX did not provide sufficient information when it reported the

20   charges to GLB. Frederick has stated that he was told by representatives of NYFIX that the

21   charges would be waived if Tuco was unable to allocate them to its Members. According to

22   NYFIX, it has provided all of the information that it has regarding the charges and the trades to

23   which they relate. NYFIX has stated that it will not waive the charges.

24       With the assistance of IT, the Receiver has undertaken to allocate the charges to the

25   applicable Members. This work is ongoing.

26

27   [10]  Portfolio Margin trading is understood generally by the Receiver to be an alternate method of
          calculating margin limits on trading accounts. Depending on the account, Portfolio Margin

28        may allow the trader greater leverage. Accounts eligible for Portfolio Margin trading must
          meet specific requirements under SEC regulations.

3.    Penson Interest Charges

The Tuco Financial Statement lists an amount of $170,147.17 for "Interest Owed" from Penson as of January 31, 2008.  The Receiver has interviewed Frederick and Gus Katsafaros of GLB, and obtained documents through counsel for GLB and Penson regarding this issue.  The Receiver understands that Penson deducts interest charges from Tuco accounts at Penson when Penson loans money in order for Tuco to meet overnight margin limits.  These interest charges have been cancelled and credited to Tuco upon review and recognition by Penson that the margin limits were in fact met on the relevant date.  Information that the Receiver has received to date indicates that the amount listed on the Tuco Financial Statement is not accurate.  The documents produced GLB indicate that the amount listed is too low, while the documents produced by Penson indicate that the amount is too high.  The Receiver has requested additional information from Penson regarding these charges.

4.    T3 Ownership Interest

In his testimony before the SEC and in interviews with the Receiver, Frederick has stated that Tuco holds a 10% ownership interest in Tuco Member T3.  T3 is a limited liability company headquartered in New York.  The Receiver has discussed this matter with T3 and requested documentation from its counsel relating to this interest.  The documents requested have not yet been received.  The Receiver does not yet know what value, if any, this ownership interest may have.

B.    **Investigation of Payments**

Additionally, the Receiver is investigating various payments to and from Tuco, and amounts deducted from Commissions earned by Frederick.  The Receiver's ongoing investigation includes, without limitation, the following payments and deductions:

1.    GLB Deductions

GLB deducted various amounts from the gross Commissions earned by Frederick.  The Receiver has discussed these deductions with Frederick and requested information about certain of them from GLB.  These deductions include:

1) Industry fees and charges for Tuco's trading activity;

1    2) GLB's monthly service fees of $15,000;

2    3) Rent and other charges pertaining to the Chicago office space which Tuco sub-leased

3    from GLB;

4    4) GLB's legal fees and other costs pertaining to this case, the FINRA Proceeding

5    (discussed below), an investigation relating to certain trades of Tuco Member Jamie Hodge, and

6    an SEC investigation of GLB.

7    A summary of these deductions is included in Exhibit XX to the Preliminary Accounting.

8            2.    <u>Schiller/Southwest Securities</u>

9    Tuco made payments to and received payments from an account at Southwest Securities

10    under the name Schiller, LLC. The Receiver interviewed Frederick regarding these transactions.

11    Per Frederick, in early 2007, Tuco decided to make the Trading Platform Lightspeed available to

12    its Members. This decision was made in connection with opening a Tuco account for Member T3,

13    which preferred Lightspeed to other Trading Platforms.

14    Lightspeed, which is a broker-dealer in addition to being a Trading Platform, did not have

15    an account at Tuco's clearing broker Penson. Accordingly, Tuco needed an account with

16    Southwest Securities, the clearing broker used by Lightspeed, in order to make the Lightspeed

17    platform available to its Members. McDonald already had an account at Southwest Securities

18    under the name Schiller, LLC. Tuco and McDonald agreed that Tuco would temporarily use

19    McDonald's Schiller account for the Tuco Members using the Lightspeed Trading Platform.

20    Lightspeed agreed to open an account with Penson by June 1, 2007.

21    In fact, Lightspeed did not set up an account at Penson until much later. Tuco began using

22    the Schiller account at the end of March 2007 and did not terminate use of the account until

23    December 2007. The Receiver has received and is currently reviewing statements from

24    Lightspeed for the Tuco activity in the Schiller account.

25            3.    <u>Halperin/Marquis Jet Partners</u>

26    David Halperin had Member accounts at Tuco under the name CT Trade. Mr. Halperin

27    also received commission payments from Tuco for Members that he referred. These payments

28    generally went directly to Mr. Halperin, although on one occasion Tuco issued a payment on

1  behalf of Mr. Halperin to a company called Marquis Jet Partners.  A summary of these

2  transactions is attached to the Preliminary Accounting as Exhibit XXIV.

3             4.    Jonathan Kirkland

4        Jonathan Kirkland was a managing member of Evolution.  When Tuco acquired Evolution,

5  a loan Mr. Kirkland had previously made to Evolution was assumed by Tuco and repaid.

6  According to Frederick, Mr. Kirkland relocated to China in early 2007.  Mr. Kirkland received

7  periodic payments from Tuco and was involved with Tuco Member Blackhawk Trading

8  ("Blackhawk").  The Receiver understands that Blackhawk is a Chinese company owned by

9  Mr. Kirkland and a partner named Ferdinand Ledesma.  Blackhawk is headquartered in Hong

10  Kong.  Blackhawk's Member account had a negative balance of $266,080.98 as of May 5, 2008.

11  A summary of the transactions between Tuco and Mr. Kirkland is attached to the Preliminary

12  Accounting as Exhibit XIX.

13             5.    Michael Kestler

14        Michael Kestler was a managing member of Evolution.  He was the "head of trading" for

15  Tuco, a role that included participating in the Tuco Internet chat room, monitoring Member

16  accounts for risk purposes, and consulting with Members on various trading issues.  Mr. Kestler

17  received periodic payments or other compensation from Tuco.  According to Frederick,

18  Mr. Kestler is the guarantor on a $100,000 line of credit obtained by Evolution and on which Tuco

19  has made payments.  Mr. Kestler has an account at Tuco with a negative balance of $54,715 as of

20  May 5, 2008.  Tuco made a $25,000 loan to Black Cat, LLC, an entity owned by Mr. Kestler,

21  which has not yet been repaid.  A summary of the transactions between Tuco and Mr. Kestler is

22  attached to the Preliminary Accounting as Exhibit XVIII.

23             6.    Lisa Hyatt/Kayo Financial

24        Lisa Hyatt, owner of Kayo Financial ("Kayo"), had various transactions with Tuco.  These

25  transactions are summarized in Exhibit XXIII to the Preliminary Accounting.  Ms. Hyatt/Kayo

26  invested in Tuco as a class A member.  These funds came from an entity called E.S. Lovell, at

27  which Ms. Hyatt was employed at the time.  The investment was later recharacterized as a loan

28  and the amount transferred from E.S. Lovell was repaid by Tuco with interest.  Tuco then loaned

1  Kayo funds to invest in a clearing broker called ETC Clearing. The loan from Tuco was repaid by

2  Kayo with funds that came from E.S. Lovell.

3      Ms. Hyatt/Kayo used desk space at the Tuco Premises. The Receiver understands that

4  Ms. Hyatt, in partnership with Michael Kestler, owns Ocean View Capital, the entity that leased

5  the Tuco Premises from the landlord after the Receiver terminated the lease.

6              **VI.    SHORTFALL ANALYSIS**

7      The analysis performed by the Securities and Exchange Commission ("SEC") and

8  presented in connection with its Complaint and Ex Parte Motion for TRO indicates that a shortfall

9  existed with respect to Tuco's assets and the aggregate Member account balance. The shortfall

10  reported by the SEC was $3.51 million as of December 31, 2007, and $1.35 million as of

11  January 31, 2008.

12      The Receiver and Ling have endeavored to determine whether, and in what amount, a

13  shortfall existed with respect to Tuco's net assets over liabilities and aggregate positive Member

14  account balance. This preliminary assessment, shown on Exhibit XVI to the Preliminary

15  Accounting, indicates that a shortfall existed in the following amount on the following dates:

16          December 31, 2006          $1,507,881

17          December 31, 2007          $1,553,396

18          March 5, 2008              $2,990,805

19          May 5, 2008                $3,026,373

20      As noted above, this analysis is preliminary only and is subject to adjustment as the

21  Receiver's investigation continues and outstanding issues are resolved.

22          **VII.    RECEIPTS AND DISBURSEMENTS**

23      Attached hereto as Exhibit B are schedules prepared by the Receiver reflecting receipts and

24  disbursements for the Tuco receivership account from March 18, 2008 through May 15, 2008. As

25  of that date, the balance in the Tuco receivership account was $9,779,314. The receivership

26  account balance has grown steadily as balances from Tuco bank and brokerage accounts have been

27  received, Commissions have been paid, and interest has been earned. The Receiver has obtained a

28  rate of interest higher than the money-market rate currently available at most banks due to the

1  substantial balance in the receivership account and the volume of business he has with California

2  Bank & Trust. The account is currently earning interest at the rate of 2.7%. This rate is also

3  higher than that currently available for most short-term certificates of deposit.

### VIII.   CREDITORS AND CLAIM AMOUNTS

5       The Receiver sent a letter to all known creditors advising them of his appointment and that

6  they should communicate directly with him on all Tuco-related matters. He also had all telephone

7  calls and mail sent to the Tuco offices forwarded to his office. The largest creditor claim appears

8  to be held by Lightspeed. Lightspeed has sent the Receiver invoices stating that it is owed more

9  than $1.3 million. Tuco's books and records indicate that remaining creditor claims combined

10 total less than $200,000.

11      As reflected in the Preliminary Accounting, the aggregate Member account balance as of

12 May 5, 2008 was approximately $12.3 million. The largest Member claims are held by Lanai and

13 T3.

### IX.   PENDING AND POTENTIAL LITIGATION

15      The Receiver is not aware of any pending litigation, other than the instant proceeding, in

16 which Tuco has been named as a party. The Receiver is informed that the SEC has commenced an

17 administrative proceeding against Frederick.

18      GLB Trading was named in a proceeding initiated by The Nasdaq Stock Market

19 ("Nasdaq") before the Financial Industry Regulatory Authority Office of Hearing Officers in or

20 about November 2007 ("FINRA Proceeding"). This proceeding was the result of an investigation

21 into certain trade orders that violated the New York Stock Exchange's rules and policies regarding

22 the use of partial or odd-lots. GLB identified these trade orders as coming from Tuco, which in

23 turn identified them as coming from Member Lanai. The trade orders were made by Lanai using

24 the Trading Platform of Sterling Financial Services ("Sterling").

25      In December 2007, GLB and Nasdaq agreed to settle and dismiss the FINRA Proceeding

26 on certain terms and conditions, including (a) that GLB permanently terminate all customers

27 known to have engaged in the trades at issue, (b) that GLB retain, at its own expense, an

28 independent consultant to evaluate, examine and audit GLB and its preventative system processes,

1　whether at GLB or at Sterling, (c) that the independent consultant again conduct a review at GLB's

2　expense 120 days after his initial review, and (d) that GLB fully cooperate with the independent

3　consultant (the "Settlement").  The independent consultant selected by Nasdaq and GLB

4　conducted his initial review in February 2008.  The follow-up review is scheduled in June 2008.

5　　　　As a result of the FINRA Proceeding and the Settlement, GLB has deducted certain legal

6　fees and costs from Commissions payable to Frederick.  The Receiver's investigation into and

7　efforts to resolve these and other deductions, as well as the $100,000 balance remaining on the

8　loan made to GLB, are ongoing.

9　　　　Additionally, Penson withheld $300,000 when it closed the Tuco accounts and transferred

10　the balances to the Receiver.  Penson has asserted the right to offset from those balances all losses

11　suffered in connection with the liquidation of market positions.  The Receiver does not agree with

12　Penson regarding the allocation of loss responsibility.  Separately, the Receiver has asserted the

13　right to recover from Penson interest charges that were collected by Penson from the Tuco

14　accounts (discussed above).  The Receiver and Penson are engaged in settlement discussions in an

15　effort to resolve both of these issues.

16　　　　Finally, as noted above, Frederick has stated that Tuco has an ownership interest in T3, a

17　Member with a large trading volume.  Thus far, T3 has neither agreed with nor disputed this

18　ownership claim.  The Receiver is investigating this issue and hopes to resolve it with T3 without

19　litigation.

20　　　　　　　　　**X.　　CONTINUING ACTIVITY**

21　　　　Based on his preliminary investigation and accounting, the Receiver recommends and

22　requests that the Court order that the receivership continue pursuant to the Judgment, Order in Aid

23　and any supplemental orders issued by the Court.  The Receiver will continue his investigation,

24　analysis and accounting of Tuco, and provide an updated report and accounting in approximately

25　120 days.

26　　　　Certain transactions discussed herein and in the Preliminary Accounting, as they have been

27　described to the Receiver and based on his initial review, may give rise to fraudulent conveyance

28　and/or preferential transfer claims.  Fraudulent conveyance claims arise from transfers from an

1   insolvent or undercapitalized debtor in return for which reasonably equivalent value is not

2   received.  Fraudulent intent is not a required element for these claims.  Preference claims, a theory

3   developed under bankruptcy law, arise from payments to creditors during the period immediately

4   preceding commencement of the action that allow the creditor to obtain a larger portion of the

5   estate that it otherwise would.  The Receiver will investigate and pursue any such claims and seek

6   relief from the Court as appropriate.

7        In the next several weeks, the Receiver hopes to apply to the Court for authority to make

8   an interim distribution.  An interim distribution was contemplated by the Receiver early in the

9   case.  At that time, however, the Receiver was unaware of the large number of trades placed into

10  the error account by Penson and the open positions remaining in the Tuco accounts.  As noted

11  above, these error account trades and open positions had to be liquidated and reconciled, a process

12  that was completed in early May.  In the meantime, Tuco creditor Lightspeed has raised an issue

13  about the priority of distribution between Members and other creditors.  Lightspeed may want to

14  put this priority issue before the Court in connection with the Receiver's application regarding an

15  interim distribution.  The SEC may also wish to be heard on this issue.

16       The Receiver and his professionals also intend to apply to the Court for approval of their

17  fees and costs in the next several weeks.  The Receiver and his professionals have worked

18  diligently on this case without compensation since early March.

19       With respect to final distribution of the receivership estate, all creditor and Member claims

20  should be resolved by way of a relatively short claims process, approval of which the Receiver

21  will seek in the coming weeks.  The Receiver hopes to have the claims process completed by the

22

23

24

25

26

27

28

1   time his next report is filed.  The Receiver will then propose a plan of distribution, including final

2   payment of administrative expenses and distribution of all estate assets.  The Receiver is hopeful

3   that a plan can be approved and final distribution made before the end of the year.

4

5   Dated:  June 2, 2008                        ALLEN MATKINS LECK GAMBLE
                                                MALLORY & NATSIS LLP
6

7                                               By:/s/ David L. Osias
                                                   _____
8                                                  DAVID L. OSIAS
                                                   Attorneys for Permanent Receiver Thomas F.
                                                   Lennon
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28