DANIEL G. VIOLA, Pro Hac Vice
dviola@sglawyers.com
DENNIS R. HIRSCH, Cal. Bar No. 194243
drhirsch@sglawyers.com

SADIS & GOLDBERG LLP
50 California Street, Suite 2320
San Francisco, California 94111
Tel: (415) 490-0563

Counsel for Defendants
Tuco Trading LLC and Douglas G. Frederick

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> TUCO TRADING, LLC and DOUGLAS G. FREDERICK, <br><br> Defendants. | Case No.: 08 CV 00400 DMS (BLM) <br><br> DEFENDANT DOUGLAS G. FREDERICK'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION UNDER FED.R.CIV.P. 60(B)(6) FOR VACATUR OF THE JUDGMENT <br><br> DATE:        September 19, 2008 <br> TIME:        1:30 p.m. <br> COURTROOM:   10 <br> Hon.         Hon. Dana M. Sabraw |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT................................................................. 1

II.   STATEMENT OF FACTS .................................................................. 2

      Background of Doug Frederick and Tuco................................................ 2

      Frederick cooperated fully with the SEC investigation of Tuco ............................... 5

      The SEC sought a TRO freezing Tuco's and Frederick's Assets ............................ 6

      Penson took action cutting off Frederick's commissions from GLB ........................ 8

      Frederick was under extraordinary stress at the time he was confronted
      with the Consent ........................................................................ 9

      Frederick signed a consent decree in exchange for assurances that his
      personal assets would not be frozen .................................................... 12

      Following the Consent and the Judgment, the SEC has requested a lifetime
      ban of Frederick from the securities industry............................................13

III.  STANDARDS FOR VACATING A JUDGMENT UNDER RULE 60(b) ............13

      Standard under Rule 60(b) ..............................................................14

IV.   FREDERICK IS ENTITLED TO RELIEF UNDER RULE 60(b) DUE TO
      CIRCUMSTANCES BEYOND HIS CONTROL AND A RESULTING INJURY....14

      A     The Permanent Injunction is a Career-Ending Injury......................................14

      B.    Circumstances Beyond His Control Prevented Frederick from Defending
            this Matter Properly and Taking Action to Prevent the Judgment .................... ...15

V.    CONCLUSION ........................................................................ 16

i

# TABLE OF AUTHORITIES

## CASES

Page

*Yanow v. Weyerhaeuser S.S. Co.*
    274 F.2d 274, 284 (9th Cir. 1959) ............................................................ 13

*Slaven v. American Trading Transp. Co., Inc.*
    146 F.3d 1066, 1070 (9th Cir. 1998) ...................................................... 14

*Stratfman v. Babbitt*
    42 F.3d 1402 (Table), 1994 WL 681071, *1, *3, (9th Cir. 1994) ............................ 14

*In re Hammer*
    940 F.2d 524, 525 (9th Cir. 1991) ........................................................ 14

*United States v. Alpine Land & Reservoir Co.*
    984 F.2d 1047, 1049 (9th Cir. 1993 ...................................................... 14

*Community Dental Services v. Tani*
    282 F.3d 1164, 1168 (9th Cir. 2002) ..................................................... 14

## FEDERAL STATUTES

**Securities Exchange Act of 1934**

Section 10(b)
    [15 U.S.C. § 78j(b)] ......................................................... 1, 6, 14

Section 10(b)(5)
    [15 U.S.C. § 78j(b)] ...................................................... 1, 6, 14, 15

Section 15(b)(6)
    [15 U.S.C. § 78o(b)(6)] .................................................. 15, 16, 17

## FEDERAL REGULATIONS

Regulation T ...................................................................................................4

Fed.R.Civ.P. 60(b)(6)
  [17 C.F.R. § 240.60b] ..............................................................2, 13, 14

NASD/FINRA Rule 2520.................................................................................4

## MISCELLANEOUS AUTHORITIES

Merriam-Webster Online Dictionary
(http://www.merriam-webster.com/dictionary/autism .....................................9

SEC Obtains Emergency Orders Against California Firm Defrauding
(http://www.merriam-webster.com/dictionary/autism .....................................15

## I.     PRELIMINARY STATEMENT

The SEC presented Douglas G. Frederick ("Frederick") with a choice—jeopardize the health and safety of his family or sign a consent decree in which he would admit to doing things that he never actually did.  As a result of extraordinary circumstances in his life at that time, Frederick was unable to think clearly or understand what he was doing—and signed the consent decree.

At the time he was asked to sign the consent decree, Frederick was under extraordinary stress due to a "perfect storm" of factors:  (a) he had recently begun a intensive treatment plan for his autistic child that would cost thousands of dollars each month; (b) Frederick's wife, having already miscarried once, was seven months pregnant with their second child; (c) dozens of the 1,700 Class B Members of Tuco were calling Frederick daily to demand an explanation from him why the SEC was seeking to shut down Tuco's business; (d) Frederick was personally incurring expenses of about $20,000 each day for the services of the receiver that the Court had appointed in this matter; and (e) while confronted with these drastically increased expenses, Frederick was facing a potential freeze of his personal assets.

This perfect storm was exacerbated by the fact that this case involves issues of first impression.  These issues include whether:

(a) the specific statutory exemption from the duty to register for persons associated with a broker or dealer applies to a day-trading firm that is operated by a registered representative of a member firm; and

(b) an interest in a day-trading firm organized as a limited liability company is a "security" under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. [1]

---

[1] In the related administrative proceeding, the SEC recently filed a memorandum of law claiming that everyone has misunderstood the SEC's allegation of which "securities" were misrepresented by Tuco and Frederick. According to the SEC's recently filed papers, it is now their position that the purported omissions of accounts receivable were "in connection with the purchase and sale" of *all* securities. This position is nearly impossible to find in the Complaint.
{00121989.DOC}

When the SEC presented the Consent, Frederick did not understand what he was signing. He does not and did not believe that he or Tuco engaged in any wrongdoing or illegal conduct. He would never have signed the Consent if he had not been under such considerable stress at the time. Accordingly, due to these extraordinary circumstances, Frederick now seeks modification and partial vacatur of the judgment, and the consent decree upon which it was based, under Fed.R.Civ.P. 60(b)(6).

## II.    STATEMENT OF FACTS

*Background of Doug Frederick and Tuco*

Frederick formed Tuco in August 2006. Tuco was a Nevada limited liability company, with its main offices in California. It was a proprietary trading customer account that did not solicit, execute, or carry accounts for public customers.

Frederick was a Series 7 licensed registered representative of GLB Trading, Inc. ("GLB"), a FINRA/NASD licensed broker-dealer under Section 15 of the Securities Exchange Act of 1934.[2] Tuco was an outside business activity that was fully disclosed on Frederick's Form U-4 Filing with FINRA and the SEC.

GLB supervised Frederick at all relevant times and assisted him in operating Tuco. In fact, GLB instructed Frederick, its registered representative, that Tuco and Frederick should both operate out of GLB's offices in Irvine, CA.

Tuco had three brokerage accounts at GLB, and Frederick was the registered GLB representative on each account[3] and reported directly to the president of GLB. Tuco was never registered as a broker-dealer because it was not a broker-dealer. It was an LLC customer account that was operated by Frederick, a registered representative of member firm GLB.

---

[2] See Complaint, ¶15, a copy of which is annexed to the Frederick Declaration as Exhibit A.
[3] See Complaint, ¶15.
{00121989.DOC}

All customer trades were cleared by GLB through Penson Financial Services, Inc. ("Penson")[4]. Penson is a registered clearing broker-dealer and clears numerous brokerage customer accounts structured similar to Tuco.

Tuco had two classes of members, as indicated in Tuco's operating agreement, a copy of which is annexed to the Frederick Declaration as Exhibit B. Frederick was the Class A member. The traders that worked for Tuco were Class B members.

Tuco's business was to provide services and support to the Class B members, professional securities traders who sought to generate profits based upon their own self-directed trading. All Class B members are generally sophisticated and experienced traders that possess the desire to be self-employed independent securities traders. A Class B member was able to make capital contributions to Tuco to support his or her own trading activity. The capital contribution was typically credited to a unique sub-account for such Class B member. Such sub-account was created by Penson at the request of GLB and Frederick, the supervised agent of GLB. The margin requirements and trading profits and losses of the Class B member were reflected in the name of Tuco, the customer account.

Each Class B member managed their own trading by determining their own strategies in day-to-day business operations. Those members were responsible for their own trading profits and losses based on their own trading decisions. This responsibility was made clear in the operating agreement for Tuco Trading LLC: "[A] member shall have the authority to (i) purchase, hold, sell (including sell short), transfer, exchange, or otherwise acquire and dispose of, and exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to, Securities"[5].

---

[4] See Complaint, ¶8.
[5] See Operating Agreement of Tuco Trading LLC, paragraph 2.05(a), a copy of which is annexed to the Frederick Declaration as Exhibit B.
{00121989.DOC}

Tuco never purchased any securities for any third parties. All trades were submitted to GLB by the customer, namely Tuco, in Tuco's name.

The Tuco investment scenario involved hundreds of separate investment enterprises between Tuco and each individual trader. Under that scenario, one trader's profits did not inure to another, nor did any trader's losses negatively impact any other. Moreover, no trader had any rights to distributions based on earnings of the company, nor did it have any appreciation rights in Tuco through membership holdings.

Margin calls were based on the overall net equity of all of the sub-accounts of Tuco, consistent with the industry standards and Regulation T and NASD/FINRA Rule 2520.

In order to meet margin calls and satisfy other operational requirements, Tuco borrowed money from one of three entities: Schiller, LLC; Worldwide Trader Capital, LLC; or Caledonia, LLC (collectively the "McDonald Entities"). These entities are all controlled by, or owned by an individual named Frank McDonald.

Each Monday, Tuco borrowed funds from one of the McDonald Entities in an amount ranging from $500,000 to $1.8 million, depending on GLB's and Frederick's estimation of the upcoming volume of trading that would occur. The McDonald Entities each had accounts at Penson. On Mondays, McDonald would simply journal funds from the appropriate Penson account into Tuco's account. Each Friday, Tuco would then pay these funds back to the lending McDonald Entity, with interest.

Tuco never received any transaction-based compensation, the key test in determining whether an individual or entity must register as a broker-dealer. Penson collected all commissions and took its percentage, then paid them to GLB, which then paid Frederick a monthly salary of approximately $10,000 to $15,000 per month. After Frederick had deposited his share, he then paid any of Tuco's bills, but never issued any transaction-based commissions to Tuco.

{00121989.DOC}

*Frederick cooperated fully with the SEC's investigation of Tuco.*

In November 2007, SEC investigator Kent Woo ("Woo") contacted Frederick and informed him that the SEC was conducting a routine investigation of GLB and Tuco. Woo requested copies of documents regarding operating agreements and customer accounts. Frederick obliged without hesitation.

In mid-January 2008, Frederick told Woo that he was about to buy his own self-executing broker-dealer and operate it, in order to avoid continuing to pay Penson to clear Tuco's trades. Frederick explained to Woo that he wanted to be sure that the SEC did not plan to pursue any sanctions against Tuco for any reason, because Frederick's purchase of the broker-dealer required a nonrefundable $250,000 deposit and Frederick did not want to buy the broker-dealer if there were going to be any regulatory difficulties. In response, Woo did not inform Frederick that the SEC was planning to seek any sanctions against Tuco.

Woo asked Frederick on February 7, 2008 to come in and meet with some SEC staff members. Frederick again agreed to do so.

However, Frederick was informed by the SEC on or about the following day, February 8th, that his appearance was required at the SEC's offices in Los Angeles on February 11, 2008, in the presence of a court-appointed stenographer and four senior attorneys from the SEC's Division of Enforcement. After receiving this shocking information, Frederick contacted Woo and stated that he may need to retain an attorney and would call to reschedule the meeting in a week.

In a panic, Frederick then retained the law firm of Keesal, Young & Logan, of Long Beach, CA. Both Frederick and his attorney, Stephen Young, were planning vacations in February 2008, so Young told Frederick that he planned to ask the SEC for additional time to reschedule Frederick's testimony.

{00121989.DOC}

1  The SEC, however, was unwilling to postpone Frederick's testimony and stated that if he

2  did not appear on February 13th, the SEC would shut down Tuco. This was the first indication that

3  Frederick received that the SEC wanted to shut down Tuco.

4  Accordingly, Frederick—unprepared, naturally—appeared at the SEC's offices with Young

5  on February 13, 2008, and testified under oath for several hours.

6  On March 3, 2008, the SEC informed Frederick that it would be filing a complaint and a

7  motion for temporary restraining order against Tuco and Frederick on the following day. This was

8  the first time that Frederick learned that the SEC planned to pursue any sanctions against Tuco or

9

10  Frederick for their conduct.

11  The SEC did in fact file a complaint (the "Complaint", Document No. 1) in this matter

12  against Tuco and Frederick, on the next day, March 4, 2008. Notably, the Complaint did not allege

13  any ill-gotten gains by Frederick, but only by Tuco. Nor did the Complaint elucidate how Tuco, a

14  customer of GLB, could be considered a broker-dealer, or how the interests in Tuco could be

15  considered "securities" within the meaning of Section 10(b) of the Securities Exchange Act of 1934

16  and Rule 10b-5[6].

17

18  ***The SEC sought a TRO freezing Tuco's and Frederick's assets.***

19  On the same day that it filed the Complaint, March 4, 2008, the SEC moved this Court *ex*

20  *parte* for an temporary restraining order and orders, among other things, (1) freezing the assets of

21  both Frederick and Tuco; and (2) appointing a temporary receiver.

22

23

24

25

26

27

28

---

[6] Frederick has challenged the legal theories behind the Complaint in an SEC administrative proceeding, In re Frederick, File No. 3-13004. A copy of his Motion for Summary Disposition is annexed to the Frederick Declaration as Exhibit C.
{00121989.DOC}

SEC V. TUCO AND FREDERICK, CASE NO. 08-CV-00400

6

Following the hearing, the Court issued an order (the "TRO", Document No. 7) on March 5th appointing a temporary receiver, but denying the SEC's request to freeze Frederick's and Tuco's assets[7], pending a hearing scheduled for March 19th.

Later that day, in a follow-up telephone conference, SEC attorney Donald Searles indicated to the Court that there was "confusion" regarding whether Tuco's traders would be allowed to continue to trade under the TRO[8]. In response, the Court clarified that "rather than issue a TRO freezing assets and enjoining the defendants from conducting business", it wanted instead to "decline to do that" and instead schedule the matter for a hearing[9].

To further shed light on what the TRO had meant, Defendants' attorney Michele Fron stated during the telephone conference, "It is our understanding that the intent of the court was to allow Tuco Trading to continue in its normal business practices between now and March 19[th], and that their investors are allowed to execute orders, as they have been. And if they wish to withdraw funds, that they will be allowed to do so."[10] The Court answered Ms. Fron by stating, "That's correct"[11].

The Court confirmed this interpretation in its Supplemental Order (the "Supplemental TRO", Document No. 9) on March 6, 2008, which stated that Tuco could withdraw cash or other assets from its accounts at any brokerage firm if the receiver confirmed "that the person or entity requesting the withdrawal: (1) has a contractual right to withdrawal prior to March 20, 2008; or (2) the requested withdrawal is in the ordinary course of business for the specific trader's account at

---

[7] See Temporary Restraining Order of March 5, 2008, Doc. No. 7, p.2 ("the Court denies the Commission's request to freeze Defendants' assets").
[8] See Tr. of Telephonic Hearing re Temporary Restraining Order, Mar. 5, 2008, at 3:14-16, a copy of which is annexed to the Frederick Declaration as Exhibit D.
[9] See Tr. of Telephonic Hearing re Temporary Restraining Order, Mar. 5, 2008, at 4:11-15, a copy of which is annexed to the Frederick Declaration as Exhibit D.
[10] See Tr. of Telephonic Hearing re Temporary Restraining Order, Mar. 5, 2008, at 5:21-6:1, a copy of which is annexed to the Frederick Declaration as Exhibit D.
[11] See Tr. of Telephonic Hearing re Temporary Restraining Order, Mar. 5, 2008, at 6:2, a copy of which is annexed to the Frederick Declaration as Exhibit D.

{00121989.DOC}

SEC V. TUCO AND FREDERICK, CASE NO. 08-CV-00400

issue; or (3) other exigent circumstances are demonstrated warranting a withdrawal prior to March 20, 2008."

Two more telephonic hearings with the Court ensued, in attempts to further clarify the mounting confusion regarding the meaning of "ordinary course of business". These hearings took place on March 7th and March 10th.

### Penson took action cutting off Frederick's commissions from GLB.

In spite of repeated clarifications of the TRO, Tuco was not able to operate in the ordinary course of business. This was because after the Court issued the TRO and the Supplemental TRO, its clearing broker, Penson, refused to honor margin calls to Tuco and then shut down Tuco's account.

There had been a margin call on February 29, 2008, just as there was every Friday while Tuco was operating. In the ordinary course of Tuco's business, Penson would have honored such a margin call on the same day, by allowing the weekly deposit from one of the McDonald Entities. Instead, Penson took the position that once the McDonald funds were in Tuco's account at Penson, the TRO would bar any withdrawal of those funds[12]. Thus, Penson stated, it could not be repaid by Tuco for covering the margin call. Therefore, Penson terminated clearing services to Tuco's main accounts, and thenceforth allowed only liquidations of open positions.

This action by Penson effectively shut down Tuco's ability to trade. Without any trading activity, no commissions were generated for Frederick from GLB, thus depriving Frederick of any income.

---

[12] Penson's conduct was precipitated by the SEC's overaggressive tactics. The SEC had previously contacted Penson regarding Tuco's account. During the hearing before this Court on March 4th, SEC attorney Roberto Tercero indicated that he had contacted Penson on March 3rd—the day before the SEC filed its motion for the TRO—and asked Penson to voluntarily put a hold on Tuco's account, but that Penson had declined to do so. See Tr. of Hearing re Temporary Restraining Order, Mar. 4, 2008, at 22:19-23:1, a copy of which is annexed to the Frederick Declaration as Exhibit E.
{00121989.DOC}

During two telephonic hearings on March 7th and March 10th, the parties approached the Court and informed the Court of Penson's conduct and Tuco's subsequent de facto shutdown. In response, the Court confirmed that "if an individual wants to withdraw funds, he has a contractual right to withdraw it" pursuant to the TRO, and that Tuco may honor that withdrawal request if it is "in the ordinary course of business".

Following the March 10th telephonic hearing, Frederick and SEC attorney Roberto Tercero contacted Penson together and informed Penson's attorney Tim Davis that the Court's orders did not mean that it should refuse to cover margin calls or shut down Tuco, which would put 1,700 Class B member Tuco traders out of work. Despite these efforts, Davis informed Frederick and Tercero that due to the SEC's initial request to shut Tuco down, Penson would not change its position.

***Frederick was under extraordinary stress at the time he was confronted with the Consent.***

Frederick was experiencing extraordinary levels of stress at the time that the SEC began to prosecute this case. The most prominent factor that led to his extreme stress at the time was that he and his wife were struggling to institute a treatment plan for their six-year old son Jack, who has autism. Autism is a variable developmental disorder that appears by age three and is characterized by impairment of the ability to form normal social relationships, by impairment of the ability to communicate with others, and by stereotyped behavior patterns[13].

Jack's autism creates special needs, which require a comprehensive treatment plan, consisting of thousands of dollars' worth of evaluations, treatments, and medications, only some of which are covered by insurance.

Shortly before this matter arose, Frederick and his wife committed to this treatment plan. Jack attended the UCLA Autism Evaluation in February 2008, which cost $2,800. Every six weeks,

---

[13] autism. (2008). In Merriam-Webster Online Dictionary. Retrieved July 22, 2008, from http://www.merriam-webster.com/dictionary/autism
{00121989.DOC}

1    Jack began going to a special physician as part of a biomedical program called Defeat Autism

2    Now!, and those visits cost $500. In order to develop and monitor his treatment plan, Jack was

3    required to have his blood tested frequently, which cost a total of $1,344 in February 2008. To

4    block neurotoxins and bacteria in his body, he began taking dietary supplements called probiotics,

5    which cost over $100 monthly. He attended speech and occupational therapy, each of which visits

6    cost nearly $100 each week. He also received regular injections of vitamin B-12 with folinic acid,

7    which are $60 a month, as well as homeopathic drops, which are $130 per month.

8

9         Jack also had a dietary intervention to lessen the digestive and bowel issues sometimes

10   connected with autistic children. This intervention requires a gluten-free and casein-free ("GF/CF")

11   diet. All of his foods had to be purchased from Whole Foods Market or online retailers specializing

12   in GF/CF foods, which is considerably more expensive than regular food. For instance, a loaf of

13   GF/CF bread costs $5.19 and making a batch of GF/CF cupcakes costs $14.00.

14

15        Since the SEC had tried repeatedly to freeze Frederick's personal assets in this case—and he

16   understood that if he litigated this case with the SEC, he would most likely get no more than $3,000

17   each month for living expenses while the case was pending—Frederick feared that this case would

18   jeopardize his ability to continue to pay for Jack's treatment plan. This was because $3,000 would

19   not have been enough to pay for both Jack's treatments and Frederick's fixed household expenses.

20        Since the treatment plan was instituted for Jack, he has made significant strides and

21   dramatically improved his quality of life. Frederick and his wife have noticed vast improvements in

22   Jack's attention, focus, speech, and socialization.

23

24        Another factor that contributed to Frederick's extreme stress at the time that he signed the

25   Consent was the fact that his wife was seven months pregnant with their second child. It was

26   stressful because she had already had a miscarriage during an earlier pregnancy. In addition,

27   Frederick feared that a personal asset freeze or a $3,000 limit to his monthly allowance would

28

{00121989.DOC}

SEC V. TUCO AND FREDERICK, CASE NO. 08-CV-00400

endanger his ability to pay any necessary medical bills connected to the birth. Currently, Frederick's wife is no longer pregnant. She gave birth in May 2008 to a healthy baby boy.

A third factor that contributed to Frederick's extreme stress at the time that he signed the Consent was the fact that the 1,700 Class B members of Tuco were calling him every day at that time, demanding an explanation for what had transpired in this matter.

As set forth above, the TRO was intended to allow Tuco to continue in its normal business practices, allowing the Class B members to trade and make any necessary withdrawals in the ordinary course of Tuco's business. Nevertheless, as set forth above, in response to a request by the SEC, clearing broker Penson shut down Tuco's master account in the wake of the TRO.

After Penson took this action, the Class B members began calling Frederick every day, demanding to know what was going on and why they could not withdraw any money. Frederick believed that Penson was disobeying the TRO by shutting down Tuco and refusing to honor the margin call, but he was ultimately unable to convince it to change its position.

Exacerbating Frederick's stress was the fact that Penson's action ceased all of Tuco's trading activity, and therefore no commissions were generated for Frederick from GLB, thus depriving him of any income.

At this point, the Class B members are no longer calling Frederick every day. They are dealing directly with the receiver in this matter.

A fourth factor that contributed to Frederick's extreme stress at the time that he signed the Consent was the fact that the Court had ordered Tuco and Frederick to pay all costs, fees, and expenses of the temporary receiver incurred in connection with his duties under the TRO, including all costs and expenses of anyone "engaged or employed" by the receiver to assist him, and these costs, fees, and expenses were mounting at an approximate daily cost of $20,000.

{00121989.DOC}

Following the hearing on March 4th, receiver Thomas Lennon appeared at Tuco's offices on the morning of March 5th, along with his attorney and his accountants, and reviewed Tuco's records for approximately 10 hours, at a combined hourly rate of approximately $1,900. This entourage continued to appear daily at Tuco's offices, including weekends, mounting devastating fees equivalent to economic sanctions.

***Frederick signed a consent decree in exchange for assurances that his personal assets would not be frozen.***

In response to Frederick's concerns regarding his ability to continue paying for Jack's special needs and also support a second child, the SEC indicated that if Frederick were to agree to the freezing of all of Tuco's assets—which would essentially put Tuco out of business—then the SEC would agree not to freeze Frederick's personal assets, which would allow Frederick to pay his bills and use his credit cards.

Frederick did not and does not believe that he or Tuco engaged in any illegal conduct. As the Class A Member of Tuco, he operated in accordance with the operating agreement that his Class B partners/traders signed. The Class B Members were sophisticated and active in the Tuco business. His attorneys informed him, however, that he would spend at least $500,000 litigating this matter if he did not settle the case with the SEC, and that he could not be guaranteed a victory, since the case involves issues of first impression (this being the first proceeding against a registered representative of a registered broker-dealer who operated a fully-disclosed day-trading firm through the member firm).

Frederick was under extraordinary stress, in that he was faced with thousands of dollars of monthly expenses to care for his family, including the special needs of his child. He had ceased receiving income, since his commissions through GLB had stopped, due to Penson's decision to shut down Tuco. He was personally incurring approximately $20,000 of expenses each day for the

{00121989.DOC}

1  receiver's services in this case.  He did not possess sufficient savings to fund these expenses and

2  this litigation.

3  Due to all of these factors, on or about March 14, 2008, Frederick instructed his attorneys to

4  contact the SEC and inform them that he would agree to their conditions.  The SEC quickly drafted

5  a consent waiver and presented it to Frederick.  As the SEC had promised, the consent would freeze

6  Tuco's assets but would not seek to freeze Frederick's personal assets.

7  On March 14, 2008, Frederick signed the Consent of Defendant Douglas G. Frederick (the

8  "Consent", Document No. 23-3), as well as the Consent of Defendant Tuco Trading, LLC.

9

10  On March 31, 2008, the Court entered a Judgment (the "Judgment", Document No. 24) as to

11  Defendants, as well as Orders: (1) Freezing Tuco's Assets; (2) Appointing a Permanent Receiver

12  over Tuco; and (3) Prohibiting the Destruction of Documents.  The Judgment ordered that Tuco and

13  Frederick "shall pay disgorgement of ill-gotten gains" with interest, as well as a civil penalty, to be

14  determined upon motion by the SEC.

15

16  *Following the Consent and the Judgment, the SEC has requested a lifetime ban of Frederick
from the securities industry.*

17  In the companion administrative proceeding, In re Frederick, File No. 3-13004, the SEC is

18

19  now seeking to bar Frederick from ever working in the securities industry again[14], and is relying

20  entirely upon the Consent.

21

22  **III.    STANDARDS FOR VACATING A JUDGMENT UNDER RULE 60(b)**

23  Courts are to use their power under Rule 60(b) to vacate judgments "whenever such action is

24  appropriate to accomplish justice".  Yanow v. Weyerhaeuser S.S. Co., 274 F.2d 274, 284 (9th Cir.

25  1959).

26

27
—————————————

28  [14] A copy of the SEC's Motion for Summary Disposition in the administrative proceeding is annexed to the Frederick
Declaration as Exhibit G.
{00121989.DOC}

1    If the judgment at issue was entered pursuant to a stipulation, a party seeking relief from it

2    must do so through Rule 60(b), since there is no right of direct appeal from judgments entered

3    through consent decrees. See Slaven v. American Trading Transp. Co., Inc., 146 F.3d 1066, 1070

4    (9th Cir. 1998).

5    A motion under Rule 60(b) must be made "within a reasonable time". The primary

6    considerations in this determination are whether the moving party had good reason for not acting

7    sooner and whether the adverse party was prejudiced by the delay. Stratman v. Babbitt, 42 F.3d

8    1402 (Table), 1994 WL 681071, *1, *3 (9th Cir. 1994). As the Judgment was entered on March 31,

9    2008, and there is no prejudice to the SEC, this motion is timely.

10

11   ***Standard under Rule 60(b)(6)***

12   A court may vacate a judgment for "any...reason that justifies relief". Fed.R.Civ.P. 60(b)(6).

13   Rule 60(b)(6) is remedial and therefore "should be liberally applied". In re Hammer, 940 F.2d 524,

14   525 (9th Cir. 1991).

15

16   This subsection is designed to provide relief "where extraordinary circumstances prevented

17   a party from taking timely action to prevent or correct an erroneous judgment". United States v.

18   Alpine Land & Reservoir Co., 984 F.2d 1047, 1049 (9th Cir. 1993).

19   It is appropriate to vacate a judgment under this subsection if the movant demonstrates

20   "injury and circumstances beyond his control that prevented him from proceeding with the

21   prosecution or defense of the action in a proper fashion". Community Dental Services v. Tani, 282

22   F.3d 1164, 1168 (9th Cir. 2002).

23

24

25   **IV.    FREDERICK IS ENTITLED TO RELIEF UNDER RULE 60(b)(6) DUE TO CIRCUMSTANCES BEYOND HIS CONTROL AND A RESULTING INJURY**

26

27   **A.    The Permanent Injunction is a Career-Ending Injury**

28

{00121989.DOC}

It is indisputable that Frederick has—and will continue—to suffer a career-ending injury as a result of the permanent injunction which bars him from continuing a Tuco-like business or from violating the broad provisions of Rule 10b-5 of the Exchange Act. But these injunctive provisions do not act alone—they serve as the basis for the SEC to bring a "follow-on" administrative procedure to bar Frederick from ever working in the securities industry. See e.g., Section 15(b)(6) of the Exchange Act. The SEC has indicated in the administrative proceeding that it seeks precisely this lifetime ban against Frederick. In addition, the SEC filed a press release on March 6, 2008 indicating that Frederick committed fraud[15], even though the Consent indicates that it is "[w]ithout admitting or denying the allegations of the complaint".

**B.    Circumstances Beyond His Control Prevented Frederick From Defending this Matter Properly and Taking Action to Prevent the Judgment**

This action was commenced by the SEC not merely by a complaint but by an *ex parte* motion seeking emergency relief in various forms, including freezing the personal assets of Frederick. It was this motion that placed intense pressure and extraordinary stress on Frederick and placed him in a situation of extraordinary circumstances—deciding whether to ensure the safety and well-being of his family, or instead to challenge the SEC on its legal theories.

The safety and well-being of his family was at risk because Frederick faced the prospect of losing access to his personal assets when his family had extensive health care needs. This prospect constitutes an extraordinary circumstance. As set forth above, Frederick's wife was approximately seven months pregnant with their second child, and the autism of their first child required a special treatment plan in terms of treatments, medications, and diet. These needs create an extreme financial burden of thousands of dollars a month. Aside from this burden, Frederick was also personally (along with Tuco) incurring daily expenses of about $20,000 in connection with the

---

[15] "SEC Obtains Emergency Orders Against California Firm Defrauding Day-Traders", available at http://www.sec.gov/news/press/2008/2008-36.htm.
{00121989.DOC}

1   receiver that was appointed in this matter. In addition, he was receiving daily telephone calls from

2   the 1,700 Class B members of Tuco, demanding an explanation from him.

3        In addition, the receiver refuses to reimburse Frederick for his legal fees, a right that

4   Frederick is entitled to under the Tuco operating agreement. The receiver's counsel has indicated

5   that this request may result in a negative recommendation from the receiver to the SEC.

6        These burdens were magnified by the fact that the SEC's aggressive actions in this matter

7   led to Penson shutting down Tuco's account, thus eliminating any commissions to Frederick. These

8   commissions were Frederick's sole source of income, which he reinvested into the Tuco business

9   for the benefit of the Class B Member traders, allowing them to actively trade and make their

10  livelihood. Any funds left over after this reimbursement constituted his salary. Therefore, after the

11  SEC brought this action, he had no means to pay his family's expenses.

12       When he signed the Consent, Frederick was unable to understand what he was signing

13  because he was under such extraordinary stress. The combination of these factors constitutes

14  extraordinary circumstances, and therefore the Court should vacate the judgment under

15  Fed.R.Civ.P. 60(b)(6).

16

17  **V.    CONCLUSION**

18       In the span of just over one month, Doug Frederick watched the SEC aggressively shut

19  down his day-trading business without warning, stopped receiving all income, and then learned that

20  it would cost him hundreds of thousands of dollars to fight the SEC and attempt to get his business

21  back. Frederick was unable to properly understand what he was he was signing because he was

22  under such incredible stress due to the SEC's threat to cut off the money he needed to treat his

23  autistic child's special needs. The situation was further exacerbated by the fact that the stress of

24  having personal assets frozen in the midst of his wife's pregnancy could jeopardize the health of his

{00121989.DOC}

1   child. These factors constitute the requisite injury and extraordinary circumstances to justify vacatur

2   of the judgment and consent decree under Rule 60(b)(6). This case involves issues of first

3   impression, and should be decided based upon the merits, not based upon a consent decree that was

4   signed under the aforementioned circumstances.

5

6   Dated: August 8, 2008

7

8                                                    SADIS & GOLDBERG, LLP

9
                                                     By: Daniel G. Viola, Esq., Pro Hac Vice
10                                                   Dennis R. Hirsch, Cal. Bar No.: 194243
                                                     Attorneys for Defendants
11                                                   Tuco Trading LLC and Douglas G. Frederick
                                                     50 California Street, Suite 2320
12                                                   San Francisco, CA 94111
                                                     Telephone: (415) 490-0561
13                                                   Facsimile: (415) 391-1377
                                                     E-MAIL: dviola@sglawyers.com
14                                                            drhirsch@sglawyers.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

{00121989.DOC}

SEC V. TUCO AND FREDERICK, CASE NO. 08-CV-00400