DANIEL G. VIOLA, Pro Hac Vice
dviola@sglawyers.com
DENNIS R. HIRSCH, Cal. Bar No. 194243
drhirsch@sglawyers.com

SADIS & GOLDBERG LLP
50 California Street, Suite 2320
San Francisco, California 94111
Tel: (415) 490-0563

Counsel for Defendants
Tuco Trading LLC and Douglas G. Frederick

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>TUCO TRADING, LLC and DOUGLAS G. FREDERICK,<br><br>Defendants. | Case No.: 08 CV 00400 DMS (BLM)<br><br>DECLARATION OF DEFENDANT DOUGLAS G. FREDERICK IN SUPPORT OF HIS MOTION UNDER FED.R.CIV.P. 60(B)(6) FOR VACATUR OF THE JUDGMENT |

{00122470.DOC}
SEC V. TUCO AND FREDERICK, CASE NO. 08-CV-00400

I, DOUGLAS G. FREDERICK, hereby declare, pursuant to 28 U.S.C. §1746, as follows:

1. I am a defendant in this matter and am the sole Class A Member of defendant Tuco Trading, LLC ("Tuco"). I make this declaration in support of my Motion under Fed.R.Civ.P. 60(b)(6) for Vacatur of the Judgment of March 31, 2008. I have personal knowledge of all matters set forth herein and, if called as a witness, could and would competently testify under oath hereto.

*Introduction*

2. As set forth below, at the time that I signed the Consent of Douglas G. Frederick (the "Consent", Document No. 23-3), which ultimately led to the Judgment of March 31, 2008 (the "Judgment"), the SEC had presented me with a choice: either sign the Consent or jeopardize the health and safety of my family.

3. At that time, I could not think clearly and could not understand what I was signing. This was because I was under extraordinary stress due to a "perfect storm" of factors: (a) I had recently begun a intensive treatment plan for my autistic child that would cost me thousands of dollars each month; (b) my wife, having already miscarried once, was seven months pregnant with our second child; (c) dozens of the 1,700 Class B Members of Tuco were calling me daily to demand an explanation from me; (d) I was personally incurring expenses of about $20,000 each day for the services of the receiver that the Court had appointed in this matter; and (e) while confronted with these drastically increased expenses, I was facing a potential freeze of my personal assets.

4. Due to this perfect storm of stress, when the SEC presented the Consent, I did not understand what I was signing. For example, I believed that I was not admitting any wrongdoing, since the terms of the Consent stated that I was neither admitting nor denying the allegations in this case.

{00122756.DOC}

5. Since then, some of these factors have subsided to a degree. Therefore, I am able to think more clearly and can understand the terms of the Consent.

6. I do not believe that Tuco or I engaged in any wrongdoing or illegal conduct. I would never have signed the Consent if I had not been under such considerable stress at the time.

**Background regarding Tuco**

7. I formed Tuco in August 2006. Tuco was a Nevada limited liability company, with its main offices in California. It was a proprietary trading customer account that did not solicit, execute, or carry accounts for public customers.

8. I was a Series 7 licensed registered representative of GLB Trading, Inc. ("GLB"), a FINRA/NASD licensed broker-dealer under Section 15 of the Securities Exchange Act of 1934.[1]

9. Tuco was an outside business activity that was fully disclosed on my Form U-4 Filing with FINRA and the SEC.

10. GLB supervised me at all relevant times and assisted me in operating Tuco. In fact, GLB instructed me, its registered representative, that Tuco and I should both operate out of GLB's offices in Irvine, CA.

11. Tuco had three brokerage accounts at GLB, and I was the registered GLB representative on each account[2] and reported directly to the president of GLB.

12. Tuco was never registered as a broker-dealer because it was not a broker-dealer. It was an LLC customer account that was operated by me, a registered representative of member firm GLB.

13. All customer trades were cleared by GLB through Penson Financial Services, Inc. ("Penson")[3]. Penson is a registered clearing broker-dealer and clears numerous brokerage customer accounts structured similar to Tuco.

---

[1] See Complaint, ¶15, a copy of which is annexed hereto as **Exhibit A**.
[2] See Complaint, ¶15.
[3] See Complaint, ¶8.
{00122756.DOC}

14. Tuco had two classes of members, as indicated in Tuco's operating agreement, a copy of which is annexed hereto as **Exhibit B**. I was the Class A member. The traders that worked for Tuco were Class B members.

15. Tuco's business was to provide services and support to the Class B members, professional securities traders who sought to generate profits based upon their own self-directed trading. All Class B members are generally sophisticated and experienced traders that possess the desire to be self-employed independent securities traders. A Class B member was able to make capital contributions to Tuco to support his or her own trading activity. The capital contribution was typically credited to a unique sub-account for such Class B member. Such sub-account was created by Penson at the request of GLB and me, the supervised agent of GLB. The margin requirements and trading profits and losses of the Class B member were reflected in the name of Tuco, the customer account.

16. Each Class B member managed their own trading by determining their own strategies in day-to-day business operations. Those members were responsible for their own trading profits and losses based on their own trading decisions. This responsibility was made clear in the operating agreement for Tuco Trading LLC: "[A] member shall have the authority to (i) purchase, hold, sell (including sell short), transfer, exchange, or otherwise acquire and dispose of, and exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to, Securities"[4].

17. Tuco never purchased any securities for any third parties. All trades were submitted to GLB by the customer, namely Tuco, in Tuco's name.

18. The Tuco investment scenario involved hundreds of separate investment enterprises between Tuco and each individual trader. Under that scenario, one trader's profits did not inure to another,

---

[4] See Operating Agreement of Tuco Trading LLC, paragraph 2.05(a), a copy of which is annexed hereto as **Exhibit B**.
{00122756.DOC}

SEC V. TUCO AND FREDERICK, CASE NO. 08-CV-00400
3

nor did any trader's losses negatively impact any other. Moreover, no trader had any rights to distributions based on earnings of the company, nor did it have any appreciation rights in Tuco through membership holdings.

19. Margin calls were based on the overall net equity of all of the sub-accounts of Tuco, consistent with the industry standards and Regulation T and NASD/FINRA Rule 2520.

20. In order to meet margin calls and satisfy other operational requirements, Tuco borrowed money from one of three entities: Schiller, LLC; Worldwide Trader Capital, LLC; or Caledonia, LLC (collectively the "McDonald Entities"). These entities are all controlled by, or owned by an individual named Frank McDonald.

21. Each Monday, Tuco borrowed funds from one of the McDonald Entities in an amount ranging from $500,000 to $1.8 million, depending on GLB's and my estimation of the upcoming volume of trading that would occur.

22. The McDonald Entities each had accounts at Penson. On Mondays, McDonald would simply journal funds from the appropriate Penson account into Tuco's account. Each Friday, Tuco would then pay these funds back to the lending McDonald Entity, with interest.

23. Tuco never received any transaction-based compensation. Penson collected all commissions and took its percentage, then paid them to GLB, which then paid me a monthly salary of approximately $10,000 to $15,000 per month. After I had deposited my share, I then paid any of Tuco's bills, but never issued any transaction-based commissions to Tuco.

*I cooperated fully with the SEC's investigation of Tuco.*

24. In November 2007, SEC investigator Kent Woo ("Woo") contacted me and informed me that the SEC was conducting a routine investigation of GLB and Tuco. Woo requested copies of documents regarding operating agreements and customer accounts. I obliged without hesitation.

25. In mid-January 2008, I told Woo that I was about to buy my own self-executing broker-dealer and operate it, in order to avoid continuing to pay Penson to clear Tuco's trades. I explained to Woo that I wanted to be sure that the SEC did not plan to pursue any sanctions against Tuco for any reason, because my purchase of the broker-dealer required a nonrefundable $250,000 deposit and I did not want to buy the broker-dealer if there were going to be any regulatory difficulties. In response, Woo did not inform me that the SEC was planning to seek any sanctions against Tuco.

26. Woo asked me on February 7, 2008 to come in and meet with some SEC staff members. I agreed to do so.

27. However, I was informed by the SEC on or about the following day, February 8th, that my appearance was required at the SEC's offices in Los Angeles on February 11, 2008, in the presence of a court-appointed stenographer and four senior attorneys from the SEC's Division of Enforcement.

28. After receiving this shocking information, I contacted Woo and stated that I may need to retain an attorney and would call to reschedule the meeting in a week.

29. In a panic, I then retained the law firm of Keesal, Young & Logan, of Long Beach, CA. Both my attorney, Stephen Young, and I were planning vacations in February 2008, so Young told me that he planned to ask the SEC for additional time to reschedule my testimony.

30. The SEC, however, was unwilling to postpone my testimony and stated that if I did not appear on February 13th, the SEC would shut down Tuco. This was the first indication that I received that the SEC wanted to shut down Tuco.

31. Accordingly, I appeared—unprepared, naturally—at the SEC's offices with Young on February 13, 2008, and testified under oath for several hours.

32. On March 3, 2008, the SEC informed me that it would be filing a complaint and a motion for temporary restraining order against Tuco and me on the following day. This was the first time that I learned that the SEC planned to pursue any sanctions against Tuco or me.

33. The SEC did in fact file a complaint (the "Complaint", Document No. 1) in this matter against Tuco and me, on the next day, March 4, 2008. Notably, the Complaint did not allege any ill-gotten gains by me, but only by Tuco. Nor did the Complaint elucidate how Tuco, a customer of GLB, could be considered a broker-dealer, or how the interests in Tuco could be considered "securities" within the meaning of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5[5].

*The SEC sought a TRO freezing Tuco's and my assets.*

34. On the same day that it filed the Complaint, March 4, 2008, the SEC moved this Court *ex parte* for an temporary restraining order and orders, among other things, (1) freezing the assets of both Tuco and me personally; and (2) appointing a temporary receiver.

35. Following the hearing, the Court issued an order (the "TRO", Document No. 7) on March 5th appointing a temporary receiver, but denying the SEC's request to freeze Tuco's and my assets[6], pending a hearing scheduled for March 19th.

36. Later that day, in a follow-up telephone conference, SEC attorney Donald Searles indicated to the Court that there was "confusion" regarding whether Tuco's traders would be allowed to continue to trade under the TRO[7]. In response, the Court clarified that "rather than issue a TRO

---

[5] I have challenged the legal theories behind the Complaint in an SEC administrative proceeding, In re Frederick, File No. 3-13004. A copy of my Motion for Summary Disposition is annexed hereto as **Exhibit C**.
[6] See Temporary Restraining Order of March 5, 2008, Doc. No. 7, p.2 ("the Court denies the Commission's request to freeze Defendants' assets").
[7] See Tr. of Telephonic Hearing re Temporary Restraining Order, Mar. 5, 2008, at 3:14-16, a copy of which is annexed hereto as **Exhibit D**.
{00122756.DOC}

freezing assets and enjoining the defendants from conducting business", it wanted instead to "decline to do that" and instead schedule the matter for a hearing[8].

37. To further shed light on what the TRO had meant, Tuco's and my attorney Michele Fron stated during the telephone conference, "It is our understanding that the intent of the court was to allow Tuco Trading to continue in its normal business practices between now and March 19th, and that their investors are allowed to execute orders, as they have been. And if they wish to withdraw funds, that they will be allowed to do so."[9] The Court answered Ms. Fron by stating, "That's correct"[10].

38. The Court confirmed this interpretation in its Supplemental Order (the "Supplemental TRO", Document No. 9) on March 6, 2008, which stated that Tuco could withdraw cash or other assets from its accounts at any brokerage firm if the receiver confirmed "that the person or entity requesting the withdrawal: (1) has a contractual right to withdrawal prior to March 20, 2008; or (2) the requested withdrawal is in the ordinary course of business for the specific trader's account at issue; or (3) other exigent circumstances are demonstrated warranting a withdrawal prior to March 20, 2008."

39. Two more telephonic hearings with the Court ensued, in attempts to further clarify the mounting confusion regarding the meaning of "ordinary course of business". These hearings took place on March 7th and March 10th.

*Penson took action cutting off my commissions from GLB.*

40. In spite of repeated clarifications of the TRO, Tuco was not able to operate in the ordinary course of business. This was because after the Court issued the TRO and the Supplemental TRO,

---

[8] See Tr. of Telephonic Hearing re Temporary Restraining Order, Mar. 5, 2008, at 4:11-15, a copy of which is annexed hereto as **Exhibit D**.
[9] See Tr. of Telephonic Hearing re Temporary Restraining Order, Mar. 5, 2008, at 5:21-6:1, a copy of which is annexed hereto as **Exhibit D**.
[10] See Tr. of Telephonic Hearing re Temporary Restraining Order, Mar. 5, 2008, at 6:2, a copy of which is annexed hereto as **Exhibit D**.
{00122756.DOC}

SEC V. TUCO AND FREDERICK, CASE NO. 08-CV-00400
7

its clearing broker, Penson, refused to honor margin calls to Tuco and then shut down Tuco's account.

41. There had been a margin call on February 29, 2008, just as there was every Friday while Tuco was operating. In the ordinary course of Tuco's business, Penson would have honored such a margin call on the same day, by allowing the weekly deposit from one of the McDonald Entities. Instead, Penson took the position that once the McDonald funds were in Tuco's account at Penson, the TRO would bar any withdrawal of those funds[11]. Thus, Penson stated, it could not be repaid by Tuco for covering the margin call. Therefore, Penson terminated clearing services to Tuco's main accounts, and allowed only liquidations of open positions.

42. This action by Penson effectively shut down Tuco's ability to trade. Without any trading activity, no commissions were generated for me from GLB, thus depriving me of any income.

43. During two telephonic hearings on March 7th and March 10th, the parties approached the Court and informed the Court of Penson's conduct and Tuco's subsequent de facto shutdown. In response, the Court confirmed that "if an individual wants to withdraw funds, he has a contractual right to withdraw it" pursuant to the TRO, and that Tuco may honor that withdrawal request if it is "in the ordinary course of business"[12].

44. Following the March 10th telephonic hearing, SEC attorney Roberto Tercero and I contacted Penson together and informed Penson's attorney Tim Davis that the Court's orders did not mean that it should refuse to cover margin calls or shut down Tuco, which would put 1,700 Class B Member Tuco traders out of work. Despite these efforts, Davis informed Tercero and me that due to the SEC's initial request to shut Tuco down, Penson would not change its position.

---

[11] Penson's conduct was precipitated by the SEC's overaggressive tactics. The SEC had previously contacted Penson regarding Tuco's account. During the hearing before this Court on March 4th, SEC attorney Roberto Tercero indicated that he had contacted Penson on March 3rd—the day before the SEC filed its motion for the TRO—and asked Penson to voluntarily put a hold on Tuco's account, but that Penson had declined to do so. See Tr. of Hearing re Temporary Restraining Order, Mar. 4, 2008, at 22:19-23:1, a copy of which is annexed hereto as **Exhibit E**.
[12] See Tr. of Telephonic Hearing re Temporary Restraining Order, Mar. 10, 2008, at 19:5-15, a copy of which is annexed hereto as **Exhibit F**.
{00122756.DOC}

*The Factors Leading to the Duress*

45. I was experiencing extraordinary levels of stress at the time that the SEC began to prosecute this case.

46. The most prominent factor that led to my extreme stress at the time that I signed the Consent was that my wife and I were struggling to institute a treatment plan for our six-year old son Jack, who has autism. Autism is a variable developmental disorder that appears by age three and is characterized by impairment of the ability to form normal social relationships, by impairment of the ability to communicate with others, and by stereotyped behavior patterns[13].

47. Jack's autism creates special needs, which require a comprehensive treatment plan, consisting of thousands of dollars' worth of evaluations, treatments, and medications, only some of which are covered by insurance.

48. Shortly before this matter arose, my wife and I committed to this treatment plan. Jack attended the UCLA Autism Evaluation in February 2008, which cost $2,800. Every six weeks, Jack began going to a special physician as part of a biomedical program called Defeat Autism Now!, and those visits cost $500. In order to develop and monitor his treatment plan, Jack was required to have his blood tested frequently, which cost a total of $1,344 in February 2008. To block neurotoxins and bacteria in his body, he began taking dietary supplements called probiotics, which cost over $100 monthly. He attended speech and occupational therapy, each of which visits cost nearly $100 each week. He also received regular injections of vitamin B-12 with folinic acid, which are $60 a month, as well as homeopathic drops, which are $130 per month.

49. Jack also had a dietary intervention to lessen the digestive and bowel issues sometimes connected with autistic children. This intervention requires a gluten-free and casein-free ("GF/CF") diet. All of his foods had to be purchased from Whole Foods Market or online retailers specializing

---

[13] autism. (2008). In Merriam-Webster Online Dictionary. Retrieved July 22, 2008, from http://www.merriam-webster.com/dictionary/autism
{00122756.DOC}

in GF/CF foods, which is considerably more expensive than regular food. For instance, a loaf of GF/CF bread costs $5.19 and making a batch of GF/CF cupcakes costs $14.00.

50. Since the SEC had tried repeatedly to freeze my personal assets in this case—and I understood that if I litigated this case with the SEC, I would most likely get no more than $3,000 each month for living expenses while the case was pending—I feared that this case would jeopardize my ability to continue to pay for Jack's treatment plan. This was because $3,000 would not have been enough to pay for both Jack's treatments and my fixed household expenses.

51. Since my wife and I instituted the treatment plan for Jack, he has made significant strides and dramatically improved his quality of life. My wife and I have noticed vast improvements in Jack's attention, focus, speech, and socialization.

52. Another factor that contributed to my extreme stress at the time that I signed the Consent was the fact that my wife was seven months pregnant with our second child. It was stressful because she had already had a miscarriage during an earlier pregnancy. In addition, I feared that a personal asset freeze or a $3,000 limit to my monthly allowance would endanger my ability to pay any necessary medical bills connected to the birth. Currently, my wife is no longer pregnant. She gave birth in May 2008 to a healthy baby boy.

53. A third factor that contributed to my extreme stress at the time that I signed the Consent was the fact that the 1,700 Class B members of Tuco were calling me every day at that time, demanding an explanation for what had transpired in this matter.

54. As set forth above, the TRO was intended to allow Tuco to continue in its normal business practices, allowing the Class B members to trade and make any necessary withdrawals in the ordinary course of Tuco's business.

55. Nevertheless, as set forth above, in response to a request by the SEC, clearing broker Penson shut down Tuco's master account in the wake of the TRO.

{00122756.DOC}

56. After Penson took this action, the Class B members began calling me every day, demanding to know what was going on and why they could not withdraw any money.

57. I believed that Penson was disobeying the TRO by shutting down Tuco and refusing to honor the margin call, but was ultimately unable to convince it to change its position.

58. Exacerbating my stress was the fact that Penson's action ceased all of Tuco's trading activity, and therefore no commissions were generated for me from GLB, thus depriving me of any income.

59. At this point, the Class B members are no longer calling me every day. They are dealing directly with the receiver in this matter.

60. A fourth factor that contributed to my extreme stress at the time that I signed the Consent was the fact that the Court had ordered Tuco and me to pay all costs, fees, and expenses of the temporary receiver incurred in connection with his duties under the TRO, including all costs and expenses of anyone "engaged or employed" by the receiver to assist him, and these costs, fees, and expenses were mounting at an approximate daily cost of $20,000.

61. Following the hearing on March 4th, receiver Thomas Lennon appeared at Tuco's offices on the morning of March 5th, along with his attorney and his accountants, and reviewed Tuco's records for approximately 10 hours, at a combined hourly rate of approximately $1,900. This entourage continued to appear daily at Tuco's offices, including weekends, mounting devastating fees equivalent to economic sanctions.

62. In response to my concerns regarding my ability to continue paying for Jack's special needs and also support a second child, the SEC indicated that if I were to agree to the freezing of all of Tuco's assets—which would essentially put Tuco out of business—then the SEC would agree not to seek to freeze my personal assets, which would allow me to pay my bills and use my credit cards.

63. I do not believe that Tuco or I engaged in any illegal conduct. As the Class A Member of Tuco, I operated in accordance with the operating agreement that my Class B partners/traders signed. The Class B Members were sophisticated and active in the Tuco business. My attorneys informed me, however, that I would spend at least $500,000 litigating this matter if I did not settle the case with the SEC, and that I could not be guaranteed a victory, since the regulatory policy regarding day-trading is unclear (this being the first proceeding against a registered representative of a registered broker-dealer who operated a fully-disclosed day-trading firm through the member firm).

64. Due to all of these factors, on or about March 14, 2008, I instructed my attorneys to contact the SEC and inform them that I would agree to their conditions. The SEC quickly drafted a consent waiver and presented it to me. As the SEC had promised, the consent would freeze Tuco's assets but would not seek to freeze my personal assets.

65. The proposed consent stated on its first page that I was neither "admitting nor denying the allegations of the complaint", so I believed that I would not in fact acknowledge any wrongdoing in this case by signing the proposed consent.

66. Accordingly, I signed the Consent on March 14, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 7, 2008, at La Jolla, California.

Douglas G. Frederick

{00122470.DOC}

SEC V. TUCO AND FREDERICK, CASE NO. 08-CV-00400