

# OPERATING AGREEMENT

## OF

## TUCO TRADING, LLC

### a Nevada limited liability company

**Adopted as of AUGUST 14, 2006**

Exhibit __5__ Page __123__

# OPERATING AGREEMENT

## OF

## TUCO TRADING, LLC

### a Nevada limited liability company

This OPERATING AGREEMENT is adopted as of August 14, 2006 by the Managers of the Company as set forth in Section 3.02 below and by the members of TUCO TRADING, LLC, a Nevada limited liability company (the "*Company*"), each of whom has indicated acceptance hereof by executing this Agreement.

In accordance with the Nevada Limited Liability Company Law, the Members desire to adopt this Agreement in order to set forth their agreement with respect to the business of the Company, the conduct of its affairs, and the rights, powers, preferences, limitations or responsibilities of the Company's Members, Managers, employees or agents.

NOW, THEREFORE, the Members agree as follows:

## ARTICLE I
## ORGANIZATIONAL MATTERS

1.01   Definitions. Capitalized terms used herein have the meanings assigned to such terms in Annex A attached hereto.

1.02   Formation. The Members shall file or cause to be filed Articles of Organization with the Secretary of State of the State of Nevada (the "*Articles of Organization*") in accordance with the Act.

1.03   Name. The name of the Company is "TUCO TRADING, LLC" and all of the Company business shall be conducted under that name or such other names that comply with applicable law as the Managers may select from time to time.

1.04   Registered Office; Registered Agent. The CT Corporation shall be designated as the registered agent of the Company upon whom process against the Company may be served. The post office address within or without the State of Nevada to which The CT Corporation shall mail a copy of any process against the Company served upon such person is 3333 Michelson Street, Suite 620, Irvine, CA 92612, Attn.: Doug Frederick, or at such other location (which need not be a place of business of the Company) as the Managers may designate from time to time.

1.05   Principal Office; Other Offices. The initial principal office of the Company shall be located at 3333 Michelson Street, Suite 620, Irvine, CA 92612. The Company may change its principal office or have such other offices as the Managers may designate from time to time.

Exhibit   5   Page 124

Case 3:08-cv-00400-DMS-BLM   Document 41-3   Filed 03/04/2008   Page 3 of 24

1.06   Purposes. The purposes of the Company is to engage in Securities Trading, including electronic day-trading of listed and over-the-counter securities. The Company, with the approval of the Managers, may engage in any lawful business that may be conducted by a Nevada limited liability company under the Act. The Company shall have the power to do any and all acts and things necessary, appropriate, advisable or convenient for the furtherance and accomplishment of the purposes of the Company, including, without limitation, to engage in any kind of activity and to enter into and perform obligations of any kind necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company, so long as said activity and obligations may be lawfully engaged in or performed by a limited liability company under the Act.

1.07   No State Law Partnership. The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member shall be a partner or joint venturer of any other Member, for any purposes other than federal, state and local tax purposes, and the provisions of this Agreement shall not be construed otherwise.

## ARTICLE II
## MEMBERS

2.01   Members. The names, addresses and classes of each of the Members are set forth in the Member Schedule.

2.02   Classes of Members.

(a)   The Company shall initially have two (2) classes of Members identified as Class A Members and Class B Members. The Managers may designate additional classes of Members. Each Member shall subscribe to such class or classes as shall be agreed by such Member and the Managers as set forth on a counterpart signature page hereof for each such class of membership. The initial two (2) classes of Members in the Company, as more particularly described below, are comprised of:

Class A                    Owner-Members; and

Class B                    Traders.

(b)   The Class A Members are the voting Members of the Company, each of whom shall contribute such amount of capital as he or she and the Managers shall mutually agree. Each Class A Member shall also be assigned a Designated Trading Account for the conduct of trading operations for the Company, the operations of which will be governed in all respects by the terms of the Class A Addendum. Class A Members shall be allocated Net Income and Net Losses and shall be subject to the terms and conditions of the Class A Addendum. A Class A Member may also hold a separate interest in the Company as a Member of one or more other classes of Members.

(c)   The Class B Members shall contribute such amount of capital as he or she and the Managers shall mutually agree. Except as set forth in Article XIV or as otherwise

2

Exhibit   5   Page 125

required by the Act, the Class B Members shall have no voting rights or management rights with respect to the operations of the Company. Each Class B Members shall be assigned a Designated Trading Account for the conduct of trading operations for the Company, the operations of which will be governed in all respects by the terms of such Class B Member's Trader Agreement. Profits and losses generated by each Class B Member from trading within such Class B Member's Designated Trading Account shall be allocated in accordance with the percentages set forth in such Class B Member's Trader Agreement and this Agreement. The Managers may remove a Class B Member at any time for any or no reason by giving such Member written notice of removal.

    2.03    Scope of Responsibilities. Except as otherwise expressly provided herein, no Member (in his or her capacity as such) shall take part in the management of the business of the Company, transact any business for the Company or have the power or authority to bind the Company to any agreement or document, said powers being vested solely and exclusively with the Managers as set forth herein.

    2.04    Authority and Activities of a Member.

    (a)    A Member (in his or her capacity as such) shall have only such authority to bind the Company, and shall perform only such duties with respect to the business and activities of the Company, as shall be granted or assigned to the Member by the Managers; *provided, however*, that nothing herein shall be construed to restrict any Member's authority to engage in trading activities on behalf of the Company in accordance with the trading strategies and guidelines established by the Managers. The Member is obligated at all times not to exceed his or her trading limits and any violation thereof shall constitute a breach of this Agreement and shall make such Member personally liable for any losses that accrue as a result of such violation.

    (b)    No Member shall have any interest in or rights with respect to the properties or assets of any other Member by virtue of holding an Interest in the Company.

    2.05    Trading Activities.

    (a)    Subject to such restrictions established by the Managers, a Member may be responsible for a portion of the Company's trading activities. Except as otherwise set forth herein or in any applicable Trader Agreement, and subject to such restrictions established by the Managers, a Member shall have the authority to (i) purchase, hold, sell (including sell short), transfer, exchange, or otherwise acquire and dispose of, and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Securities and (ii) acquire a long or short position with respect to any Security, subject to the approval of the Managers, and to make purchases or sales increasing, decreasing or liquidating such positions or changing from a long position to a short position or vice versa.

    (b)    Upon admission to the Company, Class B Members shall be subject to the terms and conditions of the Company's Policies and Procedures Manual (as it may be amended or modified from time to time by the Company, the "*Manual*"), a copy of which has been provided to each Class B Member. Amendments to the Manual shall not be binding upon

3

Exhibit ___5___ Page _126_

such Member until delivered to such Member, *provided* that amendments to the Manual may be delivered by any means, including, without limitation, by email. Said Manual sets forth certain rights, obligations, duties, trading restrictions and other provisions related to the Class B Member's trading activity.

(c)  Upon admission to the Company, a Class B Member shall execute a Trader Agreement. Said Trader Agreement sets forth certain rights, obligations, duties, trading restrictions and other provisions related to the Class B Member's trading activity. The terms of the Trader Agreement are incorporated herein by reference.

2.06  Voting Rights. Except as otherwise set forth herein, the Managers shall take all actions and make all decisions without requiring the approval of the Members. All voting rights shall be vested in the Class A Members as provided in this Agreement. Class A Members shall vote upon any actions and decisions requiring the approval of the Members as set forth herein. Except as set forth in Article XIV or as otherwise required by the Act, the Class B Members shall have no voting rights or management rights with respect to the operation of the Company.

2.07  Admission of Additional Members. The Company may, at such times and on such terms and conditions as determined by the Managers in their sole discretion, admit additional Members. No Person shall be admitted as a Member unless such Person executes, acknowledges and delivers such instruments as the Managers deem necessary or advisable to effect the admission of such Person as a Member, including, without limitation, a written acceptance and adoption of this Agreement. The records of the Company shall be amended from time to time to reflect any sale of additional Interests and the admission of any additional Members.

2.08  Limitation of Liability. Except as otherwise required by any non-waivable provision of the Act or other applicable law, or as provided in any guaranty by one or more Members of one or more Company obligations: (a) no Member shall be personally liable for any debt, liability or other obligation of the Company; and (b) no Member shall have any liability to any Person in excess of (i) the amount of its Capital Contributions and (ii) without duplication, its share of any assets and undistributed profits of the Company.

2.09  Indemnification of Company by Members. In the event that the Company is made a party to any claim, dispute or litigation or otherwise incurs any loss or expense as a result of, or in connection with, any Member's obligations or liabilities unrelated to the Company's business, such Member (or assignees cumulatively) will indemnify and reimburse the Company for all losses and expenses incurred in connection therewith, including attorneys' fees.

2.10  Meetings of Class A Members. At any time, and from time to time, the Managers or Class A Members holding among them at least thirty-five percent (35%) of the Interests of all Class A Members may call a meeting of the Class A Members. No meeting is required to be called or held. Written notice of a meeting, stating the place, date and hour of the meeting and the purpose(s) for which the meeting is called, shall be given by the Managers to each Class A Member entitled to vote at such meeting not less than three (3) nor more than thirty (30) days in

4

Exhibit __5__ Page _127_

advance. The Class A Members holding a Supermajority in Interest entitled to vote, present in person or represented by proxy, shall constitute a quorum at all meetings of the Class A Members. No minutes of the meetings shall be required to be taken, but the Managers may, in their sole and absolute discretion, take minutes of one or more meetings. Unless otherwise provided in this Agreement, any action required or permitted to be taken at a meeting of the Class A Members may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action to be so taken, shall be signed by the Managers and holders of Interests having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Class A Members entitled to vote thereon were present and voted. Prompt notice of the taking of any such action without a meeting by less than unanimous consent shall be given to those Class A Members that have not consented in writing.

2.11   Annual Report. Within ninety (90) days following the end of each fiscal year of the Company, the Class A Members shall be provided with an annual report containing financial statements consisting of a balance sheet as of the last day of the preceding fiscal year and a statement of operations for the preceding fiscal year.

## ARTICLE III
## MANAGEMENT; MANAGERS

3.01   General. Except where otherwise required by law, the Articles of Organization or this Agreement, the Company shall be managed and controlled by the Managers.

3.02   Election of Managers. The Managers and/or the number of Managers shall be fixed from time to time by a Supermajority in Interest of the Class A Members, *provided* that in no instance shall there be less than one (1) or more than five (5) Managers. As of the date hereof, there shall be one (1) Manager and such Manager shall initially be Douglas Frederick. Unless a Manager resigns or is removed, each Manager shall hold office until a successor shall have been elected and qualified.

3.03   Authority. The Managers shall, except as otherwise expressly provided by applicable law, the Articles of Organization or this Agreement, have all of the authority permitted to be exercised by Managers under the Act in furtherance thereof. Any decision by the Managers to be made hereunder shall require the unanimous vote of the Managers.

3.04   Indemnification of Managers and Members. Notwithstanding anything provided in Article X herein, the Company, its receiver or its trustee shall indemnify, defend and hold each Member and Manager (and their respective heirs, personal representatives and successors) harmless from and against any expense, loss, damage or liability incurred by or connected with, or any claim, suit, demand, loss, judgment, liability, cost or expense (including reasonable attorneys' fees) arising from or related to, the Company or any act or omission of the Member or Manager on behalf of the Company (exclusive of acts taken as an independent contractor for the Company), including any actions brought by the Members' former employer(s), and amounts paid in settlement of any of the foregoing, *provided* that the same were not the result of fraud, gross negligence, or reckless or intentional misconduct on the part of the Member or Manager against whom a claim is asserted, excepting any claim for breach of an express or implied

5

Exhibit __5__   Page __128__

covenant made by the Members' former employer. The Company may advance to any Member or Manager (and their respective heirs, personal representatives and successors) the costs of defending any claim, suit or action against such Person if the Person undertakes to repay the funds advanced, with interest, if the Person is not entitled to indemnification under this Section 3.04.

3.05    Procedures. Any action to be taken by the Manager may be taken without a meeting of the Managers if all Managers consent thereto in writing. The Managers may adopt such other rules, regulations and procedures for the conduct of their business as the Managers, from time to time, deem appropriate.

3.06    Compensation of Managers. Each Manager may be a paid a reasonable administrative fee for its services rendered and to be rendered on behalf of the Company, as approved by a Supermajority in Interest of the Class A Members.

3.07    Officers. The Managers may appoint and remove officers of the Company in their sole discretion, which may include a Chief Executive Officer, a Chief Financial Officer, one or more Managing Directors, a Director of Trading, a Secretary and/or one or more Assistant Secretaries, and such other officers as determined from time to time by the Managers. Any number of offices may be held by the same person. The Managers may choose such other officers and agents as they shall deem necessary who shall hold such offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Managers. Each officer shall hold such office until his or her removal or resignation.

3.08    Conflicts of Interest. Subject to the other express provisions of this Agreement, each Member or Manager of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any Member or Manager the right to participate therein. The Company may transact business with any Member or Manager or a party related thereto.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS

4.01    Initial Capital Contributions of Members. Each Member shall contribute to the capital of the Company cash in an amount determined by the Managers. Such funds shall be used for the business of the Company and subject to all of the risks of the Company. The names, addresses, classes of Interests and Capital Contributions of the Members shall be set forth on the Member Schedule.

4.02    Admission of Additional Members. Except as otherwise provided in this Agreement (including the Class A Addendum), the Managers may admit to the Company one or more additional Class A Members or Class B Members ("*Additional Members*") in their sole discretion. Each Additional Member shall, simultaneously with his or her admission to the Company, contribute to the capital of the Company cash in an amount determined by the Managers. The admission of any Additional Member to the Company shall be effected by the execution by the Additional Member of a counterpart of this Agreement and such other

6

Exhibit  5    Page  124

documents as the Managers may require. The consent or agreement of the other Members to such admission shall not be required. All references in this Agreement to "Members" shall be deemed to include Additional Members, unless the context of the reference limits such reference to the original Members.

4.03.   Additional Capital Contributions.   No Member shall be required to make an additional Capital Contribution to the Company. If a Member desires to make an additional Capital Contribution to the Company, such Member shall provide notice thereof to the Managers indicating the amount of the desired additional Capital Contribution. The Managers shall have the right, on behalf of the Company, to accept or decline to accept any such additional Capital Contribution, in whole or in part.

4.04   Loans.   Upon request made by the Managers, Members may loan money to the Company, upon such terms and conditions as the Member and the Managers may agree.

4.05   Company Assets.   All Company assets will be in the name of the Company, and no Member shall have any rights in any Company assets.

4.06   Other Matters.   Under circumstances requiring a return of any Capital Contributions, no Member shall have the right to receive property other than cash except as may be specifically provided herein. No Member shall receive any interest, salary or drawing with respect to his or her Capital Contributions or his or her Capital Account or for services rendered on behalf of the Company or otherwise in his or her capacity as a Member except as otherwise provided in this Agreement. No Member shall, either directly or indirectly, take any action to require partition or appraisal of the Company or of any of its assets or properties or cause the sale of any of the Company's property, and notwithstanding any provisions of applicable law to the contrary, each Member (and his or her legal representatives, successors and assigns) hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to his or her Interest, or with respect to any assets or property of the Company, except as otherwise expressly provided in this Agreement.

## ARTICLE V
## CAPITAL ACCOUNTS; DESIGNATED TRADING ACCOUNTS; ALLOCATIONS; AND DISTRIBUTIONS

5.01.   Capital Accounts.   A separate Capital Account shall be established and maintained for each Member on the books of the Company, which account shall set forth the initial Capital Contribution of such Member and shall be adjusted according to this Agreement.

(a)   To each such account there shall be credited:

(1)   the amount of all additional Capital Contributions made by such Member to the Company pursuant to Section 4.03 above;

(2)   the fair market value of any property other than money contributed to the Company by such Member net of the liabilities securing such contributed property that the Company is considered to

7

Exhibit   5   Page   130

assume or take subject to pursuant to Section 752 of the Code;

     (3)    the amount of Net Trading Profits from the Designated Trading Account credited to the Member pursuant to Section 5.05 below; and

     (4)    the amount of Net Income credited to the Member, if any, pursuant to Section 5.06 below; and

   (b)    From each such account there shall be debited:

     (1)    the amount of money distributed to the Member by the Company;

     (2)    the fair market value of all property distributed to such Member by the Company net of the liabilities securing such distributed property that such Member is considered to assume or take subject to pursuant to Section 752 of the Code;

     (3)    the amount of Net Trading Losses from the Designated Trading Account credited to the Member pursuant to Section 5.05 below; and

     (4)    the amount of Net Losses credited to the Member, if any, pursuant to Section 5.06 below.

   (c)    In addition to the foregoing adjustments, each Member's Adjusted Capital Account shall be maintained consistently with and reflect all adjustments described in Regulations Section 1.704-1(b)(2)(iv).

   (d)    If ownership of any Interest in the Company is assigned in accordance with the terms of this Agreement, the assignee shall succeed to the Capital Account of the assignor to the extent it relates to the assigned Interest.

   (e)    In determining the amount of any liability for purposes of subsections 5.01(a) and (b) above, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Regulations.

   (f)    To each Member's Capital Account there shall be debited or credited, as the case may be, adjustments which are necessary to reflect a revaluation of Company assets to reflect the Gross Asset Value of all Company assets, as required by Regulations Section 1.704-1(b)(2)(iv)(f) and the terms hereof.

    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 704 of the Code and Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such provisions. The Company shall make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet as computed for book purposes in accordance

Exhibit _5_ Page _131_

with Section 1.704-1(b)(2)(iv)(q) of the Regulations.

5.02    Designated Trading Accounts.  Each Class A Member and Class B Member who trades is authorized to make securities trades on behalf of the Company in accordance with Company rules, procedures and limitations established by the Managers.  One or more separate sub-account(s) of the Company's proprietary trading account (each of which, a "*Designated Trading Account*") shall be established and maintained for each trading Member with the clearing broker of the Company, which sub-account(s) shall be the only accounts through which such Member may trade.

5.03    Interest, Clearing and Administrative Charges.  Except as otherwise provided in this Agreement (including the Class A Addendum), each Designated Trading Account shall be reduced (debited) (a) by charges for the execution and clearing of each trade made by the applicable Member, (b) by charges for interest expenses for each position held in the Designated Trading Account and (c) for administrative expenses relating to such Member's trading activities.  Such clearing, interest and administrative charges shall be in such amounts and at such rates as the Managers may determine, which charges and rates may change from time to time in the sole discretion of the Managers effective upon written notice to the Members.

5.04    Trading Profits and Losses of Class B Members.  Except as otherwise provided in this Agreement, as of the end of each business day, the trading profits or losses of each Class B Member shall be determined based upon the net realized increase or net realized decrease in the Designated Trading Account resulting from such Class B Member's trading activity during the day (after all clearing and interest charges).  A daily profit or loss statement for such Class B Member's Designated Trading Account shall be prepared for each Class B Member.  This profit and loss statement will reflect the prior day's trading activity.

5.05    Allocations of Profits and Losses from the Designated Trading Accounts of Class B Members.

(a)    For each Class B Member, as of the end of each business day, the Capital Account of such Class B Member shall be adjusted by allocating an amount equal to the cumulative increase, if any, in the balance of such Class B Member's Designated Trading Account(s) from all trading gains and all trading losses, commissions, expenses and other charges made from time to time by the Company in respect of the operations of such Designated Trading Account(s) ("*Net Trading Profits*") multiplied by the percentage set forth adjacent to "Payout Percentage" on Schedule A to such Class B Member's Trader Agreement. Any amount of such Net Trading Profits that is not allocated to the Class B Member pursuant to the preceding sentence shall be allocated to the Capital Accounts of the Class A Members as set forth in the Class A Addendum (and the Designated Trading Account(s) of such Class B Member shall be accordingly reduced for the amount of Net Trading Profits allocated to the Capital Accounts of the Class A Members).

(b)    For each Class B Member, as of the end of each business day, the Capital Account of such Class B Member shall be adjusted by allocating 100% of the cumulative decrease, if any, in the balance of such Class B Member's Designated Trading Account(s) from all trading gains and all trading losses, commissions, expenses and other charges made from

9

Exhibit  5      Page  132

time to time by the Company in respect of the operations of such Designated Trading Account(s) ("*Net Trading Losses*") until the Capital Account of the Class B Member is reduced to zero, then any losses, which would reduce such Class B Member's Capital Account below zero, shall be allocated 100% to the Capital Accounts of the Class A Members as set forth in the Class A Addendum.

     5.06    Allocation of Net Income and Net Loss.

        (a)    "*Net Income*" or "*Net Loss*" is the Company's annual taxable income or loss, respectively, from Member investments and trading, execution, clearing charges, interest charges, administrative fees and such other sources of income as may arise, determined annually or for such other period as determined by the Managers, in each case after all expenses have been paid. Subject to Section 5.06(b) below, the Net Income or Net Loss of the Company shall be allocated 100% to the Class A Members in accordance with their respective ownership percentages as set forth in the Class A Addendum.

        (b)    The Managers may allocate a portion of the Net Income or Net Loss of the Company to the Capital Accounts of one or more Class B Members based on the trading results of such Class B Member(s) in their sole and absolute discretion; *provided, however,* that Net Losses shall only be allocated to a Class B Member to the extent of any Net Income previously allocated to such Class B Member pursuant to this Section 5.06(b).

     5.07.    Tax Allocations.  All items of income, gain, loss and deduction shall be allocated among the Members for federal income tax purposes in accordance with the allocations of profits or losses from the Designated Trading Accounts to the extent they relate thereto, and to the extent they are unrelated to profits or losses from the Designated Trading Accounts, such items shall be allocated among the Members in accordance with the allocation of Net Income or Net Loss (and items thereof) as provided for in this Agreement.

     5.08    Distributions.

        (a)    Tax Distributions.  To the full extent of available funds and subject to the provisions of the Act, the Company shall, on or before March 31 of each year, make a distribution to the Members in accordance with their Interests that, in the judgment of the Managers, reasonably approximates the personal federal, state and local tax liability of the Members resulting from their respective allocations of Net Income.

        (b)    Distributions of Realized Net Trading Profits to Class B Members. Distributions of realized Net Trading Profits, if any, shall be made as mutually agreed upon by the Company and each Class B Member and shall be paid on or about the [first] and [fifteenth] days of the month.  The Company reserves the right to permit distributions to Class B Members under this Section 5.08(b) on a more frequent basis in its sole discretion.

        (c)    Distributions of Net Income.

            (1)    At the end of each quarter, the Managers shall determine the amount of Net Income which shall be distributed to the Class A Members and the amounts

10

which are to be retained by the Company. Notwithstanding the foregoing, the Managers in their sole and absolute discretion may make additional distributions of Net Income at any time.

(2)    In determining the Net Income or Net Losses of the Company for any accounting period, the following deductions or reserves shall first be charged as part of the expense of doing business: (i) expenses, maintenance and overhead charges of the operations of the Company's business, including start-up expenses relating to the formation of the Company and compensation to the Managers; and (ii) such reserves for accrued or contingent liabilities as the Managers deem reasonably necessary.

(3)    Class A Members shall be fully reimbursed for any out-of-pocket expenditures made in connection with the formation of the Company, including legal, accounting and other fees and costs.

(d)    Distributions Upon Dissolution of the Company.  Upon the dissolution of the Company, the Company's assets will be distributed in accordance with Article VIII below.

5.09    Offset.  The Company may offset all amounts owing to it by a Member against any amounts that would otherwise have been distributable to such Member hereunder.

5.10    Interest.  Members are not entitled to the payment of interest on their Capital Accounts.

## ARTICLE VI
## TRANSFER AND DISASSOCIATION

6.01    Transfer.

(a)    The Class A Members shall be subject to the restrictions on transfer set forth in the Class A Addendum.

(b)    No Class B Member may sell, assign, pledge, encumber, exchange or otherwise transfer (each, a "*Transfer*") their Interests in the Company or any rights as a Class B Member thereof without the prior written consent of the Managers. Notwithstanding the foregoing, each Class B Member may, without the written consent of the Managers, Transfer his or her Interest in the Company to a family trust or other entity which is set up for estate planning purposes, and which is for the benefit of such Class B Member's immediate family members, and of which such Class B Member is the sole trustee or equivalent officer.

(c)    In all cases a Transfer of an Interest hereunder must comply with all applicable Federal and state securities laws.

6.02    Disassociation.  Except as otherwise set forth in this Agreement (including the Class A Addendum), a Person shall cease to be a Member hereunder upon the occurrence of any of the following events:

(a)    the voluntary withdrawal of a Member, *provided* that no Member may withdraw from the Company after the Company has announced its intent to liquidate, except

11

Exhibit __5__ Page _134_

with the consent of the Managers (which consent may be given or withheld in their sole discretion);

      (b)    the decision by the Managers to remove a Class B Member;

      (c)    a Member (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition of bankruptcy, (iii) is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding, (iv) seeks, consents to or acquiesces in the appointment of a trustee for, receiver for or liquidation of the Member or of all or any substantial part of the Member's properties or (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in subsections (i) through (iv) above;

      (d)    in the case of a Member who is a natural person, the death of the Member or an adjudication by a court of competent jurisdiction that such Member is incompetent to manage his or her person or property;

      (e)    in the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not the mere substitution of a new trustee thereof); or

      (f)    in the case of a Member that is an entity, the dissolution and commencement of winding up of such entity or the filing of a certificate of dissolution for such entity (or similar document) or the revocation of such entity's charter (or other similar document) by the state in which such entity was incorporated or formed.

    6.03    <u>Rights Upon Disassociation</u>. Upon the occurrence of any of the events specified in Section 6.02 above, the Company shall distribute to such disassociating Member (or such other person as required by law), the amount of such Member's Capital Account (as determined by the Managers or any person designated by the Managers in accordance with generally accepted accounting principles) as set forth below.

      (a)    The disassociation of a Class A Member shall be subject to the terms of the Class A Addendum.

      (b)    Upon disassociation of a Class B Member, the Company shall review such Class B Member's Designated Trading Account and make any necessary adjustments to the Capital Account of such Class B Member to give effect to any Net Trading Profits or Net Trading Losses that have not otherwise been allocated to such Class B Member's Capital Account. Subject to any retention pursuant to Section 6.03(c) below, the Company shall pay to the Class B Member (i) within forty five (45) calendar days of disassociation an amount equal to 50% of the Class B Member's positive Capital Account balance, if any, and (ii) within one hundred and eighty (180) calendar days of disassociation an amount equal to 50% of the Class B Member's positive Capital Account balance, if any.

      (c)    Notwithstanding the foregoing, the Managers may retain from the distribution contemplated by this Section 6.03 an amount deemed sufficient by the Managers to

Exhibit   _5_   Page _135_

satisfy any liability or contingent liability pertaining to the disassociating Member. The retained amount or any remaining portion thereof will be released to the disassociating Member upon the resolution of the liability or contingent liability or after a reasonable time (as determined in the sole discretion of the Managers) during which the contingent liability does not occur. By executing this Agreement, each Member specifically consents to the provisions of this Section 6.03(c).

6.04    Tax Considerations. Any capital gains, income, transfer, gift or other taxes imposed upon any transferor or transferee as a result of any conveyance of any interest in the Company shall be exclusively the responsibility of the person upon whom such tax is imposed. The Company shall have no responsibility therefor whatsoever. In the event that any tax, expense (including legal and accounting fees) or cost is incurred by or imposed upon the Company as a result of any conveyance of an interest in the Company, except as a result of the Company's issuing or purchasing any interest in the Company, the Member conveying such interest shall indemnify, or cause the transferee to indemnify, the Company for such tax and the reasonable and necessary expenses or costs incurred by the Company in connection therewith.

**ARTICLE VII**
**MERGERS AND CONSOLIDATION**

7.01    The Company may enter into a merger or consolidation, in accordance with the Act, pursuant to an agreement of merger or consolidation (the "*Merger Agreement*") that has been adopted by the Company under the procedures set forth in Section 7.02 below.

7.02    The Company may adopt a Merger Agreement only if:

    (a)    the Merger Agreement is approved by the Managers;

    (b)    after approval of the Managers, the Merger Agreement is approved by a Supermajority in Interest of the Class A Members, who shall be the only members entitled to vote thereon.

**ARTICLE VIII**
**LIQUIDATION**

8.01    Upon dissolution of the Company, the assets of the Company shall be liquidated by one of the Managers (or a liquidating trustee appointed by the Managers, which may be a Member) as promptly as possible, but in an orderly and businesslike manner so as not to involve undue sacrifice, and the proceeds thereof will be applied and distributed in the following priority, unless otherwise required by applicable law:

    (a)    to pay all creditors of the Company (other than Members), in the order of priority provided by law;

    (b)    to pay all creditors of the Company that are Members; and

    (c)    after the payment of all debts, liabilities and obligations of the Company,

13

Exhibit _5_ Page _136_

to increase the Members' capital accounts in accordance with this Agreement and to distribute to the Members their respective positive capital accounts' balances, if any, after giving effect to all contributions, distributions and allocations for all periods, including the period during which such liquidation occurs. Any property distributed in kind in the liquidation shall be valued at fair market value.

8.02    Distributions to Members pursuant to this Article VIII shall be made by the end of the taxable year of the liquidation, or, if later, ninety (90) days after the date of such liquidation in accordance with Regulations Section 1.704-1(b)(2)(ii)(b).

8.03    The Managers may withhold from distributions under this Article VIII, such reserves which are required by applicable law and such other reserves for subsequent computation adjustments and for contingencies, including contingent liabilities relating to pending or anticipated litigation or to examinations by the Internal Revenue Service. Any amount held as a reserve shall reduce the amount payable under this Article VIII. The unused portion of any reserve shall be distributed pursuant to this Article VIII after the Managers shall have determined that the need therefore shall have ceased.

8.04    If a Member has a deficit balance in his or her Capital Account after giving effect to all contributions, distributions and allocations for all taxable years, including the year in which the liquidation occurs, such deficit shall not be considered a debt owed by such Member to the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

8.05    Within one hundred eighty (180) days after the completion of final distributions, the Manager (or liquidating trustee) shall cause to be prepared by a firm of certified public accountants a statement setting forth the assets and liabilities of the Company as at the date of dissolution, which statement shall be furnished to all of the Members.

8.06    The liquidating trustee, if engaged, shall be entitled to receive reasonable compensation.

## ARTICLE IX
## DURATION

Unless the Company shall have been sooner dissolved in accordance with the provisions of the Act, the Company shall dissolve on the earlier of:

(a)    the one hundred eightieth (180th) day following the bankruptcy, death, dissolution, expulsion, incapacity or withdrawal of any Class A Member, unless at least 67% of the capital interests and 67% of the interests in profits of the surviving Class A Members are sooner voted in favor of the continuation of the Company; or

(b)    at any time upon the unanimous written consent of all of the Class A Members.

14

Exhibit _5_    Page _137_

## ARTICLE X
## INDEMNIFICATION

Every person (and the heirs, executors and administrators of such person) who is or was a Member, Manager, officer, employee or agent of the Company or of any other company (including another company, partnership, joint venture, trust or other enterprise) which such person serves or served as such at the request of the Company, shall be indemnified by the Company against all judgments, payments in settlement (whether or not approved by court), fines, penalties and other reasonable costs and expenses (including fees and disbursements of counsel) imposed upon or incurred by such person in connection with or resulting from any action, suit, proceeding, investigation or claim, whether civil, criminal, administrative, legislative or other (including any criminal action, suit or proceeding in which such person enters a plea of guilty or nolo contendere or its equivalent), or any appeal relating thereto which is brought or threatened by any other person, governmental authority or instrumentality (herein called a "*third-party action*") and in which such person is made a party or is otherwise involved by reason of his being or having been such Member, Manager, officer, employee or agent or by reason of any action or omission, or alleged action or omission, by such person in his capacity as such Member, Manager, officer, employee or agent if either (a) such person is wholly successful, on the merits or otherwise, in defending such third-party action or (b) in the judgment of a court of competent jurisdiction or, in the absence of such determination, in the judgment of the Managers of the Company, such person acted in good faith and in what he or she reasonably believed to be the best interest of the Company or such other company and, in addition, in any criminal action, he or she had no reasonable cause to believe that his or her conduct was unlawful. In case such person is successful, on the merits or otherwise, in defending part of such action, or, in the judgment of such a court or the Managers, has met the applicable standard of conduct specified in the preceding sentence with respect to part of such action, he or she shall be indemnified by the Company against the judgments, settlement payments, fines, penalties and other costs and expenses attributable to such part of such action.

The foregoing rights of indemnification shall be in addition to any rights to which any such Member, Manager, officer, employee or agent may otherwise be entitled.

In any case in which, in the judgment of the Managers, any such Member, Manager, officer or employee will be entitled to indemnification under the foregoing provisions of this Article X, such amounts as they deem necessary to cover the reasonable costs and expenses incurred by such person in connection with the action, suit, proceeding, investigation or claim prior to final disposition thereof shall be advanced to such person upon receipt of an undertaking by or on behalf of such person to repay such amounts if it is ultimately determined that he or she is not so entitled to indemnification.

## ARTICLE XI
## ARBITRATION

The parties acknowledge that the expeditious and equitable settlement of disputes arising under this Agreement is to their mutual advantage. To that end, the parties agree to use their best efforts to resolve all differences of opinion and to settle all disputes through joint cooperation and consultation. Any dispute, alleged breach, interpretation, challenge or disagreement

15

Exhibit ___5___ Page *138*

whatsoever arising out of this Agreement (or any other agreement to the extent incorporated herein by reference) that the parties are unable to settle within sixty (60) days, as set forth in the preceding sentence, shall be resolved by final and binding arbitration before a single arbitrator selected and serving under the Commercial Arbitration Rules of the American Arbitration Association. The arbitration shall be held in Orange County, California or such other location as is mutually agreed upon by the parties to such arbitration. Such arbitration shall be the exclusive remedy hereunder. The decision of the arbitrator may, but need not, be entered as a judgment in accordance with the provisions of the laws of the State of California. If this arbitration provision is for any reason held to be invalid or otherwise inapplicable to any dispute, the parties hereto agree that any action or proceeding brought with respect to any dispute arising under this Agreement, or to interpret or clarify any rights or obligations arising hereunder, shall be maintained solely and exclusively in the courts of the State of California.

## ARTICLE XII
## BOOKS AND RECORDS; ACCOUNTING AND TAX ELECTIONS

12.01  Maintenance of Records. The Company shall maintain true and correct books and records, in which shall be entered all transactions of the Company, and shall maintain all other records necessary, convenient or incidental to recording the Company's business and affairs, which shall be sufficient to record the allocation of Net Income and Net Losses and distributions as provided for herein. All decisions as to accounting principles, accounting methods and other accounting matters shall be made by the Managers. Each Class A Member or its authorized representative may examine any of the books and records of the Company during normal business hours upon reasonable notice for a proper purpose reasonably related to the Member's Interest in the Company. The Class B Members shall not be entitled to review the books and records of the Company but shall be entitled to receive upon request (i) information with respect to such Class B Member's Designated Trading Account and (ii) information concerning such Member as set forth in the Member Schedule (as the same may be revised from time to time), including with respect to the value of such Member's Capital Account and the Capital Contributions made by such Member.

12.02  Reports to Class A Members. As soon as practicable after the end of each Fiscal Year, the Company (i) shall cause to be prepared and sent to each Class A Member a balance sheet and a statement of income for the Company which may, but need not, be audited by a certified public accountant, and (ii) shall cause to be prepared and sent to each Member a report setting forth in sufficient detail all such information and data with respect to the Company for such Fiscal Year as shall enable each Member to prepare his or its income tax returns in accordance with the laws, rules and regulations then prevailing. The Company shall also cause to be prepared and filed all tax returns required of the Company. All balance sheets, statements, reports and tax returns required pursuant to this Section 12.02 shall be prepared at the expense of the Company.

12.03  Tax Elections; Determinations Not Provided for in the Agreement. The Managers shall be empowered to make or revoke any elections now or hereafter required or permitted to be made by the Code or any state or local tax law, and to decide in a fair and equitable manner any accounting procedures and other matters arising with respect to the Company or under this Agreement which are not expressly provided for in this Agreement. Notwithstanding the

16

Exhibit 5 Page 139

foregoing, neither the Company nor any Member shall make an election for the Company to be excluded from taxation as a partnership under the Code or any state or local law, and no provision of this Agreement (including Section 1.06) shall be construed to sanction or approve any such election.

## ARTICLE XIII
## GENERAL PROVISIONS

13.01  Miscellaneous.

(a)     Article, section and subsection headings are not to be considered part of this Agreement, are included solely for convenience of reference and are not intended to be full or accurate descriptions of the contents thereof.

(b)     Use of the terms "herein," "hereunder," "hereof," and like terms shall be deemed to refer to this entire Agreement and not merely to the particular provision in which the term is contained, unless the context clearly indicates otherwise.

(c)     Use of the word "including" or a like term shall be construed to mean "including but not limited to."

(d)     Exhibits and schedules to this Agreement are an integral part of this Agreement.

(e)     Words importing a particular gender shall include every other gender and words importing the singular shall include the plural and vice-versa, unless the context clearly indicates otherwise.

(f)     Any reference to a provision of the Code, Regulations or the Act shall be construed to be a reference to any successor provision thereof.

13.02  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada, excluding any conflict-of-laws rule or principle that might refer the governance, construction or interpretation of this Agreement to the laws of another State.

13.03  Binding Agreement.  This Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, executors, administrators, personal representatives and successors.

13.04  Severability.  Each term and provision of this Agreement is intended to be severable.  If any term or provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable for any reason whatsoever that term or provision shall be ineffectual and void and the validity of the remainder of this Agreement shall not be adversely affected thereby.

13.05  Entire Agreement.  This Agreement (including the exhibits hereto) supersedes any and all other understandings and agreements, either oral or in writing, between the Members with

17

Exhibit   5   Page   140

respect to the Interests and constitutes the sole and only agreement between the Members with respect to the Interests.

13.06  Further Action. Each Member shall execute and deliver all papers, documents and instruments and perform all acts that are reasonably necessary or appropriate to implement the terms of this Agreement and the intent of the Members.

13.07  Notices. Except as expressly provided in this Agreement, all notices, consents, waivers, requests or other instruments or communications given pursuant to this Agreement shall be in writing, signed by the party giving the same, and shall be delivered by hand or sent by registered or certified United States mail, return receipt requested, postage prepaid, or by a recognized overnight delivery service, addressed, in the case of the Company, to the Company at its principal place of business, and to any of the Members at the address set forth in the Member Schedule. Any Member may, by notice to the Company and each other Member, specify any other address for the receipt of such notices, instruments or communications. Except as expressly provided in this Agreement, any notice, instrument or other communication shall be deemed properly given only when received, or upon refusal of receipt, by the person to whom it is sent.

## ARTICLE XIV
## AMENDMENTS

This Agreement may be amended only by the affirmative vote of a Supermajority in Interest of the Class A Members (or such higher percentage as may be required for such amendment pursuant to the Act); *provided, however*, that the adoption of any matter which materially and adversely affects in a disproportionate manner the rights, obligations or economic interests of the Class B Members, taken as a whole, shall require the approval of the holders of a Supermajority in Interest of the Class B Members voting in person or by proxy.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

18

Exhibit ___5___ Page _141_

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

MANAGER:

_____

DOUGLAS FREDERICK

19

Exhibit ___5___ Page ___142___

**COUNTERPART SIGNATURE PAGE TO**
**OPERATING AGREEMENT OF TUCO TRADING, LLC**

By execution of this counterpart signature page, the undersigned does hereby become a Member of TUCO TRADING, LLC, a Nevada limited liability company (the "Company"), pursuant to the Operating Agreement of TUCO TRADING, LLC, adopted as of August 14, 2006 (the "Agreement"). The undersigned hereby agrees to be bound by all of the terms and conditions of the Agreement and authorizes the Managers to attach this counterpart signature page to the Agreement and, when so attached with the signature pages of all of the Members, such Agreement will constitute one and the same document as if all signatories had originally signed thereon.

**MEMBER:**

_____
[Print Name of Class B Member/Trader]

_____
[Initial Capital Contribution]

_____
[Signature]

_____
[Print Name]

_____

_____
[Address]

_____
[Federal Taxpayer Identification Number]

COUNTERPART SIGNATURE PAGE

Exhibit ___5___ Page _143_

## ANNEX A

## DEFINITIONS

*Unless otherwise identified, references contained in this Appendix to "Sections" are references to the Sections of the Operating Agreement of TUCO TRADING, LLC, of which this Annex is a part.*

"*Act*" means the Nevada Limited Liability Company Act and any successor statute, as amended from time to time.

"*Additional Members*" is defined in Section 4.02.

"*Adjusted Capital Account*" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant accounting period, after giving effect to the following adjustments:

        (1)    credit to such Capital Account any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the next to the last sentences of Section 1.704-2(g)(1) and Section 1.704-2(i)(5) of the Regulations; and

        (2)    debit to such Capital Account the items described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) and Section 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

"*Agreement*" means this Operating Agreement, the Class A Addendum executed by the Company and by each Class A Member and any schedules or exhibits hereto or thereto, all as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Operating Agreement as a whole, unless the context otherwise requires.

"*Articles of Organization*" is defined in Section 1.02.

"*Capital Account*" means an account established for each Member on the books of the Company (i) as of the date of formation of the Company or (ii) on such later date on which such Member is admitted to the Company, in each case as increased or decreased as provided in this Agreement.

"*Capital Contribution*" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property other than money contributed to the Company by that Member.

"*Class A Addendum*" means the Class A Addendum entered into by the Company and the Class A Members. The Class A Addendum sets forth certain additional terms governing the rights and responsibilities of the Class A Members. Class B Members shall not have the right to review or otherwise gain access to the Class A Addendum or any of the terms thereof.

Exhibit __5__   Page _144_

"*Class A Members*" means those Members admitted to the Company as Class A Members, as shown from time to time on the Member Schedule.

"*Class B Members*" means those Members admitted to the Company as Class B Members, as shown from time to time on the Member Schedule.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time.

"*Company*" is defined in the preamble.

"*Designated Trading Account*" is defined in Section 5.02.

"*Interest*" means an ownership interest in the Company and, if applicable, voting rights, and any and all benefits to which the holder of such interest may be entitled as provided in this Agreement, together with all obligations of such holder to comply with the terms and provisions of this Agreement.

"*Managers*" means the Person or Persons designated as a Manager by the Members pursuant to the terms of this Agreement.

"*Manual*" is defined in Section 2.05(b).

"*Members*" means the Class A Members and the Class B Members as shown from time to time on the Member Schedule.

"*Member Schedule*" means a schedule to be maintained by the Managers (and updated from time to time as provided herein) showing the names and addresses, Capital Contributions and Interests owned by the Members. The Member Schedule may include any additional information deemed appropriate by the Managers. No Member shall have the right to review the Member Schedule without the consent of the Managers, which consent the Managers may withhold or grant in their sole, absolute and unfettered discretion. However, each Member shall have the right to obtain from the Managers the information concerning such Member as set forth in the Member Schedule, as the same may be revised from time to time.

"*Merger Agreement*" is defined in Section 7.01.

"*Net Income*" and "*Net Loss*" are defined in Section 5.06.

"*Net Trading Losses*" is defined in Section 5.05(b).

"*Net Trading Profits*" is defined in Section 5.05(a).

"*Person*" means an individual, corporation, association, partnership, joint venture, limited liability company, estate, trust or any other legal entity.

"*Regulations*" means the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time.

Exhibit __5__    Page _145_

"*Securities*" has the meaning given to such term in Section 3 of the Securities Exchange Act of 1934, as amended.

"*Securities Trading*" means the trading, buying, selling, selling short, spreading or otherwise acquiring, holding or disposing of Securities.

"*Supermajority in Interest*" means Members entitled to vote (or any specified subset thereof) holding, in the aggregate, at least 66 2/3% of the Interests entitled to vote held by all Members entitled to vote (or by such specified subset).

"*Trader Agreement*" means, with respect to each Class B Member, the Trader Agreement entered into by the Company and such Class B Member with respect to the trading operations of such Class B Member.

"*Transfer*" is defined in Section 6.01(b).

A-3

Exhibit ___5___ Page __146__