UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

ADMINISTRATIVE PROCEEDING
File No. 3-13004

In the Matter of

DOUGLAS G. FREDERICK,

Respondent.

RESPONDENT DOUGLAS G. FREDERICK'S
MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY DISPOSITION

I.    Introduction

Respondent Douglas Frederick ("Frederick") seeks summary disposition of this

administrative proceeding since—even taking the facts in the Complaint against him as true—as

a matter of law none of his alleged actions violate Section 10(b) or Rule 10b-5, nor was Tuco

Trading, LLC ("Tuco") a broker-dealer requiring registration.  Neither of the two legal theories

alleged by the Division of Enforcement are justified or supported.

Indeed, even in recognition of the collateral estoppel doctrine used in "follow-on"

administrative proceedings, Frederick is entitled to summary adjudication in his favor.  Frederick

limits this summary disposition motion to legal issues that were never addressed in the civil

enforcement action filed in the Southern District of California[1]. The U.S. Securities and

Exchange Commission's (the "SEC" or "Commission") collateral estoppel position is limited to

factual findings and conclusions, not to relevant legal challenges. Frederick's arguments are

legal challenges to the Division of Enforcement's allegations and should be decided by summary

adjudication under Rule of Practice 250(b). 17 C.F.R. Sec. 201.250(b). Accordingly, the

Commission is obligated to determine whether Frederick's alleged misrepresentations and/or

omissions relating to Tuco's financial stability constitute violations of Section 10(b) and Rule

10b-5, and also whether Tuco's failure to register as a broker-dealer constitutes a violation of

Rule 15(a).

    As set forth below, the alleged misrepresentations and omissions relating to Tuco's

ability to survive a "run on the bank" are absolutely not "in connection with the sale or purchase

of securities". In short, a Tuco trader's purchase of Class B interests in Tuco is not a "security",

as defined by Howey and the dozens of cases following its definition of a security. Even if such

an interest were a "security" and even if Frederick had made a misrepresentation regarding the

interest, the Complaint does not identify a single purchase or sale of a security based on such

misrepresentation. Thus, as a matter of law there can be no violations of Section 10(b) or Rule

10b-5.

    As for the second issue, the Complaint recognizes that (a) Frederick is a Series 7

registered representative of a registered broker-dealer, namely GLB Trading, Inc. ("GLB"); and

(b) all of Tuco's trades occurred in its accounts at GLB. There is a specific statutory exemption

in Rule 15(a) from the duty to register for persons associated with a broker or dealer, and the

SEC has recognized this exemption in cases in no-action letters for years. Under Upton, if there

---

[1] Frederick plans to file a motion to vacate the judgment against him under Fed.R.Civ.P. 60(b) in the civil enforcement action.

is no reasonable notice to the public of the SEC's position or its change of position with respect to an industry practice, sanctions are inappropriate. Until this case, the SEC has never prosecuted a registered representative of a member firm for failure to register as a broker-dealer. Therefore, there should be no sanctions against Frederick for any violation of Rule 15(a).

Finally, Steadman provides for softer remediation against those whose violations of securities laws are merely "technical", rather than flagrant or intentional. Even accepting the factual findings listed in Frederick's consent decree, Frederick did not engage in any fraudulent conduct, nor did he receive any ill-gotten gains. This was at most a "minor rule violation". Accordingly, under Steadman, sanctions against Frederick should be limited to a letter of caution.

II.    Background Facts

Tuco is a customer account, operated by Doug Frederick, a Series 7 licensed registered representative of GLB,, a FINRA/NASD licensed broker-dealer under Section 15 of the Securities Exchange Act of 1934.[2]  In the new account documents, the blank labeled "Customer Name" contains the words "Tuco Trading LLC".

GLB supervised Frederick at all relevant times and assisted Frederick in operating Tuco, an outside business activity that was fully disclosed on Frederick's U-4.[3]  Tuco is a proprietary trading customer account that does not solicit, execute, or carry accounts for public customers.

---

[2] See Tuco's new account documents approved by GLB and Penson Financial Services, LLC, and GLB's Independent Contractor Agreement, paragraph III(A), copies of which are annexed hereto as **Exhibit A.**

[3] See Form U-4 of Frederick, Question #13, annexed hereto as **Exhibit B**.

Tuco has three brokerage accounts at GLB Trading, and Frederick was the registered representative on each account[4].

GLB in fact encouraged the very actions that form the basis of the SEC's Complaint in that GLB instructed its registered representative, Frederick, that he and Tuco should both operate out of GLB's offices in Irvine, CA.

All customer trades were cleared by GLB through Penson Financial Services, Inc. ("Penson"). Penson is a registered clearing broker-dealer and clears numerous brokerage customer accounts structured similar to Tuco.

The SEC not only has possession of the documents identifying Tuco as a "customer", and disclosing Tuco on Frederick's U-4, but the SEC also attached those documents to the Declaration of SEC Branch Chief of Broker-Dealer Regulation Kent L. Woo in connection with the SEC's ex parte motion for a temporary restraining order and orders freezing Tuco's and Frederick's assets in the matter of *SEC v. Tuco Trading, LLC and Douglas G. Frederick*, (the "Federal Court Action") Case No. 08CV0400 (DMS)(BLM), currently pending in the United States District Court, Southern District of California.

Tuco is also a Nevada limited liability company, with its main offices in California. The Tuco operating agreement[5] reflects the rights and obligations between the Class A member and the Class B members. Tuco has been a Nevada LLC since August 2006 and Frederick was the sole Class A member of Tuco.

Tuco's business is to provide services and support to professional securities traders ("Tuco Traders") who seek to generate profits based upon their own self-directed trading. All

---

[4] See Complaint, ¶15, a copy of which is annexed hereto as **Exhibit C**.

[5] A copy of the Tuco operating agreement is annexed hereto as **Exhibit D**.

Tuco Traders are generally sophisticated and experienced traders that possess the desire to be self-employed independent securities traders. A Tuco Trader may make capital contributions to Tuco to support his or her own trading activity (the capital contribution is typically credited to a unique sub-account for such Tuco Trader). Such sub-account is created by Penson at the request of GLB and Frederick, the supervised agent of GLB. The margin requirements and trading profits and losses of the Tuco Trader were reflected in the name of Tuco, the customer account.

Margin calls are based on the overall net equity of all of the sub-accounts of Tuco, consistent with the industry standards and Regulation T and NASD/FINRA Rule 2520. Thus, the SEC's allegations that Tuco or Frederick violated the margin or leverage requirements under Regulation T or is misplaced and factually and legally incorrect.[6]

GLB and Penson satisfied the Securities Investor Protection Corporation (SIPC) requirements. Thus, neither Tuco nor Frederick could be deemed to have public customers or be registered as broker-dealers. Tuco Traders provided written acknowledgements to Frederick— and thus to GLB—that they are not customers, that their funds will be commingled, and that they do not seek the investor protections of SIPC. On May 10, 2007, the SEC approved NASD/FINRA Rule 2342 setting forth requirements for providing information to brokerage customers, like Tuco. Under Rule 2342, all member firms, such as GLB and Penson, unless they are excluded from membership in SIPC and are not SIPC members, or they exclusively sell investments that are ineligible for SIPC protection, are required to advise all new customers that they may obtain information about SIPC, including the SIPC brochure, by contacting SIPC.[7]

---

[6] See NASD Notice to Members 01-26. April 2001, SEC Approves Proposed Rule Change Relating to Day-Trading Margin Requirements (On February 27, 2001, the Securities and Exchange Commission (SEC) approved amendments to National Association of Securities Dealers, Inc. (NASD) Rule 2520 relating to margin requirements for day traders. The amendments became effective on September 28, 2001 and are substantially similar to amendments by the New York Stock Exchange (NYSE) to its margin rules).

[7] See Notice to Members 07-29.

The Class A member, Frederick, reserves the right to control the funds of each sub-account for risk purposes and to control the trading of each Tuco Trader at all times. The rights of the Class B members inure solely to the benefit or detriment of the Class A member, Frederick. Only the administrative and execution costs incurred by the Tuco Trader are passed through and deducted from such Trader's sub-account. Any decision for a Tuco Trader, a mere agent with a limited trading authorization to trade the Tuco customer account, to close out his or her trading sub-account or take a draw therefrom is solely the Class A member's decision as defined in the operating agreement and reflected in the new account documents provided by Frederick and approved by GLB and Penson.

Based on the Tuco operating agreement, the "run on the bank" argument is a fiction. The Class A member has the unfettered right to deny requests of the Class B members. There was also no shortfall since GLB was required to regularly pay money to Frederick every month, consistent with NASD/FINRA conduct rules, which Frederick routinely used to operate Tuco and pay himself a monthly salary of approximately $10,000 to $15,000 per month.

The SEC ignored these monthly receivables from GLB to Frederick, in calculating the alleged "shortfall" that forms the basis of the Complaint against Frederick. Then, by rushing into court and obtaining an injunction against Tuco—thus ceasing all trading—the SEC ensured that Frederick would never collect these receivables and Tuco would be closed. Thus, it was the actions of the SEC that forced the closure of Tuco.

The Tuco operating agreement provides for Class A and Class B Memberships. As Class B Members, Tuco Traders do not have any ownership or control interest in Tuco. The Class A membership is owned entirely by Frederick, which also is the Manager Member. In this regard, the Class A member possesses all "voting and all management rights in the Company" and only

the Class A member shall "vote for and elect the Manager of the Company, which Manager may

be a Class A Member." A Class B Membership was created solely to codify a Tuco Trader's

rights and responsibilities as users of the firm's services. Class B Members do not have

management or ownership interests.

III.    Frederick Is Not Collaterally Estopped From Challenging the Legal Theories <u>Set Forth in the Complaint</u>

The Commission "refine[d] and expand[ed]" its view on the long-established collateral

estoppel doctrine and its application to follow-on administrative proceedings in <u>In re Marshal E. Melton</u> (July 25, 2003). The refined and expanded view precludes those who have consented to

injunctive relief "from denying the *factual allegations* of the injunctive complaint in a follow-on

proceeding before this agency". <u>Id</u>.

The Commission's view—which limits challenges in administrative proceedings to legal

challenges—is repeated throughout <u>Melton</u>. The Commission warns defendants in injunctive

actions that once they consent to injunctive relief, "they may not dispute the *factual allegations*

of the injunctive complaint in the administrative proceeding". <u>Id</u>.

And the consent decree signed by Respondent provides the same terms—that Respondent

understood that in any disciplinary proceeding before the Commission "that he shall not be

permitted to contest factual allegations of the complaint in this action". Frederick Consent, par.

12.

The challenges brought by Respondent are not challenges of the factual allegations, they

are challenges to the legal theories behind the Commission's Complaint and order instituting

proceedings. It appears that Frederick's prior counsel did not have an opportunity to challenge

the Commission's factual allegations or legal theories. Thus, this motion sets forth Frederick's

first defense to the Commission's assertions.  As discussed below, none of the accounting

misstatements were made in connection with the sale or purchase of securities and, as such,

cannot be deemed a fraudulent or deceptive securities law violation.

IV.    As a Matter of Law, Frederick's Alleged Actions Do Not Constitute Violations of Section
       10(b), Rule 10b-5, or Rule 15(a).

   A. **Frederick's alleged actions were not "in connection with the purchase or sale of
      a security" and therefore could not have violated Section 10(b) or Rule 10b-5.**

       Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 limit their scope to

actions taken "in connection with the purchase or sale of **any security**".  15 U.S.C. § 78j(b); 17

CFR § 240.10b-5 (emphasis added).

       It thus follows that if no security is present, there can be no violation of Section 10(b) or

Rule 10b-5.  See International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 99 S.Ct. 790

(1979); Stone v. Millstein, 804 F.2d 1434 (9th Cir. 1986).

       The issue presented in this proceeding is whether the purchase of Class B membership

interests by Tuco traders involved the purchase of a "security".  Whether these interests are

securities is a legal issue—not a factual one— and is therefore not barred by the Commission's

position on collateral estoppel.  Indeed, as a legal argument, it must be resolved by summary

adjudication.

       The Order Instituting Proceedings asks that the ALJ determine "[w]hether the allegations

set forth in Section II are true…".  Section II of the OIP refers to the injunctive relief entered in

federal court and further alleges that "in connection with the purchase and sale of securities,

[Respondent] made false and misleading statements to traders of Tuco Trading…".   Respondent

acknowledges that his consent to injunctive relief denies him the opportunity to challenge factual

allegations, such as whether the accounting representations were misleading.  But the collateral

estoppel position clearly leaves legal issues—and legal challenges—for adjudication. Here, although Frederick denies any accounting shortfalls, Frederick challenges whether the purported misstatements were made in connection with the purchase or sale of a "security".

The United States Supreme Court in <u>SEC v. W.J. Howey Co.</u>, 328 U.S. 293, 66 S.Ct. 1100 (1946), held that in determining whether a security exists, the following four elements must be present:

> (1) an investment of money;
>
> (2) in a common enterprise;
>
> (3) with the expectation of profits;
>
> (4) to come solely from the efforts of others.

<u>Id.</u> at 301, 66 S.Ct. at 1104[8].


### 1.    *To generate profits in their accounts, the Class B Members of Tuco relied on their own trading efforts, not on the efforts of others.*

Citing <u>Howey</u> and its four criteria, the Fourth Circuit Court of Appeals in <u>Robinson v. Glynn</u>, 349 F.3d 166 (4th Cir. 2003) found that a membership interest in the LLC at issue was not a "security", and therefore affirmed the dismissal of claims under Section 10(b) of the Exchange Act and Rule 10b-5. <u>See id.</u> at 175. <u>Robinson</u> focused on the fourth criterion, reducing it to whether the "investor, as a result of the investment agreement itself or the factual circumstances that surround it, is left unable to exercise meaningful control over his investment". <u>Id.</u> at 170. Far from finding a lack of control, the court instead held that the LLC's members did not depend

---

[8] The SEC has previously acknowledged that the <u>Howey</u> analysis is the appropriate method for determining whether a "security" is present. <u>See</u> SEC Release No. 33-5211, 1971 WL 127300 (Nov. 30, 1971).

"on the investments or expertise of others" and therefore enjoyed a level of control that was "antithetical to the notion of member passivity" required to find a "security". Id. at 171, 172.

As in Robinson, in this matter the fourth Howey criterion is lacking because the traders of Tuco Trading LLC did not depend on the efforts of others. Instead, they each managed their own trading by determining their own strategies in day-to-day business operations. Those members were responsible for their own trading profits and losses based on their own trading decisions. This responsibility was made clear in the operating agreement for Tuco Trading LLC: "[A] member shall have the authority to (i) purchase, hold, sell (including sell short), transfer, exchange, or otherwise acquire and dispose of, and exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to, Securities". See Operating Agreement of Tuco Trading LLC, paragraph 2.05(a). Since these traders never depended on the efforts of anyone but themselves, there was no "security" present here under Howey, and thus no legitimate Section 10(b) or Rule 10b-5 claim.

2.    *There was no "common enterprise", but instead a series of discrete investment enterprises, between Tuco and each Class B Member.*

In another matter that followed Howey, in Milnarik v. M-S. Commodities, Inc., 457 F.2d 274 (7th Cir. 1972), the investment contract at issue was not a "security", based on the second criterion, which requires a "common enterprise". This element was absent, since the court found that the defendant had entered into numerous investment contracts with various parties, and that the success or failure of those other contracts had no direct impact on the profitability of the plaintiffs' contract. See id. at 276-277. Thus, there was a series of discrete investment enterprises, not "the same investment enterprise". See id. at 277.

The Milnarik analysis applies here, since the Tuco investment scenario involved hundreds of separate investment enterprises between Tuco and each individual trader. Under

that scenario, one trader's profits did not inure to another, nor did any trader's losses negatively impact any other. Moreover, no trader had any rights to distributions based on earnings of the company, nor did it have any appreciation rights in Tuco through membership holdings. Thus, there was no common enterprise, and no "security" for purposes of Section 10(b) or Rule 10b-5.

3.    *Even if there were a "security" under Howey here, the SEC does not allege any "sale" or "purchase" of a security.*

The "in connection with" language of Section 10(b) or Rule 10b-5 require that the alleged fraud be "integral to the **purchase** and **sale** of the securities in question". Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 395 F.3d 25, 27 (2d. Cir. 2005)(emphasis added), rev'd on other grounds, 547 U.S. 71, 126 S.Ct. 1503 (2006). The "incidental involvement of securities does not implicate the anti-fraud provisions of the federal securities laws." Id.; SEC v. Northshore Asset Management, 2008 WL 1968299, *1, *7 (S.D.N.Y., May 5, 2008);

Here, the SEC does not allege any sale or purchase of a security. Instead, it limits its allegation to a failure "to disclose to Tuco's traders that their equity balances are overstated". See Complaint, paragraph 4. Absent an allegation tying the alleged fraud to a sale or purchase of a security, the SEC's claims under Section 10(b) and Rule 10b-5 must be rejected.

**B. Neither Tuco nor Frederick had reasonable notice that their conduct might violate Rule 15(a).**

1.    Sanctions are inappropriate to penalize an individual who has not received fair notice of a regulatory violation.

If the SEC fails to reasonably communicate its enforcement policy to the public with respect to an industry practice, it is inappropriate to issue any sanctions for that practice. See Kevin Upton v. SEC, 75 F.3d 92, 98 (2d Cir. 1996). In Upton, the SEC filed proceedings against an individual named Kevin Upton, a brokerage firm's chief financial officer, based on his failure to supervise a subordinate employee who aided and abetted a violation of the SEC's Customer

Protection Rule[9]. After an Administrative Law Judge found a violation and censured Upton, the Second Circuit Court of Appeals reversed and vacated the order censuring Upton, based on the following findings:

(a)     due process requires that "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited", id.;

(b)     there was "substantial uncertainty" in the SEC's interpretation of Rule 15c3-3(e), id.;

(c)     the SEC was aware of violations two years before the events in Upton's case took place, id.;

(d)     in spite of this knowledge, the SEC "took no steps to advise the public that it believed the practice was questionable" until three years later, id.;

(e)     the SEC "may not sanction Upton pursuant to a substantial change in its enforcement policy that was not reasonably communicated to the public," id.; and

(f)     courts cannot defer to the SEC's "interpretation of its rules if doing so would penalize an individual who has not received fair notice of a regulatory violation", id.

In this matter, as set forth below, the same factors that were dispositive in Upton are present here:  SEC knowledge of the conduct; an uncertain interpretation of the conduct by the SEC; and a resulting lack of notice to the public that said conduct was illegal.

2.     *As in Upton, the SEC has known for several years of the conduct for which it seeks to penalize Tuco, but has given no notice that such conduct was illegal.*

a. *The challenged actions were taken by a registered representative of a licensed broker-dealer.*

Frederick was at all relevant times a Series 7 licensed registered representative of GLB. GLB is and was at all relevant times a FINRA/NASD licensed broker-dealer under Section 15 of

---

[9] Rule 15c3-3(e), 17 C.F.R. § 240.15c3-3(e).

the Securities Exchange Act of 1934.  Thus, GLB supervised Frederick at all times under FINRA

Rule 3010.

All customer trades were cleared by GLB through Penson.  Penson is a registered

clearing broker-dealer and clears numerous brokerage customer accounts structured similarly to

Tuco.

Frederick operated a customer account for the day-trading firm Tuco.  Tuco was a

proprietary trading account that did not solicit, execute or carry accounts for public customers.

Tuco was a public customer of GLB, as set forth in the Complaint[10].

Thus, GLB—through its registered representative Frederick—took all of the actions at

issue here, in order to facilitate its largest customer account, Tuco.

> b. *The SEC was aware of this conduct years ago, but never gave notice that said
>    conduct was illegal.*

At least seven years before Tuco was formed, the SEC knew of the conduct for which it

seeks to penalize Tuco in this matter, namely that some day-trading firms were organized as

LLCs and were not registered as broker-dealers.  Despite its longstanding knowledge of this

conduct, the SEC gave no public notice regarding which specific activities by the LLCs were

illegal.

The SEC's knowledge is evidenced by the testimony of its chairman Arthur Levitt in

September 1999 before a Senate subcommittee[11] to convey the SEC's observations and positions

---

[10] See Complaint, ¶15 ("Tuco has three brokerage accounts at GLB Trading, and Frederick is the registered representative on each account"); ¶16 ("All but 1% of Tuco's business consists of equity trading, and 99% of that trading occurs in Tuco's master accounts at GLB Trading.")

[11] "Testimony of Arthur Levitt, Chairman of the U.S. Securities and Exchange Commission Before the Senate Permanent Subcommittee on Investigations Committee on Governmental Affairs, Concerning Day Trading," September 16, 1999. http://www.sec.gov/news/testimony/testarchive/1999/tsty2199.htm, last accessed June 25, 2008.

on day trading at the time. Levitt observed that some day-trading firms are organized as LLCs. He then noted that some firms encouraged "individual day traders to take on 'partners' or other third parties from whom the day traders would obtain additional funds for trading". Levitt vaguely remarked that "[d]epending on the facts, these activities could be characterized as unregistered broker-dealer or investment adviser activities".

But—other than parroting Sections 3(a)(4) and 3(a)(5) of the Exchange Act—the only guidance that Levitt gave regarding what actions would require a day-trading firm to register as a broker-dealer that a firm had to register if it was "handling funds and securities for others", "receiving transaction-based compensation", or "purchasing securities for third parties".

None of these actions, however, were ever taken by Tuco. The only handling of funds or securities for others was done by GLB through its registered representative Frederick. Tuco never received any transaction-based compensation; Penson collected all commissions and took its percentage, then paid them to GLB, which then paid Frederick his share. After Frederick had deposited his share, he then paid any of Tuco's bills, but never issued any transaction-based commissions to Tuco. Finally, Tuco never purchased any securities for any third parties. All trades were submitted to GLB by the customer, namely Tuco, in Tuco's name. Thus, Levitt never identified as illegal any of the activities that Tuco undertook.

c.  *The SEC has consistently recognized Section 15(a)(1)'s registration exemption in prior matters.*

Until this case, the SEC has never before instituted any proceeding against a registered representative of a registered broker-dealer who operated a fully-disclosed day-trading firm through the member firm. On the contrary, for years it has consistently recognized the

exemption from the duty to register in Section 15(a)(1) of the Exchange Act[12] for persons associated with a broker or dealer.

For example, in Roth v. SEC, 22 F.3d 1108 (D.C.Cir. 1994), the SEC took the position that there is a registration exemption under Section 15(a)(1) for persons associated with a broker-dealer who are acting within the scope of their association with the member firm. The Roth court adopted the SEC's position, since activities within the scope of the association could be supervised by the member firm and thus have the crucial "regulatory protections". See id. at 1109-1110.

In addition to this caselaw, the SEC has also clarified its position in various no-action letters. In one such letter[13], the SEC stated, "Section 15(a)(1)…provides a registration exemption only for natural persons who are associated with a registered broker-dealer". A second no-action letter, to Wolff-Juall Investments LLC[14], also specifically stated that "there is an exemption from registration for natural persons associated with a registered broker-dealer".

But a third no-action letter[15] compounds the confusion here regarding the SEC's position with respect to registration requirements, since it relieved an entity from registration as a broker-dealer in a situation analogous to this case, even though the entity (1) would be paid per-order fees, which Frederick did not; and (2) was not associated with a registered broker-dealer, in contrast to Frederick, who was.

---

[12] Section 15(a)(1) provides in relevant part that "[i]t shall be unlawful for any broker or dealer which is…a natural person no associated with a broker or dealer…to effect any transactions in, or to induce or attempt to induce the purchase or sale, of any security…unless such broker or dealer is registered [with the Commission]."

[13] See No-Action Letter re Vanasco (Feb. 17, 1999).

[14] See No-Action Letter re Wolff-Juall Investments LLC (May 17, 2005).

[15] See No-Action Letter re Swiss American Securities, Inc. and Streetline, Inc. (May 28, 2002).

*d. The SEC has also acknowledged that some day-trading firms organized as LLCs have no customers and thus no need to register with FINRA.*

And apart from recognizing the statutory registration exemption, the SEC also took the position *six* years before Tuco was formed that day-trading firms organized as LLCs had no "customer accounts", but instead had "members" whose rights were protected by operating agreements.

This position appeared in a study[16] (the "Study") issued by the SEC's Office of Compliance Inspections and Examinations that reported on its examinations of various day-trading firms. The Study made it clear that the SEC considered these day-trading firms not to have any "customer accounts". Section IV of the Study, entitled "Examination Findings and Recommendations", subsection A, "Organizational Structures", stated that "[b]ecause these firms are exempt from registering with the NASD, they are not subject to the NASD Conduct Rules." A footnote then stated that Exchange Act Rule 15b9-1 provides that the usual requirement under Section 15(b)(8) to register with the NASD is waived if, among other things, the day-trading firm "carries no customer accounts".

Thus, even though the SEC requires most "brokers" and "dealers" to join a "self-regulatory organization", or SRO, such as the NASD, now named FINRA, there is no such requirement for Tuco, because it had no public "customers".

---

[16] "Special Study: Report of Examinations of Day-Trading Broker-Dealers", dated February 25, 2000, http://www.sec.gov/news/studies/daytrading.htm, last accessed on June 25, 2008

V.    <u>No Sanctions Are Warranted Against Frederick</u>

Where a violation of securities laws is "merely technical in nature", rather than "flagrant or deliberate", it is inappropriate to permanently enjoin an individual from continuing to work in the securities industry. <u>See</u> <u>SEC v. Steadman</u>, 967 F.2d 636, 648 (D.C.Cir., 1992).

In <u>Steadman</u>, the District of Columbia Court of Appeals reversed the district court's entry of a permanent injunction against a defendant for failure to register under state Blue Sky laws, since most of the violations were "merely technical in nature" and were not "flagrant or deliberate". <u>Id.</u> The <u>Steadman</u> court also noted that a permanent injunction is a "drastic remedy" that "should be not granted lightly". <u>Id.</u>

Here, under <u>Steadman</u>, even if there were a requirement for Tuco to register as a broker-dealer, and if Frederick were to be punished for aiding and abetting Tuco's failure to register (in contravention of the SEC's longstanding written policy to the contrary), said punishment should not include a lifetime ban from the securities industry. Likewise, it would be a technical violation to find a misrepresentation in connection with a Class B membership interest in Tuco, as stated above; the <u>Howey</u> factors demonstrate that these interests are not "securities", nor does the Complaint indicate any "sale" or "purchase" in connection with any misrepresentation. Therefore, Frederick asks that if sanctions are issued against him in this proceeding, that said sanctions consist of nothing more than a letter of caution.

Dated: July 14, 2008

SADIS & GOLDBERG, LLP

By:    Daniel G. Viola, Esq., Pro Hac Vice
Attorneys for Defendant Douglas G. Frederick
50 California Street, Suite 2320
San Francisco, CA 94111
Telephone:  (415) 490-0561
Facsimile:  (415) 391-1377
E-MAIL:  dviola@sglawyers.com

# EXHIBIT A

## GLB TRADING, INC.

### Independent Contractor Agreement

**THIS AGREEMENT** made and entered into this 14TH day of July 2006, by and between, GLB TRADING, INC., a corporation organized and existing under the laws of California ("Company") and the independent contractor registered representative whose signature appears below ("RR").

WHEREAS, the Company is engaged in the securities business as a broker/dealer registered with the Securities and Exchange Commission ("SEC"), various state Securities Divisions, and is a member of the National Association of Securities Dealer, Inc. ("NASD");

WHEREAS, the undersigned RR desires to engage in the sale and purchase of securities by and through the Company;

NOW, THEREFORE, in furtherance of the foregoing, and in consideration of the mutual promises contained herein, the receipt and legal sufficiency of all of which consideration is hereby acknowledged, the parties hereby agree to and shall be legally bound as follows:

## I. REGISTERED REPRESENTATIVE AS INDEPENDENT CONTRACTOR

A.   SECURITIES REGISTRATIONS.   RR hereby represents and warrants that s/he has provided or authorized the furnishing of all the information requested and has completed all of the requisite applications, forms and agreements provided to RR by the Company and/or required by the NASD, SEC and securities division of the various states in which s/he wishes to operate and/or as otherwise may be necessary or appropriate. Further, RR represents and warrants that, other than as fully disclosed in writing to the Company, s/he is in good standing with each of the foregoing regulatory bodies and his/her registration has not been revoked and no investigation or proceeding is pending or threatened, to the best of his/her knowledge, against him/her.

B.   APPOINTMENT.   In reliance upon representations, warranties, covenants and undertakings of Contractor, the Company hereby appoints the undersigned to represent it as its independent contractor and Registered Representative so long as s/he is validly and continually licensed to offer and sell securities on its behalf and/or is under no investigating or proceeding, pending or threatened, by any person, body or agency regarding him/her and/or his/her business and or practices, and agrees to designate a Registered Principal(s) to whom RR shall be assigned for regulatory supervision purposes. RR shall not solicit or consummate transactions or provide services with respect to securities products or receive funds as a representative of the Company until s/he has received notification from the Company that he/she has been effectively registered with all the appropriate state and federal agencies and shall suspend any and all activities and/or solicitations upon notice from the Company if the Company for any or no reason determines same may be inappropriate or injurious or otherwise an undesirable activity or product, in its sole and arbitrary discretion.

2

C. INDEPENDENT STATUS. The relationship of the parties hereto is and shall be that of the Company, as owner, and RR as independent contractor. Nothing contained herein shall be deemed or construed as creating the relationship of employer and employee, principal and agent, master and servant, partnership, or joint venture between the parties. RR shall not, and agrees not to, represent him/herself as having any authority to make any warranties, representations, promises, undertakings, agreements or contracts in the name of, or binding upon, the Company. RR is expected to use his/her own judgment as to the time, place and means of exercising his/her limited authority under the terms of this Agreement.

As an independent contractor, RR understands that s/he is not eligible for any benefits made available to Company's employees. Unless so directed by authorities, the Company agrees not to withhold from RR's commissions or other payments any deductions for taxes or similar government obligations imposed upon RR's income, and RR acknowledges that s/he is liable for payment of such. RR understands that s/he is responsible for all his/her business licenses, self-employment taxes and related governmental obligations incidental to doing business as a securities sales agent. RR also agrees to inform the Company of any arrangements, business or otherwise, in which RR is engaged and for which s/he receives compensation.

Should the Company determine that it is appropriate for RR to obtain and maintain federal and state licenses as a registered investment adviser ("RIA") and to comply with all the laws and regulations applicable thereto in his or her business, RR will do so both individually and also as to his or her controlled company.

RR understands that Company is not obligated to provide any additional services to RR, other than those provided in Section III, unless Company and RR agree on such services and RR pays for such services.

## II. DUTIES OF REGISTERED REPRESENTATIVE

A. SERVICES. RR hereby agrees as follows:

(1) to offer and distribute only products or services approved for distribution by the Company and only so long as so approved and/or legally permissible;

(2) in connection with each sale or solicitation of offers to buy such products or services, to deliver or cause to be delivered to the customer, in accordance with applicable securities laws, rules and regulations, an authorized, an approved current memorandum, disclosure statement or prospectus, if any such prospectus or other documents exists, and to make no representations to customers except as are contained in such prospectus or document;

(3) to place orders for securities only through the Company, and to advise all customers and prospective customers that RR is acting as a representative of the Company and that any order for securities will be effected solely through the Company.

(4) if directly or indirectly registered as a RIA, to comply with federal and state laws and regulations (including NASD regulations) governing business operations, record keeping, disclosures to customers and others and processing business and fees through the Company.

3

B. COMPLIANCE. RR hereby agrees as follows:

(1) to faithfully observe and comply with all statutes, rules, regulations, policy statements, orders and the like, of all applicable jurisdictions and authorities (local, state, federal and foreign) including but not limited to the Conduct Rules of the NASD. RR further and more specifically agrees to observe and follow such written procedures as are issued by Company pursuant to Section 3010 of the NASD Conduct Rules, and as set forth in the Written Supervisory Procedures Manual or are issued by the Company from time to time. RR agrees to abide by the directions of the Company as to securities matters, including direction via a Registered Principal in his/her Office of Supervisory Jurisdiction, as such terms are defined by the NASD to the extent required by the Conduct Rules of the NASD.

(2) to read and understand the Written Supervisory Procedures Manual of the Company, including any amendments to it added in the future and provided to RR by the Company, and to fully comply with applicable Company policies and procedures as set forth in the Written Supervisory Procedures Manual or supplements thereto;

(3) to establish and maintain all records required to be maintained by RR pursuant to Sections 17a-3 and 17a-4 of the Securities Exchange Act or in self-regulatory or state requirements;

(4) in the offer and sale of newly issued securities and in the offer of investment services, to offer for sale only such securities and services as have been approved in advance by the Company and only in jurisdictions where s/he is registered to sell. RR understands that s/he has no authority to act for any customer in any securities transactions except to the extent specifically authorized by the Company;

(5) in the offer and sale of investment advisory services provided by the Company, to do so only to the extent specifically authorized and then under conditions prescribed by the Company, including disclosure materials and sales methods;

(6) to acknowledge that RR may not be dually registered with another securities broker/dealer and that s/he may not receive compensation for any securities-related transaction including but not limited to variable insurance product, from any other source except through the Company;

(7) to use every reasonable effort to maintain registration with the various regulatory authorities necessary to continue his/her status as a representative of the Company, which cost of obtaining and maintaining such qualification shall be paid by RR.

(8) to obtain prior approval from the Company on all correspondence, advertising, and communications with the public.

4

(9) to report immediately to the Company any complaint or other claim affecting the RR's business;

(10) to only accept checks for the payment of securities from clients that are made payable to the designated underwriter, investment company, general partner, or escrow bank. Only in the case of a wire order mutual fund transaction may a check be made payable to Company. No cash payments or checks made payable to the RR shall be accepted for the payment of securities.

(11) to conduct him/herself and his/her affairs in a professional manner.

(12) to immediately require RR to suspend his/her transacting in a particular security or transacting in any and all securities with one, several or all accounts to the extent that any such transaction could, in the opinion of the Company, be considered a violation of the Company's rules or a breach of any law, rule or regulation.

C.    ADMINISTRATION.  In accordance with all applicable regulations and rules:

(1) RR agrees to do any reasonable act to collect and/or aid in the collection of commissions, fees and cost hereunder, including but not limited to RR's forwarding all items required in a timely manner, timely endorsing of checks or other instruments; assignment of insurance claims; processing of court documents; making court appearances, and items related thereto.

(2) If RR becomes indebted or otherwise liable to the Company, then RR hereby irrevocably and unconditionally authorizes, (and consents to the Company taking any and all actions necessary or appropriate to enable the Company and its affiliates to exercise the retention rights described herein) that the Company shall be entitled to offset against and to retain and apply toward the liquidation of any such liability any and all commissions or other sums payable to RR either by the Company or any affiliated entities of the Company.  Any such indebtedness shall be a first lien upon amounts due hereunder and the Company shall have a perfected security interest and a priority claim upon such amounts due hereunder. Any indebtedness accruing hereunder or otherwise, whether before or after termination of this Agreement, shall survive the termination of this Agreement. RR agrees to pay any and all reasonable expenses including without limitation attorney fees incurred by the Company in the collection of any indebtedness and/or enforcement to realize upon such indebtedness.

(3) If RR becomes indebted or otherwise liable to GLB TRADING, Inc. Insurance Agency, Inc., as a result of a policy NTO'd (not taken) or surrendered, or for any other reason, the Company reserves the right to offset against and to retain and apply toward the liquidation of any such liability, any commissions or other sums payable to RR by or through the Company or any affiliated entity. Any indebtedness accruing hereunder or otherwise, whether before or after

5

termination of the Agreement, shall survive the termination of this agreement. RR agrees to pay reasonable attorney fees incurred by the Company in the collection of any indebtedness.

(4) RR shall pay any balance owing to Company within ten (10) business days of receipt of Company's statement unless other arrangements are made in writing by the Comptroller of the Company. Any balance outstanding after thirty (30) business days from receipt of such statement shall accrue interest at the prime rate published in the Wall Street Journal after said thirty (30) day period plus 2% per annum.

(5) In the event that through willfulness, negligence or carelessness, RR fails to comply with the provisions of applicable federal or state laws, or the procedures of the Company, NASD, SEC or state securities commission or other like governmental or a self regulatory body of the Company, the RR agrees that Company may assess against RR such expenses as the Company incurs in the resolution of any action, including without limitations attorney's fees and expenses.

B. ACTIONS OR INACTIONS IN CUSTOMER ACCOUNTS. RR agrees to be solely liable and to pay for any losses which the Company sustains as a result of RR's action or inaction involving account(s) of RR's customers ( including accounts for which RR or his/her affiliated entity provided investment advisory services). These costs include, but are not limited to, all costs of client reneges, failures to pay or to comply with margin calls and all other matters which involve the failure of a customer to meet his or her just financial responsibility.  RR hereby indemnifies the Company for identifiable and related losses and expenses, including without limitation the Company's attorneys' fees and other related costs, damages, or claims resulting from such customer activities.  RR agrees to and does hereby irrevocably grant unto the Company, and its affiliates, the right of offset concerning his/her commissions for any losses sustained by the Company for RR's errors, and agrees to execute a secured promissory note, if necessary, to repay such losses, the terms of which will be agreed upon by both parties.

Attorney's fees, adverse settlements and/or judgment imposed on RR and/or Company where fault is not determined by a court of proper jurisdiction or arbitration panel, shall be shared by Company and RR in the same proportion as the commissions on transactions such as the one in dispute were shared.  RR shall notify Company promptly of any investigations, proceedings, customer complaints or similar matters.

E. BOOKS AND RECORDS.  RR agrees to prepare and maintain full and accurate books and records as required by the SEC, NASD, and state regulatory bodies and as otherwise required by the Written Supervisory Procedures Manual. After the term of this Agreement, RR shall maintain all such items for the required holding period according to applicable regulatory authorities' rules.  RR agrees that such items shall be available at all reasonable times for inspection by

6

the Company, and that such right of inspection may be exercised without prior notice.

## III. DUTIES OF COMPANY

A. COMPANY'S EFFORTS. The Company agrees to cooperate in support of the sale and purchase of securities products and services pursuant to this Agreement, to provide a reasonable place of business in which to render such support, and to qualify for and maintain all appropriate license necessary for the sale of securities products and services pursuant to this Agreement. Company agrees to enter into sales agreements with underwriters and sponsors of various securities and investment products when such securities meet the requirements of the Company.

B. COMPENSATION.

(1) For sales made by RR of securities products and services offered by Company, RR shall receive compensation as set forth in the applicable Schedule (Schedule A) which is part of this Agreement. RR hereby waives any and all rights to receive payment of amounts due until such time as the Company is in receipt thereof. RR affirms that the Company's liability for commissions or other amounts payable is limited solely to the proceeds of commissions or other amounts receivable associated therewith, after all processing and other transaction charges. Any commission or other amount paid to RR for which RR is not entitled, at the time the sale or service or for an applicable period thereafter, for any reason, shall be promptly reimbursed by the RR to the Company upon demand by the Company.

(2) For sales made by RR of direct participation program interests that are approved for sale by the Company and offer contingent commissions, RR may be entitled to share in these fees at the percentage payout level his/her agreement is subject to at the time the commission is received (see Schedule A). RR must be registered with Company at the time the commission is received and such other terms and conditions as the Company may require from time to time in order to be eligible for participation in these commissions and comply with such other terms and conditions the Company from time to time may impose.

(3) Regular commission statements issued by the Company to RR shall be deemed, except as to clerical errors and undisclosed facts of a material nature, to constitute an accurate and complete record of all amounts due RR from the Company and of all accounts between RR and the Company purporting to be covered thereby, unless a contrary claim is made in writing within 30 days after such issuance. Settlement on the basis of such statements shall constitute full satisfaction and accord between the parties as to such amounts, except with respect to such contrary claim, clerical error or undisclosed facts.

7

## IV. TERMINATION OF AGREEMENT

A. The term of this agreement shall commence with the date first written above and continue thereafter until either party gives ten (10) days prior written notice to the other, except in cases where RR violates any of the provisions herein, in which case termination may be immediate. This agreement shall be considered self-renewing unless terminated in writing by December 31 of each succeeding year, provided that the RR has made all appropriate registration payments and is in good standing with the Company and applicable regulatory bodies.

B. Death of the RR shall constitute immediate termination of this agreement. Any commissions or other fees earned prior to death will be paid to the decedent's estate. Any trail commissions and/or continuing service fees shall be paid to the estate of the deceased RR for a period of six (6) months measured from the date of the RR's death.

## V. RIGHTS ON TERMINATION

A. Upon termination by either party to this Agreement, Company shall retain sufficient commissions or other amounts due RR to pay any fees or charges incurred in connection with the termination, or any anticipated fees or charges due to Company under this Agreement.

B. Upon termination, RR will be paid all commissions or other amounts earned as of the date of termination at the payout level as of the date of termination subject to Schedule A and clause V (A).

C. Any override commission agreement entered into between RR, Company and another registered representative of Company shall terminate upon the termination of the Agreement.

D. Upon termination, the RR shall no longer hold him/herself out as a representative of GLB TRADING,. INC.and shall immediately return all materials bearing the GLB TRADING,. INC. name to Company.

## VI. MISCELLANEOUS

A. AUTHORIZATION FOR BACKGROUND CHECK. RR hereby grants his/her unconditional authorization for any bank, credit organization, self-regulatory association, law enforcement agency or relevant entity, public or private to fully disclose and provide to Company any and all information pertaining to RR that the Company, or a contract organization, finds reasonably necessary to confirm any and all representations made by RR to Company or to otherwise satisfy regulatory requirements.

8

B. NO MODIFICATION. No modification or addition to the Agreement shall be valid or binding unless in writing and signed by both parties. This Agreement shall not be encumbered by liens of any kind, except as previously provided, without prior written consent of the parties.

C. BINDING EFFECT.    The terms, conditions and provisions of this Agreement shall inure to the benefit of the legal representatives, successors and assigns of the respective parties hereto and shall be binding on any firm or corporation controlling, controlled by or under common control with, RR; provided however, that this paragraph shall not be construed to permit assignments by RR.

D. ARBITRATION. Any dispute arising under this Agreement shall be submitted to binding arbitration in the city of Worcester, Massachusetts, under the arbitration rules then prevailing of the NASD, and judgment upon the award rendered may be entered and enforced in any court of competent jurisdiction. The arbitrators shall follow California law. The party submitting such dispute shall require the NASD to:

(a) Appoint arbitrators who are knowledgeable in the securities law area and familiar with securities industry and who will follow the substantive rule of law;

(b)  Require the testimony to be transcribed; and

(c) Require the award to be accompanied by a finding of fact and a statement of reasons for decision.

E:  INDEMNIFICATION.  RR agrees to indemnify and hold harmless the Company, its officers, directors, employees and agents from and against all loss, liability, claim or expense ( including reasonable attorneys fees) arising from or connected with any claim based in whole or in part on an asserted violation by RR of the terms of this Agreement or of the requirements of federal or state law or regulations or of any regulatory body, in particular claims or expenses arising from the activities of RR or any affiliated entity as an investment adviser representative, RIA, insurance agent, financial or tax planner. RR agrees that any such rights or indemnification shall not diminish and shall be in addition to, and not in substitution for, any rights of indemnification which may exist under insurance or other arrangements covering these activities or otherwise under law. If RR fails to defend any action or proceeding with counsel approved by the Company the Company shall have the right to defend such action or proceeding at RR's cost and expense.

The Company agrees to indemnify and hold harmless the RR and/or his affiliated companies from and against any and all claims, actions, damages and costs ( including reasonable attorneys fees ) arising out of any grossly negligent, dishonest, fraudulent or criminal act, error and/or omission on the part of any of the Company's officers, employees or affiliates with respect to the services to be provided the Company under this Agreement.

F. INVALIDITY OF A PART. This Agreement is severable. Should any term, condition or provision of this Agreement be determined by a court of competent

9

jurisdiction to be invalid for any reason, all of the remaining terms and conditions of the Agreement shall remain in full force and effect.

G. AMENDMENT. This Agreement may be amended from time to time by the Company upon 30 days' written notice to RR or may be amended in writing by RR and an authorized officer of the Company.

H. BREACH. This is an Agreement for the furnishing of personal services to Clients of the Company. In the event of a breach, or threatened breach, of this Agreement by RR, the parties agree that a remedy in damages would be inadequate and that the Company should be entitled to injunctive or similar relief restraining such breach without showing or proving actual damages sustained or about to be sustained. This remedy and all other remedies provided in this Agreement shall be cumulative and the exercise or non-exercise of this remedy shall not preclude any other remedy at law or in equity.

G. GOVERNING LAW AND ENTIRE AGREEMENT. This Agreement shall be construed and interpreted in accordance with the laws of the State of California. This Agreement shall supersede any prior agreements with respect to the subject matter hereof between the RR and the Company. No representation, inducement or commitment other than expressly set forth in this Agreement should be made or relied upon by RR or the Company. The failure of the Company to declare a breach or termination of this Agreement because of any violation of its terms shall not be deemed to be a waiver of any subsequent violation of this Agreement.

BY: _____
        Signature of Registered Representative

NAME (PRINT): _Doug Frederick_____

ACCEPTED IN _____, This _24_ day of _July_, 2006

By: _____
        Authorized Home Office Principal Signature




**SCHEDULE A**

PENSON FINANCIAL SERVICES, INC.
AND/OR BROKER DEALERS FOR WHICH IT CLEARS
CUSTOMER OPTION AGREEMENT

**ORIGINAL**

To open an Options Account we must obtain the following supplemental information in addition to that on the New Account form. If account is a joint account, give information as to all owners. Information concerning the customer obtained from sources other than the customer, including estimates, should be noted as such on this form. Also, the customer's refusal to provide information called for on this form should be noted on the form.

| | | |
|---|---|---|
| Account Name: | Tuco Trading LLC | Account Number: 2131407S |
| Address: (No P.O. Boxes) | 1807 Morgan Lake ct. | Home Phone #: 810 844-0697 |
| | Brighton, MI 48114 | No. of Dependants: |
| Birth date: | 9/16/1969 | Marital Status: S M D W (N/A) |
| | | Spouse's Name: |
| Work Phone #: | 317 - 286 - 1894 | Spouse's Birth date: |
| Employer / Position: | N/A | Spouse's Employer / Position: |

**PREVIOUS OPTIONS EXPERIENCE:**   **PREVIOUS INVESTMENT EXPERIENCE:**   **INVESTMENT OBJECTIVES & ANTICIPATED TYPE(S) OF OPTION TRANSACTIONS:** Choose one or more

| | Stock Options | Index Options | | Years of Experience | Usual Size of Trades Per Year | Usual No. Of Trades Per Year | |
|---|---|---|---|---|---|---|---|
| Buying (Includes Debit Spreads & Straddles) | 8 | 4 | Options: | 8 | 1000 | 60 | Income: |
| Covered Writing: | 8 | 4 | Stocks: | 14 | 1500 | 800K | Safety or Leverage: ✓ |
| | | | | | | | Speculation: ✓ |
| Spreads: | 8 | 4 | Bonds: | 0 | | | Covered Call Writing: ✓ |
| Uncovered Writing: | 8 | 4 | Commodities: | 0 | | | Purchasing Options: ✓ *Puts for Safety or Leverage/Calls for Leverage |
| None: | | | Other: (Specify) | | | | Other Option Transactions: *(Uncovered) Spreads, Straddles, Combinations |

**APPROXIMATE ANNUAL INCOME AND NET WORTH:**

| 129,000 Salary | Bonus | Other | 129,000 Total | Approximate net worth: (Exclusive of residence, etc.) 400,000 | Approximate liquid net worth: (Cash, cash equivalents, marketable securities) 100,000 |
|---|---|---|---|---|---|

BY SIGNING BELOW, THE UNDERSIGNED CERTIFIES THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE AND ACCURATE. THE UNDERSIGNED AGREES TO ADVISE ITS BROKER OF ANY MATERIAL CHANGE IN THE UNDERSIGNED'S FINANCIAL STATUS AND/OR INVESTMENT OBJECTIVES. BY SIGNING BELOW, THE UNDERSIGNED AGREES TO ALL TERMS OF THE CUSTOMER OPTIONS AGREEMENT PRINTED ON THE BOTH SIDES OF THIS DOCUMENT. THE REVERSE SIDE OF THIS DOCUMENT, PARAGRAPH 9, CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE. THE UNDERSIGNED ACKNOWLEDGES THAT HE/SHE HAS RECEIVED THE DISCLOSURE DOCUMENT, "CHARACTERISTICS AND RISKS OF STANDARDIZED OPTIONS" AND IS AWARE OF THE SPECIAL RISKS INHERENT IN OPTIONS TRADING.

For use by individual, including accounts:

Signature _____

Print Name _____

Signature (Second Party, if Joint Account) _____

Print Name _____

Date: _____

For use by entity customers only (i.e., corporations, partnerships, trusts)

Customer Name  Tuco Trading LLC

By: _____

Title: Managing Director

Date: 10/16/06

| BROKERS USE ONLY: (Must be filled in before Penson can accept) Please note Date of Delivery: | TO BE COMPLETED BY MANAGER PRIOR TO OPTION TRADING: Approved for option trading as follows: |
|---|---|
| 1.  Characteristics and Risks of Standard Options: 10/19/06 | Covered Call Writing: YES |
| 2.  Special Statement for Uncovered Option Writers: 10/19/06 | Purchasing Options: Equity & Index |
| AE Signature: ___ Date: 10/19/06 | Other Option Transactions: Spreads Butterfly / Straddle |
| ROP Signature: ___ Date: 11/1/06 | Approved Subject to the Following Limits: No Contracts |
| | Manager Signature: ___ Date: 10/31/06 |

4/2005 – Customer Options Agreement

Page 1 of

Exhibit 6   Page 84

# EXHIBIT B



Exhibit 3   Page 36

# FORM U4

# UNIFORM APPLICATION FOR SECURITIES INDUSTRY REGISTRATION OR TRANSFER

U4 - AMENDMENT
11/16/2007

Rev. Form U4 (10/2005)

## 1. GENERAL INFORMATION

| First Name: | Middle Name: | Last Name: | Suffix: |
|---|---|---|---|
| DOUGLAS | GLEN | FREDERICK | |

**Firm CRD #:** 125363    **Firm Name:** GLB TRADING, INC    **Employment Date** (MM/DD/YYYY): 04/11/2006

**Firm Billing Code:**    **Individual CRD #:** 2348759    **Individual SSN:** 6596

Do you have an independent contractor relationship with the above named firm?:

⊙ Yes ○ No

### Office of Employment Address

| CRD Branch # | NYSE Branch Code | Firm Billing Code | Address | Private Residence | Type of Office | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| BD Main | | | 3333 MICHELSON ST 620 IRVINE, CA 92612 | N | Supervised From | 04/11/2006 | |
| 2837794 | | | 3333 MICHELSON ST 620 IRVINE, CA 92612 UNITED STATES | N | Supervised From | 06/23/2006 | |

## 2. FINGERPRINT INFORMATION

Rev. Form U4 (10/2005)

**Electronic Filing Representation**

① By selecting this option, I represent that I am submitting, have submitted, or promptly will submit to the appropriate SRO a fingerprint card as required under applicable SRO rules; or

Fingerprint card barcode

By selecting this option, I represent that I have been employed continuously by the *filing firm* since the last submission of a

Exhibit 3     Page 37

Please indicate whether the individual will maintain a "dual registration" status by answering the questions in this section. (Note: An individual should answer 'yes' only if the individual is currently registered and is seeking registration with a *firm* (either BD or IA) that is

---

## 3. REGISTRATIONS WITH UNAFFILIATED FIRMS

Rev. Form U4 (10/2005)

Some *jurisdictions* prohibit "dual registration," which occurs when an individual chooses to maintain a concurrent registration as a representative/agent with two or more *firms* (either BD or IA *firms*) that are not affiliated. *Jurisdictions* that prohibit dual registration would not, for example, permit a broker-dealer agent working with brokerage *firm* A to maintain a registration with brokerage *firm* B if *firms* A and B are not owned or controlled by a common parent. Before seeking a dual registration status, you should consult the applicable rules or statutes of the *jurisdictions* with which you seek registration for prohibitions on dual registrations or any liability provisions.

---

### Investment Adviser Representative Only Applicants

O  I affirm that I am applying only as an investment adviser representative and that I am not also applying or have not also applied with this *firm* to become a broker-dealer representative. If this radio button/box is selected, continue below.

O  I am applying for registration only in *jurisdictions* that do not have fingerprint card filing requirements, or

O  I am applying for registration in *jurisdictions* that have fingerprint card filing requirements and I am submitting, have submitted, or promptly will submit the appropriate fingerprint card directly to the *jurisdictions* for processing pursuant to applicable *jurisdiction* rules.

---

### Exceptions to the Fingerprint Requirement

O  By selecting one or more of the following two options, I affirm that I am exempt from the federal fingerprint requirement because 1/filing *firm* currently satisfy(ies) the requirements of at least one of the permissive exemptions indicated below pursuant to Rule 17f-2 under the Securities Exchange Act of 1934, including any notice or application requirements specified therein:

  ☐  Rule 17f-2(a)(1)(i)

  ☐  Rule 17f-2(a)(1)(iii)

O  By selecting this option, I represent that I have been employed continuously by the *filing firm* and my fingerprints have been processed by an *SRO* other than NASD. I am submitting, have submitted, or promptly will submit the processed results for posting to CRD.

O  fingerprint card to CRD and am not required to resubmit a fingerprint card at this time; or,

Exhibit 3  Page 38

not affiliated with the individual's current employing *firm*. If this is an initial application, an individual must answer 'no' to these questions; a 'dual registration' may be initiated only after an initial registration has been established).

Answer 'yes' or 'no' to the following questions:

|  | Yes | No |
|---|---|---|
| A. Will *applicant* maintain registration with a broker-dealer that is not *affiliated* with the *filing firm*? If you answer 'yes,' list the *firm(s)* in Section 12 (Employment History). | ○ | ⊙ |
| B. Will *applicant* maintain registration with an investment adviser that is not *affiliated* with the *filing firm*? If you answer 'yes,' list the *firm(s)* in Section 12 (Employment History). | ○ | ⊙ |

Rev. Form U4 (10/2005)

## 4. SRO REGISTRATIONS

**Check appropriate SRO Registration requests. If you are only scheduling or re-scheduling an exam, skip this section and complete Section 7 (EXAMINATION REQUESTS).**

Qualifying examinations will be automatically scheduled if needed.

| REGISTRATION CATEGORY | NASD | NYSE | AMEX | BSE | NSX | ARCA | CBOE | CHX | PHLX | ISE | NQX |
|---|---|---|---|---|---|---|---|---|---|---|---|
| OP - Registered Options Principal (S4) | ☐ | ☐ | ☐ | ☐ | ☐ | | ☐ | | | ☐ | ☐ |
| IR - Investment Company and Variable Contracts Products Rep. (S6) | ☐ | ☐ | ☐ | ☐ | ☐ | | ☐ | | | ☐ | ☐ |
| GS - Full Registration/General Securities Representative (S7) | ☑ | ☐ | ☐ | ☐ | ☐ | | ☐ | | | ☐ | ☐ |
| TR - Securities Trader (S7) | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | | |
| TS - Trading Supervisor (S7) | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | | |
| SU - General Securities Sales Supervisor (S9 and S10) | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | | |
| BM - Branch Office Manager (S9 and S10) | | ☐ | ☐ | | | | | | | | |
| SM - Securities Manager (S10) | | ☐ | | | | | | | | | |
| AR - Assistant Representative/Order Processing (S11) | ☐ | | | | | | | | | | |
| **REGISTRATION CATEGORY** | **NASD** | **NYSE** | **AMEX** | **BSE** | **NSX** | **ARCA** | **CBOE** | **CHX** | **PHLX** | **ISE** | **NQX** |
| IE - United Kingdom - Limited General Securities Registered Representative (S17) | ☐ | ☐ | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ |
| DR - Direct Participation Program Representative (S22) | ☐ | ☐ | | | | | | | | | ☐ |
| GP - General Securities Principal (S24) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

Exhibit 3 — Page 34

| REGISTRATION CATEGORY | NASD | NYSE | AMEX | BSE | NSX | ARCA | CBOE | CHX | PHLX | ISE | NQX |
|---|---|---|---|---|---|---|---|---|---|---|---|
| IP - Investment Company and Variable Contracts Products Principal (S26) | ☐ | | ☐ | | ☐ | | ☐ | ☐ | | | ☐ |
| FA - Foreign Associate | ☐ | | ☐ | | ☐ | | ☐ | ☐ | | | ☐ |
| FN - Financial and Operations Principal (S27) | ☐ | | | | ☐ | | ☐ | ☐ | | | ☐ |
| FT - Introducing Broker-Dealer/Financial and Operations Principal (S28) | ☐ | | ☐ | | ☐ | | ☐ | ☐ | ☐ | | |
| RS - Research Analyst (S86, S87) | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | | |
| RP - Research Principal | | | | | | | | | | | |
| DP - Direct Participation Program Principal (S39) | ☐ | | | | | | | | | | |
| OR - Options Representative (S42) | ☐ | | | | | | | | | | |

| REGISTRATION CATEGORY | NASD | NYSE | AMEX | BSE | NSX | ARCA | CBOE | CHX | PHLX | ISE | NQX |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MR - Municipal Securities Representative (S52) | ☐ | ☐ | ☐ | | | | | | | | |
| MP - Municipal Securities Principal (S53) | ☐ | | | | | | | | | | ☐ |
| CS - Corporate Securities Representative (S62) | ☐ | | ☐ | | ☐ | | | ☐ | | | |
| RG - Government Securities Representative (S72) | ☐ | | ☐ | | ☐ | | | ☐ | | | |
| PG - Government Securities Principal (S73) | ☐ | | | | | | | | | | |
| SA - Supervisory Analyst (S16) | | ☐ | | | | | | | | | |
| PR - Limited Representative - Private Securities Offerings (S82) | ☐ | ☐ | ☐ | | | | | | | | |
| CD - Canada-Limited General Securities Registered Representative (S37) | ☐ | | ☐ | | | ☐ | | | | | |
| CN - Canada-Limited General Securities Registered Representative (S38) | ☐ | | ☐ | | | ☐ | | | | | |

| REGISTRATION CATEGORY | NASD | NYSE | AMEX | BSE | NSX | ARCA | CBOE | CHX | PHLX | ISE | NQX |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ET - Equity Trader (S55) | ☒ | ☐ | ☐ | | ☐ | | | | | | ☒ |
| AM - Allied Member | | ☐ | ☐ | | | | | | | | |
| AP - Approved Person | | ☐ | ☐ | | | | | | | | |
| LE - Securities Lending Representative | | | | | | | | | | | |

Exhibit 3, Page 40

LS - Securities Lending Supervisor
ME - Member Exchange
FE - Floor Employee
OF - Officer
CO - Compliance Official (S14)

**REGISTRATION CATEGORY**

CF - Compliance Official Specialist (S14A)
PM - Floor Member Conducting Public Business
PC - Floor Clerk Conducting Public Business
SC - Specialist Clerk (S21)
TA - Trading Assistant (S25)
FP - Municipal Fund (S51)
IF - In-Firm Delivery Proctor
MM - Market Maker Authorized Trader-Options (S44)

**REGISTRATION CATEGORY**

FB - Floor Broker
MB - Market Maker acting as Floor Broker
OT - Authorized Trader (S7)
MT - Market Maker Authorized Trader-Equities (S7)
Other _____ (Paper Form Only)

| | NASD | NYSE | AMEX | BSE | NSX | ARCA | CBOE | CHX | PHLX | ISE | NQX |
|---|---|---|---|---|---|---|---|---|---|---|---|

## 5. JURISDICTION REGISTRATION

Check appropriate *jurisdiction(s)* for broker-dealer agent (AG) and/or investment adviser representative (RA) registration requests.

| JURISDICTION | AG | RA | JURISDICTION | AG | RA | JURISDICTION | AG | RA | JURISDICTION | AG | RA |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | ☐ | ☐ | Illinois | ☐ | ☐ | Montana | | | Puerto Rico | ☐ | ☐ |
| Alaska | ☐ | ☐ | Indiana | ☒ | ☐ | Nebraska | | | Rhode Island | ☐ | ☐ |

Rev. Form U4 (10/2005)

Exhibit 3 Page 41

**AGENT OF THE ISSUER REGISTRATION (AI) □ Indicate 2 letter jurisdiction code(s):**

| State | | | State | | | State | | | State | |
|---|---|---|---|---|---|---|---|---|---|---|
| Arizona | ☒ | | Iowa | □ | | Nevada | ☒ | | South Carolina | □ |
| Arkansas | ☒ | | Kansas | □ | | New Hampshire | □ | | South Dakota | □ |
| California | ☒ | | Kentucky | □ | | New Jersey | ☒ | | Tennessee | □ |
| Colorado | □ | | Louisiana | ☒ | | New Mexico | □ | | Texas | □ |
| Connecticut | □ | | Maine | ☒ | | New York | □ | | Utah | □ |
| Delaware | □ | | Maryland | □ | | North Carolina | □ | | Vermont | □ |
| District of Columbia | □ | | Massachusetts | □ | | North Dakota | ☒ | | Virgin Islands | □ |
| Florida | ☒ | | Michigan | ☒ | | Ohio | □ | | Virginia | □ |
| Georgia | □ | | Minnesota | ☒ | | Oklahoma | □ | | Washington | □ |
| Hawaii | □ | | Mississippi | □ | | Oregon | □ | | West Virginia | □ |
| Idaho | □ | | Missouri | □ | | Pennsylvania | □ | | Wisconsin | ☒ |
| | | | | | | | | | Wyoming | □ |

## 6. REGISTRATION REQUESTS WITH AFFILIATED FIRMS

Will *applicant* maintain registration with *firm(s)* under common ownership or control with the *filing firm?*
If "yes", fill in the details to indicate a request for registration with additional *firm(s)*.

○ Yes    ● No

No Information Filed

*Rev. Form U4 (10/2005)*

## 7. EXAMINATION REQUESTS

**Scheduling or Rescheduling Examinations** Complete this section only if you are scheduling or rescheduling an examination or continuing education session. Do *not* select the Series 63 (S63) or Series 65 (S65) examinations in this section if you have completed Section 5 (JURISDICTION REGISTRATION) and have selected registration in a *jurisdiction*. If you have completed Section 5 (JURISDICTION REGISTRATION), and requested an AG registration in a *jurisdiction* that requires that you pass the S63 examination, an S63 examination will be automatically scheduled for you upon submission of this Form U4. If you have completed Section 5 (JURISDICTION REGISTRATION), and requested an RA registration in a *jurisdiction* that requires that you pass the S65 examination, an

*Rev. Form U4 (10/2005)*

Exhibit 3, Page 42

S65 examination will be automatically scheduled for you upon submission of this Form U4.

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ S3 | ☐ S11 | ☐ S22 | ☐ S32 | ☐ S51 | ☐ S73 | |
| ☐ S4 | ☐ S12 | ☐ S23 | ☐ S33 | ☐ S52 | ☐ S82 | |
| ☐ S5 | ☐ S14 | ☐ S24 | ☐ S37 | ☐ S53 | ☐ S86 | |
| ☐ S6 | ☐ S14A | ☐ S25 | ☐ S38 | ☐ S55 | ☐ S87 | |
| ☐ S7 | ☐ S15 | ☐ S26 | ☐ S39 | ☐ S62 | ☐ S101 | |
| ☐ S7A | ☐ S16 | ☐ S27 | ☐ S42 | ☐ S63 | ☐ S106 | |
| ☐ S9 | ☐ S17 | ☐ S28 | ☐ S44 | ☐ S65 | ☐ S201 | |
| ☐ S10 | ☐ S21 | ☐ S30 | ☐ S45 | ☐ S66 | | |
| | | ☐ S31 | ☐ S46 | ☐ S72 | | |

Other _____

OPTIONAL: Foreign Exam City | Date (MM/DD/YYYY)

(Paper Form Only)

## 8. PROFESSIONAL DESIGNATIONS

Select each designation you currently maintain.

☐ Certified Financial Planner
☐ Chartered Financial Consultant (ChFC)
☐ Personal Financial Specialist (PFS)
☐ Chartered Financial Analyst (CFA)
☐ Chartered Investment Counselor (CIC)

Rev. Form U4 (10/2005)

## 9. IDENTIFYING INFORMATION/NAME CHANGE

First Name:
DOUGLAS

Middle Name:
GLEN

Last Name:
FREDERICK

Suffix:

Date of Birth
(MM/DD/YYYY)

State/Province of Birth
IOWA

Country of Birth
USA

Sex
⦿ Male ○ Female

Rev. Form U4 (10/2005)

Exhibit 3   Page 43

| Height (ft) | Height (in) | Weight (lbs) |
|---|---|---|
| 5 | 9 | 170 |
| Hair Color | Eye Color | |
| Brown | Green | |

## 10. OTHER NAMES

No Information Filed

Rev. Form U4 (10/2005)

## 11. RESIDENTIAL HISTORY

Starting with the current address, give all addresses for the past 5 years. Report changes as they occur.

| From | To | Street | City | State | Country | Postal Code |
|---|---|---|---|---|---|---|
| 09/2003 | PRESENT | 1807 MORGANLAKE CT. | BRIGHTON | MI | USA | 48114 |
| 04/2003 | 09/2003 | 1730 N. CLARK #2013 | CHICAGO | IL | USA | 60614 |
| 10/1999 | 04/2003 | 811 N. RACINE #3F | CHICAGO | IL | USA | 60622 |
| 05/1999 | 09/1999 | 1221 N. DEORBORN #P95 | CHICAGO | IL | USA | 60614 |

Rev. Form U4 (10/2005)

## 12. EMPLOYMENT HISTORY

Provide complete employment history for the past 10 years. Include the firm(s) noted in Section 1 (GENERAL INFORMATION) and Section 6 (REGISTRATION REQUESTS WITH AFFILIATED FIRMS). Include all firm(s) from Section 3 (REGISTRATION WITH UNAFFILIATED FIRMS). Account for all time including full and part-time employments, self-employment, military service, and homemaking. Also include statuses such as unemployed, full-time education, extended travel, or other similar statuses. Report changes as they occur.

| From | To | Name of Firm or Company | Investment-Related business? | City | State | Country | Position |
|---|---|---|---|---|---|---|---|
| 06/2004 | PRESENT | SPIKE FINANCIAL SERVICES, LLC | ⊙ Yes ○ No | CHICAGO | IL | USA | TRADER |
| 04/2006 | PRESENT | GLOBALVEST GROUP, INC | ⊙ Yes ○ No | IRVINE | CA | US | REG |
| 11/2003 | 06/2004 | TJM INVESTMENTS, LLC | ⊙ Yes ○ No | CHICAGO | IL | USA | SOLICITOR OF NEW |

Rev. Form U4 (10/2005)


Exhibit 3   Page 44

| | | | | | | | BUSINESS |
|---|---|---|---|---|---|---|---|
| 12/2002 | 11/2003 | NT SECURITIES LLC | ⊙ Yes ○ No | CHICAGO | IL | USA | TRADER |
| 06/2003 | 11/2003 | HOLD BROTHERS ON-LINE INVESTMENT SERVICES LLC | ⊙ Yes ○ No | CHICAGO | IL | USA | TRADER |
| 08/2002 | 11/2002 | HOLD BROTHERS ON-LINE INVESTMENT SERVICES, LLC | ⊙ Yes ○ No | CHICAGO | IL | USA | TRADER |
| 07/2002 | 08/2002 | SKEFFINGTON SECURITIES, LLC | ⊙ Yes ○ No | JERSEY CITY | NJ | USA | MEMBER -- TRADER |
| 04/2001 | 07/2002 | DYNAMIC TRADING | ⊙ Yes ○ No | BOCA RATON | FL | USA | TRADER |
| 04/2001 | 07/2001 | ANDOVER BROKERAGE, LLC | ⊙ Yes ○ No | BOCA RATON | FL | USA | REG. REP. |
| 10/1998 | 04/2001 | ONLINE INVESTMENTS | ⊙ Yes ○ No | CHICAGO | IL | USA | TRADER |
| 04/1997 | 09/1998 | BLOCK TRADING, INC. | ⊙ Yes ○ No | MIAMI | FL | USA | TRADER |
| 03/1996 | 03/1997 | NATIONAL FUELSOVER | ○ Yes ⊙ No | SCOTTSDALE | AZ | USA | SALES |
| 05/1994 | 02/1996 | MML INVESTORS SERVICES, INC. | ⊙ Yes ○ No | PHOENIX | AZ | USA | AGENT |

Rev. Form U4 (10/2005)

## 13. OTHER BUSINESS

Are you <u>currently</u> engaged in any other business either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise? (Please exclude non *investment-related* activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.) If YES, please provide the following details: the name of the other business, whether the business is *investment-related*; the address of the other business, the nature of the other business, your position, title, or relationship with the other business, the start date of your relationship, the approximate number of hours/month you devote to the other business, the number of hours you devote to the other business during securities trading hours, and briefly describe your duties relating to the other business.

⊙ Yes ○ No
MANAGER TUCO 20 HRS

## 14. DISCLOSURE QUESTIONS

IF THE ANSWER TO ANY OF THE FOLLOWING QUESTIONS IS 'YES', COMPLETE DETAILS OF ALL EVENTS OR PROCEEDINGS ON APPROPRIATE DRP(S)

REFER TO THE EXPLANATION OF TERMS SECTION OF FORM U4 INSTRUCTIONS FOR EXPLANATIONS OF ITALICIZED TERMS.

Rev. Form U4 (10/2005)

Exhibit 3   Page 45

## Criminal Disclosure

| | YES | NO |
|---|---|---|
| **14A. (1) Have you ever:** | | |
| (a) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any felony? | O | ⊙ |
| (b) been charged with any felony? | O | ⊙ |
| **(2) Based upon activities that occurred while you exercised control over it, has an organization ever:** | | |
| (a) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic or foreign court to any felony? | ⊙ | O |
| (b) been charged with any felony? | O | ⊙ |
| **14B. (1) Have you ever:** | | |
| (a) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign or military court to a misdemeanor involving: investments or an investment-related business or any fraud, false statements or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | O | ⊙ |
| (b) been charged with a misdemeanor specified in 14B(1)(a)? | O | ⊙ |
| **(2) Based upon activities that occurred while you exercised control over it, has an organization ever:** | | |
| (a) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic or foreign court to a misdemeanor specified in 14B(1)(a)? | O | ⊙ |
| (b) been charged with a misdemeanor specified in 14B(1)(a)? | O | ⊙ |

## Regulatory Action Disclosure

| | YES | NO |
|---|---|---|
| **14C. Has the U.S. Securities and Exchange Commission or the Commodity Futures Trading Commission ever:** | | |
| (1) found you to have made a false statement or omission? | O | ⊙ |
| (2) found you to have been involved in a violation of its regulations or statutes? | O | ⊙ |
| (3) found you to have been a cause of an investment-related business having its authorization to do business denied, suspended, revoked, or restricted? | O | ⊙ |
| (4) entered an order against you in connection with investment-related activity? | O | ⊙ |
| (5) imposed a civil money penalty on you, or ordered you to cease and desist from any activity? | O | ⊙ |
| **14D(1) Has any other Federal regulatory agency or any state regulatory agency or foreign financial regulatory authority ever:** | | |
| (a) found you to have made a false statement or omission or been dishonest, unfair or unethical? | O | ⊙ |

Exhibit 3 Page 46

**(b)** *found* you to have been *Involved* in a violation of *investment-related* regulation(s) or statute(s)?

**(c)** *found* you to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked or restricted?

**(d)** entered an *order* against you in connection with an *investment-related* activity?

**(e)** denied, suspended, or revoked your registration or license or otherwise, by *order*, prevented you from associating with an *investment-related* business or restricted your activities?

**14D(2)** **Have you been subject to any *final order* of a state securities commission (or any agency or officer performing like functions); state authority that supervises or examines banks, savings associations, or credit unions; state insurance commission (or any agency or office performing like functions); an appropriate *federal banking agency*; or the National Credit Union Administration, that:**

**(a)** bars you from association with an entity regulated by such commission, authority, agency, or officer, or from engaging in the business of securities, insurance, banking, savings association activities, or credit union activities; or

**(b)** constitutes a *final order* based on violations of any laws or regulations that prohibit fraudulent, manipulative, or deceptive conduct?

**14E.** **Has any *self-regulatory organization* or commodities exchange ever:**

**(1)** *found* you to have made a false statement or omission?

**(2)** *found* you to have been *involved* in a violation of its rules (other than a violation designated as a *"minor rule violation"* under a plan approved by the U.S. Securities and Exchange Commission)?

**(3)** *found* you to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked or restricted?

**(4)** disciplined you by expelling or suspending you from membership, barring or suspending your association with its members, or restricting your activities?

**14F.** **Have you ever had an authorization to act as an attorney, accountant or federal contractor that was revoked or suspended?**

**14G.** **Have you been notified, in writing, that you are now the subject of any:**

**(1)** regulatory complaint or *proceeding* that could result in a "yes" answer to any part of 14C, D or E? (If yes, complete the *Regulatory Action Disclosure Reporting Page*.)

**(2)** *investigation* that could result in a "yes" answer to any part of 14A, B, C, D or E? (If yes, complete the *Investigation Disclosure Reporting Page*.)

Exhibit 3 Page 47

## Civil Judicial Disclosure

| | YES | NO |
|---|---|---|
| **14H. (1) Has any domestic or foreign court ever:** | | |
| (a) *enjoined* you in connection with any *investment-related* activity? | O | ⊙ |
| (b) *found* that you were *involved* in a violation of any *investment-related* statute(s) or regulation(s)? | O | ⊙ |
| (c) dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you by a state or *foreign financial regulatory authority*? | O | ⊙ |
| **(2) Are you named in any pending *investment-related* civil action that could result in a "yes" answer to any part of 14H(1)?** | O | ⊙ |

### Customer Complaint/Arbitration/Civil Litigation Disclosure

| | YES | NO |
|---|---|---|
| **14I. (1) Have you ever been named as a respondent/defendant in an *investment-related*, consumer-initiated arbitration or civil litigation which alleged that you were *involved* in one or more *sales practice violations* and which:** | | |
| (a) is still pending, or; | O | ⊙ |
| (b) resulted in an arbitration award or civil judgment against you, regardless of amount, or; | O | ⊙ |
| (c) was settled for an amount of $10,000 or more? | O | ⊙ |
| **(2) Have you ever been the subject of an *investment-related*, consumer-initiated complaint, not otherwise reported under question 14I(1) above, which alleged that you were *involved* in one or more *sales practice violations*, and which complaint was settled for an amount of $10,000 or more?** | O | ⊙ |
| **(3) Within the past twenty four (24) months, have you been the subject of an *investment-related*, consumer-initiated, written complaint, not otherwise reported under question 14I(1) or (2) above, which:** | | |
| (a) alleged that you were *involved* in one or more *sales practice violations* and contained a claim for compensatory damages of $5,000 or more (if no damage amount is alleged, the complaint must be reported unless the firm has made a good faith determination that the damages from the alleged conduct would be less than $5,000), or; | O | ⊙ |
| (b) alleged that you were *involved* in forgery, theft, misappropriation or conversion of funds or securities? | O | ⊙ |

### Termination Disclosure

| | YES | NO |
|---|---|---|
| **14J. Have you ever voluntarily *resigned*, been discharged or *permitted to resign* after allegations were made that accused you of:** | | |
| (1) violating *investment-related* statutes, regulations, rules, or industry standards of conduct? | O | ⊙ |
| (2) fraud or the wrongful taking of property? | O | ⊙ |
| (3) failure to supervise in connection with *investment-related* statutes, regulations, rules or industry standards of conduct? | O | ⊙ |

### Financial Disclosure

Exhibit 3    Page 48

**14K. Within the past 10 years:**

(1) have you made a compromise with creditors, filed a bankruptcy petition or been the subject of an involuntary bankruptcy petition?

(2) based upon events that occurred while you exercised control over it, has an organization made a compromise with creditors, filed a bankruptcy petition or been the subject of an involuntary bankruptcy petition?

(3) based upon events that occurred while you exercised control over it, has a broker or dealer been the subject of an involuntary bankruptcy petition, or had a trustee appointed, or had a direct payment procedure initiated under the Securities Investor Protection Act?

**14L. Has a bonding company ever denied, paid out on, or revoked a bond for you?**

**14M. Do you have any unsatisfied judgments or liens against you?**

| | YES | NO |
|---|---|---|
| | O | ⊗ |
| | O | ⊗ |
| | O | ⊗ |
| | O | ⊗ |
| | O | ⊗ |

## 15. SIGNATURE SECTION

Rev. Form U4 (10/2005)

**Please Read Carefully**

All signatures required on this Form U4 filing must be made in this section.

A "signature" includes a manual signature or an electronically transmitted equivalent. For purposes of an electronic form filing, a signature is effected by typing a name in the designated signature field. By typing a name in this field, the signatory acknowledges and represents that the entry constitutes in every way, use, or aspect, his or her legally binding signature.

**15A    INDIVIDUAL/APPLICANT'S ACKNOWLEDGMENT AND CONSENT**
This section must be completed on all Initial or Temporary Registration form filings.

**15B    FIRM/APPROPRIATE SIGNATORY REPRESENTATIONS**
This section must be completed on all Initial or Temporary Registration form filings.

**15C    TEMPORARY REGISTRATION ACKNOWLEDGMENT**
This section must be completed on Temporary Registration form filings to be able to receive Temporary Registration.

**15D    INDIVIDUAL/APPLICANT'S AMENDMENT ACKNOWLEDGMENT AND CONSENT**
This section must be completed on any amendment filing that amends any information in Section 14 (Disclosure Questions) or any Disclosure Reporting Page (DRP).

**15E    FIRM/APPROPRIATE SIGNATORY AMENDMENT REPRESENTATIONS**

Exhibit __3__    Page __49__

* This section must be completed on all amendment form filings.

15F    FIRM/APPROPRIATE SIGNATORY CONCURRENCE
This section must be completed to concur with a U4 filing made by another *firm* (1A/BD) on behalf of an individual that is also registered with that other *firm* (1A/BD).

### 15G. TEMPORARY REGISTRATION ACKNOWLEDGMENT

If an *applicant* has been registered in a *jurisdiction* or *self regulatory organization* (SRO) in the 30 days prior to the date an application for registration is filed with the Central Registration Depository or Investment Adviser Registration Depository, he or she may qualify for a Temporary Registration to conduct securities business in that *jurisdiction* or SRO if this acknowledgment is executed and filed with the Form U4 at the *applicant's firm*.

This acknowledgment must be signed only if the *applicant* intends to apply for a Temporary Registration while the application for registration is under review.

I request a Temporary Registration in each *jurisdiction* and/or SRO requested on this Form U4, while my registration with the *jurisdiction(s)* and/or SRO(s) requested is under review;

I am requesting a Temporary Registration with the *firm* filing on my behalf for the *jurisdiction(s)* and/or SRO(s) noted in Section 4 (SRO REGISTRATION) and/or Section 5 (JURISDICTION REGISTRATION) of this Form U4;

I understand that I may request a Temporary Registration only in those *jurisdiction(s)* and/or SRO(s) in which I have been registered with my prior *firm* within the previous 30 days;

I understand that I may not engage in any securities activities requiring registration in a *jurisdiction* and/or SRO until I have received notice from the CRD or IARD that I have been granted a Temporary Registration in that *jurisdiction* and/or SRO;

I agree that until the Temporary Registration has been replaced by a registration, any *jurisdiction* and/or SRO in which I have applied for registration may withdraw the Temporary Registration;

If a *jurisdiction* or SRO withdraws my Temporary Registration, my application will then be held pending in that *jurisdiction* and/or SRO until its review is complete and the registration is granted or denied, or the application is withdrawn;

I understand and agree that, in the event my Temporary Registration is withdrawn by a *jurisdiction* and/or SRO, I must immediately cease any securities activities requiring a registration in that *jurisdiction* and/or SRO until it grants my registration;

I understand that by executing this Acknowledgment I am agreeing not to challenge the withdrawal of a Temporary Registration; however, I do not waive any right I may have in any *jurisdiction* and/or SRO with respect to any decision by that *jurisdiction* and/or SRO to deny my application for registration.

Date (MM/DD/YYYY)
11/16/2007

**Signature of Applicant**
D FREDERICK

Signature

### 15D. AMENDMENT INDIVIDUAL/APPLICANT'S ACKNOWLEDGMENT AND CONSENT

Exhibit 3    Page 50

**15E. FIRM/APPROPRIATE SIGNATORY AMENDMENT REPRESENTATIONS**

| | | Rev. Form U4 (10/2005) |
|---|---|---|

Date (MM/DD/YYYY)
11/16/2007

Signature of Applicant
D FREDERICKN

Signature

Date (MM/DD/YYYY)
11/16/2007

Signature of Appropriate Signatory
R LECHMAN

Signature

---

**CRIMINAL DRP**

This Disclosure Reporting Page is an ○ INITIAL OR ⊙ AMENDED response to report details for affirmative responses to *Questions 14A and 14B* on *Form U4*.

Check question(s) you are responding to:

| | Criminal | | |
|---|---|---|---|
| ☐14A(1)(a) | ☐14A(2)(a) | ☐14B(1)(a) | ☐14B(2)(a) |
| ☑14A(1)(b) | ☐14A(2)(b) | ☐14B(1)(b) | ☐14B(2)(b) |

Use this DRP to report all charges arising out of the same event. One event may result in more than one affirmative answer to the above Items. Multiple counts of the same charge arising out of the same event should be reported on the same DRP. Unrelated criminal actions, including separate cases arising out of the same event, must be reported on separate DRPs. **Applicable court documents (i.e., criminal complaint, information or indictment as well as judgment of conviction or sentencing documents) must be provided to the CRD if not previously submitted.**

1. If charge(s) were brought against an organization over which you exercise(d) control: Enter Organization Name, whether or not the organization was an *investment-related* business and your position, title or relationship.

2. Formal Charge(s) were brought in: (include name of Federal, Military, State or Foreign Court, Location of Court - City or County *and* State or Country, Docket/Case number).
   CHARGED FOR DWI, CHICAGO IL.

3. Event Disclosure Detail (Use this for both organizational and individual charges.)

Exhibit 3    Page 51

A.  Date First Charged (MM/DD/YYYY):
09/01/1990  ⊙ Exact   ○ Explanation
If not exact, provide explanation:

B.  Event Disclosure Detail (include Charge(s)/Charge Description(s), and for each charge provide 1. number of counts, 2. felony or misdemeanor, 3. plea for each charge, and 4. product type if charge is investment-related):
STOPPED WHILE SPEEDING AND CHARGED FOR DWI

C.  Did any of the Charge(s) within the Event involve a felony?  ⊙ Yes ○ No

D.  Current status of the Event?  ○ Pending   ○ On Appeal   ⊙ Final

E.  Event Status Date (complete unless status is Pending) (MM/DD/YYYY):
11/01/1990   ⊙ Exact   ○ Explanation
If not exact, provide explanation:

4.  Disposition Disclosure Detail
Include for each charge, A. Disposition Type [e.g., convicted, acquitted, dismissed, pretrial, etc.], B. Date, C. Sentence/Penalty, D. Duration [if sentence-suspension, probation, etc.], E. Start Date of Penalty, F. Penalty/Fine Amount and G. Date Paid.
DEFERRED SENTENCE FOR OPERATING A MOTOR VEICHEL ON 11/90. PAID FINE ON 11/92. $500.00

5.  Comment (Optional). You may use this field to provide a brief summary of the circumstances leading to the charge(s) as well as the current status or final disposition. Your information must fit within the space provided.
STOPPED FOR SPEEDING ON 9/90, SENTENCED FOR DWI ON 11/90. PAID FINE OF $500.00 ON 11/92.

| REGULATORY ACTION DRP | | | Rev. Form U4 (10/2005) |
|---|---|---|---|

This Disclosure Reporting Page is an ⊙ INITIAL OR   ⊙ AMENDED response to report details for affirmative responses to Questions 14C, 14D, 14E, 14F and 14G(1) on Form U4;
Check question(s) you are responding to:

| | Regulatory Action | | |
|---|---|---|---|
| ☐14C(1) | ☐14D(1)(a) | ☐14E(1) | ☐14F |

Exhibit 3    Page 53

One event may result in more than one affirmative answer within each of the above items. Use only one DRP to report details related to the same event. If an event gives rise to actions by more than one regulator, provide details to each action on a separate DRP.

1. Regulatory Action initiated by:

   ○ SEC   ○ Other Federal   ○ State   ⊙ SRO   ○ Foreign   ○ Federal Banking Agency   ○ National Credit Union

   **Administration**   ○ Other
   (Full name of regulator, foreign financial regulatory authority, federal, state, SRO, commodities exchange or National Credit Union Administration)
   NASD

2. Principal Sanction:
   Revocation
   Other Sanctions:

3. Date Initiated (MM/DD/YYYY):
   01/26/1998   ⊙ Exact   ○ Explanation
   If not exact, provide explanation:

4. Docket/Case Number:
   C3A970080

5. Employing *Firm* when activity occurred which led to the regulatory action:
   MML INVESTORS SERVICES, INC.

6. Principal Product Type:
   No Product
   Other Product Types:

7. Describe the allegations related to this regulatory action. (Your information must fit within the space provided.):

| □14C(2) | □14D(1)(b) | □14E(2) | |
|---|---|---|---|
| □14C(3) | □14D(1)(c) | □14E(3) | □14G(1) |
| □14C(4) | □14D(1)(d) | ☑14E(4) | |
| □14C(5) | □14D(1)(e) | | |
| | □14D(2)(a) | | |
| | □14D(2)(b) | | |

Exhibit 3   Page 53

**FAILED TO PAY FINES AND/OR COST.**

8.  Current status ?  ○ Pending   ○ On Appeal   ◉ Final

9.  If on appeal, regulatory action appealed to: (SEC, SRO, Federal or State Court) and Date Appeal Filed:

**If Final or On Appeal, complete all items below. For Pending Actions, complete Item 13 only.**

10. How was matter resolved:
Other

11. Resolution Date (MM/DD/YYYY):
12/23/2002   ◉ Exact   ○ Explanation
If not exact, provide explanation:

12. **Resolution Detail:**

A. Were any of the following sanctions ordered? (Check all appropriate items):

□ Monetary/Fine                      Amount: $
□ Revocation/Expulsion/Denial
□ Censure                            □ Disgorgement/Restitution
□ Bar                                □ Cease and Desist/Injunction
                                     □ Suspension

B. Other sanctions ordered:
NASD REGISTRATION REVOKED ON 7/16/98. REVOCATION RESCINDED ON 12/23/02 DUE TO FULL PAYMENT OF FINES AND/OR COST.

C. Sanction detail: if suspended, enjoined or barred, provide duration including start date and capacities affected: (General Securities Principal, Financial Operations Principal, etc.). If requalification by exam/retraining was a condition of the sanction, provide length of time given to requalify/retrain, type of exam required and whether condition has been satisfied. If disposition resulted in a fine, penalty, restitution, disgorgement or monetary compensation, provide total amount, portion levied against you, date paid and if any portion of penalty was waived:
FINE PAID AND ATTACHED IS A COPY OF THE AGREEMENT. MR FREDERICK PAID $6500 BY WIRE TRANSFER 12/23/2002.

13. Comment (Optional). You may use this field to provide a brief summary of the circumstances leading to the action as well as the current status or disposition and/or finding(s). Your information must fit within the space provided.

This Disclosure Reporting Page is an ○ INITIAL OR ◉ AMENDED response to report details for affirmative responses to *Questions*

Exhibit 3 Page 54

**14C, 14D, 14E, 14F and 14G(1) on Form U4;**

Check question(s) you are responding to:

**Regulatory Action**

| | | |
|---|---|---|
| ☐14C(1) | ☐14D(1)(a) | ☐14E(1) |
| ☐14C(2) | ☐14D(1)(b) | ☒14E(2) |
| ☐14C(3) | ☐14D(1)(c) | ☐14E(3) |
| ☐14C(4) | ☐14D(1)(d) | ☐14E(4) |
| ☐14C(5) | ☐14D(1)(e) | |
| | ☐14D(2)(a) | ☐14F |
| | ☐14D(2)(b) | ☐14G(1) |

One event may result in more than one affirmative answer within each of the above items. Use only one DRP to report details related to the same event. If an event gives rise to actions by more than one regulator, provide details to each action on a separate DRP.

1. Regulatory Action Initiated by:
   O SEC   O Other Federal   O State   ⊙ SRO   O Foreign   O Federal Banking Agency   O National Credit Union
   Administration   O Other
   (Full name of regulator, foreign financial regulatory authority, federal, state, SRO, commodities exchange or National Credit Union Administration)
   NASD

2. Principal Sanction:

   Other Sanctions:

3. Date Initiated (MM/DD/YYYY):
   01/26/1998   ⊙ Exact   O Explanation
   If not exact, provide explanation:

4. Docket/Case Number:
   C3A970080

5. Employing Firm when activity occurred which led to the regulatory action:
   MML INVESTORS SERVICES, INC.

Exhibit 3    Page 56

ON 01/26/1998, DISTRICT #3 ACCEPTED THE AWC AND I HAVE PAID THE FINE OF $6500 VIA WIRE TRANSFER ON 12/23/2002.

| | | Rev. Form U4 (10/2005) |
|---|---|---|

13.  Comment (Optional). You may use this field to provide a brief summary of the circumstances leading to the action as well as the current status or disposition and/or finding(s). Your information must fit within the space provided.
I HAVE PAID THE FINE AND WILL NOT ENGAGE IN OUTSIDE BUSINESS ACTIVITIES IN THE FUTURE WITHOUT GIVING WRITTEN
NOTIFICATION TO MY EMPLOYER B/D FIRM.

| | | Rev. Form U4 (10/2005) |
|---|---|---|

**CIVIL JUDICIAL DRP**

No Information Filed

| | | Rev. Form U4 (10/2005) |
|---|---|---|

**CUSTOMER COMPLAINT/ARBITRATION/CIVIL LITIGATION DRP**

No Information Filed

| | | Rev. Form U4 (10/2005) |
|---|---|---|

**TERMINATION DRP**

This Disclosure Reporting Page is an ○ INITIAL OR ● AMENDED response to report details for affirmative response to *Question 14J*
on Form U4;

**Check question(s) you are responding to:**

| Termination | | |
|---|---|---|
| ☑ 14J(1) | ☐ 14J(2) | ☐ 14J(3) |

One event may result in more than one affirmative answer to the above items. Use only one DRP to report details related to the same
termination. Use a separate DRP for each termination reported.

1.  Firm Name:
MASS MUTUAL

2.  Termination Type:
Voluntary Resignation

3.  Termination Date (MM/DD/YYYY):
02/19/1996   ● Exact   ○ Explanation
If not exact, provide explanation:

Exhibit 3 Page 57

4. Allegation(s):
OUTSIDE BUSINESS.

5. Principal Product Type:
Insurance
Other Product Types:

6. Comment (Optional). You may use this field to provide a brief summary of the circumstances leading to the termination. Your information must fit within the space provided.
SOLD ANOTHER FIRM'S PRODUCTS TO A CUSTOMER OF MASS MUTUAL.

| INVESTIGATION DRP | |
|---|---|
| No Information Filed | Rev. Form U4 (10/2005) |

| BANKRUPTCY/SIPC/COMPROMISE WITH CREDITORS DRP | |
|---|---|
| No Information Filed | Rev. Form U4 (10/2005) |

| BOND DRP | |
|---|---|
| No Information Filed | Rev. Form U4 (10/2005) |

| JUDGMENT LIEN DRP | |
|---|---|
| No Information Filed | Rev. Form U4 (10/2005) |

EXHIBIT C

ORIGINAL

1  DONALD W. SEARLES, Cal. Bar No. 135705
   SearlesD@sec.gov
2  KELLY BOWERS, Cal. Bar No. 164007
   BowersK@sec.gov
3  J. CINDY ESON, Cal. Bar No. 219782
   EsonJC@sec.gov
4  ROBERTO A. TERCERO, Cal. Bar No. 143760
   TerceroR@sec.gov
5
   Attorneys for Plaintiff
6  Securities and Exchange Commission
   Rosalind R. Tyson, Acting Regional Director
7  Andrew Petillon, Associate Regional Director
   5670 Wilshire Boulevard, 11th Floor
8  Los Angeles, California 90036
   Telephone: (323) 965-3998
9  Facsimile: (323) 965-3908

```
                    FILED

                 MAR 0 4 2008

        CLERK, U.S. DISTRICT COURT
   SOUTHERN DISTRICT OF CALIFORNIA
   BY                        DEPUTY
```

10

11                 UNITED STATES DISTRICT COURT

12              SOUTHERN DISTRICT OF CALIFORNIA

13

14  SECURITIES AND EXCHANGE            Case No.: '08 CV 0400 DMS BLM
    COMMISSION,
15                                     COMPLAINT FOR VIOLATIONS OF THE
                                       FEDERAL SECURITIES LAWS
16              Plaintiff,

17       vs.

18  TUCO TRADING, LLC and
    DOUGLAS G. FREDERICK,
19
                Defendants.
20

21

22

23

24

25

26

27

28

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.      This case involves ongoing violations of the antifraud and broker-dealer registration provisions of the federal securities laws by Tuco Trading, LLC ("Tuco"), an unregistered Southern California securities day-trading firm, and its controlling principal, Douglas G. Frederick ("Frederick" and collectively "Defendants").

2.      Tuco and Frederick provide day-trading capability to over 250 day-traders. A day-trader actively purchases and sells securities, often on the same day, and hopes to make at least a small profit on a large number of buy-and-sell transactions. Tuco and Frederick allow Tuco's members to day-trade through Tuco's own brokerage accounts ("master accounts"), by creating "sub-accounts" for each trader. Tuco and Frederick then track the activity in each trader's sub-account, including trades, balances, commissions, fees, deposits and withdrawals, which Tuco reports to the trader on a daily basis. Tuco, however, is not registered as a broker or dealer with the Commission, in violation of Section 15(a) of the Exchange Act, 15 U.S.C. §78o(a)(1).

3.      Tuco and Frederick entice traders with services unavailable to day-traders at any registered broker-dealer. First, the Defendants allow a trader to day-trade even if his or her sub-account has less than $25,000 equity, which, under applicable National Association of Securities Dealers ("NASD") regulations, is the minimum equity requirement to day-trade. Second, traders at Tuco can use up to $20 of Tuco's equity to purchase securities for each $1 in the trader's sub-account (*i.e.*, 20:1 buying power). Applicable NASD and New York Stock Exchange ("NYSE") rules, however, only allow a day-trader to have 4:1 buying power.

4.      Tuco and Frederick are also violating the antifraud provisions of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. On a daily basis, Tuco and Frederick report to the traders their purported equity balances in their sub-accounts. As of December 31, 2007, however, Tuco and Frederick have used approximately $3.62 million of the traders' approximate $10.2 million total equity to pay Tuco's expenses and to cover trader losses. In reporting the traders' equity balances, however, Tuco and Frederick

1   have failed to disclose to Tuco's traders that their equity balances are overstated and that Tuco

2   and Frederick have misused approximately 35% of the traders' equity to pay Tuco's expenses

3   and to cover other traders' losses.  Defendants' misuse of the traders' equity is continuous and

4   ongoing.  As of January 31, 2008, Tuco and Frederick used approximately $1.35 million of the

5   traders' approximate $11.4 million total equity to pay Tuco's expenses and to cover trader losses.

6       5.    The Defendants' conduct violates the antifraud and broker-dealer registration

7   provisions of the federal securities laws.  By this action, the Commission seeks a temporary

8   restraining order, preliminary and permanent injunctive relief, an asset freeze, an accounting, an

9   order preventing the destruction of documents, the appointment of a receiver over Tuco,

10  disgorgement with prejudgment interest of the defendants' ill-gotten gains, and civil penalties.

11  **THE DEFENDANTS**

12      6.    Tuco Trading, LLC, is a Nevada limited liability company formed in August 2006

13  and based in La Jolla, California.  Tuco is a self-described "trading firm" that creates sub-

14  accounts for members to day-trade securities through Tuco's master brokerage accounts.  Tuco is

15  not registered with the Commission as a broker or dealer.

16      7.    Douglas G. Frederick, age 38, resides in San Diego, California.  Frederick formed

17  Tuco in August 2006 and is its sole managing member.  He has held various securities licenses,

18  including Series 6 and 7 since 1993 and Series 55 and 63 since 2002.  Frederick has been

19  associated as a registered representative with thirteen broker-dealers since 1993, including GLB

20  Trading, Inc. since April 2006.  Frederick is not registered with the Commission in any capacity.

21  **RELATED NON-PARTY**

22      8.    GLB Trading, Inc. ("GLB Trading") has been registered with the Commission

23  since 2003 as a broker-dealer.  It is an introducing broker-dealer based in Irvine, California, and

24  clears through Penson Financial Services, Inc.  Tuco maintains it principal master accounts at

25  GLB Trading.

26  **JURISDICTION AND VENUE**

27      9.    This Court has jurisdiction over this action pursuant to Sections 21(d)(1),

28  21(d)(1)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15

1  U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa.  Defendants have, directly or indirectly, made

2  use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a

3  national securities exchange, in connection with the transactions, acts, practices, and courses of

4  conduct alleged in this Complaint.

5        10.      Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15

6  U.S.C. § 78aa, because the defendants reside and transact business in this district and certain of

7  the transactions, acts, practices, and courses of conduct constituting violations of the federal

8  securities laws alleged in this Complaint occurred within this district.

9                              **GENERAL ALLEGATIONS**

10     **Tuco's Operations**

11        11.      Tuco describes itself on its website as a "private equity firm" that provides

12 "trading solutions for the active trader."  Frederick is Tuco's only Class A "owner member" and,

13 as such, has exclusive managerial authority over Tuco and is vested with the sole and exclusive

14 power to transact business on Tuco's behalf.  Frederick also actively participates in Tuco's day-

15 to-day activities, controls all of Tuco's trading and bank accounts, and is the only person

16 authorized to withdraw funds from Tuco's accounts.  Frederick also controls and monitors the

17 daily trading activity of Tuco's traders and determines each trader's maximum buying power.

18        12.      To trade through Tuco, customers contribute funds to Tuco and sign Tuco's

19 Operating Agreement as a "Class B" member, and sign Trader Agreements and Confidentiality

20 Agreements with Tuco.  There is no minimum initial capital contribution amount required by

21 Tuco or Frederick for a customer to open an account.  New traders come from referrals by

22 Tuco's existing traders or vendors, or through Tuco's website, which Tuco uses to advertise its

23 day-trading brokerage services.

24        13.      As of December 31, 2007, Tuco had 274 traders, with 330 sub-accounts.  Of

25 those, 186 traders had 229 sub-accounts with positive equity balances totaling approximately

26 $10.2 million.  Significantly, 157 of the 229 sub-accounts that had positive equity balances had

27 equity balances below $25,000, the minimum equity required by NASD day-trading rules.

28 ///

1      14.     As of January 31, 2008, Tuco had 261 traders, with 335 sub-accounts. Of those,

2  198 traders had 257 sub-accounts with positive equity balances totaling approximately $11.4

3  million. Significantly, 159 of the 257 sub-accounts that had positive equity balances had equity

4  balances below $25,000, the minimum equity required by NASD day-trading rules.

5      15.     Tuco pools its traders' funds in bank, brokerage and commodity futures accounts

6  in Tuco's name, all of which are controlled by Frederick. Tuco has three brokerage accounts at

7  GLB Trading, and Frederick is the registered representative on each account. Tuco also allows

8  customers to trade commodity futures through two commodities accounts in Tuco's name which

9  are also controlled by Frederick. Tuco also maintains two bank accounts, both controlled by

10  Frederick, which Tuco uses to receive traders' initial and additional contributions, to send

11  withdrawals or distributions to traders, and to pay Tuco's expenses. Frederick is the only person

12  authorized to withdraw funds from Tuco's accounts.

13      16.     Tuco uses its own back office system to create sub-accounts for each trader

14  through which the trader can day-trade securities through Tuco's master accounts. All but 1% of

15  Tuco's business consists of equity trading, and 99% of that trading occurs in Tuco's master

16  accounts at GLB Trading. Traders can conduct their trading activities at Tuco's six offices

17  located nationwide, its two foreign offices, and at a remote location of the customer's choosing.

18  Tuco provides trading platform software from several vendors, which enables a trader to use his

19  or her sub-account to place trades through Tuco's master accounts. Tuco also uses the trading

20  software to monitor each trader's profits and losses on a real-time basis and whether the trader is

21  incurring substantial trading losses.

22      17.     Under Tuco's Operating and Trader Agreements, Tuco determines how much of

23  Tuco's funds each trader may use in trading securities and can stop the trader from trading at any

24  point. Frederick sets each trader's buying power based upon the amount of funds in the trader's

25  sub-account and the trader's trading experience. New traders begin with 6:1 to 10:1 buying

26  power (*i.e.*, a new trader can use $6 to $10 of Tuco's equity to purchase securities for each $1 in

27  the trader's sub-account). Approximately 80% of Tuco's traders have between 10:1 and 20:1

28  buying power, far in excess of the 4:1 buying power maximum imposed by applicable NASD