UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING.

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,) | |
| PLAINTIFF, ) | CASE NO. 08CV0400-DMS |
| VS. ) | |
| TUCO TRADING, LLC AND ) | SAN DIEGO, CALIFORNIA |
| DOUGLAS G. FREDERICK, ) | MARCH 4, 2008 |
| DEFENDANTS. ) | |

HEARING RE TEMPORARY RESTRAINING ORDER

REPORTER'S TRANSCRIPT OF PROCEEDINGS

COUNSEL APPEARING:

FOR PLAINTIFF:     ROBERTO TERCERO, SENIOR COUNSEL
                   DONALD W. SERLES, ESQ.
                   UNITED STATES SECURITIES AND EXCHANGE
                     COMMISSION
                   11TH FLOOR
                   5670 WILSHIRE BOULEVARD
                   LOS ANGELES, CALIFORNIA 90036

FOR DEFENDANTS:    MICHELE R. FRON, ESQ.
                   AUDETTE MORALES, ESQ.
                   KEESAL, YOUNG & LOGAN &
                   400 OCEANGATE
                   LONG BEACH, CALIFORNIA 90801

FOR THE RECEIVER:  DAVID L. OSIAS, ESQ.
                   EDWARD FATES, ESQ.
                   ALLEN MATKINS LECK GAMBLE & MALLORY
                   501 WEST BROADWAY, 15TH FLOOR
                   SAN DIEGO, CALIFORNIA 92101

REPORTED BY:   LEE ANN PENCE,
               OFFICIAL COURT REPORTER
               UNITED STATES COURTHOUSE
               940 FRONT STREET, BOX 4199
               SAN DIEGO, CALIFORNIA 92101

1    SAN DIEGO, CALIFORNIA – TUESDAY, MARCH 4, 2008 – 12:00 P.M.

2                          *   *   *

3              **THE CLERK:**  NO. A1 ON CALENDAR, CASE NO. 08CV0400,

4    SECURITIES AND EXCHANGE COMMISSION VERSUS TUCO TRADING, LLC

5    AND DOUGLAS G. FREDERICK; ON FOR HEARING RE TEMPORARY

6    RESTRAINING ORDER.

7              **THE COURT:**  GOOD AFTERNOON.

8              MAY I HAVE APPEARANCES, PLEASE?

9              **MR. TERCERO:**  CERTAINLY.  GOOD MORNING, YOUR HONOR.

10   ROBERTO A. TERCERO ON BEHALF OF PLAINTIFFS, SECURITIES AND

11   EXCHANGE COMMISSION.

12             AND I AM ALSO APPEARING WITH DONALD SEARLES, ALSO

13   FROM THE SECURITIES AND EXCHANGE COMMISSION.

14             IF I MIGHT ASK FOR JUST A COUPLE OF MINUTES FOR US

15   TO GET OUR TABLE AND PUT DOWN SOME THINGS AFTER THE PREVIOUS

16   CASE, I WOULD GREATLY APPRECIATE IT.

17             **THE COURT:**  THAT WOULD BE FINE.

18             **MS. FRON:**  GOOD AFTERNOON, YOUR HONOR.  I AM MICHELE

19   FRON, AND I AM HERE WITH AUDETTE MORALES.  WE ARE FROM KEESAL,

20   YOUNG & LOGAN.

21             WE REPRESENT TUCO, LLC, AS WELL AS MR. DOUGLAS

22   FREDERICK, THE DEFENDANTS.

23             **THE COURT:**  THANK YOU.  GOOD AFTERNOON.

24             **MS. FRON:**  GOOD AFTERNOON.

25             **MR. OSIAS:**  GOOD AFTERNOON, YOUR HONOR.  DAVID

1   OSIAS, OF ALLEN MATKINS, PROPOSED COUNSEL FOR THE PROPOSED

2   RECEIVER, WHO IS HERE, MR. THOMAS LENNON OF TFL, INC.

3           **THE COURT:**  THANK YOU.  GOOD AFTERNOON.

4           **MR. TERCERO:**  YOUR HONOR, THANK YOU FOR THE MOMENT.

5   WE ARE READY.

6           **THE COURT:**  YES.

7           FIRST, I RECEIVED -- THERE WAS AN APPLICATION FOR

8   TRO APPOINTMENT OF RECEIVER AND RELATED MATTERS, EXPEDITED

9   DISCOVERY.  I HAVE READ SOME, BUT NOT ALL, OF THE BRIEFING.

10  AND, SPECIFICALLY, I PAID CAREFUL ATTENTION TO THE POINTS AND

11  AUTHORITIES AND THE COMPLAINT THAT WAS FILED THEREON.  AND I

12  HAVE THE OTHER PLEADINGS IN FRONT OF ME.

13          AM I CORRECT THAT GIVEN THE SHORT NOTICE TO THE

14  DEFENSE THAT AN OPPOSITION -- WRITTEN OPPOSITION WAS NOT

15  FILED?

16          **MS. FRON:**  THAT IS CORRECT, YOUR HONOR.  FOR THAT

17  REASON WE HAVE ASKED TO HAVE AN ORAL PRESENTATION, BECAUSE WE

18  HAVE HAD THE OPPORTUNITY TO UNDERSTAND THE POSITION OF THE

19  S.E.C., SINCE RECEIVING THE PAPERS LATE YESTERDAY AFTERNOON.

20          **THE COURT:**  YES.

21          LET ME START, FIRST, IF I MIGHT, WITH YOU.

22          THEN I WILL TURN BACK TO THE S.E.C.

23          **MR. TERCERO:**  CERTAINLY.

24          **THE COURT:**  HAVING READ THE POINTS AND AUTHORITIES

25  AND THE ASSERTIONS STATED THEREIN, WHAT IS YOUR RESPONSE TO

1   THE CONTENTION, GIVEN THE FACTS THAT ARE SET FORTH, THAT THE

2   S.E.C. HAS NOT MET ITS BURDEN WITH RESPECT TO SEEKING A TRO,

3   AND THE LOWER THRESHOLD THAT IS ATTENDANT TO THAT BURDEN,

4   GIVEN THE S.E.C.'S STATUS?

5          **MS. FRON:**  THANK YOU, YOUR HONOR.

6         THE REASON THAT WE DON'T BELIEVE THAT A TRO SHOULD

7   BE ISSUED TODAY IS BECAUSE, NUMBER ONE, THE STRUCTURE THAT IS

8   IN PLACE, WITH TUCO BEING AN LLC, THEY ARE NOT ACTING AS A

9   BROKER/DEALER.  THEY HAVE MEMBERS THAT SUBMIT THEIR MONEY INTO

10  THEIR ACCOUNT IN ORDER TO TRANSACT BUSINESS AS TRADERS.

11        THE S.E.C.'S POSITION IS THAT TUCO IS ACTING AS A

12  BROKER/DEALER.  IT IS NOT.  ITS CONTRACTS DON'T REVEAL THAT IT

13  IS ACTING AS A BROKER/DEALER.  THE BROKER/DEALER IS GLB, AND

14  THEIR CLEARING FIRM IS PENSON.

15        SO THE STRUCTURE THAT HAS BEEN IMPLEMENTED, WITH

16  RESPECT TO TUCO, IS A STRUCTURE THAT IS USED QUITE FREQUENTLY

17  WITH OTHER BROKER/DEALERS, OTHER ENTITIES SUCH AS LLC, THAT

18  IMPLEMENT THE DAY TRADING FOR CUSTOMERS.

19        THE SECOND POSITION THAT THE S.E.C. IS CONTENDING,

20  WE BELIEVE, IS INACCURATE IN TERMS OF THE FACTS.  THAT IS

21  WHERE I NEEDED SOME TIME TO TAKE A LOOK AT THE FACTS.

22        THERE IS NO SHORTFALL WITH RESPECT TO THE MONEY THAT

23  THE TRADERS HAVE IN THEIR ACCOUNTS, AND THE MONEY -- IN THE

24  EVENT THAT THERE MAY HAVE BEEN A, QUOTE, UNQUOTE, RUN ON THE

25  BANK FOR THE FOLLOWING REASONS:

1            NUMBER ONE, THE INVESTORS THAT PUT THEIR MONEY INTO

2    TUCO, LLC AS MEMBERS OF THE LIMITED LIABILITY COMPANY SIGN

3    AGREEMENTS WHEREIN THEY UNDERSTAND THAT IF THEY WANT THEIR

4    FUNDS LIQUIDATED AND ISSUED OUT TO THEM THAT THERE MAY BE UP

5    TO A 90-DAY DELAY IN ORDER TO GET THEIR MONEY.

6            THAT IS BECAUSE TUCO HAS A HUGE ACCOUNTS RECEIVABLE

7    THAT IS NOT BEING TAKEN INTO CONSIDERATION, WITH RESPECT TO

8    THE SHORTFALLS.

9            DURING THE MONTHS OF OCTOBER THROUGH FEBRUARY,

10   TUCO'S ACCOUNTS RECEIVABLE WAS APPROXIMATELY $2 MILLION.  THAT

11   WAS OWED TO THEM BY PENSON BECAUSE OF THE COMMISSIONS AND THE

12   TRADING FEES AND NETTING OUT THE EXPENSES.  SO THOSE ARE REAL

13   DOLLARS, AND THOSE WOULD BE AVAILABLE.

14           WE ARE NOW WORKING WITH PENSON TO TRY TO GET THE

15   TURNAROUND ON THOSE FUNDS TO COME TO TUCO QUICKER THAN THEY

16   HAVE IN THE PAST.  THAT IS SOMETHING THAT TUCO IS WORKING ON

17   IN ORDER TO ENSURE THAT THE STRUCTURE OF THE LLC COMPORTS WITH

18   THE S.E.C.'S RULINGS.

19           MORE IMPORTANT, ON MANY OF THE CALCULATIONS THAT

20   THEY HAVE IN THEIR PAPERWORK THEY DON'T COMPORT WITH THE

21   INFORMATION THAT IS IN MR. WOO'S DECLARATION.

22           AS AN EXAMPLE, ON THE ISSUES OF THE SHORTFALL, IN

23   HIS DECLARATION HE HAS LISTED OUT THE AMOUNTS IN THE VARIOUS

24   ACCOUNTS.  FOR EXAMPLE, TO JUST GIVE ONE EXAMPLE, ON ACCOUNT

25   THAT ENDS IN 4075, HE SHOWS THAT THE AMOUNT IS $6,887,065.

1        IF WE LOOK AT THE EXHIBIT THAT SHOWS THE BALANCE ON

2   THAT ACCOUNT, AS OF THAT DATE, IT IS $6,957,000 -- 337,000.

3        SO THE SHORTFALL FIGURES FROM MR. WOO'S DECLARATION

4   TO THE DOCUMENTS THAT ARE BEING UTILIZED TO SUBSTANTIATE THAT

5   ARE OFF BY $222,000.  SO FOR THAT REASON, THESE SHORTFALLS ARE

6   NOT ACCURATE.

7        ANOTHER REASON THAT THE SHORTFALLS ARE NOT ACCURATE

8   IS BECAUSE THE CALCULATIONS MADE BY MR. WOO DO NOT TAKE INTO

9   CONSIDERATION TRANSACTIONS THAT OCCURRED, FOR EXAMPLE, ON

10  JANUARY 31ST OF 2008 THAT WERE PLACED ON THAT DATE BUT DIDN'T

11  SETTLE FOR THREE MORE TRANSACTION DAYS, AS TRADES SETTLE THREE

12  DAYS AFTER THEY ARE EXECUTED.

13       WE PROVIDED THE S.E.C., THIS MORNING, WITH SOME

14  DOCUMENTATION, THAT WE HAVE, THAT SHOWED THE ACTUAL EQUITIES

15  IN THE TUCO TRADING ACCOUNTS AS OF JANUARY 31ST, TAKING INTO

16  CONSIDERATION TRADES EXECUTED, BUT NOT SETTLED.  AND THAT

17  FIGURE COMES UP TO $7,788,564.

18       IF THOSE FIGURES ARE UTILIZED ON THE SNAPSHOT

19  PICTURE OF WHAT HAPPENED ON JANUARY 31ST, THERE IS NO

20  SHORTFALL.  THERE IS NO PROBLEM WITH RESPECT TO THE TUCO

21  TRADERS HAVING THE FUNDS THAT THEY DEPOSITED INTO THE LLC

22  AVAILABLE FOR THEM TO TRADE, AND LIKEWISE AVAILABLE FOR THEM

23  TO WITHDRAW THEIR FUNDS.

24       FOR THAT REASON WE DON'T BELIEVE THAT AN EX PARTE

25  TEMPORARY RESTRAINING ORDER SHOULD BE PUT IN PLACE BECAUSE OF

1  THE FACT THAT -- THE FACTS SUPPORTING IT ARE INACCURATE AND

2  DON'T COMPORT WITH THE REALITY OF THE STRUCTURE OF THE

3  BUSINESS THAT IS BEING RUN HERE.

4          MORE IMPORTANTLY, IF A TRO IS ISSUED IT BASICALLY IS

5  GOING TO DESTROY THE ENTIRETY OF THE TUCO, LLC STRUCTURE.  IT

6  IS GOING TO DESTROY THE ABILITY FOR THE 1500 TRADERS THAT USE

7  THIS AS A MEANS TO MAKE THEIR MONEY.

8          THIS IS THEIR BUSINESS.  THESE FOLKS ARE GOING TO BE

9  SHUT DOWN IMMEDIATELY, THEY ARE NOT GOING TO HAVE THE ABILITY

10  TO WITHDRAW THEIR FUNDS.

11          AND THERE IS NOTHING WRONG HERE.  THERE HAS BEEN

12  ABSOLUTELY NO ALLEGATIONS, NO FACTS, THAT THERE HAS BEEN ANY

13  MISAPPROPRIATION.  NOTHING IS BEING DONE ILLEGALLY, NOTHING IS

14  BEING DONE IMPROPERLY.

15          AND THE INVESTORS, WHO THE S.E.C. IS OUT THERE TO

16  PROTECT, ARE NOT COMPLAINING.  THEY ARE NOT LOSING ANY MONEY.

17  THE MONEY IS AVAILABLE.

18          THE ISSUE RIGHT NOW, I THINK, BOILS DOWN TO THE FACT

19  THAT TUCO DOESN'T GET ALL OF THE COMMISSION MONEY IMMEDIATELY

20  FROM PENSON.

21          NOW, IN ORDER TO RESOLVE THOSE PROBLEMS,

22  MR. FREDERICK HAS HIRED SEPARATE COUNSEL TO REVIEW ALL OF HIS

23  AGREEMENTS, TO REVIEW HIS OPERATING SYSTEMS, AND TO MAKE

24  RECOMMENDATIONS.  IF THINGS NEED TO BE CHANGED, HE IS WILLING

25  TO MAKE THOSE ADMINISTRATIVE CHANGES.

1          BUT THAT CAN'T POSSIBLY TAKE PLACE IF WE ARE SHUT

2     DOWN HERE TODAY.  AND IF WE ARE SHUT DOWN HERE TODAY, ALL OF

3     THE TRADERS ARE GOING TO BE LEFT HIGH AND DRY, ESPECIALLY

4     BECAUSE THEY CERTAINLY CAN'T GET THEIR MONEY OUT RIGHT NOW

5     BECAUSE OUR HANDS ARE TIED.

6          THEY ARE NOT GOING TO BE ALLOWED TO TRADE.  THEY ARE

7     NOT GOING TO BE ALLOWED TO MOVE THEIR MONEY TO ANOTHER

8     BROKER/DEALER TO CONTINUE WITH THEIR BUSINESSES.

9          IN ADDITION, ANY TRO, OBVIOUSLY, IS GOING TO PUT

10    MR. FREDERICK OUT OF BUSINESS, AND IS GOING TO AFFECT THE

11    SEVERITY OF HIS EMPLOYEES, THE PEOPLE THAT ARE RUNNING HIS

12    SOFTWARE COMPANY.

13         IT IS JUST GOING TO AFFECT A NUMBER OF PEOPLE, FOR

14    NO REASON.  THERE IS NOTHING BEING STOLEN, THERE IS NOTHING

15    BEING MISAPPROPRIATED.  THE ONLY ISSUE IS THE MONEY FLOW, AND

16    WE ARE WORKING VERY DILIGENTLY ON GETTING THAT ISSUE RESOLVED.

17         WE WOULD ASK THAT THE EX PARTE MATTER NOT BE

18    GRANTED.  AND IN THE EVENT THAT THE COURT WISHES TO PURSUE

19    ANYTHING ALONG THOSE LINES, WE WOULD THEN ASK THAT WE BE HEARD

20    ON ANY SPECIFIC ISSUES WITH RESPECT TO THE INJUNCTION, BECAUSE

21    WE BELIEVE THE SCOPE OF IT IS SEVERE.

22         IT IS BINDING MR. FREDERICK'S PERSONAL ACCOUNT SO

23    THAT HE CAN'T ACCESS HIS OWN CREDIT CARDS, DEBIT CARDS,

24    CHECKING ACCOUNT.  WE THINK THAT THAT IS EXCESSIVE.  WE ALSO

25    THINK THAT IT IS NOT NECESSARY.

1           MR. FREDERICK ISN'T BEING BROUGHT HERE TODAY BECAUSE

2    THERE HAS BEEN ANY ALLEGATIONS THAT THE MONEY HAS GONE TO HIM

3    INAPPROPRIATELY, OR ANYTHING LIKE THAT.  WE THINK THAT

4    APPLYING IT TO HIM, PERSONALLY, IS INAPPROPRIATE.

5           WE ALSO BELIEVE THAT THE ISSUES WITH RESPECT TO

6    DEPOSITIONS BEING EVERY DAY, WITH A TWO-DAY NOTICE, SATURDAY,

7    SUNDAY AND HOLIDAYS INCLUDED, IS ALSO VERY SEVERE IN THIS

8    INSTANCE.  WE DON'T SEE THE EXIGENT CIRCUMSTANCES.

9           I BELIEVE THERE IS A COUPLE OF OTHER ISSUES IN HERE

10   THAT WE WOULD LIKE TO ADDRESS, IF NECESSARY.  BUT WE WOULD ASK

11   THAT EVERYONE JUST STAND STILL, WHICH WE HAVE REQUESTED IN THE

12   PAST.

13          WE WENT TO THE S.E.C. AND SAID, IF THERE IS

14   SOMETHING THAT WE ARE DOING WRONG, MR. FREDERICK IS PREPARED

15   TO ENSURE THAT HE IS COMPLYING.  LET'S JUST SIT DOWN AND TALK

16   ABOUT WHAT THE PROBLEMS ARE AND HOW HE CAN CHANGE HIS

17   ADMINISTRATIVE SYSTEMS, IF THAT BE THE CASE, IN ORDER TO BE

18   ABLE TO CONTINUE TO CONDUCT HIS BUSINESS AND ALLOW THESE

19   TRADERS TO TRADE IN THE MANNER THAT THEY WISH TO PROCEED.

20          **THE COURT:**  WHEN YOU SAY STAND STILL, YOU MEAN

21   MAINTAIN THE STATUS QUO?

22          **MS. FRON:**  WELL, TO NOT IMPLEMENT AN EX PARTE TRO,

23   BUT TO ALLOW THE BUSINESS TO CONTINUE AS IT IS.

24          AND IF THE S.E.C. SAYS THEY WANT A DIFFERENT

25   CHECKING ACCOUNT FOR THE COMMISSIONS TO COME IN, OR IF THEY

```
 1   WANT A DIFFERENT ACCOUNT FOR THE FUNDS TO COME IN FOR THE

 2   TRADERS, WE ARE HAPPY TO WORK THINGS, OF THAT NATURE, OUT.

 3           BUT WE REALLY CANNOT HAVE THIS SYSTEM BE SHUT DOWN

 4   AND HAVE THESE TRADERS BE LEFT WITH TUCO BEING SHUT DOWN OR

 5   BEING TAKEN OVER BY A RECEIVER.

 6           THE COURT:  ULTIMATELY, YOU WOULD REQUEST THAT THE

 7   COURT NOT ISSUE THE REQUESTED RELIEF, AND PERHAPS SET IT ON A

 8   NOTICED MOTION FOR FURTHER BRIEFING AND TAKING OF EVIDENCE?

 9           MS. FRON:  ABSOLUTELY.

10           THE COURT:  ALL RIGHT.

11           MS. FRON:  THANK YOU.

12           THE COURT:  COUNSEL, HOW DO YOU RESPOND?

13           MR. TERCERO:  THANK YOU, YOUR HONOR.

14           AS YOU CORRECTLY POINT OUT, WE ARE ASKING FOR A

15   STANDSTILL.  AND WE DO WANT TO MAKE SURE THAT INVESTORS ARE

16   NOT, IN FACT, HARMED.

17           LET ME JUST TAKE COUNSEL'S POSITIONS ONE BY ONE.

18           THEY ARGUE, FIRST, THAT TUCO TRADING IS NOT A

19   BROKER/DEALER BECAUSE THEY ARE AN LLC.

20           THE SECURITIES LAWS DON'T MAKE AN EXCEPTION FOR

21   LLC'S.  THE TEST IS EASY AND CLEAR.

22           IF A PERSON OR ENTITY EFFECTS SECURITIES

23   TRANSACTIONS THROUGH INTERSTATE COMMERCE --

24           THEY USE THE INTERNET, THEY USE THE EXCHANGES, SO WE

25   HAVE GOT THAT ELEMENT.
```

1              -- THEN THEY ARE A BROKER/DEALER AND THEY MUST

2    REGISTER.

3              WE HAVE PROVIDED, IN MR. WOO'S DECLARATION, THE

4    CERTIFIED COPY SHOWING THAT THEY ARE NOT, IN FACT, REGISTERED.

5              WHAT DOES "EFFECT SECURITIES TRANSACTIONS" MEAN?  IT

6    MEANS THAT THEY HAVE -- IT MEANS, FOR A BROKER, THAT THEY HAVE

7    TO BE ENGAGED IN THE BUSINESS OF EFFECTING TRANSACTIONS IN

8    SECURITIES.

9              BY "ENGAGED IN THE BUSINESS" THE CASES -- THE LAW

10   IS:  REGULAR PARTICIPATION IN SECURITIES TRANSACTIONS.

11             AND THEY DO SO.

12             THE FACTORS THAT THE COURTS HAVE POINTED OUT ARE

13   SOLICITING TRANSACTIONS AND RECEIVING TRANSACTION-BASED

14   COMPENSATION.  AND THERE ARE A COUPLE OF MORE FACTORS ON THE

15   NEXT PART OF THE WORDS.

16             THEY DO SOLICIT.  THEY HAVE GOT AN INTERNET SITE.

17   THAT IS EXHIBIT 4 TO MY DECLARATION.

18             AND, IN ADDITION TO THAT, MR. FREDERICK ADMITTED IN

19   TESTIMONY THAT HE, IN FACT, SOLICITS DAY TRADERS, TRADING

20   GROUPS, TRADING FIRMS.

21             EFFECTS TRANSACTIONS FOR OTHERS.

22             IF AN ENTITY OR A PERSON PARTICIPATES IN KEY POINTS

23   OF A SECURITIES TRANSACTION, THEY ARE A BROKER.

24             FACTORS.  SOLICITING INVESTORS.  WE HAVE GOT THAT

25   ONE ALREADY.

1    HANDLING CUSTOMER FUNDS AND SECURITIES.

2    WELL, THEY DO HANDLE CUSTOMER FUNDS.  CUSTOMERS MAKE

3  DEPOSITS CONSTANTLY.  PERSONAL BANK ACCOUNT CONTROLLED BY MR.

4  FREDERICK' IN TUCO'S NAME, AND THEN THE BROKERAGE FIRM

5  ACCOUNTS THAT TUCO HAS.

6    PARTICIPATING AND ORDER TAKING.

7    THIS ENTITY OFFERS CUSTOMERS, TRADERS, THE

8  OPPORTUNITY TO TRADE IN THE SECURITIES MARKETS.  YOU CAN OPEN

9  UP AN ACCOUNT WITH US, YOU CAN TRADE THROUGH US.  WE WILL GIVE

10  YOU THE SOFTWARE TO PLACE THESE TRADES.  AND WE ARE GOING TO

11  CHARGE COMMISSIONS.

12    IT DOES EVERYTHING THAT A REGISTERED BROKER/DEALER

13  DOES; EXCEPT IT IS NOT REGISTERED.  AND THERE ARE SERIOUS

14  CONSEQUENCES.

15    A REGISTERED BROKER/DEALER WOULD HAVE A SEGREGATED

16  BANK ACCOUNT THAT WOULD HAVE ONLY CUSTOMER FUNDS, AND WOULD BE

17  FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS.

18    MR. FREDERICK ADMITS THAT ALL OF THE MONEY GETS

19  COMMINGLED.

20    THERE IS NOT THE TYPE OF PROTECTION THAT IS SUPPOSED

21  TO OCCUR WITH A REGISTERED BROKER/DEALER BECAUSE THEY ARE NOT

22  REGISTERED.

23    ANOTHER FACTOR, ARE YOU A BROKER/DEALER AND ARE YOU

24  AFFECTING TRANSACTIONS, IS WHETHER YOU EXTEND CREDIT OR

25  ARRANGE FOR THE EXTENSION OF CREDIT.

1          WHY IS TUCO SO POPULAR, OR WHY IS IT ATTRACTIVE TO A

2    DAY TRADER?

3          A TYPICAL DAY TRADER, IF THEY OPEN UP A BROKERAGE

4    ACCOUNT AT A REGISTERED BROKER/DEALER HAS TO HAVE $25,000 IN

5    EQUITY.  MINIMUM.  CAN'T DAY TRADE WITHOUT IT.

6          TUCO DOESN'T REQUIRE THAT.  IT USES ITS BROKERAGE

7    ACCOUNT TO HAVE THAT $25,000.

8          WHAT IS ANOTHER REASON?

9          WELL, IF YOU ARE A DAY TRADER YOU CAN GET FOUR TIMES

10   THE MONEY THAT YOU HAVE GOT IN YOUR ACCOUNT.  IT IS A LITTLE

11   MORE COMPLICATED, BUT LET'S USE THAT.  4-TO-1.

12         TUCO OFFERS UP TO 20-TO-1.  AND MR. FREDERICK HAS

13   ADMITTED ALREADY IN TESTIMONY THAT 80 PERCENT OF THE PEOPLE

14   USE 10-TO-1 OR 20-TO-1 BUYING POWER.

15         THESE PROVISIONS ARE SUPPOSED TO PROTECT THE

16   TRADERS.  BUT AS WE POINT OUT IN OUR PAPERS, THEY ARE ALSO

17   SUPPOSED TO PROTECT THE SECURITIES MARKETS.

18         WE, THE COMMISSION, ARE HERE NOT ONLY TO PROTECT

19   PEOPLE WHO HAVE ACCOUNTS AT TUCO, BUT EVERYBODY ELSE WHO HAS

20   AN ACCOUNT, AND THE REST OF THE MARKET.  AND BY NOT HAVING

21   THOSE RULES MET YOU ARE PUTTING GREATER RISK INTO THE MARKET.

22         FOR THESE REASONS WE ARE ARGUING THAT THEY ARE NOT

23   REGISTERED, EVEN THOUGH THEY ARE A BROKER/DEALER.

24         AND IN THIS CASE -- AND IN THIS CASE -- BECAUSE WE

25   HAVE TWO BASES -- REGISTRATION AND ALSO THE FRAUD -- WE WILL

1  GET TO THAT IN A SECOND -- WE NEED ONE, AND THEN THE

2  INJUNCTIVE RELIEF PROVISIONS ARE TRIGGERED.

3        MR. FREDERICK HAS RUN THIS COMPANY.  I CHECKED HIS

4  WEBSITE, AND PUT IN MY DECLARATION, THAT AS OF MONDAY THE

5  WEBSITE IS STILL UP.  OPERATIONS ARE STILL GOING ON.

6        IT IS LIKELY THAT HE IS GOING TO CONTINUE, IT IS

7  LIKELY THAT TUCO WILL CONTINUE; THEREFORE, INJUNCTIVE RELIEF

8  IS APPROPRIATE.

9        WE CAN GO INTO THE FACTORS IN GREATER DETAIL IF YOU

10 WISH, SIR.

11       COUNSEL FOR THE DEFENDANTS ALSO ARGUES THAT THERE IS

12 NO SHORTFALL, AND GIVES A NUMBER OF REASONS WHY.

13       SAYS THAT THE AGREEMENTS GIVE 90 DAYS TO PAY, BUT

14 THERE IS A ONE- TO THREE-MONTH LAG ON GETTING THE COMMISSIONS

15 TO PUT IN THE MONEY, THAT THEY ARE WORKING ON GETTING IT.

16 BUT, LET'S FACE IT, THAT MEANS THAT THEY DON'T HAVE IT TODAY.

17       THEY ALSO ARGUE THAT MR. WOO'S NUMBERS IN HIS

18 DECLARATION ARE INCORRECT, IF YOU LOOK AT THE NUMBERS.

19       COUNSEL IS NOT TAKING INTO ACCOUNT WHAT ARE CALLED

20 THE "SHORT POSITIONS" RIGHT UNDERNEATH THE NUMBERS SHE IS

21 REFERRING TO.  WHEN YOU DO THAT, MR. WOO'S NUMBERS ARE

22 CORRECT.

23       THE ACTUAL EQUITY.  COUNSEL KINDLY PROVIDED US WITH

24 COPIES THIS MORNING OF THESE AMOUNTS THAT APPARENTLY SHE IS

25 ARGUING THERE IS NO SHORTFALL.

```
 1            WE RAN THE NUMBERS.  THERE IS STILL A SHORTFALL; AND

 2   THAT SHORTFALL IS IN THE AMOUNT OF ABOUT $550,000.

 3            WHY IS THERE THIS DIFFERENCE?

 4            KEEP IN MIND, YOUR HONOR, THAT IN ADDITION TO THE

 5   EQUITY NUMBERS, THE AMOUNT IN THE ACCOUNTS THAT ARE IN THE

 6   DOCUMENTS THAT DEFENSE COUNSEL HAS PROVIDED, THEY NEED TO TAKE

 7   OUT $2.3 MILLION BECAUSE, AS MR. FREDERICK HAS ALREADY

 8   ADMITTED, HE GETS A LOAN.  THAT MONEY ISN'T HIS, IT ISN'T

 9   TUCO'S; HE NEEDS TO PAY IT BACK.

10            SO WE HAVE RECEIVED -- BECAUSE WE HAVE ASKED AND

11   GRACIOUSLY THEY HAVE PROVIDED, THROUGHOUT THE LAST MONTH --

12   THE ENFORCEMENT GROUP GOT THIS CASE ABOUT JANUARY 30TH,

13   FEBRUARY 1ST, TO GET NUMBERS, TO GET INFORMATION.

14   UNFORTUNATELY, AS WE ASKED MORE QUESTIONS, WE GET DIFFERENT

15   NUMBERS.  SO WE HAVE BEEN DOING OUR BEST TO USE IT.

16            THE NUMBERS THAT WE PROVIDED IN THE WOO DECLARATION

17   ARE GIVING THEM EVERY SINGLE BIT OF CREDIT POSSIBLE.  WE MADE

18   IT HARDEST ON OURSELVES.  AND EVEN THEN WE HAVE GOT NUMBERS

19   LIKE THAT.

20            THE OTHER THING TO KEEP IN MIND THAT I WOULD ASK THE

21   COURT TO DO IS, WE HAD A $3.6 MILLION SHORTFALL IN DECEMBER,

22   AND THE COMMISSION'S BROKER/DEALER EXAMINATION STAFF WAS

23   CONTACTING MR. FREDERICK FREQUENTLY, APPARENTLY, IN JANUARY.

24            I THINK HE MIGHT HAVE FIGURED OUT SOMETHING, AND

25   THAT IS WHY THE LOAN, WHICH TYPICALLY WAS ABOUT 1.8 WENT TO
```

1    2.3 MILLION.  I THINK THAT IS WHY WE HAVE GOT SOME EXTRA MONEY

2    HERE -- BUT DON'T KNOW.

3            THAT IS WHY WE ARE ASKING FOR A RECEIVER TO GET TO

4    THE BOTTOM OF THIS, AND TO ALSO MAKE SURE THAT THE ASSETS ARE

5    MARSHALED.

6            LET ME GO DOWN TO "TRADERS WILL SUFFER," AND THAT

7    THE "TRADERS ARE NOT COMPLAINING."

8            OF COURSE THE TRADERS ARE NOT COMPLAINING.  THE

9    BASIS OF OUR CASE IS THAT CRITICAL AND MATERIAL INFORMATION IS

10   BEING OMITTED FROM THE INFORMATION THAT THEY GET.

11           THEY CAN LOG-ON, THEY CAN LOOK AND SEE WHAT THEIR

12   POSITIONS ARE, THEY CAN SEE WHAT THE AMOUNT OF MONEY IS.  THE

13   PROBLEM IS THAT TUCO IS NOT STATING THAT, OH, BY THE WAY,

14   THERE IS A SHORTFALL.  MILLIONS OF DOLLARS HERE, EVEN USING

15   THEIR NUMBERS.

16           WE HAVEN'T HAD OUR ACCOUNTANTS GO THROUGH WHAT WE

17   GOT THIS MORNING, BUT JUST THE MOST BASIC -- THE MOST CREDIT

18   TO THEM, IT IS STILL HALF A MILLION SHORT, A LITTLE BIT OVER

19   THAT.

20           THEY ARE NOT COMPLAINING BECAUSE THEY DON'T KNOW.

21   THAT IS THE OMISSION, THAT IS THE FRAUD.

22           LET ME ADDRESS SOMETHING ELSE, YOUR HONOR.  TRADERS

23   WILL SUFFER.

24           AS OUR PAPERS SHOW, WE ARE CONCERNED ABOUT THOSE

25   TRADERS AT TUCO.  AND, AS I SAID, WE ARE CONCERNED ABOUT THE

1    SECURITIES MARKETS GENERALLY.  BUT LET'S TALK ABOUT TUCO'S

2    TRADERS IN THE LAST COUPLE OF MONTHS.

3         MR. FREDERICK WAS ABLE TO GENERATE SOMEWHERE IN THE

4    NEIGHBORHOOD OF A COUPLE HUNDRED THOUSAND, MAYBE $300,000, PER

5    MONTH IN COMMISSIONS.  IT HAS SKYROCKETED IN NOVEMBER AND

6    DECEMBER.

7         WHY?  BECAUSE HE HAS GOT ANOTHER ONE OF THESE DAY

8    TRADING FIRMS AS ONE OF HIS NEW CUSTOMERS.  IT IS CALLED T3,

9    WHICH WE PUT IN OUR PAPERS.

10        AND MR. FREDERICK HAS ADMITTED IN TESTIMONY THAT HE

11   OWNS 10 PERCENT.  THAT IS THE LARGEST PLAYER, AS FAR AS WE CAN

12   TELL, AND HE OWNS A PIECE OF IT.  IF THERE IS GOING TO BE

13   HARM, THE LION'S SHARE OF IT IS GOING TO BE A COMPANY WHICH HE

14   ADMITS HE HAS AN INTEREST IN.

15        WE THINK, AS A RESULT, THAT THE AMOUNT OF HARM THAT

16   WILL BE PLACED ON TUCO TRADERS IS FAR, FAR, FAR LESS.  AND

17   BECAUSE WE HAVE A CONTINUING SHORTFALL, WE THINK THAT BY

18   FREEZING THE ASSETS WE ARE AT LEAST PROTECTING FROM FUTURE

19   LOSSES.  AS A RESULT, THE HARM IS FAR GREATER NOT ISSUING THE

20   INJUNCTIVE RELIEF.

21        I CAN TALK TO YOU ABOUT ALL OF THE REMEDIES THAT WE

22   SEEK, BUT CERTAINLY BECAUSE WE HAVE PROVED OUT BOTH THE

23   BROKER/DEALER REGISTRATION VIOLATIONS, THAT IS ENOUGH FOR

24   INJUNCTIVE RELIEF AND THE ANCILLARY RELIEF, AND ALSO THE

25   FRAUD, WE BELIEVE THAT ALL OF THIS RELIEF IS IMPORTANT.

1      STANDSTILL?  ABSOLUTELY.  STOP THE CONDUCT IS WHAT

2  WE ARE ASKING.  LET'S MARSHAL UP THIS MONEY, AND AT LEAST HAVE

3  A HOLD THROUGH THIS TEMPORARY RESTRAINING ORDER PERIOD AS SET

4  BY YOUR HONOR, WE HOPE.

5      WE WILL ALSO HAVE A TEMPORARY RECEIVER TO MAKE SURE

6  THAT THE NUMBERS ARE CORRECT.  UNFORTUNATELY, WE HAVE NOT --

7  WE HAVE MOVED AS QUICKLY AS POSSIBLE TO STOP THE CONDUCT.  WE

8  HAVE NOT HAD AN OPPORTUNITY TO LOOK THROUGH THE ACTUAL BACK

9  OFFICE SYSTEM, THAT TUCO HAS, IN ORDER TO FIGURE OUT PRECISELY

10  WHICH OF THE MANY NUMBERS THAT TUCO AND MR. FREDERICK HAVE

11  PROVIDED ARE, IN FACT, THE CASE; OR IF THERE IS, IN FACT, YET

12  ANOTHER STORY.

13      SO, FOR THOSE REASONS, WE ARE SEEKING ALL OF THAT

14  RELIEF.  DEPENDING ON WHEN A TEMPORARY -- WHEN AN ORDER TO

15  SHOW CAUSE -- ASSUMING AUTHORIZATION AND GRANTING -- WE CAN

16  TALK ABOUT OTHER MATTERS, AND CERTAINLY WE CAN TALK ABOUT

17  OTHER COMPONENTS OF RELIEF.

18      I AM GOING TO LET MY ESTEEMED CO-COUNSEL HANDLE ALL

19  OF THOSE ISSUES AS TO THE PRECISE NATURE, IF YOUR HONOR IS

20  INCLINED TO GRANT US THE EX PARTE MOTION THAT HAS BEEN HANDED

21  DOWN.

22      BUT UNLESS YOU HAVE ADDITIONAL QUESTIONS OR UNLESS

23  DEFENSE COUNSEL PROVIDES ADDITIONAL ARGUMENTS, THAT IS OUR

24  POSITION.

25      **THE COURT:**  THERE HAS BEEN DISCOVERY THAT HAS BEEN

1   ONGOING.  A DEPOSITION WAS TAKEN OF MR. FREDERICK AND OTHERS?

2         **MR. TERCERO:**  THERE HAS BEEN A FACTUAL FINDING

3   INQUIRY.  WE DO NOT HAVE SUBPOENA AUTHORITY, WHICH REQUIRES

4   COMMISSION APPROVAL.

5         WE DID ASK MR. FREDERICK TO COME IN VOLUNTARILY, AND

6   HE DID.  WE APPRECIATE THAT HE HELPED US DEVELOP THE FACTS BY

7   COMING IN.

8         WE HAVE ASKED FOR INFORMATION; HE HAS PROVIDED IT.

9   LIKE I SAID, UNFORTUNATELY, IT IS NOT MATCHING UP, BUT GIVING

10  HIM FULL CREDIT, STILL GOT A PROBLEM, STILL GOT A SHORTFALL.

11        SO, YES, THERE HAS BEEN.

12        **THE COURT:**  WHAT WOULD BE THE HARM IN SETTING THE

13  MATTER FOR AN OSC RE PRELIMINARY INJUNCTION AND APPOINTING A

14  RECEIVER AND THE ATTENDANT RELIEF THAT IS REQUESTED, ASSUMING

15  A RELATIVELY QUICK HEARING IS SET?

16        **MR. TERCERO:**  WE WANT TO MAKE SURE THAT THERE IS, IN

17  FACT, NO ASSET DISSIPATION.

18        AND, LIKE I SAID, THERE IS A HARM, POSSIBLY, TO

19  TRADERS IF THEY CONTINUE TO LOSE MONEY, OR SOME OF THEM

20  CONTINUE TO LOSE MONEY.  THOSE WITH MONEY, AT THIS POINT, THEY

21  ARE FOOTING THE BILL.  I DON'T WANT THEM TO FOOT AN EVEN

22  LARGER BILL.

23        THEN THERE IS ANOTHER HARM:  IT IS A HARM TO THE

24  MARKETS.  THERE IS A FAR MORE RISKY TYPE OF DAY TRADING GOING

25  ON.  MARKETS SHOULD NOT BE SUBJECT TO THAT.

```
 1            AND BECAUSE CAPITAL MARKET INTEGRITY -- ALL OF THE

 2    INVESTORS THERE, EVERY INVESTOR -- IS PART OF WHAT WE DO, WE

 3    ARE ASKING THAT ALL OF THE INVESTORS BE PROTECTED.

 4            WE DEFINITELY WANT TO MAKE SURE THAT THERE IS NO

 5    ASSET DISSIPATION.  WE DEFINITELY WANT TO MAKE SURE THAT THE

 6    MARKETS ARE MAINTAINED.

 7            THE COURT:  DO YOU HAVE ANY EVIDENCE WITH RESPECT TO

 8    ASSET DISSIPATION?

 9            MR. TERCERO:  IN TERMS OF ASSET DISSIPATION, WHAT WE

10    HAVE IS THAT THERE IS THIS SHORTFALL.  UP UNTIL THIS MORNING,

11    WE HAD NO DOUBT THAT IT WAS $1.3 MILLION.  WE HAVE SOME NEW

12    NUMBERS THAT, ASSUMING THEY ARE TRUE -- AND WE ARE NOT

13    CONCEDING THAT, BUT JUST FOR PURPOSES OF ARGUMENT, WE HAVE AT

14    LEAST $550,000 SHORT.

15            ESSENTIALLY, THE ASSETS HAVE BEEN DISSIPATED SINCE

16    THE TIME IN THE BEGINNING OF TUCO'S OPERATIONS.  THAT IS PROOF

17    OF THE ASSET DISSIPATION.

18            THE COURT:  HOW MUCH TIME HAS THAT BEEN, SINCE THE

19    BEGINNING OF TUCO?

20            MR. TERCERO:  TUCO STARTED IN NOVEMBER OF 2006.  SO

21    WE ARE TALKING ABOUT, AT SOME POINT IN TIME -- AGAIN, WE DON'T

22    HAVE ALL OF THE RECORDS, BUT WHAT WE DO HAVE SHOWS A SHORTFALL

23    THAT HAS BEEN GOING ON.

24            THE COURT:  SO THAT IS ABOUT A YEAR AND FOUR MONTHS.

25            MR. TERCERO:  ABOUT A YEAR AND FOUR MONTHS.  WE
```

1   DON'T KNOW PRECISELY YET.

2          **THE COURT:**  THERE IS A CONCERN THAT 5 TO 600,000

3   SHORTFALL HAS OCCURRED OVER THAT PERIOD OF TIME?

4          **MR. TERCERO:**  WE ARE ACTUALLY CONCERNED THAT AS OF

5   TODAY 1.35.

6          JUST FOR PURPOSES OF ARGUMENT AND GIVING THEM FULL

7   CREDIT, THERE IS AT LEAST HALF A MILLION THAT IS THERE -- THAT

8   IS MISSING.  BUT OUR POSITION IS STILL 1.3, BARRING AN

9   OPPORTUNITY TO DO, YOU KNOW, MORE WORK.

10          SO WE AGREE WITH DEFENSE COUNSEL THAT A STANDSTILL

11   IS APPROPRIATE AT THIS POINT, TO FREEZE ALL THAT IS THERE.

12   AND TO MAKE SURE THAT THEY ARE NO LONGER OPERATING THIS

13   BROKERAGE FIRM THAT ALLOWS FOR THIS RISKY TRADING THAT IS

14   SUBJECT TO HURTING BOTH TRADERS IN TUCO AND THE MARKETS.

15          **THE COURT:**  YOU MENTIONED A POTENTIAL HARM TO THE

16   MARKET, POTENTIAL HARM TO INVESTORS, AND A POTENTIAL

17   DISSIPATION OF 500 TO 1.3 MILLION IN ASSETS.

18          THE REQUESTED RELIEF, THOUGH, WOULD EFFECTIVELY SHUT

19   DOWN TUCO, WOULD IT NOT?

20          **MR. TERCERO:**  WELL, IT WOULD PUT IT INTO THE HANDS

21   OF THE RECEIVER THAT WE REQUESTED THE COURT APPOINT.

22          **THE COURT:**  BUT EVEN WITH A RECEIVER, HOW COULD

23   THE -- WOULDN'T IT EFFECTIVELY SHUT DOWN THE BUSINESS?

24          **MR. TERCERO:**  IT WOULD EFFECTIVELY SHUT DOWN THE

25   SOLICITATION OF NEW INVESTORS.

1      IT WOULD SHUT DOWN THE DEPOSIT OF ADDITIONAL FUNDS,

2  WHICH WE THINK IS A VERY GOOD IDEA GIVEN THAT THERE HAS BEEN

3  ASSET DISSIPATION.

4      TYPICALLY IN THESE SITUATIONS WHERE WE HAVE GOT AN

5  ACCOUNT THAT HAS SECURITIES POSITIONS AND PEOPLE HAVE, IN

6  FACT, BEEN TRADING WHAT WE TYPICALLY ASK FOR IS THAT THE

7  RECEIVER BE PUT IN CHARGE OF THE ACCOUNT, BECAUSE IT IS PART

8  OF THE RECEIVERSHIP ESTATE.

9      ONE THING THAT MIGHT MAKE SENSE -- AND WE HAVE

10  CERTAINLY DONE IT BEFORE -- IS TO ALLOW THE RECEIVER, IN HIS

11  CAPACITY, TO CLOSE OUT ALL OF THE POSITIONS SO THAT ALL OF THE

12  MONEY IS MAINTAINED.

13      ANOTHER OPTION IS TO ALLOW FOR TRADING TO CONTINUE,

14  BUT FOR NO ASSETS TO LEAVE.

15      I MUST STATE, IN FAIRNESS TO THE COURT -- SO THAT

16  THE COURT KNOWS ALL -- THERE IS NO PROTECTION RIGHT NOW WITH

17  REGARD TO TUCO'S ACCOUNTS AT WEDBUSH, NOR THE COMMODITIES

18  ACCOUNTS.  WE ARE NOT COMMODITIES, WE ARE SECURITIES.

19      WE DID ASK YESTERDAY THAT PENSON, THE CLEARING FIRM

20  FOR ALL OF THE OTHER ACCOUNTS -- SO THAT IS THIS GLB TRADING

21  WHERE MOST OF IT HAPPENS, VIEWTRADE AND EVOLUTION -- WE ASK

22  THAT THEY PUT A HOLD ON IT VOLUNTARILY.

23      WE CANNOT FORCE THEM TO DO THAT, WE DON'T HAVE THE

24  STATUTORY AUTHORITY.  WE ASKED THEM TO PUT ON A VOLUNTARY

25  HOLD.

```
 1            TRADING IS STILL GOING ON.  THEY WON'T STOP TRADING.
 2   BUT IN TERMS OF THE ASSETS LEAVING THE ACCOUNT -- WHETHER
 3   MONEY OR SECURITIES -- IT IS NOT LEAVING.
 4            AND, IN FAIRNESS TO THE COURT, I WANT TO MAKE SURE
 5   THAT THE COURT KNOWS THAT.  UNFORTUNATELY, IT IS NOT A PART OF
 6   OUR PAPERS, JUST GIVEN THE TIMING OF WHEN THAT OCCURRED.
 7            HOWEVER, IT IS VOLUNTARY.  WE HAVE NO POWER OVER
 8   PENSON, AND IT SOUNDS LIKE PENSON IS WORKING WITH TUCO TO TRY
 9   TO RESOLVE STUFF.  WE DON'T WANT THEM TO SAY, WELL, IT IS ALL
10   RESOLVED, SO LET'S LET IT CONTINUE ONWARDS.
11            FOR THOSE REASONS, AN ASSET FREEZE AND A
12   RECEIVERSHIP IS, IN FACT, IMPORTANT.  AND WE HAVE A
13   SUBSTANTIAL SHOWING HERE TO MAKE SURE THAT, YOU KNOW, THE TUCO
14   TRADERS AND THE MARKETS ARE, IN FACT, PROTECTED.
15            THE COURT:  THANK YOU.
16            MR. TERCERO:  THANK YOU, VERY MUCH.
17            THE COURT:  DOES ANYONE ELSE HAVE ANY -- MR. OSIAS
18   OR ANYONE ELSE, ANY ADDITIONAL COMMENTS?
19            MR. SEARLES:  YOUR HONOR, DO YOU WISH TO BE HEARD
20   REGARDING THE SCOPE OF THE ORDER?
21            THE COURT:  I WOULD LIKE TO DEFER ON THAT FOR JUST A
22   MOMENT.
23            MR. SEARLES:  THAT IS FINE.  THANK YOU, YOUR HONOR.
24            MR. OSIAS:  MAYBE THAT IS REDUNDANT WITH WHAT I WAS
25   JUST GOING TO SAY.  THAT IS, CERTAINLY THE MECHANICS OF THE
```

1  RECEIVERSHIP, THE TIME OF REPORTING, ALL OF THAT IS DEPENDENT

2  ON WHAT YOUR HONOR RULES TODAY.

3          THE RECEIVER -- SO, THE RECEIVER IS HERE, AND THE

4  RECEIVER HAS CONTACTED APPROPRIATE PROFESSIONALS IN CASE YOUR

5  HONOR WANTED SOMETHING LIKE A REPORT WITHIN 10 DAYS -- OR

6  POSSIBLY EVEN QUICKER -- IN ORDER TO DEAL WITH THE PERIOD.

7          SO HE HAS ARRANGED FOR BOTH A COMPUTER FORENSICS

8  PERSON TO LOOK AT THE COMPUTER SYSTEM, MAKE SURE IT IS SECURE.

9          AN ACCOUNTANT WHO WE HAVE ASKED, EVEN IN THE

10  HALLWAY, YOU KNOW, CONDITIONED ON, OF COURSE, AN APPOINTMENT

11  ORDER, IF WE COULD GET A DAILY BALANCE TODAY.  THE ANSWER WAS

12  YES, YOU KNOW, ASSUMING WE GET OUT OF HERE AT A REASONABLE

13  TIME.

14          SO THE RECEIVER IS READY.

15          THERE ARE MECHANICAL THINGS I WOULD WANT TO ADDRESS

16  WITH THE COURT ABOUT THE RECEIVER AND THE CIRCUMSTANCE.  I

17  THINK IT MIGHT BE PREMATURE UNTIL YOUR HONOR INDICATES WHETHER

18  THAT WILL HAPPEN SOON.

19          **THE COURT:**  THE REQUESTED RELIEF, TAKING THE EX

20  PARTE APPLICATION, IF THE COURT WERE TO GRANT IT AND APPOINT

21  THE RECEIVER, WOULDN'T IT, AS REQUESTED, EFFECTIVELY SHUT DOWN

22  TUCO?

23          **MR. OSIAS:**  I THINK, YOUR HONOR, IN A COMMON SENSE

24  OF THAT WORD, YES.  THE RECEIVER WOULD -- WOULD SHUT DOWN THE

25  COMPUTER SYSTEM TO HAVE IT ANALYZED, WHICH WOULD PREVENT

1    TRADING THROUGH THAT ACCOUNT.  AND HE WOULD BE IN CONTROL OF

2    TUCO ACTIVITY WITH THE GLB AND WOULD NOT MAKE NEW TRADES.

3            NOW, THERE IS TAILORING POSSIBLE.  THE RECEIVER HAS

4    BEEN AWARE OF THIS CASE FOR 24 HOURS, ROUGHLY, AND IS NOT IN A

5    POSITION TO KNOW NEARLY ENOUGH TO CREATE A PRECISION REMEDY

6    THAT FITS THE FACTS.

7            WHEN WE HAVE TALKED WITH BOTH THE S.E.C. AND THE

8    OTHER SIDE IN THE HALLWAY FOR A FEW MINUTES ABOUT CLOSING OUT

9    TRADES AND OTHER MECHANISMS THAT WOULD BOTH ACCOMPLISH THE

10   PURPOSE THAT WE UNDERSTAND -- WHICH IS PROTECT ASSETS FROM

11   BEING DISSIPATED, PROTECT FURTHER LOSSES, PROTECT MONEY FROM

12   GOING ANYWHERE UNTIL A REAL THOROUGH ACCOUNTING.

13           ON THE OTHER HAND, IF THERE IS SOMETHING THAT CAN BE

14   TWEAKED TO PROTECT SOMEONE WHO IS LOCKED INTO A POSITION IN

15   THE MARKET -- WHICH IS A VOLATILE POSITION, ESPECIALLY

16   TODAY -- AND THE RECEIVER IS NOT GOING TO BE A TRADER AND NOT

17   GOING TO MAKE TRADING DECISIONS, THEN WE WOULD TRY TO PROMPTLY

18   FIGURE THAT OUT AND SUBMIT A STIPULATED ORDER TO MODIFY, AS

19   APPROPRIATE, ANYTHING THAT IS IN THE PROPOSAL.

20           I DON'T HAVE ANYTHING SPECIFIC YET TO SUGGEST ON

21   THAT FRONT, OTHER THAN WE HAVE THE PROFESSIONALS ORGANIZED IF

22   YOU WANTED THAT TO BE DONE THIS AFTERNOON OR TOMORROW.

23           AND SO THERE ARE OTHER MECHANICS ABOUT REPORTS AND

24   DEPOSITS.  THE LOCAL RULE IS -- MAYBE LOOK AT IT -- 66.1, IF I

25   RECALL, IT HAS VARIOUS THINGS THAT WE WOULD LIKE TO CLARIFY TO

1  MAKE SURE THERE IS NO MISCOMMUNICATION ABOUT HOW THE RECEIVER

2  PERFORMS, IF IT COMES TO THAT.

3          **THE COURT:**  THANK YOU.

4          **MS. FRON:**  THANK YOU.  YOU COULD SEE ME JUMPING OUT

5  OF MY CHAIR.

6          I WOULD LIKE TO ADDRESS SOME OF THE SUBSTANTIVE

7  ISSUES THAT MR. TERCERO RAISED WITH THE COURT.

8          WITH RESPECT TO BEING A BROKER/DEALER, HE INDICATED

9  THAT TUCO WAS SOLICITING TRANSACTIONS.  TUCO DOES NOT SOLICIT

10  ANY TRANSACTIONS.  TUCO MAKES NO RECOMMENDATIONS TO INVESTORS.

11  TUCO SIMPLY ALLOWS THE INVESTORS THE PLATFORM FOR THEM TO

12  PERFORM THEIR OWN PERSONAL INVESTMENT DECISIONS AND TO ENTER

13  THE BUY-AND-SELL ORDERS.  IN THAT RESPECT, WE ARE NOT ACTING

14  AS A BROKER/DEALER.

15          WE ARE ALSO NOT ACTING AS A BROKER/DEALER WITH

16  RESPECT TO THE ISSUES THAT HE MENTIONED ABOUT THE BUYING POWER

17  AND THE CONCERNS ABOUT THE EXTENSIONS OF CREDIT.

18          TUCO IS A LIMITED LIABILITY COMPANY WHO HAS AN

19  ACCOUNT AT GLB TRADING.  TUCO, AS AN ENTIRE ENTITY, COMPLIES

20  WITH ALL OF THE MARGIN REQUIREMENTS.  IT IS NEVER OUT OF SYNC

21  WITH RESPECT TO THE SECURITIES LAWS FOR EXTENSION OF CREDIT BY

22  GLB TO TUCO.  IT IS ALWAYS IN COMPLIANCE.

23          I THINK THEY HAD TWO HOUSE CALLS IN THEIR ENTIRE

24  EXISTENCE, AND THEY MET THEM IMMEDIATELY.  SO THE EXTENSION OF

25  CREDITS ARE ALWAYS IN COMPLIANCE WITH THE BROKER/DEALER THAT

1   HAS THIS ACCOUNT.

2        THERE WAS MENTION THAT THERE IS SOME SORT OF RISKY

3   DAY TRADING GOING ON THAT IS AFFECTING THE MARKETS.

4        THAT IS NOT IN THE PAPERS.  IT HAS NOT BEEN

5   ESTABLISHED IN ANY WAY, SHAPE OR FORM THAT WHAT THE TUCO

6   MEMBERS ARE DOING IS SOMEHOW AFFECTING THE MARKETPLACE IN A

7   NEGATIVE WAY.

8        THERE ARE THOUSANDS, IF NOT MILLIONS, OF DAY TRADERS

9   IN THE MARKETPLACE TODAY.  THIS IS JUST A PLATFORM TO ALLOW

10  THOSE INDIVIDUALS TO DO THE TRADING.

11       SO THE ISSUES, WITH RESPECT TO BEING ADDITIONALLY

12  RISKY DAY TRADING STRATEGIES OR THINGS OF THAT NATURE, IS

13  SIMPLY A RED HERRING.

14       TUCO HAS MEMBERS WHO CHOOSE TO BE MEMBERS OF TUCO,

15  AND CHOSE TO TRADE IN THE MARKETPLACE AS THEY SEE FIT.  IT IS

16  SIMILAR TO A PARTNERSHIP.

17       IF IT WAS A PARTNERSHIP ACCOUNT, THEY WOULDN'T BE

18  LOOKING AT THE INDIVIDUAL PARTNERS AND HOW THEY ARE ALLOWED TO

19  BE MEMBERS OF THE PARTNERSHIP, THEY LOOK AT THE PARTNERSHIP AS

20  A WHOLE.  THAT IS HOW ALL BROKERAGE FIRMS LOOK AT PARTNERSHIP

21  ACCOUNTS OR LIMITED LIABILITY ACCOUNTS, AND THIS ACCOUNT

22  SHOULD BE NO DIFFERENT.

23       WITH RESPECT TO THE WORDS THAT ARE USED, THAT THERE

24  IS A SHORTFALL OF A HALF A MILLION DOLLARS.  THERE IS NO

25  SHORTFALL.  THE ISSUE IS CHECKS AND BALANCES WITH RESPECT TO

1    MONEY FLOW.

2          PENSON, THE CLEARING FIRM, OWES TUCO SOMEWHERE IN

3    THE NEIGHBORHOOD OF $2 MILLION.  THEY ARE SLOW ON THEIR PAY.

4          TUCO WANTS TO MAKE CERTAIN THAT THEY ARE NOT SLOW ON

5    THEIR PAY FOR THEIR VENDORS:  FOR THE SOFTWARE THAT THEY

6    UTILIZE FOR THEIR INVESTORS TO BE ABLE TO MAKE THEIR

7    TRANSACTIONS, OR FOR THE KEEPING THE LIGHTS ON OR KEEPING THE

8    RENT PAID.

9          SO, FOR THAT REASON, KNOWING THAT PENSON IS GOING TO

10   BE SENDING THAT MONEY TO THEM, TUCO IS PAYING THE BILLS THAT

11   NEED TO BE PAID.  NO INVESTOR'S MONEY IS AT RISK FOR SOME SORT

12   OF A RUN ON THE BANK OR SOME SORT OF A SHORTFALL OF THE

13   INVESTMENTS.

14         SO WE WANT TO MAKE CERTAIN THAT THE COURT IS

15   COMFORTABLE WITH THE SITUATION THAT THAT WON'T HAPPEN.

16         WITH RESPECT TO AN INJUNCTION BEING ISSUED TODAY,

17   BASED UPON IV IN THEIR PROPOSED TRO, IT ABSOLUTELY, AS IT

18   STATES HERE, WOULD REQUIRE ALL TRADERS TO CEASE COMPLETELY ALL

19   OF THEIR ACTIVITIES.

20         IF I SUGGESTED A STANDSTILL THEN I MISSPOKE, BECAUSE

21   I THINK WE NEED TO KEEP BUSINESS AS IT IS GOING NOW, AND TO

22   NOT HALT THESE TRADERS FROM BEING ALLOWED TO DO WHAT THEY HAVE

23   BEEN DOING, SUCCESSFULLY OR UNSUCCESSFULLY, DEPENDING UPON HOW

24   THEY ARE MAKING THEIR OWN INVESTMENT DECISIONS, AND NOT SHUT

25   DOWN TUCO BY THE END OF BUSINESS TODAY OR TOMORROW.

```
 1              IT IS JUST GOING TO BE A DEVASTATING SITUATION FOR

 2    THE PEOPLE WHO HAVE CHOSEN TO BE MEMBERS OF A LIMITED

 3    LIABILITY COMPANY.  AND THERE IS ABSOLUTELY NO ILLEGAL CONDUCT

 4    WITH RESPECT TO BEING A MEMBER OF A LIMITED LIABILITY COMPANY.

 5              FOR THAT REASON, WE WOULD ASK THAT WE BE ALLOWED TO

 6    PROCEED AND MOVE FORWARD WITH OUR BUSINESS.

 7              MR. FREDERICK HAS COOPERATED AT EVERY STEP OF THE

 8    WAY.  AND, QUITE FRANKLY, HAD ABSOLUTELY NO IDEA OF THE

 9    CHALLENGES -- OR THE ALLEGATIONS THAT WERE GOING TO BE BROUGHT

10    AGAINST HIM UNTIL WE RECEIVED THE PAPERS LATE YESTERDAY

11    AFTERNOON.

12              IF WE NEED TO CHANGE THE BANK ACCOUNT SYSTEM OR

13    SOMETHING ALONG THESE LINES, WE ARE HAPPY TO DO THAT.  BUT WE

14    URGE THE COURT TO LOOK AT THE ENTIRETY OF WHAT IS GOING ON

15    HERE AND TO DENY THE S.E.C.'S REQUEST.

16              THANK YOU.

17              THE COURT:  WHAT I WOULD LIKE TO DO -- I JUST

18    RECEIVED THE PAPERWORK, MAYBE ABOUT 10:30 TODAY, AND I HAVE

19    BEEN IN TRIAL.  AS I INDICATED, I HAVE READ THE POINTS AND

20    AUTHORITIES AND THE COMPLAINT.  I HAVE NOT READ THE

21    DECLARATIONS OR THE UNDERLYING EVIDENCE YET.

22              AND I HAD HEARD THAT EVERYONE WAS HERE, AND SOME ARE

23    FROM LOS ANGELES.  SO I ELECTED, RATHER THAN BRING YOU HERE

24    TOMORROW, TO PROCEED TODAY DURING THE LUNCH HOUR.  AND I AM

25    GLAD THAT WE WERE ABLE TO DO THAT.  THIS DISCUSSION HAS BEEN
```

```
 1   HELPFUL TO ME.

 2           WHAT I WOULD LIKE TO DO, GIVEN THE NATURE OF THE

 3   REQUEST -- WHICH IS DRAMATIC -- IS TO REVIEW, IN MORE DETAIL,

 4   THE BRIEFING, AND IN PARTICULAR THE EVIDENCE THAT WAS

 5   SUBMITTED IN LIGHT OF THE ARGUMENT THAT HAS BEEN PRESENTED ON

 6   BEHALF OF TUCO AND MR. FREDERICK, TAKE THE MATTER UNDER

 7   SUBMISSION AND ISSUE AN ORDER IN SHORT ORDER.

 8           IT MAY BE, UPON EVALUATION OF THE EVIDENCE, THAT THE

 9   REQUESTED RELIEF WILL BE GRANTED; IT MAY BE THAT THE

10   DEFENDANT'S REQUEST FOR AN OSC AND NOTICED HEARING WOULD BE

11   GRANTED.  BUT I WOULD LIKE TO CONTEMPLATE THE ISSUES FURTHER.

12           IF THE COURT ELECTS TO SET AN OSC WITH FURTHER

13   BRIEFING, THEN I WILL ISSUE AN ORDER TO THAT EFFECT SETTING A

14   HEARING DATE AND A BRIEFING SCHEDULE.

15           WITH THAT, ARE THERE ANY FINAL COMMENTS BEFORE WE

16   PART?

17           MR. TERCERO:  JUST A COUPLE, YOUR HONOR.

18           THE COURT:  YES.

19           MR. TERCERO:  YOUR HONOR, WE ARE NOT SAYING THAT DAY

20   TRADING IS BAD.  IT IS WHAT IT IS.  IT IS A RISKIER STEP.

21           BUT, CONTRARY TO COUNSEL'S STATEMENTS THAT WE DON'T

22   POINT OUT THE MARKET ISSUE AND THAT IT IS A PROBLEM FOR THE

23   MARKETS, WE WOULD REFER YOU TO PAGES 15 AT THE BOTTOM,

24   LINE 26, AND THEN 16 ON 3.

25           JUST TO BRIEFLY READ:  THE $25,000 MINIMUM EQUITY
```

1    AND 4-TO1 MARGIN REQUIREMENTS ARE DESIGNED, AMONG OTHER

2    THINGS, TO, QUOTE, ENSURE THE OVERALL FINANCIAL WELL BEING OF

3    THE SECURITIES MARKETS FROM THE RISK RESULTING FROM INTRA-DAY

4    CREDIT EXTENDED TO DAY TRADERS.

5            THERE IT IS, THE MARKET ISSUE.

6            WITH REGARD TO BUYING POWER.  TUCO COMPLIES WITH THE

7    4-IN-1 MARGIN REQUIREMENTS, BUT ALLOWS ITS PEOPLE -- ITS

8    TRADERS NOT TO.

9            NO REGISTERED BROKER/DEALER CAN DO THAT, THEY HAVE

10   TO FOLLOW THE RULES.  THE NATIONAL ASSOCIATION OF SECURITIES

11   DEALERS, THE NASD, AND THE NEW YORK STOCK EXCHANGE HAVE TO

12   FOLLOW THEM.

13           IF THEY WERE REGISTERED THEY WOULD HAVE TO DO THAT.

14   THEY WOULD HAVE TO MAKE SURE THAT THEIR FOLKS COMPLIED.  BUT

15   THEY ARE NOT REGISTERED.

16           SO IT IS IMPORTANT.

17           WITH REGARD TO SOLICITATION.  SOLICITATION IS NOT

18   JUST A SPECIFIC TRANSACTION, BUY THIS STOCK.  IT IS ALSO

19   SOLICITING TRADING OR SECURITIES TRANSACTIONS.

20           AND THEY ARE SAYING, COME TO US.  OPEN UP AN

21   ACCOUNT.  YOU CAN TRADE.  WE WILL PROVIDE YOU THE SOFTWARE, WE

22   WILL CHARGE COMMISSIONS.

23           IT IS A BROKERAGE FIRM.  IT IS A BROKERAGE FIRM.

24           SLOW ON PAYING.  THAT'S NOT THE ENTIRE PROBLEM.

25   UNDER THE AGREEMENT -- I WOULD REFER THE COURT TO THE

1   OPERATING AGREEMENT WHICH IS WITHIN MY DECLARATION, EXHIBIT 5.

2   IT STARTS AT PAGE 123.

3           I ENCOURAGE THE COURT TO LOOK AT ARTICLE V IN

4   SECTIONS 501, 502, 503 AND YOU WILL SEE, TUCO IS NOT SUPPOSED

5   TO BORROW ANY MONEY FROM THE INVESTORS IN THE SENSE OF, IF

6   THERE IS A LOSS THAT GOES BEYOND -- IF I AM A TUCO CUSTOMER,

7   TUCO TRADER, AND I LOSE ALL OF MY MONEY, MAYBE I DIDN'T LOSE

8   SOME MORE BECAUSE THE MARKET REALLY GOT AWAY AND THERE WAS A

9   LOSS THAT WENT BELOW ZERO, THAT IS TUCO'S RESPONSIBILITY.

10  INDEED, THE AGREEMENT SAYS MR. FREDERICK, AS THE CLASS A

11  MEMBER.

12          UNFORTUNATELY, IN OUR DISCUSSION OF THIS SHORTFALL,

13  WHAT WE ARE NOT SEEING IS, HOW DO YOU MAKE IT UP?

14          HE OWES THAT MONEY TO THE TRADERS, OR HE IS -- HE IS

15  RESPONSIBLE FOR MAKING UP THAT MONEY.  HE NEEDS TO PUT IN

16  $1.35 MILLION.  HE NEEDS TO PUT IN $550,000, IF YOU TAKE THAT

17  NUMBER.

18          HE HASN'T DONE IT.  EVEN TO THIS LAST MONTH.  HE

19  DIDN'T DO IT THE MONTH BEFORE.  THE MOST RECENT INFORMATION WE

20  HAVE GOT IS THAT THIS NEGATIVE EQUITY, YOU KNOW, THE NEGATIVE

21  NUMBERS, THE NEGATIVE POSITIONS, HE HASN'T PUT IN THE MONEY;

22  AND THAT IS THE CONTINUING PROBLEM.

23          HE REPRESENTS THAT IT IS HIS DEBT.  RIGHT NOW IT IS

24  THE TUCO TRADERS' DEBT; AND THEY DON'T KNOW THAT.

25          IF THEY DID, IF HE DID NOT AND IF TUCO DID NOT FAIL

1   TO DISCLOSE THIS MATERIAL INFORMATION, THERE IS AN ISSUE AS TO

2   WHETHER IT IS MATERIAL, BECAUSE IT AFFECTS THEIR DECISIONS.

3   GEE, SHOULD I TRADE THROUGH TUCO?  BECAUSE THERE IS THIS

4   SHORTFALL -- WE SAY 12 PERCENT.  SHOULD I TRADE, SHOULD I DAY

5   TRADE THAT DAY?

6            IN REALITY, THERE IS LESS MONEY.

7            THEN THE OTHER QUESTION IS, SHOULD I DAY TRADE

8   THROUGH TUCO?

9            IT IS AWFUL EXPENSIVE TO DAY TRADE THROUGH TUCO IF

10  YOU LOSE 12 TO 35 PERCENT OF YOUR MONEY BECAUSE THEY DON'T

11  REPLENISH THE NEGATIVE EQUITY NUMBERS.

12           SO THIS IS VERY SIGNIFICANT IN THE SENSE THAT WE

13  THINK THESE VIOLATIONS -- THESE VIOLATIONS ARE SIGNIFICANT.

14  AND, FOR THOSE REASONS, WE WOULD SUBMIT OUR MOTION.

15           YOUR HONOR, JUST SO THAT YOU KNOW, MR. SEARLES AND I

16  ARE HERE, WE CHECKED IN LAST EVENING.  WE CAN CERTAINLY STAY

17  IF WE NEED TO.

18           YOUR LAW CLERK HAS BEEN VERY GRACIOUS, CERTAINLY HAS

19  OUR CELL PHONE NUMBERS.  WE ARE AVAILABLE AS LONG AS YOU NEED

20  US.

21           **THE COURT:**  OKAY.  THANK YOU.

22           ARE YOU LOCAL, AS WELL?  ARE YOU COMING FROM LOS

23  ANGELES?

24           **MS. FRON:**  I CAME FROM LOS ANGELES, BUT I KNOW MY

25  WAY DOWN HERE.  SO I AM HAPPY TO COME WHENEVER THE COURT WOULD

1    LIKE.

2            MS. MORALES IS LOCAL, AS IS MR. FREDERICK.

3            **THE COURT:**  YES.  THANK YOU.

4            **MR. OSIAS:**  YOUR HONOR, DAVID OSIAS AGAIN.

5            JUST IN THE EVENT THAT YOU ISSUE AN ORDER OF

6    APPOINTMENT, THAT LEAVES FOR ANOTHER DAY SOME IMPORTANT BUT

7    MORE MUNDANE OPERATION UNDER RECEIVERSHIP.

8            AND EITHER YOUR HONOR COULD SPECIFY A DATE WHERE WE

9    COULD ADDRESS THOSE -- I KNOW YOU ARE IN THE MIDDLE OF

10   TRAIL -- OR WE COULD SUBMIT AND SERVE PROMPTLY WHAT WE CALL AN

11   ORDER IN AID OF RECEIVERSHIP, SORT OF SAYING THIS IS WHERE WE

12   INTEND TO DEPOSIT FUNDS, THIS IS WHEN WE INTEND TO REPORT.

13   THERE IS A WHOLE VARIETY OF THINGS.

14           THEN, IF THERE IS OBJECTIONS, THEN WE COULD HAVE A

15   HEARING.

16           BUT, IF WE GET APPOINTED, WE NEED TO KNOW ALL OF THE

17   RULES AS PROMPTLY AS POSSIBLE AND, EITHER THROUGH A DIALOGUE

18   OR SUBMITTALS, HAVE THAT RESOLVED QUICKLY.

19           IF YOU KEEP THAT IN MIND, SINCE YOU WILL BE TAKING

20   THIS UNDER SUBMISSION, WE WOULD APPRECIATE THAT.

21           **THE COURT:**  I WILL.

22           THANK YOU VERY MUCH.  I APPRECIATE YOU ALL BEING

23   HERE.

24           I WILL TAKE IT UNDER SUBMISSION.  AND IF THERE IS A

25   NEED FOR FURTHER HEARING OR DISCUSSION I WILL LET COUNSEL AND

1  PARTIES KNOW PROMPTLY.  OTHERWISE, I WILL ANTICIPATE ISSUING

2  AN ORDER QUICKLY.

3          **MS. FRON:**  THANK YOU FOR YOUR TIME.

4          **THE COURT:**  THANK YOU.

5          **MR. TERCERO:**  THANK YOU VERY MUCH.

6          **THE COURT:**  YOU ARE WELCOME.

7

8                          *   *   *

9          I CERTIFY THAT THE FOREGOING IS A CORRECT
           TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
10         IN THE ABOVE-ENTITLED MATTER.

11         S/LEEANN PENCE                    7/24/08

12         LEEANN PENCE, OFFICIAL COURT REPORTER   DATE

13

14

15

16

17

18

19

20

21

22

23

24

25