UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION
July 30, 2008

ADMINISTRATIVE PROCEEDING
File No. 3-13004

| | |
|---|---|
| In the Matter of<br><br>　　DOUGLAS G. FREDERICK,<br><br>Respondent. | DIVISION OF ENFORCEMENT'S OPPOSITION TO RESPONDENT'S MOTION FOR SUMMARY DISPOSITION<br><br>COMMISSION RULE OF PRACTICE 250<br><br>[17 C.F.R. § 201.250] |

Donald W. Searles
Roberto A. Tercero
*Attorneys for Division of Enforcement*
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-4573 (Searles)
Telephone: (323) 965-3891 (Tercero)
Facsimile: (323) 965-3908
E-Mail: searlesd@sec.gov
E-Mail: terceror@sec.gov

Exhibit 7  Page 22

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION. ...........................................................................................................1

II.  A PERMANENT BAR IS APPROPRIATE BASED ON THE FACT
     THAT FREDERICK HAS BEEN PERMANENTLY ENJOINED
     FROM FURTHER VIOLATIONS OF THE BROKER-DEALER
     AND ANTIFRAUD PROVISIONS OF THE EXCHANGE ACT. ...................................1

III. THE DOCTRINE OF COLLATERAL ESTOPPEL PREVENTS
     FREDERICK FROM RELITIGATING THE FACTUAL FINDINGS
     OR LEGAL CONCLUSIONS PREVIOUSLY DETERMINED BY
     THE DISTRICT COURT. ..............................................................................................2

IV.  AS A MATTER OF LAW, FREDERICK'S CONDUCT VIOLATED
     THE ANTIFRAUD PROVISIONS OF THE EXCHANGE ACT. ..................................4

V.   AS A MATTER OF LAW, FREDERICK'S CONDUCT VIOLATED
     THE BROKER-DEALER PROVISIONS OF THE EXCHANGE ACT..........................7

VI.  CONCLUSION. ............................................................................................................11

## TABLE OF AUTHORITIES

Page

### CASES

*Arrington v. Merrill Lynch*
651 F.2d 615 (9th Cir. 1981) .......... 5

*Elliott v. SEC*
36 F.3d 86 (11th Cir. 1994) .......... 2

*In re Brett L. Bouchy and Richard C. Whelan*
2002 SEC LEXIS 1743 (Jul. 9, 2002) .......... 4

*In re Castle Secs. Corp.*
2005 SEC Lexis 815 (Apr. 21, 2005) .......... 4

*In re Conrad P. Seghers*
2007 SEC Lexis 2238 (Sept. 26, 2007) .......... 2

*In re David A. Zwick*
2007 SEC Lexis 2413 (Oct. 27, 2007) .......... 2

*In re Marshall E. Melton*
56 S.E.C. 695 (2003) .......... 2, 4, 11

*In re Martin Kaiden*
54 S.E.C. 194 (Jul. 20, 1999) .......... 4

*In re Martin R. Kaiden*
1999 SEC Lexis 1396 (Jul. 20, 1999) .......... 2

*In re Michael Batterman*
2004 SEC Lexis 2855 (Dec. 3, 2005) .......... 2, 3

*In re Michael T. Studer, et al.*
2004 SEC 2135 (Sept. 20, 2004) .......... 3

*In re William H. Mathis*
1990 SEC LEXIS 2911 (Aug. 3, 1990) .......... 2, 3, 4

*Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp.*
411 F. Supp. 411 (D. Mass.), *aff'd*, 545 F.2d 754 (1st. Cir. 1976) .......... 7

*SEC v. Hansen*
1984 U.S. Dist. Lexis 17835 (S.D.N.Y. Apr. 6, 1984) .......... 7

*SEC v. Margolis*
    1992 U.S. Dist. Lexis 14872 (S.D.N.Y. Sept. 30, 1992) ..................................................... 7

*SEC v. Rana Research, Inc.*
    8 F.3d 1358 (9th Cir. 1993) .................................................................................................. 5

*SEC v. Schmidt*
    1971 U.S. Dist. Lexis 11884 (S.D.N.Y. Aug. 26, 1971) ..................................................... 7

*SEC v. Zandford*
    535 U.S. 813 (2002) ........................................................................................................ 5, 6

## FEDERAL STATUTES

### Securities Exchange Act of 1934

Section 3(a)(4)
    [15 U.S.C. §78c(a)(4)] ......................................................................................................... 7

Section 3(a)(9)
    [15 U.S.C. § 78c(a)(9)] ...................................................................................................... 10

Section 3(a)(12)(A)
    [15 U.S.C. § 78c(a)(12)(A)] ................................................................................................. 8

Section 6(c)(1)
    [15 U.S.C. § 78f(c)(1)] ......................................................................................................... 9

Section 10(b)
    [15 U.S.C. § 78j(b)] ..................................................................................................... 1, 4, 7

Section 15(a)
    [15 U.S.C. § 78o(a)] ................................................................................................ 1, 7, 8, 10

Section 15(a)(1)
    [15 U.S.C. § 78o(a)(1)] ................................................................................................ 10, 11

Section 15(b)(4)(C)
    [15 U.S.C. § 78o(b)(4)(C)] .................................................................................................. 1

Section 15(b)(6)
    [15 U.S.C. § 78o(b)(6)] ....................................................................................................... 1

## FEDERAL REGULATIONS

Rule 10b-5
    [17 C.F.R. § 240.10b-5] ............................................................................................1, 4

Rule 15b-91
    [17 C.F.R. § 240.15b9-1] ...............................................................................................9

## COMMISSION RELEASES

*Securities Exchange Act Release No. 44009*
    2001 SEC Lexis 383 (Feb. 27, 2001) ...........................................................................9

I.     **INTRODUCTION.**

For all of the reasons set forth in the Division of Enforcement's memorandum of points and authorities in support of its motion for summary adjudication, Respondent Douglas G. Frederick's ("Frederick") cross motion for summary adjudication must be denied. The district court permanently enjoined Frederick from violations of the broker-dealer and antifraud provisions the Securities and Exchange Act of 1934 ("Exchange Act"). 15 U.S.C. §§ 78o(a), 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. That judgment, standing alone, justifies the issuance of an order permanently barring Frederick from future association with any broker or dealer. In addition, the underlying facts set forth in the Complaint, which must be taken as true for purposes of these proceedings, further demonstrate that a permanent bar is appropriate.

II.    **A PERMANENT BAR IS APPROPRIATE BASED ON THE FACT THAT FREDERICK HAS BEEN PERMANENTLY ENJOINED FROM FURTHER VIOLATIONS OF THE BROKER-DEALER AND ANTIFRAUD PROVISIONS OF THE EXCHANGE ACT.**

In his cross motion for summary adjudication, Frederick takes issue with virtually every substantive allegation in the Complaint and attempts to argue that as a matter of law he did not violate the broker-dealer and antifraud provisions. What Frederick does not and cannot contest is that the District Court for the Southern District of California entered a judgment against him, based on his consent, permanently enjoining him from future violations of the broker-dealer and antifraud provisions of the Exchange Act. The entry of that judgment, standing alone, is a sufficient basis for the entry of an order permanently barring Frederick from associating with any broker or dealer in the future. *See* 15 U.S.C. § 78o(b)(6) (authorizing institution of administrative proceedings against any associated person for, among other things, being enjoined from any act or practice described in 15 U.S.C. § 78o(b)(4)(C)).[1]

---

[1] Section 15(b)(4)(C) of the Exchange Act, 15 U.S.C. § 78o(b)(4)(C), provides, in relevant part:

The Commission, by order, shall censure, place limitations on the activities, functions, or operations of, suspend for a period not exceeding twelve months, or revoke the registration of any broker dealer if it finds…that such censure, placing of limitations, suspension or revocation is in the public interest and that such broker or dealer …is permanently or temporarily enjoined by order, judgment or decree of any court of competent jurisdiction from acting as … [a] broker [or] dealer … or from engaging in or continuing any conduct or practice in connection with any such activity, or in connection with the purchase or sale of any security.

1

Exhibit 7 Page 27

The Commission has repeatedly held that the issuance of a permanent injunction for any conduct or practice connected with activity of a broker-dealer or investment adviser, or in connection the purchase or sale of any security, is a sufficient basis to impose a permanent bar. *See, e.g., In re Conrad P. Seghers*, 2007 SEC Lexis 2238, at * 28-29 (Sept. 26, 2007) (ordering permanent bar under the Advisers Act [15 U.S.C. §§ 80b-3(e)(4), 80b-3(f)], noting that "it is well established that [a respondent] is collaterally estopped from challenging in administrative proceedings the judgment of the District Court in the injunctive proceeding.") (collecting cases). *Accord, Elliott v. SEC*, 36 F.3d 86, 87 (11th Cir. 1994) ("[u]nder the statutory language, existence of the injunction provides a ground for the bar adequate in itself."); *In re David A. Zwick*, 2007 SEC Lexis 2413, at *7 (Oct. 27, 2007) ("ordinarily ... it will be in the public interest to revoke the registration of, or suspend or bar from participation in the securities industry ... a respondent who is enjoined from violating the antifraud provisions.") (quoting *In re Marshall E. Melton*, 56 S.E.C. 695, 713 (2003)); *In re Michael Batterman*, 2004 SEC Lexis 2855, at *13 (Dec. 3, 2005) ("the existence of the injunction is a sufficient basis for revoking respondent's registration, if such revocation [is] in the public interest."); *In re Martin R. Kaiden*, 1999 SEC Lexis 1396 (Jul. 20, 1999) (same); *In re William Mathis*, 1990 SEC Lexis 291, at *6-7 (Aug. 3, 1990) ("[t]he proof of the entry of such an injunction, whether based on the defendant's consent or otherwise, and whether the defendant has denied the allegations of the complain or not, may in itself form a sufficient basis for finding that revocation is in the public interest.")

In light of the district court's judgment permanently enjoining Frederick from violations of the broker-dealer and antifraud provisions of the Exchange Act, Frederick's motion for summary adjudication must be denied for this reason alone.

### III. THE DOCTRINE OF COLLATERAL ESTOPPEL PREVENTS FREDERICK FROM RELITIGATING THE FACTUAL FINDINGS OR LEGAL CONCLUSIONS PREVIOUSLY DETERMINED BY THE DISTRICT COURT.

In consenting to the entry of the district court's judgment permanently enjoining him from violations of the broker-dealer and antifraud provisions of the Exchange Act, Frederick expressly acknowledged that in any disciplinary proceeding before the Commission based on the entry of the injunction, "[d]efendant understands that he shall not be permitted to contest the factual allegations

of the complaint in this action." Declaration of Roberto Tercero In Support of Division of Enforcement's Motion for Summary Disposition Against Respondent Douglas G. Frederick ("Tercero Decl."), Ex. 2, p. 19 (Consent, ¶12). Frederick further acknowledged that in connection with the Commission's motion for disgorgement and/or civil penalties, "the allegations of the Complaint shall be accepted as and deemed true by the Court" and that he would "be precluded from arguing that either Tuco or Frederick did not violate the federal securities laws as alleged in the Complaint." Tercero Decl., Ex. 1, p. 8 (Judgment, Section IV); Ex. 2, p. 18 (Consent, ¶ 4).

In arguing that his conduct did not violate the broker-dealer and antifraud provisions of the Exchange Act, Frederick asks this Court to ignore the express language of his consent, as well as the district court's judgment. While conceding that the allegations of the Complaint must be taken as true, Frederick contends that the legal conclusions to be drawn from those facts remain open to debate and may be reviewed *de novo* by this Court. The doctrine of collateral estoppel, however, prevents such an end run around the district court's judgment.

The Commission has "consistently applied the doctrine of collateral estoppel to prevent respondents from relitigating in an administrative proceeding before us factual findings or ***legal conclusions*** previously determined." *In re Michael Batterman*, 2004 SEC LEXIS 2855, * 13, n. 18 (emphasis added). As this Court explained in, *In re William H. Mathis,* 1990 SEC LEXIS 2911 (Aug. 3, 1990):

> Commission case law and common sense support a finding that respondent should not be allowed to demonstrate that he did not violate the securities statutes in an administrative proceeding based on the existence of an injunction to which he consented where the issue is whether or not a sanction is in the public interest. It would be illogical, a waste of resources, and open up the possibility of inconsistent results for the Commission to decide whether respondent violated the statute as alleged in the complaint in the civil action which resulted in the injunction. From the court's view, allowing collateral attacks on the consent judgments severely undercuts important notions of judicial efficiency and finality of judgment, renders the concept of final judgments meaningless, and violates a policy of promoting settlements.

*Id.* at *15-16. *Accord, In re Michael T. Studer, et al.,* 2004 SEC 2135, at *6 (Sept. 20, 2004) ("[f]indings of fact and conclusions of law made in an injunctive action cannot be attacked in a subsequent administrative proceeding") (collecting cases), *aff'd, sub nom, In re Castle Secs. Corp.,*

2005 SEC Lexis 815, at *4-5 (Apr. 21, 2005); *In re Brett L. Bouchy and Richard C. Whelan*, 2002 SEC LEXIS 1743 (Jul. 9, 2002), at *24, n. 3 (same).

The fact that Frederick, in his consent, expressly waived findings of fact and conclusions of law (*see* Tercero Decl., Ex. 2, p. 18, (Consent, ¶ 6)), does not alter the preclusive effect of the district court's judgment. Frederick understood as much, as he expressly acknowledged, in his consent, that for purposes of subsequent proceedings in the district court, "the allegations of the Complaint shall be accepted as and deemed true by the Court" and that he would "be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint." *Id.* (Consent, ¶ 4). As such, Frederick is collaterally estopped from attacking the factual or legal validity of the consent judgment against him. *In re Martin Kaiden*, 54 S.E.C. 194, 208, n.39 (Jul. 20, 1999). *See also, In re Marshall E. Melton*, 2003 SEC Lexis 1767, at *23 ("[a]n injunction, by its very nature, is predicted on conduct that would or does violate law, rules or regulations."); *In re William H. Mathis*, 1990 SEC Lexis 2911, at *6 ("sanctions may be imposed based on a consent judgment where neither the court nor the Commission found that the defendant violated the securities statutes.").

Indeed, to permit Frederick to argue that he did not violate the securities laws in this administrative action, while being foreclosed from doing so in the district court action, would open up the possibility of inconsistent results, as well as undercut judicial efficiency and the finality of judgments. For the reasons stated by this Court in *In re William H. Mathis,* Frederick's attempt to create such inconsistencies and to avoid the full impact of the district court's judgment must be rejected.

### IV. AS A MATTER OF LAW, FREDERICK'S CONDUCT VIOLATED THE ANTIFRAUD PROVISIONS OF THE EXCHANGE ACT.

Frederick contends that his conduct did not violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as his numerous false representations to Tuco's day traders (the falsity of which Frederick cannot contest) were not "in connection with the purchase or sale of any security." In support of his argument, Frederick constructs an elaborate red herring, claiming that a membership interest in Tuco is not a security.

In addition to the preclusive effect of the district court's judgment on the issue of whether Frederick violated the antifraud provisions, there is no reason for this Court to resolve whether a membership interest in Tuco is a security, as that was not basis for the Division's 10(b) claim. Instead, the securities at issue were the publicly traded securities bought and sold by Tuco's day-traders based on Frederick's representations that the money they earned from their day-trading activity was theirs, and theirs alone. Indeed, as the Complaint alleged:

> *Tuco and Frederick agree and represent to the trader that 100% of the trader's net profits shall be allocated to the trader for the trader's exclusive benefit.*
>
> *Tuco and Frederick further represent that the only amounts that shall be debited from the trader's sub-account shall be the amount of money (or property) distributed by Tuco to the trader and the amount of any net trading losses assessed to the trader.*
>
> *Tuco and Frederick further represent that Tuco will maintain true and correct books and records ... which shall be sufficient to record the allocation of net income and net losses and distributions to traders as provided by the Operating Agreement*
>
> <u>*In connection with the daily trading activity of Tuco's traders*</u>*, and to induce Tuco's traders to continue trading with Tuco and to generate commissions and other charges for Tuco's brokerage services, Tuco and Frederick make additional representations to Tuco's traders through the operation of Tuco's back office system, which ... displays, as of the previous day, the trader's account equity, which is purportedly the amount of money available to the trader for trading, distribution or withdrawal.*

Tercero Decl., Ex. 1, p. 10 (Complaint, ¶¶ 27-30) (emphasis added). These allegations, which must be taken as true for purposes of these proceedings, clearly establish that Frederick's false representations were in connection with the purchase and sale of securities by Tuco's day-traders. That trading activity clearly satisfies the "in connection with" requirement.

Indeed, the Supreme Court has held that the "in connection with" element is met if the fraudulent statement and the securities transaction coincide. *SEC v. Zandford*, 535 U.S. 813, 822 (2002). Consistent with *Zandford*, the Ninth Circuit has stated repeatedly that the requirement is met if the fraud "'somehow touches upon' or has 'some nexus' with 'any securities transaction.'" *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) (citations omitted). The fraudulent statement need not concern a specific security. *See Zandford*, 535 U.S. at 820-21; *Arrington v. Merrill Lynch*, 651 F.2d 615, 619 (9th Cir. 1981) (misrepresenting the risks of buying securities on margin). Even undisclosed and unauthorized securities sales, as part of a course of business that

5

Exhibit 7   Page 31

operates as a fraud, are "in connection with." *Zandford*, 535 at 821. In short, Frederick's assertion that the misrepresentation must concern the security that is purchased or sold is contrary to Supreme Court and Ninth Circuit precedent.

Here, Frederick's fraudulent statements -- all to the effect, "keep on trading and keep those commissions rolling in since your money is safe with me" -- have a close nexus to securities purchases and sales and therefore meet the "in connection with" requirement. Frederick's fraudulent statements concern the value of the actual sub-accounts in which the traders purchase and sell securities and the risk of loss associated with trading in the sub-accounts. Tercero Decl., Ex 1, p. 10 (Complaint, ¶¶ 27, 28, 29). Frederick also failed to disclose that that he and Tuco used traders' funds to pay Tuco's expenses and traders' withdrawals. The fraudulent statements coincide with securities trading and, as such, satisfy the "in connection with" requirement.

Finally, Frederick's contention that "it was the actions of the SEC" that caused the multi-million dollar shortfall in Tuco's member's trading accounts is a complete fiction. *See* Respondent Douglas G. Frederick's Memorandum of Law in Support of Motion for Summary Disposition ("Frederick Motion"), p. 6. Frederick's argument, that he could have prevented a "run on the back" because he had "the unfettered right to deny requests [for withdrawals] of Class B members," is flatly contradicted by the terms of Tuco's Operating Agreement, which guaranteed members bimonthly disbursements of their net trading profits (*see* Frederick Motion, Ex. D (Tuco Operating Agreement, § 5.08(b)) as well as the complete return of all of the trader's net equity in the event the trader decided to terminate his or her membership in Tuco. (*id.*, § 6.02, 6.03). In light of those guarantees, it would undoubtedly have come as surprise to Tuco's day-traders to learn that they had no right to get their money out of Tuco. The fact that Frederick is now making such an outlandish and unsupportable argument as an excuse as to why he misappropriated millions dollars of the trader's funds strongly suggests that Frederick will continue to violate the securities law unless a permanent bar is imposed.

## V. AS A MATTER OF LAW, FREDERICK'S CONDUCT VIOLATED THE BROKER-DEALER PROVISIONS OF THE EXCHANGE ACT.

Frederick claims that he since he was a registered representative of a registered broker-dealer (GLB Trading, Inc.), he was not required to register as broker-dealer. As Frederick asserts, "[u]ntil this case, the SEC has never prosecuted a registered representative of a member firm for failure to register as a broker-dealer." Frederick Motion, p. 3. As he did with the Division's Section 10(b) claim, Frederick grossly mischaracterizes the Division's Section 15(a) claim.

The Complaint plainly alleges that Tuco failed to register as a broker-dealer, and that Frederick aided and abetted Tuco's violation of Section 15(a). *See* Tercero Decl., Ex. 1, p. 12 (Complaint, First Cause of Action). The fact that Frederick may have been a registered representative of some other broker dealer is entirely beside the point. The fact remains that Tuco was a broker, "engaged in the business of effecting transactions for the accounts of others." *See* 15 U.S.C. § 78c(a)(4) (defining "broker"). As such Tuco -- not Frederick -- was required to be registered with the Commission as a broker or dealer.

None of this should come as a surprise to Frederick. The phrase "engaged in the business" has long been interpreted to connote regular participation in securities transactions and is evidenced by soliciting securities transactions and receiving transaction-based compensation, such as commissions. *See SEC v. Margolis*, 1992 U.S. Dist. Lexis 14872 at *15 (S.D.N.Y. Sept. 30, 1992); *SEC v. Hansen*, 1984 U.S. Dist. Lexis 17835, at *26 (S.D.N.Y. Apr. 6, 1984); *Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp.*, 411 F. Supp. 411, 415 (D. Mass.), *aff'd*, 545 F.2d 754 (1st. Cir. 1976). A person effects securities transactions for others by participating in the key points of a securities transaction, including soliciting investors, handling customer funds and securities, participating in the order-taking or order-routing process, and extending or arranging for the extension of credit in connection with a securities transaction. *See SEC v. Schmidt*, 1971 U.S. Dist. Lexis 11884, at *3-4 (S.D.N.Y. Aug. 26, 1971); *Massachusetts Fin. Srvcs.*, 411 F. Supp. at 415; *Hansen*, 1984 U.S. Dist. LEXIS 17835, at *26.

Tuco satisfied all of these well-established tests. Contrary to Frederick's claim that Tuco was simply a "customer account" (Frederick Motion, p. 3), Tuco was a separate and distinct business entity that bore all the hallmarks of a day-trading firm. Tuco was organized as a Nevada

limited liability company, with the stated purpose "to engage in Securities Trading, including electronic day-trading of listed and over-the-counter securities." Frederick Motion, Ex. D (Tuco Operating Agreement, § 1.06). *See also*, Tercero Decl., Ex. 1 (Complaint, ¶¶ 5, 11) ("Tuco describes itself on its website as a 'private equity firm' that provides 'trading solutions for the active trader.'"). In furtherance of that business, Tuco solicited securities transactions through Frederick's direct efforts to solicit new traders and through Tuco's own website. *Id.* (Complaint, ¶¶ 3, 12). Tuco also regularly participated in securities transactions by providing day-trading services, including creating and maintaining sub-accounts for the traders and providing traders access to software to place and route securities orders. *Id.* (Complaint, ¶¶ 11-18). In addition, Tuco handled the traders' funds, which were used for securities transactions, and granted leverage and access to trade by allowing sub-account holders to trade against the equity of Tuco's pooled master accounts. *Id.* Tuco also received commissions. It set commission rates for each trader and deducted the commission for each trade from the trader's sub-account. Although the commissions were collected by GLB Trading's clearing broker and paid to Frederick, Frederick remitted the commissions to Tuco. Tuco relied on the commissions paid to Frederick to pay its operating expenses. *Id.* (Complaint, ¶¶ 22-25).

    Nor did Tuco qualify for any exceptions from the broker-dealer registration requirement. Section 15(a) of the Exchange Act excepts broker-dealers whose business is exclusively intrastate or is restricted to "exempted securities." 15 U.S.C. § 78o(a). Tuco did not fall within these exceptions because it enabled trading from locations nationwide and internationally. Tercero Decl., Ex. 1 (Complaint, ¶¶ 3, 9, 16, 17). The traders trade in the stock of public companies located on the various exchanges and therefore not "exempted securities" as defined in Exchange Act Section 3(a)(12)(A). 15 U.S.C. § 78c(a)(12)(A).

    Moreover, Tuco's registration violations had significant consequences for the traders and the securities markets generally. The $25,000 minimum equity and 4:1 margin requirements are designed, among other things, to "ensure the overall financial well being of the securities markets" from the risk resulting from the intra-day credit extended to day-traders. *See Securities Exchange*

*Act Release No. 44009*, 2001 SEC Lexis 383 (Feb. 27, 2001). As an unregistered broker-dealer, Tuco did not require its traders to comply with these rules.[2]

Frederick claims that at least seven years before Tuco was formed, "the SEC knew of the conduct for which it seeks to penalize Tuco in this matter, namely that some day-trading firms were organized as LLCs and were not recognized as broker-dealers." Frederick Motion, p. 13. In support of this remarkable claim, Frederick cites to the testimony of former Commission Chairman Arthur Levitt in September 1999 before a Senate subcommittee. *Id.* That testimony, however, makes clear that limited liability companies engaged in day-trading activities must be registered with the Commission. As Chairman Levitt observed:

> Other day-trading firms choose to organize as entities such as limited liability companies ("LLCs"), which sell interests in the firm to individuals wishing to day trade. ***These firms are registered as broker-dealers***, but because individuals who day trade at these firms are part owners of the day-trading firms, they are not considered "customers."...
>
> There are several implications of day traders being part owners of the firm, rather than customers. First, although ***the firms are registered as broker-dealers with the Commission***, day-trading firms organized s LLCs can avoid becoming NASD members, and are therefore not subject to NASD rules. Rule 15b9-1 under the Securities Exchange Act of 1934 ("Exchange Act") exempts a broker-dealer from the requirement of being a NASD member if the broker-dealer does not have customer accounts and is a member of a national securities exchange.
>
> http://.www.sec.gov/news/testimony/testarchive/1999/tsty2199.htm.

---

[2] Frederick contends that under Rule 15b9-1 under the Exchange Act, Tuco was not required to follow the NASD's $25,000 minimum equity and 4:1 margin requirements because, as a limited liability company, it had no "customers." Frederick Motion, p. 9. Frederick's misstates the law. Rule 15b9-1 exempts a broker-dealer from the requirement of being a NASD member if the broker-dealer: (1) is a member of a national securities exchange, (2) carries no customer accounts, and (3) has annual gross income derived from purchases and sales of securities otherwise than on a national securities exchange of which it is a member in an amount no greater than $1,000. 17 C.F.R. § 240.15b9-1. Since Tuco was not a registered broker dealer, it could not have been a member of a national securities exchange. *See* Section 6(c)(1) of the Exchange Act. 15 U.S.C. § 78f(c)(1) ("[a] national securities exchange shall deny membership to ... any person, other than a natural person, who is not a registered broker or dealer..."). Accordingly, Tuco was not exempt from the NASD minimum equity and margin rules.

Furthermore, it is debatable whether Tuco's Class B members were, in fact, "customers." The exemption from NASD rules provided to LLCs is based on the fact that members of the LLC are part owners of the firm and, hence, should not be considered "customers." As Frederick notes in his motion, however, "[a]s Class B Members, Tuco Traders do not have any ownership or control interest in Tuco." Frederick Motion, p. 6. As such, Tuco's day-traders should rightly be considered customers, further reinforcing the fact that Tuco was bound by NASD's rules. In any event, regardless of whether Tuco's day-traders were "owners" or "customers" of the firm, Tuco was required to be registered as a broker-dealer with the Commission.

9

Exhibit 7  Page 35

Frederick's reliance on a study issued in February, 2000, by the SEC's Office of Compliance Inspections and Examinations, entitled "Special Study: Report of Examinations of Day-Trading Broker-Dealers" (the "Study") is equally misplaced. As the Study reported, *"[d]ay-trading firms, like all broker-dealers registered with the SEC under the Securities and Exchange Act of 1934 ("Exchange Act"), are required to comply with applicable federal securities law and SRO rules."* http://www.sec.gov/news/studies/daytrading.htm (emphasis added). Echoing Chairman Levitt's comments, the Study went on to note that day-trading firms organized as LLCs are exempt from NASD rules, but the Study never suggested that day-trading firms organized as LLCs do not need to be registered with the Commission. In fact, the Study stated precisely the opposite, namely, that day trading firms, like all broker-dealers, must be registered.[3]

Finally, Frederick attempts to create confusion in the law where there is none. In particular, Frederick cites to a no-action letter to suggest, incorrectly, that the registration exemption under Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1), which provides for a registration exemption only for *natural persons* who are associated with a registered broker-dealer, also extends to companies, such as Tuco. Frederick's interpretation of the scope of the exemption under Section 15(a) is foreclosed by the definition of "person" under the Exchange Act, which defines person to mean a "natural person" as well as "company, government, or political subdivision, agency or instrumentality of government" 15 U.S.C. § 78c(a)(9). In short, a "natural person" is not, by definition, a "company." Moreover, Frederick's summary of the facts in the no-action letter that he relies upon to argue that an unregistered entity, not associated with a broker-dealer, could nonetheless engage in brokerage activities, is wildly imaginative. *See* No-Action Letter re Swiss American Securities, Inc. and Streetline, Inc, (May 28, 2002). First, the Division of Market Regulation specifically noted that Swiss American Securities, Inc. ("SASI"), was a

---

[3] Frederick also asserts that he fully disclosed the nature of Tuco's operations in his Form U-4. Frederick Motion, p. 3, Ex. B. Frederick's assertion is not only irrelevant, it is not true. In answer to Question 13 (Other Business), which required Frederick to provide the name of the other business, whether the business was investment-related, the address of the other business, the nature of the other business, his position, title or relationship with the other business, the start date of the other business, the number of hours devoted to the other business, the number of hours devoted to the other business during trading securities hours, and a brief description of his duties relating to the other business, all Frederick stated was "Manager Tuco 20 hrs." Frederick did not even provide the full name of Tuco, that is, Tuco Trading LLC, nor did he provide any description of the nature or purpose of Tuco's operations.

10                                    Exhibit __7__ Page __36__

registered broker-dealer. Second, the Division found that Streetline, Inc. ("Streetline"), the unregistered entity in question, was affiliated with SASI. Most importantly, the Division found that because of Streetline's narrowly defined role in providing website services, it "will not be in a position to engage in broker-dealer activities." As such, this no-action letter provides no support for Frederick's argument that the scope of the exemption for "natural persons" under Section 15(a)(1) is ambiguous and arguably extends to business entities, such as Tuco.

## VI. CONCLUSION.

For all of the foregoing reasons, and for the reasons previously set forth in the Division's motion for summary disposition, Frederick's motion for summary disposition must be denied. The district court's judgment, standing alone, justifies the issuance of an order permanently barring Frederick from future association with any broker or dealer. In addition, the underlying facts set forth in the Complaint, which must be taken as true for purposes of these proceedings, further demonstrate that a permanent bar is appropriate.

Furthermore, in light of Frederick's arguments that, even if the facts alleged in the Complaint are accepted as true, he did not violate the broker-dealer or antifraud provisions, only serves to underscore the fact that Frederick will likely to continue to violate those laws unless a permanent bar is imposed. In a nutshell, if Frederick does not understand, at this late date, that his conduct did not violate the law, he never will. Accordingly, nothing less than a permanent bar is appropriate. *See In re Marshall E. Melton*, 56 S.E.C. at 713 (noting that an antifraud injunction has "especially serious implications for the public interest").

Dated: July 30, 2008

Respectfully submitted,

Donald W. Searles
Roberto A. Tercero

*Attorneys for Division of Enforcement*

## CERTIFICATE OF SERVICE
### In the Matter of Douglas G. Frederick
Administrative Proceeding File No. 3-13004

Pursuant to Commission Rule of Practice 151 [17 C.F.R. § 201.151], I certify that the attached

**DIVISION OF ENFORCEMENT'S OPPOSITION TO RESPONDENT'S MOTION FOR SUMMARY DISPOSITION**

was filed with the Office of the Secretary of the Commission and served upon the following on July 30, 2008, in the manner described next to the name and address of each recipient:

| | |
|---|---|
| Office of the Secretary<br>Securities and Exchange Commission<br>100 F Street, N.E.<br>Washington, DC 20549-1090 | By overnight mail<br>[Original and 3 Copies] |
| Honorable Brenda P. Murray<br>Chief Administrative Law Judge<br>Securities and Exchange Commission<br>100 F Street, N.E.<br>Washington, DC 20549-2557<br>T – 202-551-6030 \| F – 202-777-1031 | By overnight mail |
| Daniel G. Viola<br>Sadis & Goldberg LLP<br>551 5th Avenue, 21st Floor<br>New York, NY 10176<br>T – 212-573-8038 \| F – 212-573-8140<br>E/dviola@sglawyers.com | By electronic and U.S. Mail |
| Dennis R. Hirsch<br>Sadis & Goldberg LLP<br>50 California Street, Suite 2320<br>San Francisco, CA 94111<br>T – 415-490-0563 \| F – 415-391-1377<br>E/drhirsch@sglawyers.com | By electronic and U.S. mail |

_Magnolia M. Marcelo_
Magnolia M. Marcelo

12

Exhibit 7 Page 38