UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION
August 8, 2008

ADMINISTRATIVE PROCEEDING
File No. 3-13004

In the Matter of

DOUGLAS G. FREDERICK,

Respondent.

RESPONDENT DOUGLAS G. FREDERICK'S REPLY IN OPPOSITION TO DIVISION OF ENFORCEMENT'S MOTION FOR SUMMARY DISPOSITION

**TO THE CHIEF ADMINISTRATIVE LAW JUDGE, THE HONORABLE BRENDA P. MURRAY, THE DIVISION AND ALL COUNSEL OF RECORD:**

I.  **Introduction:**

Good cause does not exist to grant the summary disposition motion of the Division of Enforcement ("Division"). The Division's Brief and Opposition fail to defeat Respondent Douglas Frederick's ("Frederick" or "Respondent") arguments since the Division continues to ignore the factual allegations contained in their own Complaint and the record, as further discussed below. Attached hereto are exhibits, which were bates-stamped by the Division, supporting Frederick's arguments and proving that there are no serious implications for the public interest justifying the Division's request for a permanent bar. The Division is creating a red-herring and using wildly imaginative arguments to enforce the Consent, which was ambiguously drafted by the Division, and obtained under extraordinary circumstances.

Frederick seeks summary disposition of this administrative proceeding since, even taking the facts in the Complaint against him as true, as a matter of law none of his alleged actions violate Section 10(b) or Rule 10b-5, nor was Tuco Trading, LLC ("Tuco") a broker-dealer requiring registration under

Exhibit __8__ Page __39__

Section 15. Neither of the two legal theories alleged by the Division are justified or supported by their pleadings dated July 15, 2008, July 30, 2008 and August 7, 2008. Moreover, Frederick's motion and declaration to vacate ("Motion to Vacate") the judgment against him and Tuco under Fed.R.Civ.P. 60(b) in the civil enforcement action has been filed and attached hereto as **Exhibit 1** and **Exhibit 2**, respectively. We respectfully request that the Court deny the Division's request for a permanent bar and consider the decision of Honorable Dana M. Sabraw in connection with the Motion to Vacate.

**II.     Frederick Is Not Collaterally Estopped From Challenging the Legal Theories Set Forth in the Complaint:**

Under SEC v. Steadman, 967 F.2d 636, 641 (D.C. Cir.1992), assuming the underlying facts as true, this Court may consider the legal theories or legal challenges and rule in Frederick's favor. The underlying facts are not in dispute. Under principles of equity, the Division's allegations should be challenged and duly considered by the Court. Since the underlying facts can not support the 10(b), Rule 10b-5 and/or the Section 15 claims, it would not be in the public interest for the Court to rule against Frederick. The Division's pleadings rely on an ambiguously drafted consent that was signed under extraordinary circumstances (Tecero Dec., p.1, at Paragraph 3). Also, see Exhibits 1 and 2 attached hereto. In particular, Exhibit 2, the Decl. of Frederick, page 1, Para. 3), stating that, Frederick signed the Consent with the understanding that he was not "admitting or denying any of the allegations." This language is clear and prominently displayed on page 1 of the Consent. See, page 1, Paragraph 2 of the Division's Reply in Support of Its Motion for Summary Disposition dated August 7, 2008). The consent states that , "..[Frederick] without admitting or denying the allegations of the complaint ...[Frederick] hereby consents..." See, Tercero's Decl. dated July 14, 2008, page 17, Para. 2.

**III.    There should be no sanctions against Frederick for any violation of Section 15(a) and/or Section 15(b)(6) ("Section 15").**

Exhibit  8  Page  40

Again, the Division has strained logic and reason to find a remarkable legal theory in a futile attempt to support why Tuco, a privately held operating company, should have registered as a broker-dealer as follows:

1. The Division has consistently and conveniently ignored the undisputed facts that Frederick operated Tuco through GLB Trading, Inc. ("GLB") and Penson Financial Services, Inc. ("Penson"), both registered SEC and FINRA broker-dealers under Section 15 of the Securities and Exchange Act of 1934 ("Section 15"). Frederick was registered with GLB and fully disclosed his Tuco outside business activity as required by FINRA Rule 3030. Contrary to the allegation contained in the Division's Opposition Motion dated July 30, 2008 (see page 10, FN 3 of the Div.'s Opp. Motion), Frederick did fully disclose his Tuco related activities to GLB and the Division's allegations are flatly contradicted. See **Exhibit 3** attached hereto, the Division's bates-stamped document (SEC-LA-3458 00055 to 00057). Exhibit 3 clearly proves that Frederick fully disclosed and operated Tuco through GLB. The Division is confused on how FINRA member firms file the Form U-4s via the FINRA CRD system. In fact GLB, not Frederick (and certainly not Tuco) is responsible for entering the information onto the electronic Form U-4. A supervising principal of GLB would have been responsible for entering the information that the Division faults Frederick for not disclosing. This misplaced allegation also fails, even assuming the facts to be true. For example, see **Exhibit** 4, selected pages from the FINRA Sanction Guidelines,[1] which describe a suggested fine ranging between $2,500 to $50,000, regarding even the most egregious conduct. Not a permanent bar or even a suspension, with no aggravating or egregious conduct. In practice, these technical violations are typically referenced in a letter of caution or a deficiency letter and the member firm is allowed to continue in business with revised written supervisory procedures.

---

[1] See, complete guideline sanction book at, http://www.finra.org/web/groups/enforcement/documents/enforcement/p011038.pdf

3

Exhibit  8  Page  41

2. GLB and Penson were never sanctioned by the SEC for any conduct relating to Tuco, including, but not limited to, margin or leverage compliance issues or collecting commissions. The margin calculations were compliant and Penson extended the margin in accordance with accepted regulatory guidelines approved by the SEC pursuant to a required written clearing agreement between Penson and GLB. Clearly, Tuco did not extend the same margin or leverage that Penson extended to the Class B member traders. See, Exhibit 2, page 4, Paragraphs 19 and 23, respectively. Furthermore, GLB never sanctioned Frederick for any of his activities while registered with GLB. In fact, GLB even assisted Frederick and Tuco at all times. To have required Tuco to register as a separate broker-dealer would have been illogical and duplicative since Frederick operated Tuco through and under the direct supervision of GLB. See also, pages 24 and 25 of Frederick's Decl., Exhibit 2, attached hereto, whereby Frederick states that he informed Mr. Woo of the SEC in January of 2008 that he was going to U-5 from GLB and buy his own broker-dealer. Mr. Woo did not indicate that this activity or his current activities were improper. It appears that the Division could have saved the Class B member traders several millions of dollars had it not suggested to Penson that it close GLB's largest customer account, Tuco. In addition, several Class B traders would be able to continue to trade for a living. (See page 3, Paragraphs. 15 and 16 of Exhibit 2, Frederick's Decl.).

3. The Division's allegations that Tuco, instead of Frederick, somehow handled funds, set commission rates and granted leverage in connection with securities transactions is impossible and outlandish since Frederick was the Class A member of Tuco and a registered broker with GLB, at the same time. See pages 7-8 of the Division's Opp. Motion dated July 30, 2008. It is illogical for the Division to claim that Frederick, a human being, can somehow be bifurcated with respect to his actions. *See, In re Ragone*, 2007 SEC Lexis 1157 (May 25, 2007). Clearly, Frederick operated Tuco through a registered broker-dealer at all times. These facts are not in dispute. Thus, Frederick's actions, which were simultaneously executed by Frederick as a Class A member of Tuco and a registered and licensed representative of GLB,

4

Exhibit 8   Page 42

were in compliance with Section 15 at all times. Thus, proving that no "especially serious implications exist for the public interest." See, *In re Marshall E. Melton*, 56 S.E.C. at 713.

4. The Division's argument that Frederick's conduct could have been deemed to be "aiding and abetting" a violation of Section 15 is equally false and misleading since it is entirely inconsistent with the record (See, page 1, Para. 2 of the Division's Reply in Support of Its Mot. for Summary Disp. dated August 7, 2008). For example, please refer to **Exhibit 5** attached hereto, the Division's bates-stamped document (SEC-LA-3458 00001 to 00006). Exhibit 5 is a letter from Mr. Woo of the SEC to GLB clearly stating that in order for Frederick to have been charged with aiding and abetting an unregistered broker-dealer he would have to: "...1) **[have] had actual knowledge** of the violation and his own role in furthering it; **and** 2) [have] had provided substantial assistance in the commission of the violation." (See SEC-LA-3458 00001) **(Emphasis Added)**. The Division fails to explain how Frederick should have known, under the actual knowledge requirement, that he was violating Section 15 as a registered Series 7 licensed broker with GLB, when the SEC, state regulators and/or FINRA never once cited GLB or Fredrick for any alleged deficiencies or violations. Moreover, GLB never sanctioned Frederick for any such deficiencies or violations. In fact, the Division concedes that no enforcement case has ever been brought under these circumstances, involving a registered Series 7 supervised and licensed broker (Frederick) for operating an un-registered broker-dealer. The Division's counter-arguments simply create additional confusion in the facts and law, where none exist. Under Kevin Upton v. SEC, 75 F.3d 92, 98 (2nd Cir. 1996), if there is no reasonable notice to the public of the Division's position or its change of position with respect to an industry practice, sanctions are inappropriate. Until this case against Frederick, the SEC has never prosecuted a registered representative of a member firm for failure to register as a broker-dealer.

5. Moreover, the Division refers to former SEC Chairman Levitt's sworn testimony with bold emphasis, as follows: "...these firms are registered as broker-dealers with the Commission," (see page 9 of the Division's Opp. Motion), but simply and conveniently ignores the salient sentence immediately following

5

Exhibit 8 Page 43

this bold statement. Namely, that: "...[although registered proprietary trading firms] are registered as broker-dealers with the Commission, day-trading firms organized [a]s LLCs [like Tuco] can avoid becoming NASD [now knows as FINRA] members, and therefore are not subject to NASD rules." Again, Tuco was an unregistered entity, but it was permitted to rely on an exemption from broker-dealer registration since Frederick was a Series 7 licensed and registered broker operating through GLB and Penson.

6. Finally, the Division makes an equally strange and self-serving argument, claiming that Tuco is not deemed to be a company and therefore not a natural person. This argument is also equally deficient and incorrect on its face. The Division, on page 2 of its Ex Parte Motion dated March 3, 2008, stated that Tuco was "a Nevada limited liability **company**." Thus, in short, a natural person is broadly defined as a "company, government, or political subdivision, agency or instrumentality of government." See, 15 U.S.C. Section 78c(a)(9). Clearly, Tuco would be covered by the definition of a natural person since it was a limited liability company.

As stated above and in Frederick's earlier pleadings with the Court, there is a specific statutory exemption in Section 15 from the duty to register for persons associated with a broker or dealer, and the SEC has recognized this exemption in cases in no-action letters for years. For example, Wolff-Juall Investments LLC, SEC No-Action Letter (May 17, 2005), specifically stated that "there is an exemption from registration for natural persons associated with a registered broker-dealer. The Division's counter-arguments fail to carry the day. Therefore, there should be no sanctions against Frederick for any alleged violation of Section 15.

IV.    **There should be no sanctions against Frederick for any violation of Section 10(b) and/or Rule 10b-5.**

Exhibit   8   Page   44

Again, the Division has strained logic and reason to find a remarkable legal theory in a futile attempt to support why Frederick allegedly violated Section 10(b) and/or Rule 10b-5 ("Section 10b") as follows:

1. The Division claims that Frederick made materially false and misleading statements to "Tuco's customers." (See, page 1, Paragraph 3, of the Div.'s Reply in Support of Its Mot. for Summary Disp. dated August 7, 2008). The Division insists on trying to confuse this Court by referring to the Class B member traders of Tuco as "customers." Again, this technique of confusion is clarified in the record. See, **Exhibit** 6 attached hereto. Exhibit 6 consists of four (4) pages from the SEC's deposition of Frederick on Feb. 13, 2008, bates-stamped, SEC-LA-3458 00709 to 00712. Clearly, Frederick stated, under oath, that the traders are not customers, despite the SEC's attempt to confuse Frederick during the deposition and mislead this Court now. The SEC has stripped Frederick and the Class B members of their rights under the private operating agreement of Tuco. For example, a Class B member trader should have demanded an accounting from Frederick, in the event that Frederick, refused to honor any reasonable withdrawal request. Frederick was not accused by any of his fellow Class B members of failing to honor any withdrawal requests. Moreover, the Class B members were fully informed that their capital contributions into the Tuco account were subject to offsets by Frederick and at risk with the other Class B member traders. See Paragraphs 2-3, immediately below, describing how Frederick fully disclosed the risks associated with being an active Class B member trader in a commingled LLC day-trading account. Thus, defusing any allegation that Frederick made misleading or fraudulent statements.

2. Tuco was a privately held operating company that consisted of Class B member traders, actively and willing trading the capital of Tuco, pursuant to a detailed Trader Agreement and a LLC Operating Agreement. Both agreements are attached hereto as Exhibits 7 and 8, respectively, and bates-stamped by the Division. The Class B member traders agreed to allow Frederick, the Class A member to operate their business venture together. The Class B member traders agreed that their rights would be dictated by the Tuco agreements. The Class B member traders were not passive investors or customers that required the

same protections from the SEC as limited partners in a defunct hedge fund or an innocent customer of a retail brokerage account managed by a rogue churning broker. Frederick simply operated a trading business with his sophisticated partners, the Class B member traders.

3. For example, according to Paragraph 2, Page 1 of the Trader Agreement, "...the Trader [Class B member] shall deposit a minimum sum $__ [as determined by the sole discretion of the Class A member] with the Company [Tuco]. This sum shall be held in a non-interest bearing account [at GLB through Penson under the customer name Tuco] and commingled with other monies of the Company ("Direct Capital") [of Tuco]. Such sum shall be paid by the Trader on the date of hire. Such amount is not insured by SIPC or the additional coverage obtained by the Company's clearing firm [Penson, who cleared for GLB]." This paragraph is clear and prominent disclosure of the risk of loss associated with the Tuco partnership. Also, Paragraph 7, on page 1 of the Trader Agreement, states that, "... the Company shall have the right to stop the Trader from trading at any point during the day..."

4. Clearly, Frederick, as the Class A member was afforded great operational discretion under the Operating Agreement signed by the Class B members, including indemnification rights, with respect to the capital contributions deposited in the Tuco account. The Class B member traders were not mislead by Frederick and assumed the risks of any alleged "economic shortfalls" or offsets. See, Exhibit 8, page 11, of the Tuco Operating Agreement as follows: "...The Company may offset all amounts owning to it by a Member against any amount that would have otherwise have been distributable to such Member hereunder." Also see, Exhibit 6 attached hereto, page 132, Para. 11-23, whereby Frederick discloses, under oath how he offsets the Class B members and how the money is all kept in the master account, which he is authorized to control pursuant to his sole authority to manage Tuco and pay his expenses.

5. The Division's allegations that Frederick made misrepresentations "in connection" with a purchase and sale of a security voluntarily traded by a Class B member is flatly contradicted by the Trader Agreement. In fact, several Class B member traders wanted to continue to trade for Tuco even after the Division's

8

Exhibit __8__ Page __46__

allegations of the "economic shortfalls." See Paragraph 3, Page 1, of the Frederick Decl., attached hereto as Exhibit 2. Thus, the reference that Frederick allegedly stated: "keep on trading and keep those commissions rolling in since your money is safe with me" is a gross mischaracterization by the Division with no basis in fact or law.[2]

7. Section 10(b) claims generally require "extreme recklessness." Consistent with Steadman, extreme recklessness is an "extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. at 642. In other words, extreme recklessness requires a stronger showing than simple recklessness but does not rise to the level of specific intent. The consent signed by Frederick can not satisfy the scienter requirement. The Division fails to also specifically plead or identify a single purchase or sale of a security based on any such misrepresentation. Thus, as a matter of law there can be no violations of Section 10(b) or Rule 10b-5. It thus follows that if no security is present, there can be no violation of Section 10(b) or Rule 10b-5. See, *Stone v. Millstein*, 804 F.2d 1434 (9th Cir. 1986).

8. Since the underlying facts can not support the Section 10(b) and/or Rule 10b-5 claims as stated above, it would not be in the public interest for the Court to rule against Frederick. When the Division imposes the most drastic sanctions at its disposal, it has a duty to articulate carefully the grounds for its decision, including an explanation of why lesser sanctions will not suffice. Steadman at 652. The Division's counter-arguments fail to carry the day. Therefore, there should be no sanctions against Frederick for any alleged violation of Section 10b and/or Rule 10b-5.

V.   **Conclusion:**

---

[2] The Trader Agreement was also clearly and prominently incorporated by reference in the Tuco Operating Agreement. See, Exhibit 8, page A-3, as follows: "...Trader Agreement means, with respect to each Class B Member, the Trader Agreement entered into by the Company and such Class B Member with respect to the trading operations of such Class B Member.

Exhibit  8   Page  47

Indeed, even in recognition of the collateral estoppel doctrine used in "follow-on" administrative proceedings, Frederick is entitled to summary adjudication in his favor. The Division's collateral estoppel position is limited to factual findings and conclusions, not to relevant legal challenges. Frederick's arguments are legal challenges to the Division's allegations and should be decided by summary adjudication under Rule of Practice 250(b). 17 C.F.R. Sec. 201.250(b).

The case before the Court is unique since the facts alleged by the Division are contradicted by their own declarations and the record. For example, the Tuco Operating Agreement and related Trader Agreement were attached to Tercero's Declaration and these agreements clearly set forth the rights and obligations of Frederick and the Class B member traders (non-customers). The agreements also contained a detailed protocol in the event that Tuco experienced any alleged economic shortfalls. Again, these facts are not disputed. No protection from the Division was warranted in this case. Tercero's Declaration also included numerous brokerage statements of Tuco, which reflected all of the trades of the Class B member traders of Tuco, further acknowledging that Tuco, and not the Class B member traders, was the only customer subject to the Division's protections. Since all of the trades were posted to Tuco's unique tax id customer account, then all of the trades were beneficially owned by Tuco and the margin rules were computed in accordance with common industry accepted compliance practices. Under Upton, if there is no reasonable notice to the public of the Division's position or its change of position with respect to an industry practice, sanctions are inappropriate.

Finally, Steadman provides for softer remediation against those whose violations of securities laws are merely "technical" rather than flagrant or intentional. Even accepting the factual findings listed in Frederick's consent decree, Frederick did not engage in any fraudulent conduct, nor did he receive any ill-gotten gains. Frederick was never reprimanded by GLB and Frederick had no disciplinary history. Accordingly, under Steadman, sanctions against Frederick should be limited to a letter of caution. For all of the facts, law and arguments set forth above, Frederick respectfully requests the Court deny the summary disposition motion of the Division. The fact that a permanent injunction was entered against Frederick by his "consent" on March 17, 2008, should not persuade the Court that Frederick should be

Exhibit 8 Page 48

banned from the industry. Such a draconian sanction is not warranted and should not be granted liberally, without any showing of proof by the Division. The Division continues to ignore the blatant facts, as well as, the law. Moreover, the Division has failed to provide an adequate showing of "especially serious implications for the public interest." See, In re Marshall E. Melton, 56 S.E.C. at 713.

Dated: August 8, 2008            SADIS & GOLDBERG, LLP

                                 By: *[signature]* Daniel G. Viola, Esq., Pro Hac Vice
                                 Attorneys for Defendant Douglas G. Frederick
                                 50 California Street, Suite 2320
                                 San Francisco, CA 94111
                                 Telephone: (415) 490-0561
                                 Facsimile: (415) 391-1377
                                 E-MAIL: dviola@sglawyers.com