DENNIS R. HIRSCH, Cal. Bar No. 194243
drhirsch@sglawyers.com
DANIEL G. VIOLA, Pro Hac Vice
dviola@sglawyers.com

SADIS & GOLDBERG LLP
50 California Street, Suite 2320
San Francisco, California 94111
Tel: (415) 490-0563

Counsel for Defendants
Tuco Trading LLC and Douglas G. Frederick

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>TUCO TRADING, LLC and DOUGLAS G. FREDERICK,<br><br>Defendants. | Case No.: 08 CV 00400 DMS (BLM)<br><br>DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THE RULE 60(b)(6) MOTION<br><br><br>Date:   September 19, 2008<br>Time:   1:30 p.m.<br>Place:  Courtroom 10<br>        (Honorable Dana M. Sabraw) |

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ................................................................................ 1

II. A MERITORIOUS LEGAL DEFENSE IS ONLY RELEVANT IN MOTIONS SEEKING TO VACATE JUDGMENTS ENTERED BY DEFAULT ................... 1

   A. Every Case Cited by the SEC Relates Exclusively to Default Judgments ............ 1
   B. Battling the Legal Issues is Exactly What the Defendants Now Seek to Do ......... 2

      1. Again, Even the Cases Cited by the SEC Favor the Defendants on the 10(b) Issue ................................................................................................. 2

      2. There is No Legal Authority Justifying the SEC's Position That Tuco Was Receiving Transaction-Based Compensation .......................................... 3

III. IT WAS THE SEC'S AGGRESSIVE TACTICS THAT BROUGHT ON EXTRAORDINARY CIRCUMSTANCES ............................................................... 5

   A. There Was No Basis To Seek a Freeze on Frederick's Personal Assets ............... 5

   B. Tuco's Business Was Shut Down Prior to the Commencement of this Proceeding .................................................................................................................. 6

   C. Defendants Believed They Were Left With Nothing to Fight For ...................... 7

IV. THE SEC'S CONTINUOUS AGGRESSIVE CONDUCT IS NOW UNETHICAL ......... 8

   A. The SEC Requested That Defendants' Former Counsel Breach the Attorney-Client Privilege .................................................................................................. 8

   B. The SEC Gets Cooperation From a Firm Regulated by the SEC Itself ............... 9

V. CONCLUSION .......................................................................................................... 10

# TABLE OF AUTHORITIES

Page

## CASES

*In re Hammer*
  940 F.2d 524, 525 (9th Cir. 1991) ...................................................................1

*Cassidy v. Tenorio*
  856 F.2d 1412 (9th Cir. 1991) ........................................................................1

*Falk v. Allen*
  739 F.2d 461(9th Cir. 1984) ...........................................................................1

*The Ambassador Hotel Co. Ltd. V. Wei-Chuan Investment*
  189 F.3d 1017, 1026 (9th Cir. 1999)...............................................................3

*In Re Financial Corporation of America Shareholder Litigation*
  796 F.2d 1126 (9th Cir. 1986) ........................................................................3

*Roth v. SEC*
  22 F.3d 1108 (9th Cir. 1994) ..........................................................................3

*SEC v. Schmidt*
  1971 U.S. Dist. LEXIS 11884 (S.D.N.Y. 1971) ............................................4

*Massachusetts Financial Services, Inc. v. Securities Investors Protection Corp.*
  411 F. Supp. 411 (D.Mass) aff'd 545 F.2d 754 (1st Cir.1976) ......................4

*United States v. Alpine Land Reservoir Co.*
  984 F.2d 1047 (9th Cir. 1993).........................................................................5

*Community Dental Services v. Tani*
  282 F.3d 1164, 1168 (9th Cir. 2002)...............................................................5

## FEDERAL STATUTES

**Securities Exchange Act of 1934**

Section 10(b) ......................................................................................................2, 3

Section 10(b)(5) .................................................................................................2, 3

Section 15(a)(1)...................................................................................................3, 4

Rule 60 (b) .......................................................................................................1,2,4

## MISCELLANEOUS AUTHORITIES

SEC No-Action letter re Vanasco (Feb. 17, 1999) ...............................................3

Testimony of Arthur Levitt, Chairman of the SEC
(http://www.sec.gov/news/testimony/testarchive/1999/tsty2199.htm..........……..4

## I. PRELIMINARY STATEMENT

The SEC's opposition papers fail to address the only meaningful point—whether the defendants were under extraordinary circumstances as a result of the "emergency" action forcing them to make immediate decisions. This action was commenced on March 4th, Tuco's business was shut down by March 7th (at the latest) and Douglas Frederick still faced losing access to his own money. Scared of leaving his family in an even worse situation, Frederick agreed to the entry of a judgment on March 12th, and agreed to sign the consent decrees prepared by the SEC on March 13th. It was the combination of the first-impression legal issues and the potential for a shattering economic situation that forced the defendants into making an immediate decision. And that decision was made to avoid the possibility of losing access to money needed for family issues.

## II. A MERITORIOUS LEGAL DEFENSE IS ONLY RELEVANT IN MOTIONS SEEKING TO VACATE JUDGMENTS ENTERED BY DEFAULT

### A. Every Case Cited by the SEC Relates Exclusively to Default Judgments

Despite the legal assertions found in the SEC's opposition papers, the Ninth Circuit does not require all Rule 60(b) movants to present a meritorious defense in their motion papers. In fact, it is clear that only movants seeking to vacate a judgment entered by default must provide evidence of a defense. See In re Hammer, 940 F.2d 524(9th Cir. 1991)("In this circuit, a trail court has discretion to deny a Rule 60(b) motion to vacate a default judgment if… defendant has no meritorious defense…"); Cassidy v. Tenorio, 856 F.2d 1412 (9th Cir. 1988)("In *Falk*, we identified three factors that should be evaluated in considering a motion to reopen a default judgment:… (2) whether the defendant has a meritorious defense…"); Falk v. Allen, 739 F.2d 461 (9th Cir. 1984)("We agree with the Third Circuit that three factors should be evaluated in considering a motion to reopen a default judgment… (2) whether the defendant has a meritorious defense…").[1]

---

[1] This is the list of cases cited by the SEC alleging that the defendants were obligated to present a meritorious defense.

SEC V. TUCO AND FREDERICK, CASE NO. 08-CV-00400

Accordingly, as the judgment is not a default judgment, defendants' initial moving papers cannot be deemed insufficient for failing to assert legal defenses.

**B.      Battling the Legal Issues is Exactly What the Defendants Now Seek to Do**

The ironic part of the SEC's claim that a Rule 60(b) movant must show a meritorious defense is that is the exact relief the defendants are looking for—the right to litigate the SEC's legal theories found in the complaint.

The complaint, and the SEC's opposition to the instant motion, allege two violations of statutory and regulatory law. First, the SEC alleges that Tuco and Frederick violated Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, by purportedly misrepresenting the value of each trader's sub-account. Second, the SEC alleges that Tuco's business required it to have been registered as a broker-dealer under Section 15 of the Exchange Act. While defendants are anxious for an opportunity to have this Court address each party's summary judgment motions, the following should, at a minimum, demonstrate that the SEC's positions are baseless and that even a broad interpretation of the law could not result in a decision against the defendants.

    1.  <u>Again, Even the Cases Cited by the SEC Favor the Defendants on the 10(b) Issue</u>

In order for Section 10(b) and Rule 10b-5 to have been violated, fraudulent statements or misconduct must have been made "in connection with" the purchase or sales of securities. In sum, there has to be a direct link between the misrepresentations and the actually security transactions.[2]

The Ninth Circuit has held that "the fraud in question must relate to the nature of the securities, the risks associated with their purchase or sale, or some other factor with similar connection to the

---

[2] The SEC's complaint is so vague on allegations, and conclusory on legal issues, that both defendants' current and former counsel misinterpreted the SEC's legal arguments in the same way. Both sets of counsel viewed the SEC's theory to involve the purchase of interests in Tuco as the securities at issue, not any and all securities ever purchased by Tuco's traders.

securities themselves". The Ambassador Hotel Co. Ltd. v. Wei-Chuan Investment, 189 F.3d 1017, 1026 (9th Cir. 1999). Moreover, there must be some "causal connection between the fraud and the securities transaction in question". Id.

And for those reasons, the Ninth Circuit has dismissed 10b-5 claims in situations similar to the instant one. For example, in In re Financial Corporation of America Shareholder Litigation, 796 F.2d 1126 (9th Cir. 1986), the Ninth Circuit dismissed a derivative action against the corporation's accounting firm after concluding that even the alleged fraudulent accounting actions could not have a sufficient connection to any securities transactions. "The alleged fraudulent advice concerning the accounting treatment… is not a fraud that touches, or is in connection with, the purchase or sale of a security". Id. at 1130. Accordingly, any purported misrepresentation of accounting issues made to Tuco's traders cannot be deemed "in connection with the purchase or sale of securities" to be in violation of Section 10(b) and Rule 10b-5.

### 2. There is No Legal Authority Justifying the SEC's Position That Tuco Was Receiving Transaction-Based Compensation

Individuals who are licensed representatives of a registered broker-dealer are not subject to Section 15(a)(1) of the Exchange Act. In Roth v. SEC, 22 F.3d 1108 (D.C.Cir. 1994), the SEC argued that there is a registration exemption under Section 15(a)(1) for persons associated with a broker-dealer who are acting within the scope of their association with the member firm. The Roth court adopted the SEC's argument since activities within the scope of the association could be supervised by the member firm and, thus, had the crucial "regulatory protections". Id. at 1109-1110[3].

---

[3] See also SEC No-Action Letter re Vanasco (Feb. 17, 1999)("Section 15(a)(1)…provides a registration exemption only for natural persons who are associated with a registered broker-dealer").

SEC V. TUCO AND FREDERICK, CASE NO. 08-CV-00400

3

Here, Frederick was a Series 7 registered representative of a registered broker-dealer—GLB—and all of Tuco's trades occurred in its accounts at GLB. Thus, all of Frederick's actions occurred within the scope of his association with GLB, were therefore supervised by GLB, and eliminated the need for Frederick to also register *individually* as a broker-dealer.

As for Tuco, a day-trading firm need only register as a broker-dealer if it is "handling funds and securities for others", "receiving transaction-based compensation", or "purchasing securities for third parties"[4]. But Tuco never took any of these actions. The only handling of funds or securities for others was done by GLB, a registered broker-dealer, through its registered representative, Frederick.

More importantly, Tuco never received any transaction-based compensation. All commissions charged to Tuco were paid in the normal course to Penson (as the clearing broker), GLB (as the introducing broker), and GLB's individual broker, Frederick. Finally, Tuco never purchased any securities for any third parties. All trades were submitted to GLB by the customer, namely Tuco, in Tuco's name. Thus, none of the activities that Tuco undertook would result in it being deemed a broker-dealer required to register.

And despite the SEC's assertion that this is not a case of first impression, it is. Not one of the cases cited by the SEC in its opposition papers address the issues presented in this matter. Moreover, it should not come as a surprise to the Court that day-trading did not exist in 1971 or 1976—the years that the SEC's cited-cases were decided. See SEC's Opp. Memo., *citing* SEC v. Schmidt, 1971 U.S.Dist. LEXIS 11884 (S.D.N.Y. 1971); Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp., 411 F.Supp.411 (D.Mass.) *aff'd* 545 F.2d 754 (1st Cir. 1976).

---

[4] "Testimony of Arthur Levitt, Chairman of the U.S. Securities and Exchange Commission Before the Senate Permanent Subcommittee on Investigations Committee on Governmental Affairs, Concerning Day Trading," September 16, 1999, http://www.sec.gov/news/testimony/testarchive/1999/tsty2199.htm, last accessed September 9, 2008.

## III. IT WAS THE SEC'S AGGRESSIVE TACTICS THAT BROUGHT ON EXTRAORDINARY CIRCUMSTANCES

As set forth in the defendants' initial moving papers, Rule 60(b)(6) authorizes the vacatur of a consent judgment "where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment". United States v. Alpine Land & Reservoir Co., 984 F.2d 1047, 1049 (9th Cir. 1993). All that defendants must prove is that "circumstances beyond [their] control…prevented [them] from proceeding with the prosecution or defense of the action in a proper fashion". Community Dental Services v. Tani, 282 F.3d 1164, 1168 (9th Cir. 2002).

The SEC's use of emergency proceedings, and the myriad of requested restraints to be issued, forced Frederick to make immediate decisions involving both his business, Tuco, and, more importantly, the health of his family. And once the SEC's Division of Enforcement was able to convince Penson Financial Services, Inc., to "voluntarily" close the Tuco accounts, Tuco was out of business. That left Frederick with only one thing to look after—his family and their well-being. The result, of course, was signing the consent decrees and retaining the ability to pay for everyday life.

### A. There Was No Basis To Seek a Freeze on Frederick's Personal Assets

In the SEC's initial *ex parte* motion, it sought a restraining order freezing all of Frederick's personal assets. While difficult to determine what rights, if any, Frederick would have had over his own assets, it is impossible to see why this was deemed necessary.

In all of the SEC's submissions to date, not one asserts that Frederick somehow absconded with Tuco's traders' assets. Nor is there any reference to a complaint by a trader about Tuco or Frederick and business operations. In short, the SEC concluded that Tuco was operating a brokerage shop that required registration and then took the most aggressive measures possible.

Indeed, the only "fraudulent" conduct alleged is that Tuco's in-house accounting was not up to date.[5]

In the SEC's *ex parte* motion papers, the request to have Frederick's personal assets frozen was not even addressed. There were no allegations that Frederick absconded with any money from Tuco or its traders, nor was there even an argument as to why the SEC felt that a freeze of Frederick's personal assets was needed. Yet this is what Frederick faced in the nine days of litigation.

**B.    Tuco's Business Was Shut Down Prior To the Commencement of this Proceeding**

During arguments on the SEC's initial *ex parte* motion, concern was raised that shutting down Tuco's trading abilities would result in shutting down the business of hundreds of day-traders. And despite the Court's concern on this, the SEC was able to have Penson "voluntarily" shut Tuco's accounts, in actuality, a day before this action was commenced. As stated by Timothy Davis, in-house counsel at Penson, in his declaration drafted and submitted by the SEC, Penson was called less than 24 hours before the initial *ex parte* motion was filed and was requested to place the Tuco accounts on "voluntary hold".[6] Mr. Davis describes how Penson then "discovered" that Tuco's accounts were using margin and would be restricted as a result.

But that is not the whole story, nor is it even close to accurate. As always, a margin call was made on a Friday afternoon and Tuco attempted to cover that call on the following Monday afternoon, which was March 3rd. But the SEC had called Penson at 11:15 am CT on March 3rd making the request that Penson restrict the account and advising that their action against Tuco and Frederick would seek a freeze on all Tuco assets. Davis Declaration, par. 4. Not knowing about this conversation, Tuco then attempted to cover the margin call later that afternoon, in the ordinary

---

[5] Interestingly, the SEC alleged that Tuco had a shortfall of $3.5 million as of December 31, 2007 while the receiver's interim report claims that the shortfall was $1.5M as of that date. More importantly, not even the receiver's interim report reflects any inference that assets were removed from Tuco, harming Tuco's traders' sub-accounts.

[6] As discussed below, Mr. Davis' declaration is meaningless as he has no personal knowledge on what was discussed on a phone call he was not on. This request by the SEC was made during a call with Tom Delaney at Penson. Mr. Delaney has not submitted a declaration, only Mr. Davis has.

course of business, but its deposit was rejected, leaving an outstanding margin call on Monday, March 3rd.

But what makes Davis's declaration so unbelievable is that it is contrary to what actually happened. Davis claims that they discovered the outstanding margin call on Wednesday, March 5th. But, as discussed above, there was an outstanding margin call solely because Penson restricted the accounts from making withdrawals or accepting deposits as of Monday, March 3rd. Attached to Frederick's Reply Declaration as Exhibit 1 is an email from Penson's Margins Department stating, unambiguously, that no journals (asset transfers) "will be done into or out of any of the Tuco accounts. ...". This email was sent to GLB on Monday, March 3rd, almost immediately after the SEC's request was made. This calls into question why Penson put greater restrictions on the accounts than the SEC had even requested. The likely answer is that Penson was concerned that any deposit made for purposes of settling a margin call would soon be locked into a Tuco account by a Court order. And since nearly all deposits used to satisfy margin calls on the Tuco accounts came from other Penson accounts, namely accounts held by the McDonald Entities, Penson seems to have been protective of those accounts over its Tuco accounts.

The email from Penson also makes clear that, beginning on March 3rd, GLB was told "don't let any trade [sic] in the accounts". And while some trades were inadvertently allowed over the next few days, the Tuco accounts were completely shut down by the end of the week. Thus, within days of the hearing on the SEC's initial *ex parte* motion, Tuco's business was shut down. This left Frederick with only one issue of real importance—the use of his personal assets.

C. **Defendants Believed They Were Left with Nothing to Fight For**

The SEC inexplicably determined that Tuco's operation as an unregistered broker-dealer required immediate resolution. Moreover, the SEC sought immediate orders shutting down Tuco's

business and the trading of all its members, freezing Tuco's assets, freezing Frederick's personal assets, and seeking expedited discovery.

Among the defendants, the two priorities were salvaging Tuco's business operations and allowing Frederick to retain his rights to his own personal assets. With an autistic child being provided with trial medical procedures and therapies, and a pregnant wife, Frederick's ability to use his ATM card or credit card was, to say the least, of critical importance. And once Penson shut down the trading activity within Tuco's accounts, Frederick's access to his own personal assets was the only issue remaining. The SEC then proposed a settlement wherein Frederick would retain access to his personal assets but would be enjoined from violating securities laws in the future. Being under extraordinary circumstances, Frederick agreed to the consent decree without presenting any legal defense.

## IV.  THE SEC'S CONTINUOUS AGGRESSIVE CONDUCT IS NOW UNETHICAL

### A.  The SEC Requested that Defendants' Former Counsel Breach the Attorney-Client Privilege

Following the defendants' filing of the instant motion, the SEC contacted Steve Young, of Keesal, Young & Logan, the defendants' former counsel. The SEC actually asked whether Mr. Young would sign a declaration in opposition to the instant motion despite the clear and obvious attorney-client privilege that covers all communications between defendants and Mr. Young. While Mr. Young appropriately rejected the SEC outright, it is unknown exactly what was sought in the declaration. But in light of the SEC's opposition to this motion, it is clear that they wanted Mr. Young to provide detailed information about conversations with Mr. Frederick relating to the consent decrees, his understanding of them, and the implications of a judgment with a permanent injunction. It was simply inappropriate and unethical for the SEC to reach out to defendants'

former counsel and request that they provide help in opposing their former clients' motion to vacate the judgment. Mr. Young, fortunately, handled it properly.

### B.  The SEC Gets Cooperation From a Firm Regulated by the SEC Itself

In an attempt to defend their informal actions which resulted in Tuco's business being shut down, the SEC has submitted a declaration from a Penson employee who is in-house counsel and responsible for "interfacing with financial industry regulators including the Securities and Exchange Commission". Smith Dec., par. 2. The purpose of this declaration, requested by the SEC obviously, was to persuade the Court that Penson's shut-down of Tuco's business "was independent and without consideration of the SEC's prior request" and was also "independent and without consideration of any instruction provided by the SEC...". Id., par. 6 and 8. But, as pointed out above and as specified in the email from Penson to GLB, it is obvious that Tim Davis has no personal knowledge of what his own firm did, why they did it, and when they did it. Again, the SEC called Penson at 11:15 a.m. and requested that the accounts be frozen. A few hours later Tammy Albright notified GLB that the Tuco accounts were being restricted from trading and would be barred from any withdrawals or deposits. Consequently, when Tuco attempted to make a deposit which would satisfy the outstanding margin call, it was rejected. Tim Davis, however, makes no mention of this and merely states that Clay Mullin, the director of the Margins Department (and Tammy Albright's boss) first restricted the Tuco accounts of Wednesday, March 5th. Albright's email, and Penson's rejection of a deposit, prove that Penson responded to the SEC's initial call immediately. At a minimum, this Court should disregard Tim Davis's declaration as it is clear he has no personal knowledge of how Penson handled this and his SEC-supportive statements are disingenuous.

## V. **CONCLUSION**

The instant motion, seeking to vacate the judgment entered upon consent, has few legal issues. What is truly at issue is a factual issue—whether Frederick was under extraordinary circumstances due to the pressure of this action and the pending motion seeking a variety of immediate restrictive orders.

But when all of the facts and potential pitfalls are grouped together, including the incredibly short time defendants had to make decisions, these are extraordinary circumstances. Again, as discussed repeatedly, the SEC's initial *ex parte* motion sought to shut down Tuco's business, freeze its assets, and freeze Frederick's assets, among other things. But Penson, at the "request" of the SEC, had already shut down Tuco's business and frozen its assets within days, if not hours, of the defendants first seeing this action. This left Frederick with only one battle to fight, but the SEC quickly offered to allow Frederick to retain his rights to his own money and to take care of his family's health issues.

When all of the circumstances of this 9-day litigation are aggregated, it is clear that defendants were under extraordinary circumstances when agreeing to execute the consent decrees leading to the entry of the judgment. The defendants just hope that they get the right to challenge the SEC's Division of Enforcement in its novel theories of securities law violations.

Dated: September 11, 2008

SADIS & GOLDBERG, LLP

s/Dennis R. Hirsch

By: Dennis R. Hirsch, Cal. Bar No.: 194243
Daniel G. Viola, Esq., Pro Hac Vice
Attorneys for Defendants
Tuco Trading LLC and Douglas G. Frederick
50 California Street, Suite 2320
San Francisco, CA 94111
Telephone: (415) 490-0561

Facsimile: (415) 391-1377
E-MAIL: drhirsch@sglawyers.com
dviola@sglawyers.com